# First Judicial District of Pennsylvania

*51CR00107632009*
*Dennis Johnson*

*Preliminary Hearing Volume 1*
*June 03, 2009*

**Court Reporting System**

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000 FAX:(215) 683-8005*

*Original File 6-3-09JOHNSON.txt, 40 Pages*
*CRS Catalog ID: 09071052*

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION
MUNICIPAL COURT
- - -
COMMONWEALTH :
:
- vs - :
:
DENNIS JOHNSON : NO. MC-51-CR-0010763-2009
- - -
PRELIMINARY HEARING
- - -
Criminal Justice Center
Courtroom 306
Philadelphia, Pennsylvania
Wednesday, June 3, 2009
- - -

**BEFORE**: THE HONORABLE JIMMIE MOORE

**APPEARANCES**:

CHRISTINE WECHSLER, ESQUIRE
Assistant District Attorneys
Commonwealth of Pennsylvania

BRIAN McMONAGLE, ESQUIRE
Representing Dennis Johnson

LOUISE M. MASCUILLI, RMR
OFFICIAL COURT REPORTER



I N D E X

COMMONWEALTH'S EVIDENCE


| WITNESS: | | PAGE |
|---|---|---|
| OZZIE CLARK | | |
| BY: Ms. Wechsler - Direct | | 5 |
| Redirect | 32 | |
| BY: Mr. McMonagle - Cross | | 13 |
| Recross | 38 | |




**MS. WECHSLER**: Christine Wechsler for the Commonwealth.

**MR. McMONAGLE**: Brian McMonagle on behalf of the defendant.

**MS. WECHSLER**: On Friday, August 17, 2007, at approximately 3:19 a.m, 22nd District police responded to a radio call for a shooting/hospital case at 30th and Lehigh Avenue in the city and county of Philadelphia. Upon arrival, officers would testify that they found the victim, Kenyatta Smith, a 36-year-old black male, suffering from a gunshot wound to his chest.

Mr. Smith was transported emergently to Temple University Hospital by medics where he was later pronounced by Dr. Bahna, B-A-H-N-A, at 4:04 a.m.

The remains of Mr. Smith were subsequently transported to the Office of the Medical Examiner where Dr. Gregory McDonald performed a postmortem examination.

If called to testify, Dr. McDonald would note his findings, to a reasonable degree of medical certainty; specifically, that Kenyatta Smith suffered a penetrating



gunshot wound to the right side of his chest that passed leftward and backward. Dr. McDonald would testify that this wound passed through the chest wall, the right lobe of the liver, the right atrium of the heart, the left atrium of the heart and the lower left lung. A bullet was then recovered from the left back of Kenyatta Smith.

As a result of his examination, Your Honor, Dr. McDonald would further testify that the cause of death was a gunshot wound and the manner of death was homicide.

**MR. McMONAGLE**: So stipulated for purposes of this hearing only.

**MS. WECHSLER**: With that, the Commonwealth calls as its first witness Mr. Ozzie Clark.

**MR. McMONAGLE**: I move for sequestration of all witnesses.

**THE COURT**: Granted.

**THE CRIER**: State your name.

**THE WITNESS**: Ozzie Clark, C-L-A-R-K.

OZZIE CLARK, having been duly sworn, was examined and testified as follows:

- - -
DIRECT EXAMINATION
- - -

**BY MS. WECHSLER**:
**Q.** Mr. Clark, good morning.
**A.** Good morning.
**Q.** I'm going to ask you to speak in a loud clear voice and into the microphone.
You have to give verbal answers, meaning yes or no. You cannot shake your head. Everybody wants to hear what you have to say. The woman in front of you is writing down everything that everyone says in here; okay?
**A.** Okay.
**Q.** Let me first ask you, look around the courtroom. Is there anyone that you see that you know or recognize?
**A.** Yes, a few people.
**Q.** Who in front of the bar of the court do you see that you know or recognize?
**A.** Bam.
**Q.** Will you identify him by point of finger?
**A.** I'd rather not.
**Q.** What side of the courtroom is he on?
**A.** The right side.



**MR. McMONAGLE**: For the record, identifying the defendant.
**BY MS. WECHSLER**:
**Q.** You called him the name Bam. Do you know him by any other name?
**A.** No.
**Q.** How long have known him?
**A.** Probably about 10, 11 years.
**MS. WECHSLER**: For the record, he's identifying, Your Honor, the defendant, Dennis Johnson, at the bar of the court with his attorney.
**BY MS. WECHSLER**:
**Q.** Do you also know an individual by the name of Kenyatta Smith?
**A.** Yes.
**Q.** How did you know Kenyatta Smith?
**A.** Through the newspaper, deceased in front of the store I used to work in.
**Q.** Let me direct your attention back to August 17, 2007. Were you working at 30th and Lehigh at about 3:20 in the morning?
**A.** Yes.
**Q.** What is that location?
**A.** Twenty-four-hour store.



**Q.** You said you were working?
**A.** Yes.
**Q.** What were you doing there?
**A.** Cashier.
**Q.** Did something happen that night that brings you into court?
**A.** Shooting.
**Q.** I want you to explain in detail to Judge Moore what you saw happen on the night of August 17, 2007.
**A.** I saw a robbery taking place and victim being -- how would I say -- remisssive of giving up their belongings and, you know, a shot was released.
**Q.** Let's talk about it.
Where were you standing when you saw this robbery?
**A.** Inside the store.
**Q.** Who was the victim in this case?
**A.** Kenyatta Smith.
**Q.** How far away was Mr. Smith from you when you were standing in the store?
**A.** Two-and-a-half, 3 feet.
**Q.** Were there lights on?
**A.** Yes.



**Q.** Now, did there come a time when you also saw the defendant, Bam, who you identified as Bam at the location?
**A.** Yes.
**Q.** When was that?
**A.** Before the shooting took place.
**Q.** Tell us when you first saw the defendant.
**A.** We were playing video games outside of the store.
**Q.** When you say "we," who do you mean? Who else was there?
**A.** Me, one of Philadelphia finest, before the incident happened, he got killed, a kid by the name of Johnny, Amir.
**Q.** A kid named Johnny?
**A.** Yes.
**Q.** A kid named Amir?
**A.** Amir, Amin.
**Q.** Amin or Amir?
**A.** Yes.
**Q.** And the defendant?
**A.** Yes.
**Q.** You indicated that you, along with those three other individuals, were playing video games?
**A.** Yes.

Q. Where was that?
A. Outside of the store door.
Q. How long were you playing the video game outside the store?
A. All night long.
Q. So at some point Mr. Smith, Kenyatta Smith, came onto the location?
A. Yes.
Q. When did that happen?
A. I want to say about 3:10, 3:15. Came to purchase sodas, blunts.
Q. As the cashier at that 24-hour store at 30th and Lehigh, was it your job to serve him?
A. Yes.
Q. Did you do that?
A. Yes.
Q. Did you stay where you were playing video games to serve him or did you go somewhere else?
A. Inside the store.
Q. Did you get up to leave Johnny, Amir or Amin, and the defendant playing video games?
A. Yes.
Q. How far away were they from where you were in the store?
A. From the distance I am here to the Bible.



MS. WECHSLER: Indicating for the record, about 15 feet.
MR. McMONAGLE: Yes.
BY MS. WECHSLER:
Q. What happened after you served Kenyatta Smith?
A. Someone walked up behind him brandishing a weapon, you know, and he was being robbed.
Q. Who was that someone?
A. Well, the defendant.
THE COURT: Hold it.
Counsel, for the record, you need to have a conversation with your client, please.
MR. McMONAGLE: Thank you, sir.
(Whereupon, there was an off-the-record discussion between Mr. McMonagle and Mr. Johnson.)
BY MS. WECHSLER:
Q. You just indicated that the defendant walked up behind Mr. Smith and brandished a weapon. Where did that weapon come from?
A. I'm not sure.
Q. Had you seen it earlier that day or that night?
A. No.
Q. I'm sorry?



A. No.
Q. What did it look like?
A. A revolver, chrome.
Q. A chrome revolver?
A. Yes.
Q. After he approached the victim, Mr. Smith, what did he do or say?
A. I guess Mr. Smith didn't want to give up his phone, so it was like, you know, Give me all your sugar, honey, iced tea or I will pop you.
THE COURT: I didn't hear that.
BY MS. WECHSLER:
Q. Tell us exactly.
A. Give me all your shit or I'll pop you over the head.
Q. Did Mr. Smith comply with the defendant's demands?
A. No.
Q. What happened after that?
A. A gunshot was fired. Everybody ran.
Q. Did you see where the defendant fired the shot at Mr. Smith?
A. Towards aiming towards the torso.
Q. How far away was the defendant when he fired that shot?



A. I want to say approximately 20 feet.
Q. After the defendant fired the shot, what did he do?
A. He ran.
Q. Did you see where he went?
A. Down 30th Street.
Q. Did you see where Johnny and Amir or Amin went?
A. Same direction.
Q. Did they run with him?
A. Everybody took off the same direction.
Q. What did you do?
A. I called 9-1-1 and tried to assist the victim.
Q. Did you remain on location for police to arrive?
A. Yes.
Q. Did you later go down to Homicide and give a statement?
A. Yes.
Q. Did you tell the detectives at Homicide on the night of the incident what happened?
A. Yes.
Q. Did you tell them who did it?
A. No.
Q. How come?

A. I still worked at the place.
Q. Did there later come a time when you went back to Homicide and you told the detectives who did it?
A. Yes.
Q. Who did you tell them shot Mr. Kenyatta Smith?
A. The defendant.
Q. Did you identify the defendant in a series of pictures?
A. Yes.
MS. WECHSLER: Mr. Clark, that's all I have for you here today.
- - -
CROSS-EXAMINATION
- - -
BY MR. McMONAGLE:
Q. Mr. Clark, have you ever lied in connection with this incident?
A. No.
Q. Are you sure about that?
A. Yes.
Q. Do you remember when this incident happened giving a statement to homicide detectives?
A. Yes.
MR. McMONAGLE: And, Your Honor, may I ask that this statement be marked as Defense



1?
THE COURT: You may.
MS. WECHSLER: I have a copy for the Court.
MR. McMONAGLE: Is there a way that one of the copies could be shown to this witness?
MS. WECHSLER: I have plenty.
(Whereupon, document marked as D-1 for identification.)
BY MR. McMONAGLE:
Q. Mr. Clark, take a look, if you would, at what has been marked for identification as D-1. Tell me if, in fact, this is a statement you gave to homicide detectives on August 17, 2007?
A. This is.
Q. It is?
A. Yes.
Q. Your signature appears below the first page of this?
A. Yes.
Q. And again on the second page?
A. Yes.
Q. And at the time you gave this statement you were down at Homicide headquarters, correct?



A. Correct.
Q. Homicide detectives were asking you about what happened?
A. Correct.
Q. I'd like you to take a look at the statement. I will start with the third paragraph. That's really when homicide detectives ask you about the incident; would you agree with me?
A. Yes.
Q. It says, Tell us what you know about this incident.
Correct?
A. Correct.
Q. QUESTION: I was working at Lehigh -- tell us what you know about this incident.
ANSWER: I was working at Lehigh Variety Store tonight. The victim came up to the window and ordered two cans of soda and a bag of potato chips.
You said that, correct?
A. Yes.
Q. I gave him the items and his change and someone else came up and ordered a soda, and while I went to get the soda and when I turned around, the other customer who ordered the soda was gone.
Did you say that?



A. Yes.
Q. Is that true?
A. Yes.
Q. That actually happened?
A. Yes.
Q. So as I understand what you told them, the victim comes up and someone else comes up and orders a soda?
A. Correct.
Q. Who was that?
A. I'm not sure.
Q. When I turned around, the other customer who ordered the soda was gone. I saw the victim and another black male, 18 to 22, who was about an inch taller than the victim, brown skin, clean-shaven, low haircut, holding a revolver standing behind the victim, telling the victim, Give me all that shit, old head, or I will pop you.
Did you tell that to the detectives on that day?
A. Yes.
Q. Is that what happened?
A. Yes.
Q. The individual with the gun, did he have brown skin?

Page 17

**A.** Yes.
**Q.** Was he clean-shaven?
**A.** Yes.
**Q.** Did he have a low haircut?
**A.** Yes.
**Q.** Then the black male said, You want to get popped then, and he fired the gun one time. The shooter was standing in front of the front door of Lehigh Variety and the victim was standing next to the bike.
Is that where they were standing?
**A.** Yes.
**Q.** The victim was in front of my car that was parked in front of 2948 Lehigh Avenue laying in the bike lane. I called 9-1-1 and requested an ambulance because a victim had just been shot.
You told the homicide detectives that, correct?
**A.** Yes.
**Q.** **Next question**: Can you tell us how the shooter was dressed?
**Your answer**: He was wearing a white T-shirt, blue jeans and white sneakers and he was wearing a watch on his left wrist.
Is that what the shooter was wearing?

Page 18

**A.** Yes.
**Q.** Could you tell us which hand the shooter was holding the revolver in?
He had that in his right hand.
Did you say that?
**A.** Yes.
**Q.** Is that, in fact, where the shooter had his -- had the gun, in his right hand?
**A.** Yes.
**Q.** Next page.
Can you describe the revolver that the shooter had?
It was a chrome revolver.
You said that, correct?
**A.** Yes.
**Q.** And then, finally, you're asked this question: Have you ever seen the shooter prior to this incident?
What was your answer?
**A.** No.
**Q.** No.
Was that the truth?
**A.** Correct, it was the truth.
**Q.** It was?
**A.** Yes.

Page 19

**Q.** So you had never seen the shooter before this incident; is that correct?
**A.** Correct.
**Q.** Now, the gentleman to my left, you have known for 10 or 11 years, right?
**A.** Correct.
**Q.** So today when you identified him in the courtroom, you lied, didn't you?
**A.** No.
**Q.** Well, you can't have it both ways. Which is the lie and which is the truth, sir?
**A.** Well, I have seen him before. So have you ever seen him prior to this incident would be a lie.
**Q.** So you did lie to homicide detectives that night?
**A.** Maybe the detective misrecorded it.
**Q.** Maybe the detective misrecorded it.
Is that really your honest answer under oath?
**A.** Yes, sir.
**Q.** So earlier in your direct testimony or your cross-examination, I should say, when I asked you if you lied to the detectives, you told me no, correct?
**A.** Correct.

Page 20

**Q.** And now when I confront you with this question and answer, Have you ever seen the shooter prior to the incident, your answer was no, you're telling me the detective wrote down the wrong answer?
**A.** Correct.
**Q.** Really?
Well, how do you explain the fact that -- homicide detectives showed you photos that night, didn't they?
**A.** No.
**Q.** They didn't?
**A.** Not that night.
**Q.** You're telling me that on the night of the incident, homicide detectives never showed you photographs?
**A.** No, sir.
**Q.** You're sure about that?
**A.** I'm positive.
**Q.** Did they show them photographs to you any other night after the incident?
**A.** Yes.
**Q.** When?
**A.** I don't recall the night.
**Q.** Well, was it the next week, the next month, the next year?

Page 21

A. Maybe a month later.
Q. A month later.
A month later when you were shown photographs, did you identify a photograph?
A. No.
Q. No.
A month later when you were shown photographs, were you shown this gentleman's photograph?
A. Yes.
Q. Did you identify it?
A. Yes.
Q. You did. I thought you just said a month later you did not identify a photograph of the shooter? Sir, I want to remind you you're under oath today.
A. A month later, no, I didn't identify. Months later I did.
Q. Let's see if I can try to get this all right for us.
You then are interviewed in a second interview on February 19 of 2009, correct?
A. Correct.
**MR. McMONAGLE**: May I ask that that statement be shown to this witness?
**MS. WECHSLER**: I have it.

Page 22

**MR. McMONAGLE**: Thank you.
Mark that as D-2.
(Whereupon, document marked as D-2 for identification.)
**BY MR. McMONAGLE**:
Q. Take a look at what has been marked for identification as D-2.
Now, D-2 is the statement that was given on February 19 of '09, correct?
A. Correct.
Q. This is the second formal interview you gave in this case, correct?
A. Correct.
Q. Go down to the fourth question:
**QUESTION**: Did you tell them everything you knew about the incident at the time you spoke with the detectives?
You're being asked by homicide detectives in February of '09 whether or not that first statement was true and accurate, right?
A. Correct.
Q. **Your answer**: I told them everything, but when they showed me the one set of pictures, I didn't tell them that I recognized the guy called Bam. Bam is the one who shot Kenyatta that night.

Page 23

Is that what you told the homicide detectives in February?
A. Yes.
Q. So it is true, then, if I understand this statement, that you lied in your first statement to homicide detectives, when you said have you ever seen the shooter prior to the incident, right?
A. Well, I didn't recall.
Q. You didn't recall? You mean to tell me -- well, let me ask it this way. In August of '07, right, when the shooting happened that night, did you know who did it?
A. To my recollection, you know, yes and no.
Q. Yes and no. You've lied in this case, haven't you, sir? You want a lawyer?
A. No.
Q. You've lied in this case, haven't you?
**MS. WECHSLER**: Objection. It's been asked and answered.
**THE COURT**: No, he didn't answer.
**MR. McMONAGLE**: I don't know that he answered it.
**THE COURT**: He can answer.
**BY MR. McMONAGLE**:
Q. You just said to me under oath a moment ago

Page 24

that when this incident happened, you kind of knew who it was and you kind of didn't know who it was. Is that the answer you want to stick with?
A. Correct.
Q. How is that?
A. Well, you know, the identity came through talk, speech, not visual.
Q. The identity came from walk, talk, speech, not visual. So you didn't see the shooter's face?
A. No.
Q. What part of the shooter's body did you see?
A. The hands, the body, the shoulders.
Q. Well, let me ask you this, in your first statement, if I can show you it, could you look at it, go to the second page.
In the first statement, you said you never seen the shooter prior to the incident, correct?
A. Correct.
Q. So that could be true, right, because you didn't see the shooter's face, right?
A. Yes.
Q. And then it says here, Is there anything else you can tell us that might assist us in the investigation? And your answer was, There were two kids playing video games outside the store when

Page 25

this happened. One is a kid they call Johnny and the other male had a tattoo on his right arm, "Certified Gangster." I know he just got that tattoo on Tuesday night on Stanley Street at a tattoo party.
Did you tell homicide detectives that?
**A.** Correct.
**Q.** So there wasn't -- there were three people out there -- there were two people out there playing a video game outside the store when the incident happened, right?
**A.** Right.
**Q.** None of them were this guy to my left, are they?
**A.** Strong possibility that it is the guy to your left.
**Q.** A strong possibility. Sir, someone's life is in the loop here.
Well, is he Johnny?
**A.** No.
**Q.** Is he the guy that had "Certified Gangster" tattooed on his arm?
**A.** No.
**Q.** Well, how could it be a strong possibility; he's not even one of those two guys, is he?

Page 26

**A.** Repeat that question again.
**Q.** He can't be any one of those two guys because one of them is named Johnny. That's not Johnny, is it? And one of them has a tattoo on his right arm called "Certified Gangster." And you know that's not him, too, right?
**A.** Right.
**Q.** When was it that you started putting it in your mind that the shooter in this case might have been Bam? What month was that?
**A.** The first day.
**Q.** Well, you didn't tell that to homicide detectives the first day, did you?
**A.** Correct.
**Q.** You didn't say, Hey, listen, I saw kind of the body of the shooter but I didn't see the face. You didn't say that to the homicide detectives, did you?
**A.** I did.
**Q.** You did?
**A.** Yeah.
**Q.** And they didn't put it in here?
**A.** Correct.
**Q.** So homicide detectives were told by you that you didn't see the face of the shooter and they

Page 27

left it out of both statements, these homicide detectives?
**A.** Correct.
**Q.** I thought you told us a moment ago under direct examination that the defendant was out there with you playing video games before the incident. Did I hallucinate that?
**A.** No.
**Q.** Well, was he?
**A.** Yeah, he was standing around while we were playing video games.
**Q.** Is that how you got it in your mind that because he must have been out there earlier, that he must have been the shooter?
**A.** Well, three people out there and I go in the store and there is three people still outside, yeah.
**Q.** When you didn't see the shooter's face?
**A.** No.
**Q.** Was he wearing anything on his head?
**A.** Baseball cap.
**Q.** How did you come to being in Homicide in February of '09 when you gave this second statement?
**A.** They were looking for me.

Page 28

**Q.** Homicide detectives?
**A.** Yes.
**Q.** Where did they find you?
**A.** I found them.
**Q.** You found them.
Have you ever been accused of having some role in this homicide by anybody in law enforcement?
**MS. WECHSLER**: Objection.
**THE COURT**: What is the question?
**BY MR. McMONAGLE**:
**Q.** Have you ever been accused of having some role in this homicide by anybody in law enforcement?
**A.** No.
**Q.** In this second statement that you gave to homicide detectives, when you're saying to homicide detectives that Bam was the shooter, are you telling us that you also told the homicide detectives that you never saw Bam's face?
**A.** Correct.
**Q.** And they didn't put it in here? Were you ever asked to identify -- well, let me just ask you **this**: Can you show me -- do you have D-1 up there?
**A.** Yes.
**Q.** Is there any photographs attached to D-1?
**A.** Yes.

Q. Is there a photograph at the end of D-1?
A. Yes.
Q. With a "Certified Gangster" arm?
A. Yes.
Q. Did they show you that photograph on May 15, 2008?
A. Yes.
Q. "Certified Gangster" arm. Did they ever show you a face and who the "Certified Gangster" arm belonged to?
A. Yes.
Q. Did you identify that face?
A. Yes.
Q. Is that face in either one of the photo arrays that are also part of this?
A. Mine are pretty blanked out.
Q. I know. See if mine is a little lighter.
I guess the question I have before you is whether or not "Certified Gangster" is part of that photo display?
A. No.
Q. No.
Who is "Certified Gangster" again?
A. Amir/Amin.
Q. Amir or Amin; okay.



And you're telling us that at some point in time prior to February 19, when you gave that second statement, you were shown photos by homicide detectives prior to it, correct?
A. Correct.
Q. I guess that would have been -- the homicide is in 2007, correct?
A. Yes.
Q. In May of 2008, is that the first time that you were shown photographs?
A. Yes.
Q. So at no point in time in August, September, October, November, December, do homicide detectives ever show you photographs of anybody?
A. No.
Q. In May of 2008, do you give another statement?
A. Another statement?
Q. Yes. A formal statement when you went down to look at these photographs?
A. They came to my house.
Q. And at that point in time they showed you an array, a display?
A. Yes.
Q. And Bam's face was in the display, correct?
A. Correct.



Q. But you did not identify him as the shooter, correct?
A. Correct.
Q. Did not, right?
A. Correct.
Q. That's because you didn't see the shooter's face, I take it?
A. Correct.
Q. But then you come back in February and say that he was the shooter?
A. Correct.
Q. Even though you didn't see the shooter's face?
A. Correct.
Q. And you said you told homicide detectives that?
A. Correct.
Q. Well, did the homicide detectives say how the heck can you identify his photograph if you didn't see his face?
A. No.
Q. No.
Did somebody give you his name and say that he is actually involved in this homicide before you identified this photo?
A. No.



Q. How close --
THE COURT: Hold on. Ma'am in the pink, you're to go outside, please.
BY MR. McMONAGLE:
Q. Are there any surveillance video cameras on that store at all?
A. No.
MR. McMONAGLE: Judge, thank you.
MS. WECHSLER: May I?
- - -
REDIRECT EXAMINATION
- - -
BY MS. WECHSLER:
Q. Was there a woman in the audience just gesturing to you?
A. Yeah.
Q. How many other people do you know in this courtroom?
A. Several.
Q. How do you know these people?
A. Through working at the store.
Q. How long have you known these people?
A. Years.
Q. How many years?
A. Minimum of six, seven.

**Q.** What was she gesturing to you?
**A.** She was just putting her hands up and down.
**Q.** Who is she?
**A.** I suppose the defendant's mother.
**MR. McMONAGLE**: I object to who he supposes anybody is.
**THE COURT**: Sustained.
**BY MS. WECHSLER**:
**Q.** Do you know her to be the defendant's mother?
**A.** Yes.
**Q.** Who shot Kenyatta Smith that night?
**A.** The defendant.
**Q.** How do you feel sitting here and telling everybody in front of all these people that you know from the neighborhood?
**A.** I'm doing my civil duty.
**Q.** How do you feel answering questions from Mr. McMonagle who is yelling at you?
**MR. McMONAGLE**: Objection.
**THE COURT**: Sustained.
**BY MS. WECHSLER**:
**Q.** You indicated that you gave a statement to the detectives where you failed to identify the defendant as the shooter.
**A.** Correct.



**Q.** How come?
**A.** Well, you know, reasonable doubt, you know, things like that. You know, he had a baseball cap on, but I -- you know, I know him very well.
**Q.** You had been sitting with him for how long playing that video game?
**A.** Probably about 15, 20 minutes.
**Q.** And Johnny was there, right?
**A.** Yes.
**Q.** And this guy named Amir or Amin was there?
**A.** Yes.
**Q.** Now, Amir/Amin, he's the one who has got the "Certified Gangster" tattoo?
**A.** Correct.
**Q.** Was he the shooter?
**A.** No.
**Q.** Was Johnny the shooter?
**A.** No.
**Q.** Were you the shooter?
**A.** No.
**Q.** Who else was there on the location?
**A.** Defendant.
**Q.** And Mr. Smith; is that right?
**A.** Correct.
**Q.** And Mr. Smith didn't shoot himself, did he?



**A.** No.
**Q.** Now, then you went into Homicide on February 19, 2009; do you remember that?
**A.** Yes.
**Q.** And this time you were asked questions again by Homicide and at this time you told detectives that Bam was, in fact, the shooter; is that right?
**A.** Correct.
**Q.** Do you remember being asked this question and giving this answer, question four, it's on D-2, which is sitting in front of you:
Did you tell them everything that you knew about this incident at the time you spoke with the detectives?
**ANSWER**: I told them everything, but when they showed me the one set of pictures, I didn't tell them that I recognized the guy called Bam. Bam is the one who shot Kenyatta that night.
**QUESTION**: Why didn't you tell the detectives that you knew who committed this shooting?
**ANSWER**: Because I was still working at the store then. It was me and my mother at that time. Bam used to come around all the time. He stayed right over on Hollywood Street. I didn't need any problems by getting involved in all this.



Do you remember being asked those two questions and giving those answers?
**A.** Yes.
**Q.** Is that the truth?
**A.** Yes.
**Q.** **Next question**:
**QUESTION**: Why are you now telling us that the male you know as Bam was responsible for the shooting death of Kenyatta Smith?
**ANSWER**: Mostly because it's my civic duty. It was wrong what he did to that guy. Plus, now the store is closed down. I don't work there anymore.
Do you remember being asked that question and giving that answer?
**A.** Yes.
**Q.** Is that the truth?
**A.** Yes.
**Q.** Today do you work at that store?
**A.** No.
**Q.** How long did you work at that store from August 17 after the incident?
**A.** Approximately like six months, seven months.
**Q.** And in the six or seven months that you continued to work at that store, how often did you

see the defendant after the shooting?
**A.** After the shooting, I didn't see the defendant.
**Q.** You didn't see him anymore?
**A.** No.
**Q.** Did you see Johnny?
**A.** Yes.
**Q.** How many times did you see Johnny after this?
**A.** Six, seven.
**Q.** How about the certified gangster, Amin?
**A.** The same, probably about six, seven times.
**Q.** Did they ever talk to you at all about this incident?
**A.** No.
**Q.** Now, on February -- February 19, 2009, you finally identified him in the pictures that Mr. McMonagle went over with you; is that correct?
**A.** Yes.
**Q.** They're attached to the end of the statement that has been marked D-2. Do you see them there?
**A.** Yes.
**Q.** Are these the same pictures that you looked at before with detectives?
**A.** Yes.
**Q.** And why is it that before you did not identify



him in the pictures, the defendant in the pictures?
**A.** Because they asked me did I recognize anybody from that night without a reasonable doubt.
**Q.** When you say that, what do you mean?
**A.** Well, he had on a baseball cap.
**Q.** And so that to you gave you reason to pause?
**A.** Yes.
**Q.** As you sit here today, are you sure who killed Kenyatta Smith?
**A.** Well, yes.
**Q.** Who is that?
**A.** The defendant.
**MS. WECHSLER:** I have no more questions.

- - -

RECROSS-EXAMINATION

- - -

**BY MR. McMONAGLE:**
**Q.** So you had a reasonable doubt on August 17, 2007, that is your sworn testimony, correct?
**A.** Yes.
**Q.** In fact, on August 17, 2007, not only did you have a reasonable doubt, you didn't even tell homicide detectives that the defendant was there, did you?



**A.** Correct.
**MR. McMONAGLE:** I'm through.
**MS. WECHSLER:** I have nothing else.
**THE COURT:** Any additional questions?
You may step down, sir.
**MS. WECHSLER:** Pursuant to Rick and Branch, I mark as C-1 the defendant's criminal extract indicating he's ineligible to carry under Section 6105. And I would rest for purposes of the preliminary hearing.
**THE COURT:** Any argument?
**MR. McMONAGLE:** Not at this level.
**THE COURT:** He will be arraigned on June 24, Room 505 at 11 o'clock.



I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the trial of the above cause, and that this copy is a correct transcript of the same.

- - -

Louise M. Mascuilli, RMR
Official Court Reporter

- - -

The foregoing record of the proceedings upon the trial of the above cause is hereby approved and directed to be filed.

Court Reporting System (Generated 2023/02/01 12:18:00)