# First Judicial District of Pennsylvania

*51CR00073192009*
*Dennis Johnson*

*Trial (Jury) Volume 1*
*September 28, 2010*

Court Reporting System

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000 FAX:(215) 683-8005*

*Original File COMVJOHNSON^9-28-10.txt, 227 Pages*
*CRS Catalog ID: 10110967*

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION
-----

COMMONWEALTH :
:
:
vs. : C.P.# 51-CR-0006731-2009
:
:
DENNIS JOHNSON :

-----
Room 1107, Criminal Justice Center
Philadelphia, Pennsylvania
-----
Tuesday, September 28, 2010
-----

**BEFORE**: THE HONORABLE ROSE MARIE DEFINO-NASTASI, J.

-----
JURY TRIAL
VOLUME I
-----



**APPEARANCES**:

MK FEENEY, ESQUIRE
Assistant District Attorney
For the Commonwealth

MICHAEL COARD, ESQUIRE
Attorney for the Defendant



INDEX

COMMONWEALTH'S EVIDENCE


| WITNESS | DR. | CR. | RDR. | RCR. |
|---|---|---|---|---|
| KAREN AUERWICK | 53 | | | |
| POLICE OFFICER ANTHONY COWARD | 70 | | | |
| POLICE OFFICER LISA CONROY | 81 | | | |
| OLIVIA HAVEN | 90 | | | |
| CURTIS SMITH | 111 | 154 | 194 | 207 |
| POLICE OFFICER LEWIS GRANDIZIO | 211 | | | |


EXHIBITS


| NO. | DESCRIPTION | FOR IDENT. | IN EVD. |
|---|---|---|---|
| C-14 | Sketch | 56 | |
| C-1 through C-13 | Photographs | 56 | |
| C-15 | Map | 58 | |
| C-16 | Map | 67 | |
| C-17 | Police 75-48 | 86 | |
| C-18 | Paramedic report | 95 | |
| C-19 | Statement | 151 | |
| C-20 | FIU report | 218 | |
| C-21 | Certificate of non-licensure | 225 | |




DEFENDANT'S EVIDENCE


| WITNESS | DR. | CR. | RDR. | RCR. |
|---|---|---|---|---|
| NONE | | | | |


EXHIBITS


| NO. | DESCRIPTION | FOR IDENT. | IN EVD. |
|---|---|---|---|
| NONE | | | |

**THE COURT CRIER**: Please remain seated as the jury enters the courtroom.

- - -

(Jury enters the courtroom at 9:55 a.m.)

- - -

**THE COURT CRIER**: Your Honor, may I swear in the jury?

**THE COURT**: Yes.

**THE COURT CRIER**: Do you solemnly swear and those who affirm, declare and affirm to try the issues joined between the Commonwealth and Dennis Johnson, and render a true verdict according to the evidence?

Please say I do.

- - -

(Jury panel sworn.)

- - -

**THE COURT CRIER**: Mr. Johnson, state your full name for the record.

**THE DEFENDANT**: Dennis Johnson.

DENNIS JOHNSON, after having been first duly sworn, was examined and **testified as follows**:



**THE COURT CRIER**: On Bill of Information NO. 00067319-2009, to the charge of murder generally, victim Kenyatta Smith, how do you plead?

**THE DEFENDANT**: Not guilty.

**THE COURT CRIER**: To the charge of robbery, how do you plead?

**THE DEFENDANT**: Not guilty.

**THE COURT CRIER**: To the charge of carrying a firearm without a license, how do you plead?

**THE DEFENDANT**: Not guilty.

**THE COURT CRIER**: How do you wish to be tried, by Judge alone or by this jury?

**THE DEFENDANT**: By this jury.

**THE COURT CRIER**: Your Honor, Defendant pleads not guilty to all charges and wishes to be tried by this jury.

**THE COURT**: Thank you.

Good morning, ladies and gentlemen. Before we get started I'm going to describe to you in a general way what will happen. You should listen carefully. Opening



and closing arguments are not evidence, that's coming from the attorneys. Questions are not evidence; answers are. After the Commonwealth outlines their case for you the Defense may open at that time. They can reserve their opening for later in the trial, but generally they open after the Commonwealth. Once again, the Defense will outline their case to you as they see the case to be.

After both sides open, the Commonwealth will present their case in chief. They do that by calling witnesses to the stand. When the Commonwealth calls a witness to the stand the witness is on direct examination by the Commonwealth. The witness is called to establish some fact or facts in the case.

After direct examination by the Commonwealth the Defense will have the opportunity to cross-examine the witness. Some things you may see come up on cross-examination. Now, I speak in generalities. I may tell you something and it may not happen in this case. I am where you



are with the case basically. I don't know anything about it, I just tell you generally what can happen.

When an incident occurs the first person on the scene is a police officer. Whenever a police officer goes out to any scene anywhere, they fill out a 75-48. You don't have to remember any of these numbers because any witness that testifies they'll have to explain it to you. But basically it's a brief incident report why the officer was where the officer was at that time. Afterwards, usually an investigator or detective is assigned to a case. A detective does a more thorough investigation. A detective may even interview witnesses and create witness statements.

Also, before a case gets this far in the system every case has what we call preliminary hearings. And just like we have a stenographer here taking down everything being said in this room, all criminal courts are courts of record, so anything being said or any testimony ever taken is taking down by a

stenographer and transcribed and you'll have notes of testimony that exist from that prior hearing.

So if a witness takes the stand in this case and says anything that is different than what they may have said to the first police officer on the scene or spoke to detective or if they testified at the preliminary hearing, you'll see one of the attorneys take out, you know, either the 48, that's what the detective creates, or the notes of testimony and say to the witness, you know, you're saying thus and such today, but back when you spoke to the detective or testified at the preliminary hearing you said something different. That's called impeachment evidence, and that may be something that you see in the case.

Now, after the Commonwealth calls all of their witnesses and rests, the Defense at that time may present evidence. The Defendant is under no obligation to present any evidence. The Defendant has an absolute right to choose not to present



evidence and not to testify in this case and you cannot by law hold that against the Defendant. However, if the Defense chooses to present evidence then the Defense will call a witness to the stand. When the Defense calls a witness to the witness stand on direct examination by the Defense that witness is called by the Defense to either establish a fact in the case or discredit some fact or facts that the Commonwealth brought up in their case.

After direct examination by the Defense the Commonwealth will then have the opportunity to cross-examine the witness. Look for the same things on cross-examination. After the Defense rests, the Commonwealth can present something called rebuttal evidence to rebut something the Defense presented. It happens once in a while but not often.

After both sides rest you will hear closing arguments. Counsel will sum up the case for you as they see the case to be and I'll talk to you about that later on. Once again that's argument, that's not



evidence. After both sides close, I will then charge you on the law, you will then go into the back to deliberate.

Now, you may take notes if you choose, that's solely up to you. If you do choose to take notes you won't take them during openings, closings, or my charge on the law. You won't take them during openings and closings because that's not evidence, it's argument and my charge on the law is the state of the law as it is right now.

There's a new law out as of last February. Actually I give you the crimes that are charged themselves written down and the elements. If you do decide to take notes you'll take them on the blue books. You are only allowed to take them when the evidence is presented in this courtroom and when we are all here together. You can't go home tonight and say, you know what, I remembered something, I forgot to write it in the book, and come in and write it in. It doesn't work that way. It has to be simultaneous.

The best notetaker doesn't win.



Someone may choose not to take any notes because they hear things better than if they write them down. Others take notes five, six blue books full of notes. That does not mean in the deliberation room the person with the most notes has the most say. Each and every one of you has equal say in that deliberation room whether you took zero notes or five blue books full of notes. That's why it's important that each and every one of you has 100 percent recollection of the evidence.

Juror No. 3 can't say I missed that but between No. 2 and No. 4, we'll put it altogether. I have 60 and they have 20, and we'll get 100. You each have to have 100 percent recollection to be on equal footing in the deliberation room. So if you miss something, raise your hand right away. We'll have it repeated or read back because you really need to know everything. I don't want you to wait, go in the back, and then send out a question to me, "Judge, we need Witness A's testimony, the entire testimony reread."

First of all, how could you all

miss the entire testimony of that witness? Secondly, what the stenographer does looks like she is typing words but it's more difficult than that, and if she had to go back and pull out testimony on an entire witness, you'll probably in be in the back for 30 minutes. And say the witness testified for an hour or two hours, do you see how you would hold yourself up. So it's important that you pay careful attention.

Just because you have something written down in your notes doesn't mean you have it written in stone. You can write it down correctly just as easily as you hear it and recollect it incorrectly, so you have to keep an open mind. If you have something written and 11 jurors have something different written down or remember it differently, then you have to keep an open mind that maybe you wrote it down incorrectly.

Also, the most important thing, ladies and gentlemen, is to watch the witness on the witness stand, to study their demeanor and body language. You learn a lot through



your eyes. So if you're the type of notetaker trying to get every word and you're looking down and writing everything verbatim word for word and missing what's going on down here, you're not doing yourself justice so no pun intended there. So really watch the witness on the witness stand, that's really the most important thing you can do.

Now the notes, they will never leave this courtroom. When we take short breaks they will go under your seats. When we break for the day, they are collected. No one will ever see those notes. Once you reached a decision in the case, a verdict, those notes are ordered destroyed by me and shredded in the robing room. No one will see those notes except for other jurors during jury deliberations when you are all in the room together deliberating, then you may share your notes. But not before then because you're not in a position to. We want you to wait until the entire case is over with, you've been charged on the law, and you are in the back deliberating. You cannot discuss the case



with each other until the very end of the case after you're charged on the law and you're in the deliberation room.

You will be alone a lot, you can't talk about the case with anyone else, friends or family at home. You can't look it up on the internet. And I have a whole charge on which I don't feel like reading, but they give it to us because they name every social web site, any form of communication they don't want you to communicate on.

You can't go out to the scene and investigate, you can't read about it in the newspaper. We don't know which cases are near the newspaper generally, so I couldn't say this is or isn't. And you can't watch it if it's on the news.

As far as these sites, let's see. I'll give it to you brief. You may not communicate with anyone through e-mail, text messages or Twitter, through any blog or web site, any internet chat room or any social networking web sites, Facebook, MySpace, Linked-In and U-Tube. Does everybody have



that?

I am the Judge of the law; you're the judge of the facts. So you might say to me, I'm not a lawyer, I'm not a Judge, how am I qualified to do that? I don't think there is any lawyers on the panel. Each and every one of you to be sitting before me today to have gotten through life this far to be here Tuesday morning at 10:10 has acquired the common sense that we call life experience. We all make credibility determinations in our lives every single day or you could not have gotten this far.

You have co-workers, friends, spouses, and children. They come to you and tell you the story of how something happens. You decide do I believe this person or not? How do you do that? You look at them in the eye when they talk to you. You look at their body language, their demeanor. As I told you before, do the words have the ring of truth? Are they believable? Or are they utterly ridiculous? So maybe they don't sound right so you hold off and see what other people have

Page 17

to say about that situation, and in the end you make a credibility determination. You do it every day, use the same exact skills in making your credibility determination.

As Judge of the law, whenever an issue comes up in the case that is purely legal, not factual -- you are the judges of the facts, that's your domain. Anything that's factual, that's your domain. Anything purely legal I decide. So you will see the lawyers and I from time to time go to sidebar or in the back. There is nothing sneaky or tricky about that. That just means that an issue has arisen that is purely legal. If it's purely legal I decide not in your presence so as to not distract you from your function as factfinder.

Now, a quick thumbnail sketch for objections. If you don't know it you will when you see it. It's on TV. The witness is on the witness stand, the attorney is asking a question, the other side objects, I say sustained. That means that that witness may not answer that question. They will

Page 18

oftentimes blurt out a few words but once I say sustained, you are to disregard anything they say.

Opposite scenario. An attorney is asking a question, the other side objects, I say overruled. That means the witness may answer the question, you'll hear an answer. The answer is evidence, it's something for you to consider. If I said sustained they are not allowed to answer the question. There is no evidence. There's no evidence, nothing for you to consider.

Usually this is what I say so I might as well say it. I told you before openings and closings are not evidence. Questions are not evidence; that comes from the attorney. So oftentimes, I'm not saying these attorneys will do this, but an attorney is asking a question and will put facts into the question so they are almost testifying and they are giving you information. The witness is on the stand and it's aggravated assault. The Defense attorney says to the witness, "Isn't it true you were in a bar fight?"

Page 19

And the Defense attorney says to to the witness, the eyewitness that says "I saw the Defendant hit him over the head," he says, "You were in the back of the bar, you weren't up front when this happened, you didn't see a thing. It's just that two years ago he told stole your girlfriend and you've been waiting to get back at him ever since." Do you see those facts that went into your brain? Two years ago he stole his girlfriend, ill will, this witness has bias, all these things. And he looks at the witness and says, "I never saw that person in my life." The answer, ladies and gentleman, is the evidence, not the question.

Now, can a witness lie? Of course, but if you never heard anywhere in the case they knew each other that's why you have to listen to the whole case to get things in contact. So if the question is not evidence and I say sustained, there's nothing for you to consider if that happens in the case. I think that's about it.

I told you to wear your juror

Page 20

badges when you are outside and in the building so they know you are jurors and can't come up to you for anything.

Under the Rules of Criminal Procedure the Commonwealth opens first followed by the Defense.

Ms. Feeney, you may address the jury.

**MS. FEENEY**: If I could see Your Honor at sidebar.

\- - -

(The following occurred at sidebar:)

\- - -

**MS. FEENEY**: The mom might testify and she is in the room and I never got her information. So for sequestration none of those people are going to be testifying. The lady in the back is in the brown, my victim's mom is it okay, life and being, she's going to testify?

**MR. COARD**: Not a problem.

**MS. FEENEY**: I just wanted to make sure. My first witness is the crime scene person, they are not here yet, and

waiting to get a ride. I am hoping that by the time --

**THE COURT**: You should be okay; we'll give them a bathroom break.

\- - -

(Sidebar discussion concluded:)

\- - -

**MS. FEENEY**: Good morning. I'm sure all of you have watched Law and Order, Special Victims Unit, Criminal Intent, you probably have seen it in one form or another. The Judge probably told you at one point during the trial, this is not Law & Order, this is not TV. The people here are not actors. The detectives in this case don't have the luxury of working on one case at a time as they do on television.

The location you are going to hear about is not glamorous. The motive in this case is probably -- it's probably hard to understand why a young black man -- I can't explain it to you because unlike Law and Order this is a story ripped from the pages of today's headlines. They'll take a case going



on a couple years ago like the Scott Peterson's case, take something like that and twist the facts around and make a story out of it to catch our interest.

Well, the case you are about the hear is a story ripped from pages of the streets. It doesn't involve glamorous people or a glamorous location. It happens in a neighborhood, 30th and Lehigh, it's a high crime, drug-infested neighborhood. It's in a place where people there don't trust police and may have criminal records and may be on probation and might be in jail, might be on parole. It's the type of place where people have street names and nicknames and it's not cool to talk to the police at all. Snitching is bad. Snitching has consequences on the streets, whether it's consequence that you are socially isolated because people will know you're a snitch up to your life could be in danger. So what I want you to do and the Judge already explained to you, you know, the reason we chose you, No. 1, we asked all the questions yesterday, is to be fair. But you



come here and even though you're not an attorney, but you bring with you valuable knowledge and experience that you use in your everyday life and common sense because you deal with people all the time and you have to make credibility judgments. And you do that based on your common sense.

What I am asking you to do in this case is see the people and the facts in that and in the filter of street sense. Bring your street sense with you because this is an occasion from the streets. And I need you to know that going into it, because in this particular case and the facts you are about to hear at 30th and Lehigh life is cheap, ladies and gentleman. People can get killed for something as minor as disrespect, over something as minor as getting robbed and won't give it up fast enough or as in this case something as trivial as a cell phone. A cell phone is what the victim lost his life over.

Ladies and gentlemen, like I said, this happens at 30th and Lehigh, 3:19 in the morning. It's a godforsaken time and a



godforsaken neighborhood. I'm sure in your neighborhoods, I don't know or I don't remember, yesterday we talked about where you live. You might have a convenience store like a Wawa or something that's opened 24 hours or like a Rite Aid or CS, something in your neighborhood that if you need something and it's the middle of the night you can get to it and get in and get out and get what you need.

In this neighborhood they don't have a Wawa. What they have is this little window cut-out, and you're going to see pictures of it. It's what's called the Lehigh Variety Store. And this is a store that has been in the neighborhood for many years and it sells candy, soda, chips, pampers, not perishable items. It's not a grocery store, but you can get cigarettes, whatever you need in the middle of the night is there. But because of the way the neighborhood is it changed over the years to the point that you can't go in the store anymore, it's a little cut out window. It's like sometimes when you go to the bank and put something through or

buy tokens at SEPTA, but this window opens out. That is where this happened. This is a robbery/murder, ladies and gentlemen.

The victim in this case, Kenyatta Smith, was a 36-year-old man. He had a mom named Joyce, he had two brothers. He lived by himself in the neighborhood and worked the night shift at a pool in the neighborhood as the night watchman of sorts at this pool. And he would come to that store in the middle of the night because it was open for 24 hours in the middle of the night to get whatever he needed, but something was going on in his life at the time. Years before he struggled with an addiction with drugs. He had gotten into rehab and tried to get himself clean. And right before this happened his mom noticed a change about him. He was keeping a secret, the secret was he was back on drugs, he was smoking crack. And with no disrespect to the family, he was a crackhead.

He was struggling with that and keeping it from the family. And that, ladies and gentlemen, that night he was high. He



goes to the store to get a soft drink and some blunts. He had bigger problems, ladies and gentlemen, than his addiction. His bigger problem is he came across the path of this Defendant Dennis Johnson. Dennis Johnson was out there to be a stick-up boy to rob somebody. He had a gun, he was in possession of an illegal gun and he was going to make some fast money and he sees Kenyatta Johnson. And Mr. Johnson is an easy target because he's a crackhead, he's by himself and he's 36-years-old. And you'll hear testimony that this Defendant Dennis Johnson identifies him as Oldhead. For those of you who may not know that's a slang for somebody who is old, oldhead. And it's sad because in that neighborhood 36 is old. It's not told to you and I, a lot of us are probably older than 36, but to this Defendant he was an oldhead, he was on crack and he was an easy target.

So he goes up to Mr. Smith and says, "give me all your shit, Oldhead, or I'll pop you," meaning he'll shot him. He pulls out a gun, it's a revolver. He goes through



his pockets and takes out whatever measly amount of money that Kenyatta Smith has, but Mr. Smith doesn't want to give up his phone. For whatever reason he's like, please don't take my cell phone. The Defendant says, you want to get popped then? Bam. Fires one shot into Mr. Smith and flees, all over a cell phone.

Now, the Defendant was out there with two friends, Curtis Smith, no relation to Kenyatta Smith, and Amin Vicks. They were out there hanging on the corner. They did not know that he was about to rob somebody. He decides he sees the guy, it's a crime of opportunity, it's an easy target. Pulls out a gun, robbery gone bad, shoots and kills and leaves Mr. Smith laying on the street.

You'll hear testimony that as Her Honor told you most of the time the first person on the scene is a police officer. And usually what happens is people call 9-1-1 and an officer from that police district comes out to the scene. Now, this district is the 22nd Police district. However, you're going to



hear testimony that the first officer on the scene was the 19th District, which is West Philly. It's not really close to there, but it was an officer transporting a victim to the Special Victims Unit and he happens to be driving in his car and sees Mr. Smith laying in the middle of the street and almost hits him with his car. He gets out of his car and sees that Mr. Smith has been shot and bleeding to death. He calls 9-1-1 and then officers from the district respond. Paramedics comes to the scene, they do the best they can, but basically he's literally dead when they find him. And they have to do all kinds of advanced lifesaving techniques to try to get him to breathe and get a pulse.

They take him to Temple Hospital and he's dead within 45 minutes because that shot that Dennis Johnson fired at him because he was angry that this man would dare to disrespect him and not just give it up and give up the cell phone, that shot went in and did so much damage to his vital organs that he barely survived the 40-some minutes.

Page 29

I believe the medical examiner would say had it not been for immediate intervention by paramedics he would have been dead within minutes because his inside, his organs filled up with his own blood all over a cell phone, ladies and gentlemen.

Now, you're going to hear from two different witnesses. These witnesses are from different worlds. You have Ozzie Clark. Ozzie Clark is a young man who has no record, he's never been arrested. He's someone whose father owned that business for years and years, the Lehigh Variety Store. He worked in that store since he was seven years old, he knew everybody in the neighborhood from waiting on them and he was working that night. He was the person at the window that was waiting on Kenyatta Smith before he was killed and saw the Defendant and he saw it all. And he knew this Defendant for 10 to 12 years because he knew him from the neighborhood. He knew his friends, he knew where he lived, the Defendant would come to the store, he sees everything.

Page 30

The other witness, ladies and gentlemen, is a young man named Curtis Smith. Curtis Smith is someone who is a criminal; he's a drug dealer. He's on probation right now for selling drugs. And he is someone who is a friend of the Defendant who was out there with him that night. He was with him and Amin Vicks and Ozzie Clark will tell you that they were out there together.

Now, Curtis was with the Defendant all day long, sees him do it, doesn't expect him to do it, doesn't participate but does run off with him because the crime just happened. Now, neither of these witnesses want to be here, ladies and gentlemen. And the people who want to be here less than you guys is them. What I will tell you is in a homicide trial it's not like TV, it's not like Law and Order, anything can happen. Sometimes witnesses don't come in and we get bench warrants for them. Sometimes witnesses come in here and do something, I don't know if it's going to happen, it may, there's a term for it called "going south,"

Page 31

where they give a statement to detectives and they say what happened and all of a sudden they come to court and say, "I never said that, that's not my signature", or, "That's my signature and they forced me to say it and I didn't see it, that's not the person." It's fear, ladies and gentlemen, because they live out there in that neighborhood. So if it does happen in this case, and I'm not saying it will obviously because I don't have a script, but if it does happen don't be surprised because it's extremely common. It's so common in fact that if it does happen the Judge will explain to you in her charge that we are allowed to read in the statement taking by the detectives and you're allowed to accept that as if that was their testimony because the law recognizes this is a common phenomena in criminal cases but especially in homicide cases.

Now, going back to the night of the murder/robbery, no witnesses really come forward which is not unusual for that area. The police do interview Mr. Clark, Ozzie

Page 32

Clark, and he does give a statement and he cooperates to an extent because don't forget he knows Dennis Johnson. But Mr. Clark, that's a family business, it's not like he can quit and get another job. He has to go to work the next day and he's out there at the store and in the neighborhood, so he doesn't tell police he knows who did it. He gives a description and knows what happens, but he doesn't say it's Dennis Johnson.

And he knows him by his nickname, his street name, Bam. That is his nickname and he knows him as Bam, but he doesn't tell the detectives that because he's got to show up to work the next day. He's living by himself with his mom, he's the man of the house, he's terrified. So that's the statement he gives.

Time goes by and you'll hear testimony from Detective McDermott, who is not the original detective in this case because the way it works in homicide is you have what they call line detectives, and they work on a wheel system. So if a call comes in and

there's a homicide, if it's your turn and you're the next person up, you get that person, then the next person and the next person and the wheel keeps moving.

Now, sometimes like I said, since it's not Law and Order you don't just have one case at a time because it's not like one person gets murdered and everything stops until that's solved. Things keep happening and investigations may stall in a particular case because you can't find witnesses or you find them and they are not cooperative or whatever reason.

What happens in this case is that it goes to a squad called Special Investigations Unit. Detective McDermott is with that squad. What it is is you are a detective in a line unit and time is going by and you're not getting anywhere and time is going by and you have five other cases, you pass it to your colleagues in the Special Investigations Unit. They work a little bit different schedule, they are supposed to have more time. It's kind of the cold case squad,



but the case isn't that cold, it could be a couple months and go and do the followup work and they try to pick up the ball you passed to them and solve the case. That's what happened in this case, because they have Ozzie Clark's statement but he doesn't say it's this Defendant.

It's goes to the Special Investigation Unit and they do further investigation. They start hearing word on the street --

**MR. COARD**: Objection.

**THE COURT**: Sustained.

**MS. FEENEY**: They come into contact with Curtis Smith and say, "We hear you were out there, what's going on? Were you there? What happened?" And he gives a statement to detectives and he gives a statement about a year later.

And basically because he's not involved in this and he doesn't want to get blamed for something he didn't do, he says, "Yeah, I was out there Amin Vicks and Bam, Dennis Johnson. And we were out there and



hanging out all day and by the store. And this crackhead guy comes up and Bam decides to go over and rob him. As he pulls out the gun and pops the guy, we all ran." He gives a statement and makes an identification of this person of his colleague, his friend, Dennis Johnson, Bam, at which time because detectives are reinvestigating the whole thing they say, "Let's go back to Ozzie Clark." Things have changed in a year-and-a-half. The store shut down, so the family business is done, Ozzie Clark doesn't work there anymore. He's got a job as a truck driver. He's married, he's a family guy. He's not dealing with that neighborhood anymore and he says, "Yeah, you know what, I did see who did it and I wasn't honest with you because of all those reasons, but it's my civic duty and I want to tell you the truth now." And they show him pictures and he identifies Dennis Johnson, Bam, as the person he saw rob and kill Kenyatta Smith at 3:19 in the morning at 30th and Lehigh all for his cell phone. And he gives a statement to detectives and signs a photo of Dennis



Johnson.

So Curtis and Ozzie from two different worlds both identify the Defendant as the shooter, both say Amin Vicks was there. They are consistent, they corroborate each other. They are corroborated by physical evidence from the scene. You'll hear the gun was never recovered in this case, the only thing that was of ballistics evidentiary value was from the victim himself, there was a bullet taken from his body. But you'll hear despite the fact that no gun was recovered the ballistics expert was still able to tell what type of gun was used. The weight of the bullet, the characteristics, the lands and grooves, and he determined it was a .32 revolver. Both of these witnesses say this Defendant used a revolver to end the life of Kenyatta Smith. They had no idea what the ballistics evidence would reveal, but it's consistent.

Their details of the crime and the victim all comport with one another, ladies and gentlemen. And these are people

with no reason to lie because they never had any problem with this Defendant. As a matter of fact, Curtis was someone that was his friend. They may be scared, I don't know what's going to happen. And all of us can understand why they would be so watch their demeanor. They are not perfect, they are going to try to tell you what happened as best they can, but watch their demeanor and body language. And remember then you are viewing it through your street sense, ladies and gentlemen.

At the end of the case I'll get back up and talk to you about everything you saw and heard and the exhibits. And I know you are going to pay attention and I know you already are paying attention. At that time when I review everything with you I'm going to ask you to find Bam, Dennis Johnson, guilty of what he did that night which is the murder and the robbery of Kenyatta Smith all over a cell phone.

Thank you.

**THE COURT**: Thank you,



Ms. Feeney.

Mr. Coard, you may address the jury.

**MR. COARD**: Your Honor, may we briefly go to sidebar?

**THE COURT**: Yes, with the stenographer.

\- - -

(The following discussion occurred at sidebar:)

\- - -

**MR. COARD**: At this point I am moving for a mistrial. I didn't object during Commonwealth's opening. It was inflammatory, and unduly prejudicial, irrelevant, and racist **for the following reasons**: The Commonwealth stated that people don't trust police, there's no basis for say that. People in the neighborhood of 30th and Lehigh don't trust police. In addition, they have criminal records.

**THE COURT**: Some of them I think it was. You should have objected while it was going on.

**MR. COARD**: I don't like to



interfere with the Commonwealth's openings and closing; that's my practice. People there have criminal records, are opposed to snitching, life is cheap. People there get killed for disrespect. She went on to mention that no witnesses come forward because that's usual in that neighborhood. There's no basis for condemning that entire neighborhood and making it appear that everything there and including the Defendant is guilty because of that neighborhood.

**THE COURT**: I think it's argument and you can address it in your argument.

**MR. COARD**: That's my point, it's arguments, we are not even at argument.

**THE COURT**: Opening statements are argument. It shows the outline of the case. I do think it was right on that line and had you objected I would have stopped it. You really need to object while things are going on. However, I explain to the jury clearly, if you were listening, it's argument. If comes from the attorneys and it



doesn't come from the witness, and you can all pay attention to the witness. You heard me say that. You can argue it during your argument. But there's a fine line there sort of that whole neighborhood or whatever, you have to watch what you say.

**MS. FEENEY**: I understand but it's not --

**THE COURT**: Some places, whatever.

**MS. FEENEY**: I said in this case, Your Honor. And there's going to be evidence from the police that nobody came forward, nobody wanted to cooperate. It's not like I was making this up.

**THE COURT**: I can give a cautionary instruction, but I think you can deal with it in your opening. And if you don't think it's sufficient then we'll talk about a cautionary instruction.

**MR. COARD**: In fact, I'm not going anywhere near it. If Your Honor is denying my motion for mistrial I'll request a cautionary instruction.

**MS. FEENEY**: Openings in counsel and evidence --

**THE COURT**: I'll say whatever I'm going to say and you tell me if you like it.

**MS. FEENEY**: What's going on with the other thing?

**THE COURT**: If they take out a phone in the courtroom, we take it.

\- - -

(The following occurred in open court:)

\- - -

**THE COURT**: Okay.

Remember what I told you earlier that opening arguments are not evidence. There were some remarks by the District Attorney that were not evidence and I don't know if you will see them come out in evidence so they were more argument and you need to disregard that as evidence. And that will be that life is cheap in that area, I believe those were the words. That's not evidence in this case and really you need to disregard that. And that all people are afraid and all



people don't like to talk to police in this area, if that's the way it came out. Or that all people are afraid to snitch, if that's how it came out. You're to disregard those remarks.

Okay. Mr. Coard.

**MR. COARD**: Thank you, Your Honor.

Lies, contradictions, inconsistencies. Remember those three words. What you heard from the prosecutor is what we lawyers call argument. You can't do that during the opening statement. The purpose of the opening statement is to tell you what the evidence is going to prove. Talking stuff about a neighborhood, so what, this is North Philadelphia. So what, this is 30th and Lehigh. That doesn't mean everybody there is a criminal. That doesn't mean that everybody there refuses to cooperate with the police. That's outrageous to say and that's not part of what lawyers are supposed to do in a criminal case. We come in the opening statement and tell you what the evidence is



going to prove.

Evidence is not going to prove that everybody in this neighborhood is afraid of talking to the police, everybody in this neighborhood is a criminal, everybody in this neighborhood doesn't cooperate with law enforcement. That was totally outrageous and totally inappropriate because the purpose of an opening statement is to tell you what the evidence is going to prove. If you got a case you bring a case. You come here to the ladies and gentlemen, you people here, and say, hey, I got a witness Joe. Joe is going to say I saw him commit a murder. I have this witness Mary, she saw him with a gun. That's the purpose of the opening statement.

**MS. FEENEY**: Your Honor, I would object. You already gave a cautionary instruction. He's just yelling about --

**MR. COARD**: Your Honor, if the Commonwealth --

**THE COURT**: Overruled for now, but let's move off of that and you give your opening statement.



**MR. COARD**: I certainly will.

The purpose of an opening statement, ladies and gentlemen, is to tell you what the evidence is going to prove or from the Defense standpoint to tell you what the evidence is not going to prove.

I'll tell you first of all what it's going to prove. As I said at the outset, it's going to prove lies, it's going to prove contradictions and it's going to prove inconsistencies. And I'm going to be brief with the opening statements because I want you all to hear the prosecution's case. I don't want to get up here and take all your time because I want you to hear what they are going to say. And you can decide whether that evidence reaches the level of proof beyond a reasonable doubt.

First of all, one of things that I think the Commonwealth and I will agree upon and maybe nothing else is that we know whatever your decision is, we know it's going to be the right decision because we picked the right people, fair people, and reasonable

people. So you are going to hear the evidence and decide what that evidence proves or doesn't prove so I thank you for that.

By the way, my name is Michael Coard and I'm the attorney representing Dennis Johnson. You are going to hear throughout the trial people referring to him as the Defendant or as the suspect, but technically from a technical standpoint, what is Dennis Johnson? Dennis Johnson is simply the accused. Dennis Johnson is here, ladies and gentlemen, because somebody said he committed the crime. He's the accused and that's all he is at this point.

Why do I say it like that? Because I'm taking a page from what the Judge told you. The Judge told you about something called the presumption of innocence. That means that right now, right here at exactly 10:44 a.m., if the case ended right now, because the law says he's presumed innocent, you would have to find him not guilty.

You heard what the prosecutor said and you're hearing what I'm saying, you



heard what the Judge said. If the case ended right now you'd have to vote not guilty. Why? Because he's presumed innocent and that's very important. When you talk about this presumption of innocence that goes hand in hand with burden of proof.

Now, presumption of innocence is a legal term, burden of proof is a legal term, and I don't want the Judge yelling at me so I don't want to tell you what that means. The Judge is going to tell you what those terms mean. But in regards to burden of proof this is the one thing I can tell you. Dennis Johnson can put his head down and go to sleep for the entire trial. I, Michael Coard, can put my head down and go to sleep for the entire trial and not object, not call witnesses, not argue, not do anything. Why? Because the burden is not over here, the burden is here. The prosecution has to prove the case and prove the case beyond a reasonable doubt.

Let me jump quickly back to the presumption of innocence and want to quote



what the Judge pointed out. The Judge said that everyone in America has this presumption of innocence. People accused of crimes, people accused of serious crimes. People accused of the most serious crime, murder, and that includes Dennis Johnson. So Dennis Johnson like anyone else, everyone in America, has this presumption of innocence. And this presumption of innocence as the Judge told you is this protective cloak. That's why I said right now at this time if the case ended that protective cloak remains throughout the trial until you go to the deliberation room. But that protective cloak is very important.

That whole burden of proof thing I mentioned saying both of us can fall asleep and do nothing throughout the entire trial, that burden of proof is important because as the Judge said to you and said it clearly, charges are not evidence. You might say, well, this is not a minor shoplifting case or this is not a minor marijuana case. This is the big league, this is murder. And since it's murder he must be guilty or since it's



murder I got to look at it differently. No, the Judge said charges are not evidence.

I don't know who the prosecutor is going to call. I have no idea. But the prosecutor has the right to call each of those witnesses, some of those witness, most of those witnesses, a few of those witnesses. But I can tell you this, not one so-called eyewitness is going to tell you that I saw Dennis Johnson commit this crime and be consistent about it. What I mean is nobody is going to come in here and say Dennis Johnson committed this crime and I called the police and told the police and I'm saying the same thing today that I said to the police before. There's not going to be one eyewitness, alleged eyewitness, who is going to come in here with a consistent statement about what Dennis Johnson did or didn't do. But those so-called eyewitnesses, they are going to have to admit that they lied. What? They lied? You mean the prosecutor is going to bring in alleged eyewitnesses who are going to have to admit that they lied. Well, if the prosecutor

Page 49

is going to bring in so-called eyewitnesses who are going to admit that they lied, how does that help them with this burden of proof thing that the Judge is talking about? Do you bring liars in to prove your case? Do you bring liars in to prove your case beyond a reasonable doubt?

And you, ladies and gentlemen, might say, Mr. Coard, I'm not going to be that harsh, maybe these people weren't lying. Then if they weren't lying we go to the contradictions. So clearly the lying won't help the prosecution beyond a reasonable doubt. If you want to be a nice guy and say they are not lying but it's contradictions. Do the contradictions prove the case beyond a reasonable doubt? You'll say maybe it's not contradictions, it's inconsistencies. That's why I said those three words in the beginning. Lies, contradictions, inconsistencies. Can lies, contradictions, inconsistencies prove a case beyond a reasonable doubt on murder? Because that's what the prosecution is going to show you. That, ladies and gentlemen, is

Page 50

what the evidence is going to prove.

This is a murder case which means a human being is dead. I don't care if the prosecutor used the term a crackhead or the President of United States, it doesn't matter. It's a fellow human being who is dead and that's a horrible thing. But ladies and gentlemen, two wrongs don't make a right. I don't want you all to say I'm so sympathetic to the loss of life that I'm going to make this guy here pay because he's sitting here. Remember the Judge told you charges are not evidence. So we all sympathize with the loss of the life of a human being. Whether we know this person or not, whether he's unknown or famous, it doesn't matter, a human being lost his life and we all must be sympathetic. But sympathy is not evidence. Also, lies are not evidence. Contradictions are not evidence. Inconsistencies are not evidence.

Let me rephrase that. Maybe they are not evidence, but they are not evidence of proof beyond a reasonable doubt.

Thank you.

Page 51

**THE COURT**: Thank you, Mr. Coard.

We are going to give the jury a short bathroom break before we start the evidence, and then we'll pass out the books and everything.

**THE COURT CRIER**: Please remain seated as the jury exits the courtroom.

\- - -

(Jury departs the courtroom at 10:55 a.m.)

\- - -

(Short recess.)

\- - -

**THE COURT CRIER**: Court is reconvened.

Please remain seated as the jury enters the courtroom.

\- - -

(Jury enters the courtroom at 11:10 a.m.)

\- - -

**THE COURT**: Sequestration is ordered. That means that any witness testifying cannot be in the courtroom. They cannot come in until called and cannot discuss

Page 52

their testimony with anyone.

**MS. FEENEY**: Your Honor, counsel agreed that Ms. Smith can stay, she is life in being.

**MR. COARD**: That's fine.

**THE COURT**: Your books are under your chairs. Even though you don't know if you are going to take notes, find out if the pen writes. But you can start taking notes officially if you choose to now.

Ms. Feeney, you can call your first witness.

**MS. FEENEY**: Thank you, Your Honor.

We call Karen Auerwick from the Crime Scene Unit.

**THE COURT CRIER**: State your full name, spell your last name, and unit of assignment.

**THE WITNESS**: Karen Auerwick, A-U-E-R-W-I-C-K, Crime Scene Investigator, Philadelphia Police Department.

KAREN AUERWICK, after having been first duly sworn, was examined and

**testified as follows**:

- - -

COMMONWEALTH'S EVIDENCE

DIRECT EXAMINATION

- - -

**BY MS. FEENEY**:

**Q.** Good morning, Ms. Auerwick.
**A.** Good morning.
**Q.** You're not a police officer.
**A.** Yes.
**Q.** And you're assigned to the Crime Scene Unit?
**A.** Yes.
**Q.** How long have you been assigned to Crime Scene Unit?
**A.** Twenty-eight years now.
**Q.** Can you tell the ladies and gentlemen, what a Crime Scene Unit does?
**A.** We go out to crime scenes after speaking with the assigned detectives. We'll search the scene, collect, package, and submit any evidence that we collect to the relevant laboratories for testing. We do latent fingerprint, if requested. We also take measurements and sketches.



**Q.** How many people are in the Crime Scene Unit?
**A.** Twenty-eight.
**Q.** And that's for the whole city?
**A.** Yes.
**Q.** And how many officers are there, if you know?
**A.** Twenty-five of the 28.
**Q.** And do you go out to every single crime scene?
**A.** Not every single crime scene, no.
**Q.** Which ones do you go to?
**A.** When it's my turn if I am the assigned?
**Q.** I don't mean you personally. I mean, is it your units duty to come to the crime scene?
**A.** No, only when we are requested.
**Q.** What types of cases?
A. On the midnight to 8:00 shift it's mostly homicides and aggravated assaults.
**Q.** And what training do you have to be in the Crime Scene Unit?
**A.** Well, my early years was on-the-job training with the senior technicians, I have been invited to the police academy three times for a total of five weeks of training. I have been to numerous



seminars, training by the police department, medical examiner's office, and also the surrounding counties, Montgomery County has giving training.
**Q.** And I want to direct your attention to a specific scene, a scene at 30th and Lehigh Streets in Philadelphia. Were you on duty on August 17th, in the early morning hours at about 3:15 in the morning or so?
**A.** Yes.
**Q.** And did you get called out to investigate a scene?
**A.** Yes.
**Q.** Did you create a report?
**A.** Yes.
**Q.** Do you have a copy of it with you?
**A.** Yes.
**Q.** I'm going to ask you what time you arrived on the scene?
A. I arrived at 6:16 a.m.
**Q.** Is that usual or unusual that you would get there three hours later after the crime happened?
A. Well, we were notified at 4:50 a.m., but we were at another scene at the time. So we went



from that scene to this scene at 30th and Lehigh.
**Q.** So when you finished the crime scene you were processing you got the call?
**A.** Yes.
**Q.** When you arrived at the scene, did you a observe a body there?
**A.** Yes.
**Q.** Did you create a map and sketch to see what the scene looked like?
**A.** Yes.

**MS. FEENEY**: Your Honor, I would ask what's been marked as C-14 be placed up.

- - -

(Sketch marked Commonwealth's Exhibit 14 for identification.)

- - -

**BY MS. FEENEY**:

**Q.** Did you also photograph the scene?
**A.** Yes, I did.

**MS. FEENEY**: And Your Honor, I would mark as Commonwealth 1 through 13 the crime scene photos.

- - -

(Photographs marked Commonwealth's Exhibit 1 through 13

Page 57

for identification.)

- - -

BY MS. FEENEY:

Q. If you could start with C-14 and tell ladies and gentlemen what that shows?

A. C-14 is an enlargement of a sketch drawn to scale showing the southeast corner of 30th and Lehigh Avenue. Drawn to scale is everything depicted on the sketch is measured down to the inch and you can see there's a scale placed on it. If it was blew up this street to life size, it would fit over the street itself and it would have the same dimensions.

Q. So this is 30th Street and this direction is going north up to C-14?

A. Yes.

Q. And this thing that looks like a mark here or a tree.

A. It's the overhead street light.

Q. Was that in working order?

A. It was off by the time we arrived, but the officers at the scene their information was it was on when they arrived.

Q. Is that one that's light sensitive?

Page 58

A. Yes.

Q. And then east is going towards the right; is that correct?

A. Yes.

Q. And would this be going towards Broad Street?

A. Yes, it would.

Q. And this is west, right?

A. Yes.

Q. And 30th is south?

A. Yes.

Q. And what is this on the diagram?

A. It's a bicycle laying on the sidewalk.

Q. And this is what right here?

A. The address of 2950 Lehigh Avenue, a discount store.

Q. And did you also prepare an aerial view of this scene?

A. Yes.

MS. FEENEY: And, Your Honor, this is marked as C-15. If we could see that for a second.

- - -

(Aerial view map marked Commonwealth's Exhibit 15 for

Page 59

identification.)

- - -

BY MS. FEENEY:

Q. Referring to C-15, explain what that shows?

A. This is the aerial view showing the area of 30th and Lehigh. It's one of the Google views of the map that we blew up.

Q. And regarding the sketch, I'll put the sketch up on the screen. Is the sketch marked as C-14?

A. Yes.

Q. And here we have 30th Street and north goes up this way and the store is right there.

A. That's correct.

Q. And you see these are parked cars.

A. Yes.

THE COURT: I'm sorry. Is that 20th Street or 23rd Street. What does it say on there, 3 or 2?

MR. COARD: A faded 3.

BY MS. FEENEY:

Q. When you compare C-15, is it oriented the same way or a different way?

A. No, a different way.

Page 60

Q. Can you explain that to us?

A. Well, we try to keep north facing upwards in our sketches and that's why it is the way it is. The Southwest corner is what's depicted on the sketch. On the aerial view, we didn't orient it the same way because when we did the view showing the sidewalk in front of the property would disappear and since we wanted to show the sidewalk we now have north being on the south of this map.

MS. FEENEY: May I approach, Your Honor?

THE COURT: Yes.

BY MS. FEENEY:

Q. Just so we are clear on C-15, the Lehigh Discount Store is here?

A. Yes.

Q. So in order to kind of sketch it would be this way, we would turn it upside down?

A. Yes.

Q. So this would be north going this way?

A. That's correct.

Q. So 30th Street north turns into Chalmers?

A. Yes.

**Q.** And this is south?
**A.** Yes.
**Q.** And then we have east going towards the right?
**A.** Yes.
**Q.** Did you have any information when you got to the scene either from witnesses about anything that happened or did you know what you were looking for, if anything?
**A.** No, it was just that it was a shooting and some of the items in area belonged to the deceased.
**Q.** And you said you photographed the scene?
**A.** Yes.
**MS. FEENEY**: I know we marked the photographs C-1 through C-13.
**BY MS. FEENEY**:
**Q.** Did you use extrinsic lighting or did you use flash?
**A.** I didn't need flash because it was daylight by then.
**Q.** So I'm going to take you through the photographs one by one. If you can explain to us this one marked Commonwealth's Exhibit 1?



**MS. FEENEY**: If I may, Your Honor, I am going to switch. If we can have C-4 up there.
**BY MS. FEENEY**:
**Q.** When you describe the photographs, if you can show the jury on the sketch what part of the sketch it shows?
**A.** Your Honor, may I stand next to the sketch?
**THE COURT**: That's fine, you can stand.
**BY MS. FEENEY**:
**Q.** So this is Commonwealth's Exhibit 15, what does this show?
**A.** This is an overall view showing the southwest corner of 2030 and Lehigh showing this view.
**Q.** You're facing east?
**A.** Southeast indicating the intersection.
**Q.** And we'll go to Commonwealth's Exhibit 2.
**A.** C-2 is an overall view looking east on Lehigh Avenue from 30th Street. You can see the crosswalk is right beneath the photograph on Lehigh Avenue looking east across.
**Q.** So you're indicating the west side of 30th



looking across?
**A.** Yes.
**Q.** And this is C-3?
**A.** C-3 is an overall view looking west on Lehigh Avenue on the sidewalk in front of 2944 Lehigh Avenue. 2944 is marked and on the sidewalk in front of the property and looking west towards 30th Street.
**Q.** Okay.
Commonwealth's Exhibit 4.
**A.** C-4 is an overall view looking west on Lehigh Avenue in front of 2944 Lehigh Avenue. What I did was move out in the street in the same property and look west towards the photograph.
**Q.** We can see crime scene tape, did you set that up or was it already there?
**A.** It was already there.
**Q.** And the purpose of that was what?
**A.** To keep anybody except for authorized personnel entering the crime scene.
**Q.** And we see two parked cars on the sketch.
**A.** Yes, two parked cars in front of 2946 on Lehigh Avenue.
**Q.** And this is the streetlight?



**A.** Yes.
**Q.** And then this is what?
**A.** A bike lane.
**Q.** And the bike lane is right next to the two parked vehicles?
**A.** Yes.
**Q.** Going to Commonwealth's Exhibit No. 5?
**A.** C-5 is a front view of the Lehigh Discount Store, 2950 Lehigh Avenue. In the highway of the avenue looking south showing the front of the property.
**Q.** Okay.
**A.** And C-6 shows two chairs and a television near the step of 2950 Lehigh Avenue.
C-7 is a close up view showing the cell phone in front of 2950 Lehigh Avenue.
**Q.** Did you have any information about that phone?
**A.** No.
**Q.** Did you fingerprint that phone?
**A.** No, Homicide requested they package it and turn it over to them and that's what I did.
**Q.** And what about C-8; we have some items on what looks like a step?

A. Yes, it's a close up view showing items on the front step on 2950 of Lehigh Avenue.
Q. That's the front step of the store?
A. Yes.
Q. And this is what?
A. Empty packet of Newport cigarettes, there was a folding knife, some change, and I believe it was an ID card of some sort.
Q. And what, if anything, was done with those items?
A. Nothing. I asked Homicide if they wanted anything from the step area packaged or processed and they said they only wanted the phone.
THE COURT: Where's the ID item?
MS. FEENEY: You can see it better in the picture.
THE COURT: It looks like matches to me.
MS. FEENEY: I'm going to ask you at the end if we could publish it to the jury because the detail is better.
BY MS. FEENEY:
Q. Commonwealth's Exhibit 9.



A. This is a view of the bicycle showing 2948, 2950 Lehigh Avenue depicted on the sketch and say bike.
Q. And was any service performed on that?
A. No. The bicycle -- there was a bag and a set of keys that all belonged to the deceased, to the victim.
Q. Commonwealth's Exhibit No. 10.
A. C-10 is a view showing a set of keys and a black plastic bag on the highway of 2946 Lehigh Avenue.
Q. And the keys are where?
A. No, they are up forward.
Q. And the bag is back there?
A. Yes, that's were the bag is.
Q. Under the bumper of the first car, maroon colored car?
A. Yes.
Q. And the keys are out to the left of the bike lane?
A. Yes.
THE COURT: Was there anything in the bag?
THE WITNESS: It's coming up,



Your Honor.
BY MS. FEENEY:
Q. C-11.
A. Close up view of two cigars and a juice.
Q. And that's the bag on the street?
A. Yes.
Q. And this is taking in the back part of the car?
A. Yes, I just used the vehicle that was there to place it on.
Q. Was there anything done to those items?
A. No.
Q. Do you know who that belonged to?
A. The information we received is it belonged to the deceased.
Q. Now, we have C-12.
A. Overall view looking east on Lehigh Avenue from sidewalk in front of 2950.
Q. So in this photograph, would the store be off the frame to the right there?
A. I'm standing in front of the store, yes.
Q. And C-13.
A. Overall view looking south on 30th Street from Lehigh Avenue, so I'm on the southeast



corner and I am looking south. The building on the left side of the photograph is the store.
MS. FEENEY: There's another map I'm going to mark as C-16, if I can.
\- - -
(Map marked Commonwealth's Exhibit 16 for identification.)
\- - -
BY MS. FEENEY:
Q. C-16 is what?
A. Enlargement of a Microsoft area street map it shows more of the surrounding area of 30th and Lehigh.
Q. So this area here is 30th and Lehigh?
A. Yes.
Q. And this is oriented with the north going up?
A. Yes.
Q. So 30th turns into Chalmers?
A. Yes.
Q. And if you go south on 30th Street, what's the first street you come to that is parallel to Lehigh?
A. Oakdale Street.
Q. And then Huntingdon is below that?

Page 69

**A.** Yes.
**Q.** Did you recover any ballistics evidence at the scene, gun, or shell casings or anything of that nature?
**A.** No, ma'am.
**Q.** Did you conduct a search for shell casings?
**A.** Yes.
**Q.** If you could explain to the jury what a shell casing is?
**A.** A shell casing is what's ejected from a semi-automatic weapon or removed from a revolver.
**Q.** If one shoots a revolver, does a revolver remove shell casings?
**A.** No, you would have to open the cylinder and remove it.
**THE COURT**: But a semi-automatic fired, fired cartridge casings, and automatically ejects; is that right?
**THE WITNESS**: Yes, ma'am.
**MS. FEENEY**: I have no further questions. Thank you.
**THE COURT**: Cross-examination.
**MR. COARD**: Thank you, Your Honor.

Page 70

I have no questions, thank you.
**THE COURT**: Can she be excused or does anyone need her to remain?
**MR. COARD**: Yes, Your Honor.
**THE COURT**: You may be excused.
- - -
(Witness excused.)
- - -
**THE COURT**: You may call your next witness.
**MS. FEENEY**: Thank you, Your Honor. I call Police Officer Anthony Coward.
**THE COURT CRIER**: State your full name, last name, badge number for the court.
**THE WITNESS**: Police officer Anthony Coward, Badge No. 4867, currently in the 19th District.
POLICE OFFICER ANTHONY COWARD, after having been first duly sworn, was examined and testified as follows:
- - -
DIRECT EXAMINATION
- - -

Page 71

**BY MS. FEENEY**:
**Q.** Good morning, Officer.
**A.** Good morning.
**Q.** Can you tell the ladies and gentlemen how long you have been a police officer?
**A.** Nine-and-a-half years.
**Q.** You are assigned to the 19th Police District?
**A.** Yes.
**Q.** And the 19th Police District, just so we know, covers what area?
**A.** From City Line Avenue to 52nd Street to 52nd and Market from 77th and City Line to Presidential almost to the Expressway.
**Q.** So West Philadelphia?
**A.** Yes.
**Q.** Part of West Philadelphia?
**A.** Yes.
**Q.** Were you assigned to the 19th District back in 2007?
**A.** Yes.
**Q.** I want to draw your attention to a specific date, August 17th about 3:17 in the morning, August 17th, '07, were you on duty?

Page 72

**A.** Yes.
**Q.** Were you in uniform as you are here today?
**A.** Yes.
**Q.** What was your assignment on that tour?
A. Regular patrol 11:30 at night to 7:30 in the morning.
**Q.** And that's what they call last-out?
**A.** Last-out.
**Q.** Were you in a marked vehicle?
**A.** Yes.
Q. Did you have occasion at about 3:15 in the morning to leave your district and to experience something that brings you to court today?
**A.** Yes, I had an assignment. I was going to Special Victims with a complainant in the vehicle.
**Q.** You were going to Special Victims with a complainant in the rear of the vehicle?
**A.** Yes.
**Q.** And you had somebody in the car and transporting them to the Special Victims Unit?
**A.** Yes.
**Q.** And what was the purpose of taking them there?

A. They had a complaint.
Q. And Special Victims is what, so the jury understands?
A. They handle rapes, reports of rapes, any deviate sex issues.
Q. So it's 3:15 in the morning and you're in the marked car in uniform and you have the victim or complainant and you're taking them to Special Victims, and what happens?
A. I was traveling eastbound on Lehigh Avenue towards 30th Street.
Q. Okay.
I'm going to refer C-13. So you're on Lehigh and you're going from west to east?
A. Yes.
Q. I have this laser pointer. Is this pretty much where you were traveling?
A. Yes.
Q. And what happens?
A. I was stopped at a red light at 30th Street, I noticed on the corner -- I would call that southeast corner.
THE COURT: Why doesn't he do that?



MS. FEENEY: Okay. Your Honor, if you want we can put that up on the board maybe because he was right there.
THE COURT: No, he can do it with the pointer so everybody can see it.
THE WITNESS: I was sitting facing eastbound at the red light.
BY MS. FEENEY:
Q. Okay.
At 30th Street?
A. At 30th Street. And on my right side which is the southeast corner standing right here was three people, one black male, two black females.
Q. Okay.
A. I just noticed and thinking why were they staring at me. And they weren't moving so when the light turned green I proceeded to go across 30th Street and a black male ran in front of my car and stopped me and stated that someone just got shot. And I asked him where did they get shot at and he pointed at the black male laying right here between the two vehicles. He was laying -- his waist area and legs were laying between both of the cars and his torso was laying



across the bike lane, right next to the vehicle's driver's side.
Q. I'll show you another picture. Does that show you, this is Commonwealth's Exhibit 4?
A. Yes.
Q. Okay.
And can you point out to us where you saw him?
A. He was laying right around here.
MS. FEENEY: Indicating in the bike lane.
THE WITNESS: Yes.
BY MS. FEENEY:
Q. Now, the male that came up to you and said there was a shooting, can you describe what he looked like?
A. He was a light skin black male with red hair.
Q. Did you see him here today outside or in the hallway or anything?
A. No, I didn't see him.
Q. Okay.
Did you ever get a name?
A. I didn't get a name from him. I just stated



to him, just stay right there because I need you as a witness. And I was also trying to watch the female in the back seat of my car and make sure no one didn't run up to that car. And at the same time I was checking the pulse to see if the victim that was on the ground was still breathing and still had a beating heart pulse in his neck.
MS. FEENEY: Your Honor, if I can ask if Mr. Clark can step in the room to see if that's the gentleman the officer is talking about?
THE COURT: Yes, we'll send somebody out. What's the name?
MS. FEENEY: Ozzie Clark.
- - -
(Witness Ozzie Clark enters the courtroom.)
- - -
BY MS. FEENEY:
Q. I'm going to ask someone to step in and tell the jury if that's who you recall?
A. Yes.
Q. And where do you recall him from?
A. He was the male standing on the corner.
Q. Was he the one that flagged you down?

**A.** Yes.
**Q.** Tell us if you would, I know you were trying to keep an eye on the lady in your car and check the victim in the street, were you able to go over to the victim in the street and see what was going on?
**A.** Yes. At the same time I was telling the male that flagged me down to stay right here and I went to the victim that was laying in the street.
**Q.** Okay.
And what, if anything, did you notice about that person?
**A.** I was hearing noises, it sounded like he was trying to breath. He was laying face down with his right arm stretched out and his left arm kind of back a little bit. I rolled him over to make sure he was trying to breathe, laying him on his right side.
**Q.** And you said that it was a black male?
**A.** Yes, that was in the street, yes.
**Q.** Was he conscious at all? Was he able to talk to you?
**A.** No.



**Q.** And did you notice anything, any blood or injuries?
**A.** I unzipped his jacket to see if he had any bullet holes or anything or if he was just bleeding. I unzipped his jacket and I noticed in his chest area he was bleeding.
**Q.** So what's the next thing you do at this point?
**A.** I radioed my dispatcher which is on the westband, it's not the northband.
**Q.** And just because I don't understand what that means, if you could explain it to the jury?
**A.** Westband is West Philadelphia, the 16th and the 19th. That's the band that we talk to the dispatcher. Once we leave our district which was the 22nd District, the borderline of 22nd and the 39th, we can't switch bands because that's their rule. Because if we switch bands some people may not know what band you are on and if we happen to have this something like this, they don't know.
**THE COURT**: You mean on the radio you can only communicate with people from your own district?



**THE WITNESS**: I can switch a band but I am not supposed to because my dispatcher needs to know where I am. They can key in where I am through GPS.
**THE COURT**: So you talk back to your dispatcher to tell them what's going on and they communicate with the other districts that you are in.
**THE WITNESS**: Yes. And my dispatcher contacted the 22nd and the 39th dispatchers and both districts came because that is their borderline.
**BY MS. FEENEY**:
**Q.** So you call your own dispatcher and tell them the situation and they contact the 22nd Police District and 39th because it's on the border of those two districts; is that right?
**A.** Yes.
**Q.** So do you stay there until either the 22nd District or the 39th District show up?
**A.** Yes.
**Q.** And what do you do when they get there?
**A.** I relay a message to the supervisor, I don't know his name. I relayed a message and



everything and told them who I had and told them who is the witness that flagged me down.
**Q.** Is this on the radio or in person?
**A.** This is in person. Multiple cars came, they started blocking off the scene and the supervisor I told him I was on my way to Special Victims and he noticed that is a priority because I have a complainant and they don't want to cross anything up and shock the complainant any more, but I got into the vehicle and proceeded to Special Victims.
**Q.** Okay.
So you told them what you saw and you were able to go on your way?
**A.** Yes, I gave them my badge number, district, and car number.
**Q.** With regard to the young man that you said flagged you down, did you make the police aware that he had information?
**A.** Yes, that he flagged me down.
**Q.** And where's he as you left the scene; is he talking to police?
**A.** Yeah, he's talking, he stated that someone got shot.

Page 81

**MS. FEENEY**: Officer Coward, I have no further questions. Thank you.

**THE COURT**: Cross-examination.

**MR. COARD**: Good morning, sir. How are you? I have no questions for you. Thank you very much.

**THE COURT**: May this officer be excused?

**MR. COARD**: No objection.

**MS. FEENEY**: No objection.

\- - -

(Witness excused.)

\- - -

**THE COURT**: You can call your next witness.

**MS. FEENEY**: Your Honor, we call Police Officer Lisa Conroy.

**THE COURT CRIER**: State your full name, badge number, and current assignment for the Court.

**THE WITNESS**: Lisa Conroy, Badge No. 6383, 22nd District.

POLICE OFFICER LISA CONROY, after having been first duly sworn, was

Page 82

examined and testified as follows:

\- - -

DIRECT EXAMINATION

\- - -

**BY MS. FEENEY**:

**Q.** Good morning, Officer.

**A.** Good morning.

**Q.** How long have you been with the Philadelphia Police?

**A.** Three years.

**Q.** And in August of 2007, were you assigned to the 22nd Police District?

**A.** Yes.

**Q.** And just so the jury understands, can you tell us the physical boundaries of that district?

**A.** It's from 10th Street to 33rd.

**Q.** And what is the north and south?

**A.** It's from Montgomery to -- I'm not sure where the cut off is.

**Q.** Montgomery is the northern boundary?

**A.** Yes.

**Q.** Does it go as far down as Girard?

**A.** No, it's farther up, I'm not sure where the cut-off is because it changed.

Page 83

**Q.** What was it when it --

**THE COURT**: Does it make a difference for the purpose of this case?

**MS. FEENEY**: No, just so the people have an idea of where we are talking about. That's okay.

**BY MS. FEENEY**:

Q. Were you on duty at 3:15 in the morning?

**A.** Yes.

**Q.** Were you in uniform?

**A.** Yes.

**Q.** Did you have a partner?

**A.** No.

**Q.** Were you in a marked police vehicle?

**A.** Yes.

**Q.** And what was your assignment that shift? What were you supposed to be doing?

**A.** Routine patrol, Car 2220.

**Q.** Is it part of your duties to respond to radio calls?

**A.** Yes.

**Q.** Did there come a point you responded to the area of 30th and Lehigh?

**A.** Yes.

Page 84

**Q.** Tell us why, if you would?

**A.** A radio call for a shooting at 30th and Lehigh.

**Q.** What did you do when you got at that location?

**A.** When I got on location rescue was already attending to the victim.

**Q.** Did anybody come forward as a witness and tell you what happened?

**A.** No.

**Q.** Were there people out there?

**A.** No. There was a corner store with people inside the store, but not actually any witnesses on location.

**Q.** Okay.

So there were people inside the corner store?

**A.** Yes.

**Q.** And when you say in the corner store I'm going to show you a photograph, Commonwealth's Exhibit No. 1. Is this the store you're talking about?

**A.** Yes.

**Q.** And where did you see the people?

Page 85

A. Inside the corner store.
Q. Okay.
Through the windows there?
A. Yes.
Q. Did you know who any of them were?
A. No.
Q. Did you see -- you said medic was on location; were they attending to the victim?
A. Yes.
Q. What happened with regard to the victim?
A. Actually right after I got on location the medics were on their way to transporting the victim to Temple Hospital.
Q. And what did you do? Did you stay at the scene or go to Temple Hospital along with them?
A. Went to Temple Hospital.
Q. Explain the purpose of that?
A. To check on the condition of the victim.
Q. When you got to the hospital did you make any observations?
A. No, I was just waiting to see what was going to happen with the victim.
Q. And what, if anything, happened?
A. Well, actually he was pronounced at about

Page 86

4:04 a.m.
Q. And did you prepare what's known as a 75-48?
A. Yes.
Q. Can you explain to the jury what that is?
A. The description of the radio calls and the victim's name and that's basically it.
**MS. FEENEY**: If I can mark this as C-17.

\- - -

(Police 75-48 marked Commonwealth's Exhibit 17 for identification.)

\- - -

**BY MS. FEENEY**:
Q. Officer, do you recognize this document recognized as C-17?
A. Yes.
Q. And what is that?
A. That's the 75-48.
Q. At the top there's what's known as a district control number.
A. Yes.
Q. And then it says sector.
A. Yes.
Q. What's that?

Page 87

A. The area the patrol car covers, that particular area.
Q. And what's the date and time on this report?
A. August 17th, 3:19 a.m.
Q. 3:19 is time out, what does that mean?
A. The time the call was received.
Q. That's when you got the radio call?
A. Yes.
Q. The location is what?
A. 3000 West Lehigh.
Q. And day code means, what?
A. The fifth day of the week. In the police system the seventh day would be Sunday to Monday so Friday would be the day of the week.
Q. So this was a Friday?
A. Yes.
Q. And now for complainant, you have a name and date of birth and age and all that and address. Can you tell us what that is?
A. That's the victim's name and address, date of birth.
Q. What is the victim's name?
A. Kenyatta Smith.
Q. And date of birth?

Page 88

A. 12/10/70.
Q. And what is his age?
A. Thirty-six.
Q. Where did you get this information from?
A. On the identification in the wallet.
Q. And do you remember what kind of identification that was?
A. Driver's license.
Q. And if you would tell us what you reported here for a description of incident?
A. Radio call for a shooting. It says, "Police responded to police call for shooting at the above location, which was 3000 West Lehigh. Above male observed on the highway with gunshot wound to the chest. Medical victim taken to Temple Hospital. Above male pronounced at 4:04 a.m."
Q. And when you say "highway," what does that mean?
A. The street and location.
Q. Is that just a police term?
A. Yes.
Q. Were you able to have any conversation with Kenyatta Smith? Was he able to talk to you and

tell you what happened?
A. No.
Q. And there's no information here about what you called flash information about any suspects or anything like that?
A. No.
Q. And why is that?
A. Because nothing came out at that time.
Q. And had there been a description of a suspect would you have recorded it on here?
A. Yes.
Q. Once you found out that he was pronounced dead at 4:04 a.m., what, if anything, do you do?
A. We have to notify our front desk through telephone for detectives to come to the hospital.
MS. FEENEY: I have no further questions.
THE COURT: I need a copy of C-17, please.
Cross-examination.
MR. COARD: Good afternoon, Officer. I have no questions for you. Thank you very much.
THE COURT: Thank you, Officer.



Any objection to this officer being excused?
MR. COARD: None from Defense.
MS. FEENEY: No, Your Honor.
THE COURT: You may be excused.
\- - -
(Witness excused.)
\- - -
THE COURT: You may call your next witness.
MS. FEENEY: Your Honor, I would call paramedic, Olivia Haven.
THE COURT CRIER: State your full name and unit of assignment.
THE WITNESS: Olivia Haven, MAG 23.
OLIVIA HAVEN, after having been first duly sworn, was examined and testified as follows:
\- - -
DIRECT EXAMINATION
\- - -
By MS. FEENEY:
Q. Good morning, Ms. Haven.



A. Good morning.
Q. Can you tell the ladies and gentlemen how you are employed?
A. Philadelphia Fire Department as a paramedic.
Q. And describe for us your job. What does a paramedic do?
A. We go on 9-1-1 calls, help people that's sick, and that's pretty much the extent of that. We give meds and start IVs.
THE COURT: Can you keep your voice up a little bit.
THE WITNESS: We treat people that's sick, that's just to sum it up, transport them to the hospital, give meds, put them on the monitor, start IVs, put them on oxygen.
BY MS. FEENEY:
Q. And what, if any, training do you have to have to do this job?
A. Go to school for EMT first, then you to go to school for paramedic.
Q. Okay.
And you been doing this for how long?
A. I have been with the Fire Department for



nine years.
Q. All right.
So you were working with them back in August of 2007?
A. Yes.
Q. And were you on duty August 17th, 2007, at about 3:15 in the morning?
A. Yes.
Q. Did you receive a call to go to the area of 30th and Lehigh?
A. Yes.
Q. Tell us about that, how does that work?
A. We responded to 30th and Lehigh and as we were approaching 30th and Lehigh I saw a male laying on his stomach in between the two cars. We rolled him over and he took one last breath and we picked him up with the board and put him on the stretcher and put him in the truck and started working on him.
Q. Now, I'm going to show you what's marked as Commonwealth's Exhibit 4, if I can.
How is it that you get dispatched? Where do you work out of?
A. That particular night I was working out of

26th and York.
**Q.** Is there a paramedic station or a fire station?
**A.** A fire station.
**Q.** So you're stationed with the firemen?
**A.** Yes.
**Q.** This is C-4. Do you see where it is that you saw the man that needed help?
**A.** The bike lane wasn't there and he was laying in the street in between the cars. He was laying in the street in between the two cars.
**THE COURT**: We are going to give you a pointer.
**THE WITNESS**: The bike line wasn't there at the time.
**BY MS. FEENEY**:
**Q.** These photographs were taken three hours after the crime so you do not recall seeing the bike line?
**A.** I don't remember the bike line there and the police car and he's laying in the street and he was laying in front of the police car. So he was in between the police car, but in the street.
**Q.** And do you know if any other officers



attended to him or tried to help him before you got there? Were you aware of that?
**A.** No, it was Officer Coward. He was the only one there at the time we were there.
**Q.** Did he tell you anything about what he tried to do for the victim?
**A.** No.
**Q.** Now, tell us the victim's condition when you saw him?
**A.** At first he looked like he was just laying on the ground unconscious after being drunk and we rolled him and saw he took the last breath. We picked him up and got him in the truck, I discovered he was shot.
**Q.** What do you mean he took his last breath?
**A.** We rolled him over and he went (indicating).
**MS. FEENEY**: Indicating like a sigh, an exhale.
**THE WITNESS**: One breath.
**BY MS. FEENEY**:
**Q.** And what do you mean that was it, he didn't breathe any more after that?
**A.** No.
**Q.** What, if anything, do you do?



**A.** Since he's not breathing, we have to if we are able to put a tube down his throat and give him oxygen through that. Then since he was on the monitor -- do you want me to get into that part?
**Q.** You did prepare a report, right?
**A.** Yes.
**MS. FEENEY**: I'm going to mark this as Commonwealth's Exhibit No. 18. Counsel should have a copy of it.
**MR. COARD**: I do.
**MS. FEENEY**: The Judge should have one as well.

\- - -

(Paramedic report marked Commonwealth's Exhibit 18 for identification.)

\- - -

**BY MS. FEENEY**:
**Q.** Just so we cover everything, I'm going to have ask you to go through your report to explain anything you did. Is C-18 a copy of your report that you prepared that night?
**A.** Yes.
**Q.** Now, if you go up to the top of it you have



a call number, call type. What did you put for call type?
**A.** Call type is shooting.
**Q.** And then you have your scene as 30th and Lehigh in Philadelphia, correct?
**A.** Yes.
**Q.** Now, under status it says, "emergency lights and sirens." Does that mean how you responded to 30th and Lehigh or how you left from there?
**A.** That's how we responded to 30th and Lehigh.
**Q.** And you were with whom according to this?
**A.** Kathy MacDougall.
**Q.** Is that another paramedic?
**A.** Yes, she's assigned to that section.
**Q.** And you have a section for patient information. Did you have a name of who it was you were working on?
**A.** Actually I don't remember. I probably got that when I got to the hospital or I can't remember if someone, like one of the officers went in his pocket and got his ID. I'm not sure, but I more likely got it from the hospital.
**Q.** And that says what?
**A.** Kenyatta Smith.

Page 97

Q. And it indicates you were notified at what time?
A. What time we got dispatched was 3:19.
Q. And what time did you make it to the scene?
A. 3:22.
Q. And you were coming from where?
A. 26th and York.
Q. So it only took you three minutes to get there?
A. Yes.
Q. And you left the scene at what time?
A. We departed at 3:31.
Q. Was that nine minutes later you left?
A. Yes.
Q. And destination it says 3:35?
A. Yes.
Q. What is the destination?
A. Temple University Hospital.
Q. So from there what were you doing?
A. We were working on the patient. It's called invasion when we have to put a tube down their throat to help them breath or if they are breathing you assist them breathing. We put him on a monitor to see what his heart rhythm was on

Page 98

the monitor to see what we call a PBA rhythm which is pulse electrical activity. Where the heart has electrical activity, but you can't feel a pulse, it's not beating correctly.
Q. Was Mr. Smith able to regain consciousness and give you information?
A. No.
Q. And it looks like you have a section for history, history present and history past on the first page?
A. Yes.
Q. Okay.
And it says cause and you put what?
A. Shooting.
Q. And that was based on your observations?
A. Yes.
Q. And then you have complaint.
A. Chest shot.
Q. And symptoms.
A. Chest shot.
Q. And do you have that start unknown?
A. Yes.
Q. What does that mean?
A. We don't know how long ago it started. The

Page 99

computer does all this stuff. It's a drop down menu and we click on what happened, and if we don't know the start time we'll put unknown start time.
Q. And you're able to do it on scene?
A. We don't do our chart while on location, we handle the patient especially if someone is critical. We do it at the hospital once we transfer care over to the hospital.
Q. And the next section is history past, allergies, meds, preexisting, for that you say what?
A. Unknown.
Q. And that's why?
A. Because he was never talking so we can't asked him does he have any allergies or meds or any meds or medical problems because he was never able to talk to us.
Q. And the next section is findings?
A. Yes.
Q. And the first category is impression?
A. Yes.
Q. And you said what?
A. Gun shot wounds, abbreviation GSW.

Page 100

Q. And under initial there's a lot of different categories and you say patient found?
A. Laying on stomach.
Q. And the next category is LOC which stands for what?
A. It stands for loss of consciousness, so he was unresponsive.
Q. And what about for airway?
A. It's patent because there was no blood or anything in there or any mucus so we'll put down patent. That means open, it's clear.
Q. And airway is what?
A. Your throat, your trachea.
Q. Did he have a gag reflex present?
A. No.
Q. Can you indicate the significance of that?
A. Usually if you don't have a gag you are not breathing.
Q. And how do you test for that?
A. We don't test for that. Usually if you got to intubate someone you put the blade down their mouth and it will move the tongue over and you're able the see the trachea. And if they don't act like they are about to vomit, that means you have

a gag. Usually when you are nonresponsive you don't have a gag, that's the way he was.
**Q.** And then we have breathing as what?
**A.** Agonal.
**Q.** Agonal is what?
**A.** That means that there breaths should be between three to four per minute, and when we rolled him over it was only one. That's not good, that means he's not able to breath on his own.
**Q.** What's the normal breaths per minute?
**A.** It could be from 16 to 20, and if you start going up higher than that 24 means you're breathing is considered labored.
**Q.** So 16 to 20 is normal and agonal is three to four and he was at one?
**A.** Yes.
**Q.** After that you have right lung?
**A.** It's right lung sounds clear and left lung sounds clear and equal expansion.
**Q.** And what does that mean?
**A.** It means that when we go to bag him that you'll hear the air from the oxygen going into his lungs and your chest rise is going to be



equal. So when you go to bag the chest will rise equal, and when the air goes out, it will go back down to normal size.
**Q.** And when you say you go to bag him, what do you mean by that?
**A.** Ventilate him with the bag mask. That's the device we hook up to the oxygen and we put it at the top of the ET tube, the tube in their throat to intubate and giving him air that way.
**Q.** Is that thing sometimes you see on TV, it has a squeeze thing?
**A.** Yes, a bag mask.
**Q.** And then for circulation, did he have any pulse?
**A.** No pulse.
**Q.** You have pulse absent but then you have carotid, what does that mean?
**A.** We would check for a pulse in his carotid artery in the neck.
**Q.** And that was absent as well?
**A.** Yes.
**Q.** And what, if any, observations did you make about his skin and eyes?
**A.** His skin was normal, pale. Moist was



normal, means he wasn't clammy, he was normal.
**Q.** Okay.
**A.** His eyes were nonreactive. Usually if you are alive you'll have some type of reaction. Your pupils will react and he didn't do that. They were nonreactive and dilated.
**Q.** And nonreactive is what?
**A.** Light.
**Q.** And you shine a light in his eyes?
**A.** Yes.
**Q.** And nothing happens?
**A.** Nothing happened.
**Q.** And again you put chest gunshot wound and patient status was what?
**A.** Stable.
**Q.** Why did you put stable?
**A.** I put stable because technically he is stable. He doesn't have to any vital signs, he can't get any worse.
**Q.** All right.
The next page is 3:22, I guess it's the time when you did all the different procedures. So you start at 3:22 and it's GCS, which is what?
**A.** Glascow coma scale which is checking your



motor, your orientation, your movement, stuff like that.
**Q.** So on the Glascow coma scale, what is the range for that?
**A.** Range is a different one, but the max is 15.
**Q.** Max meaning that you're in a coma or max you're doing fine?
**A.** Max is you're doing fine. Three is not fine, you can't do anything. You can't talk, can't move, and can't breath.
**Q.** Does it go from 1 to 15?
**A.** Each one is different because it goes in sections and I can't remember each number for each section.
**Q.** But overall he got a 3 out of 15?
**A.** Yes.
**Q.** And that's because why?
**A.** Because he wasn't breathing, he wasn't moving, and he couldn't talk to me.
**Q.** Okay.
And then it says procedure; you performed the procedure at 3:22 in the morning which is what?
**A.** ET tube, intubation. That is what I was

saying we use to help people breathe when they are not able to breathe on their own or need assistance breathing.
**Q.** You put the tube down the throat and oxygen bag?
**A.** Yes.
**Q.** And what was the result of that, anything?
**A.** No, nothing.
**Q.** And you indicated no change.
**A.** When there's no change it means he didn't come back to breathing on his own.
**Q.** And you take his vital at that point?
**A.** He has no vital signs so there's need for me to take them.
Q. And at 3:34 you performed a procedure, what's that?
**A.** Cardiac monitor. We put him on the heart monitor to see what the rhythm they are on the monitor. When you're alive you normally have a normal rhythm, he was in a rhythm where it's PA, pulse electrical activity. And his heart has electrical currents going through it but it's not beating, you can't feel a pulse with this. So you have to give meds to see if you can actually



help the heart beat.
Q. So at 3:26 I see that you put in an IV?
**A.** Yes.
**Q.** And do you give him through the IV?
**A.** You put normal Saline, Epi, Atropine. If I was to go by each person and rhythm that you consider unstable and that's what he was.
**Q.** An Epi is epinephrine?
**A.** Yes.
**Q.** And what's the roll of the epinephrine, what's that supposed to do?
**A.** It's supposed to get the heart functioning again, but it didn't do that.
**Q.** And Atropine, what does that do?
**A.** The same thing.
Q. So at 3:26 you start the Saline IV, is there any change?
**A.** No.
Q. 3:27, you administer Epi, 1 milligram, any change?
**A.** No.
Q. 3:28, you give him Atropine, 1 milligram, any change?
**A.** No.



Q. And 3:29, more Epi, 1 milligram, any change?
**A.** No.
Q. At 3:30, more Atropine, 1 milligram, any change?
**A.** No.
**Q.** And at this point you're doing all this in your truck?
**A.** Yes.
**Q.** Can you tell us what you put for a narrative?
**A.** Do you want me to read it?
**Q.** Yes.
**A.** I put "Possible 25-year-old male laying in prone position in the middle of the street."
**Q.** All right.
You have 25-year-old male?
**A.** Yes.
**Q.** Did you have an age or guessing at that point?
**A.** I guessed. I'm not sure, I think he might have had a Social Security card on him, that's how I got the name because I don't think the bystanders knew his name. I got his name somehow



some way, but I know I didn't go in his pockets and take anything out to get his name, I can tell you that.
"Patient has a single GSW to the right side of his chest. Patient was placed on board and placed on the stretcher. Patient was intubated EGT, PG rate 5. IV placed with three Epi, two Atropine, no change in patient. Patient was trans to trauma, Temple University, and giving to staff, PR staff."
**Q.** GSW is what?
**A.** Gunshot wound.
**Q.** You get to the Temple?
**A.** Yes.
**Q.** Tell us what happens when you get to Temple?
**A.** When we get to Temple we take him out of the truck and continue everything we were doing, CPR, continue to ventilate and give them a report of how we found the patient and they continue to work on him from that point.
**Q.** Were you there when they were doing their work?
**A.** Yes, I stayed.
**Q.** What kind of things did they do to try to

revive him?
**A.** I remember them opening his chest. I remember putting chest tubes in. I remember them still continuing CPR. They have these paddles that they'll use and then they'll massage the heart manually when they open the chest, so I got a chance to see all of that.
**Q.** Was any of that successful for Mr. Smith?
**A.** No.
**Q.** Were you there when he was pronounced dead?
**A.** Yes.
Q. That was at 4:04 in the morning?
**A.** Yes.
**MS. FEENEY**: I have no further questions. Thank you, Ms. Haven.
**THE COURT**: Cross-examine.
**MR. COARD**: Good afternoon. I have no questions. Thank you.
**THE COURT**: Thank you. Any objection to this witness being excused?
**MR. COARD**: No.
**THE COURT**: Thank you. You may be excused.
- - -



(Witness excused.)
- - -
**MS. FEENEY**: I was wondering if you could publish C-1 through C-18.
**THE COURT**: Do you have another witness?
**MS. FEENEY**: I do, he's long. It was one of the eye witnesses.
**THE COURT**: Why don't we break for lunch and so we'll break until 1:30. Enjoy your lunch, ladies and gentlemen.
**THE COURT CRIER**: Please remain seated as the jury exits the courtroom.
- - -
(Jury departs the courtroom at 12:15 p.m.)
- - -
(Lunch recess.)
- - -
**THE COURT CRIER**: Court is reconvened. Cease all conversation.
May I, your Honor?
**THE COURT**: Yes.
**THE COURT CRIER**: Remain seated as the jury enters the courtroom.



- - -
(Jury enters the courtroom at 1:55 p.m.)
- - -
**THE COURT**: Good afternoon, ladies and gentlemen.
You may call your next witness.
**MS. FEENEY**: Thank you, Your Honor.
The Commonwealth calls Mr. Curtis Smith.
**THE COURT CRIER**: Please state your name for the record.
**THE WITNESS**: Curtis Smith.
CURTIS SMITH, after having been first duly sworn, was examined and testified **as follows**:
- - -
DIRECT EXAMINATION
- - -
**BY MS. FEENEY**:
**Q.** Mr. Smith, good afternoon.
**A.** How you doing?
**Q.** I need you to speak up to the mic.
**A.** How are you doing?



**Q.** Do you want to start off by telling us how old you are?
**A.** I'm 25.
**Q.** Do you know the person seated at counsel table in the white shirt?
**A.** Yes.
**THE COURT**: Here's how it works, Mr. Smith. See that microphone, you can move it and get right up into it, but don't get real close, but we need to hear you.
**BY MS. FEENEY**:
**Q.** Do you know this person seated at counsel table?
**A.** Yes.
**Q.** And who is that?
**A.** Bam Johnson, Darnell Johnson.
**MS. FEENEY**: Indicating for the record, the Defendant.
**MR. COARD**: Objection, that's not what he said and that's not the Defendant's name.
**THE COURT**: He said Bam Johnson. And I didn't hear the last thing you said so what was it?

**THE WITNESS**: Darnell Johnson.
**BY MS. FEENEY**:
**Q.** Do you know him as Dennis Johnson?
**MR. COARD**: Objection, leading.
**THE COURT**: First of all, when you nod the stenographer cannot take that down. You can't nod and say -- you have to say yes and no and answer the question because she writes down what you say.
**THE WITNESS**: All right.
**BY MS. FEENEY**:
**Q.** Do you know him by any other names?
**A.** No.
**Q.** What first name do you know him as?
**MR. COARD**: Objection. Asked and answered.
**THE COURT**: Overruled.
**THE WITNESS**: Darryl Johnson.
**BY MS. FEENEY**:
**Q.** Do you know him by a nickname, you said it earlier?
**A.** Bam.
**Q.** B-A-M?
**A.** Yes.



**Q.** Can you tell the ladies and gentlemen, how long you've known him?
**A.** I've known him all my life.
**Q.** All your life and you're 25-years-old, correct?
**A.** Yeah.
**MS. FEENEY**: May I approach, Your Honor? There's a exhibit I would like to show him.
**THE COURT**: With this witness my staff will show him.
**MS. FEENEY**: It's C-16, it should already be on the board, it's the expanded map.
**THE COURT**: Okay.
**MS. FEENEY**: I'd like to be able to walk up and point to things if that's okay he's not in custody.
**THE COURT**: Okay. Go ahead.
**BY MS. FEENEY**:
**Q.** Okay.
Mr. Smith, behind you I want you to take a look at this. This has been marked as Commonwealth's Exhibit 16. This is a map of



Lehigh Avenue here and 30th Street here; do you see that?
**A.** Yes.
**Q.** And you said you've known the Defendant, Bam, all your life. Where did you grow up?
**A.** I grew up at 2830 North Huntingdon Street.
**MR. COARD**: I can't hear him.
**THE WITNESS**: Grew up at 2830 Huntingdon Street.
**BY MS. FEENEY**:
**Q.** So 2830 Huntingdon Street is down here?
**A.** Yes.
**Q.** And here's 28th Street?
**A.** Yes.
**Q.** So was it between 28th and 29th, where you grew up?
**A.** Yes.
**Q.** And where did he grow up?
**A.** On Harold Street.
**Q.** Is that this little street here?
**A.** Yes, the little street right there. It runs between 28th and Lehigh, between Huntingdon and Lehigh.
**Q.** Okay.



This is Huntingdon here, right?
**A.** Yes.
**Q.** And this is Lehigh up here?
**A.** Yeah.
**Q.** And did he grow up on this block of Harold Street here?
**A.** It's between 28th and like 28th Street is going up this way and Huntingdon is at the top. Lehigh is at the bottom of the block so it's 28th Street, so it's the 2800 block of Harold Street.
**Q.** So this is 28th Street here and 29th Street here, he grew up on this block?
**A.** No, between Harold and Albert.
**THE COURT**: Is it on the map or a smaller street not on the map?
**THE WITNESS**: It's right there. This is Lehigh, next block is Albert, then Harold is all in a row. But Lehigh is on the bottom and 28th Street goes straight across. Oakdale then Harold, then it's Huntingdon.
**BY MS. FEENEY**:
**Q.** Did he grow up closer to 28th or closer to 29th?
**A.** Closer to 28th.

**Q.** And you grew up on the next block over here, correct?
**A.** Yes.
**Q.** And do you know anybody by the name of Amin Vicks?
**A.** Yes.
**Q.** And was he from this neighborhood, too?
**A.** He lived off of 28th Street on Hollywood Street.
**Q.** So here's 29th and here's Hollywood. So he was here, Vicks, and then Bam, the Defendant, was around this area here?
**A.** Yeah.
**Q.** And you were closer to 28th and closer to 29th?
**A.** In the middle.
**Q.** Over by Dover or Newkirk?
**A.** Newkirk.
**Q.** So you're over here?
**A.** Yeah.
**Q.** All right.
In this neighborhood was there an afterhours store open 24 hours?
**A.** Yes, it's on 30th and Lehigh.



**Q.** So up here?
**A.** Yes.
**Q.** Okay. All right.
I'm going to change to C-14, I believe. All right. Looking at C-14, do you see where the store is here?
**A.** Yes.
**Q.** Can you point it out to the jury, if you would?
**A.** It's right there. There is Lehigh right there (indicating).
**Q.** So if we go back here, then all the blocks where you guys are from are down this way from the store indicating down to the right so it would be this way (indicating)?
**A.** Yes.
**Q.** Now, you said you knew him your whole life, the Defendant. Did you go to school with him?
**A.** No.
**Q.** You just knew him from the neighborhood?
**A.** Yup.
**Q.** And what was your relationship? Were you friends?
**A.** Yeah, we were cool.



**Q.** I just need you to speak up.
**A.** Yeah, we were cool.
**Q.** Do you still have people that live in the neighborhood?
**A.** Yeah, my grandmom and aunt still live in the neighborhood.
**Q.** And do you see people from that neighborhood here in court?
**A.** Yeah, a lot of them.
**Q.** Okay.
I want to direct your attention to August 27th, 2007. I'm going start with August 16th, 2007, which would have been a Thursday. Who were you with that day?
**A.** On Thursday, I was home.
**Q.** Do you recall something happening about 3 o'clock in the morning on August 17th, early Friday morning?
**A.** Yes.
**Q.** What happened?
**A.** We went to the 24-hour store to get some Dutches.
**Q.** I need you to --
**A.** We went to the 24-hour store and got



Dutches.
**Q.** When you say late night?
**A.** Me, myself, Amin, and Bam.
**Q.** What were you doing earlier in the day?
**A.** During the course of the day we were just around the neighborhood, he was riding the dirt bike.
**Q.** The Defendant was riding the dirt bike?
**A.** Yeah.
**Q.** Where was that?
**MR. COARD**: Objection. Relevance.
**THE COURT**: Sustained.
**BY MS. FEENEY**:
**Q.** You had spent the day with the Defendant?
**A.** No, we be right there on the corner on Dover and Huntingdon close to the area. But while he was riding around the neighborhood everybody's at their own station or place, somebody at the corner of 28th and Huntingdon --
**MR. COARD**: Same objection.
**THE COURT**: Sustained.
**MS. FEENEY**: It goes to they were together all day when this happened.

**THE COURT**: That's a simple question.

That day, were you all hanging around the neighborhood, meaning you and the Defendant and your other friend, Amin?

**THE WITNESS**: We all wasn't hanging together that day.

**THE COURT**: You weren't?

**THE WITNESS**: No, we just were around the neighborhood. But once he stepped off everybody went to their only station areas.

**THE COURT**: Station areas in the neighborhood?

**MS. FEENEY**: Some people go in the house, some people stay on the corner.

**BY MS. FEENEY**:

**Q.** Sir, you said you went to the 24-hour store to get Dutches.
**A.** Yes.
**Q.** What are Dutches?
**A.** Long cigars.
**Q.** What, if anything, were you going to do with them?



**A.** Going to put weed in them.
**Q.** Marijuana?
**A.** Yes.
**Q.** And smoke it?
**A.** Yes.
**Q.** When you say 24-hour, I want you to show us. I want what's been marked as Commonwealth's Exhibit 1 -- there is a picture on the screen I want you to take a look at it.
**A.** Okay.
**Q.** Commonwealth's Exhibit 1, do you recognize what that is?
**A.** Yeah, that's the store on 30th.
**Q.** That's the store you're talking about?
**A.** Yes.
**Q.** This is Commonwealth's Exhibit 2. Do you recognize what that shows?
**A.** Yes.
**Q.** What is that?
**A.** That's a discount 24-hour store.
**Q.** And that's where you guys were headed?
**A.** Yes.
**Q.** Okay.

This is Commonwealth's Exhibit 3, that's



another view of it.
**A.** Yes.
**Q.** All right.

Now, showing you Commonwealth's Exhibit 5, is that the front of the store?
**A.** Yes.
**Q.** When you go to the store at 3 o'clock in the morning, how is it that you are able to order things?
**A.** Out the side window.
**Q.** Can you use the laser? Point to show us where you would make the order?
**A.** Okay.
**Q.** To the left of the door?
**A.** Yes.
**Q.** And how does that work?
**A.** It's like a little window. It's got a little door and it opens up like when you slide your money there. They close the door and give you your stuff and one of them old plastic things that turn around.
**Q.** Okay.

So you go up to the window. Is there a person behind the window?



**A.** Yes.
**Q.** Do you know the guy that works in the store?
**A.** Yes.
**Q.** Do you know what his name is?
**A.** His name is Ozzie.
**Q.** And how long had you known him, know him to see him?
**A.** I knew him since I was a kid. I had been going to the store for a number of years.
**Q.** He was always there working at the store?
**A.** Yeah, always there working at the store.
**Q.** So the night you went with the Defendant and Amin to get the Dutches was Ozzie working there?
**A.** Yes.
**Q.** Tell us what and who else was out there, if anybody?
**A.** There were other people out there, but I didn't pay attention to them.
**Q.** Okay.

Did you guys get a chance to give your order to the guy, Ozzie, at the window?
**A.** I did because I was the first one at the window.
**Q.** What did you get?

A. Four or five Dutches. I can't remember exactly, but I got like four or five Dutches.
Q. And where was the Defendant while you were making your order at the window?
A. They were all standing in back of me.
Q. Can you see on that picture where you were standing?
A. I was up by the door right there (indicating).
Q. And where was the Defendant?
A. They were standing on the curb and all right here (indicating).
Q. On the curb of Lehigh Street?
A. Yes.
Q. Where was Amin Vicks?
A. He was standing in back of me where the stop light is.
Q. Where the stop light is there?
A. Yeah.
Q. Tell us what happened while you guys were at the store?
A. I was ordering Dutches and everything and I got the Dutches and I stepped to the side. Somebody else went up and ordered something and



got something. And then I just heard noise, somebody was screaming and talking and all that stuff. So that's when I looked over to the side and I seen him with a gun out. I said, "Yo, what you doing, Dog?" That's what I tell him. So when I go around the corner like to turn the corner right there, I heard shots.
Q. Let me stop you for a second. You said you heard a noise and looked and see the Defendant with a gun out?
A. Yes.
Q. Okay.
You need to speak up. I don't know if the jury can hear you, this is important.
Did you see what type of gun he had in his hand?
A. A little revolver. A small gun.
Q. A small revolver?
A. Yes.
Q. And what was he doing with the gun?
A. Pointing it.
Q. Who was he pointing it at?
A. Pointing it at the guy. I didn't know his first name, but I know the last name is Smith.



Q. How do you know his last name was Smith?
A. Because I was told that when we was in the back.
Q. Who were you talking to?
A. A detective, detectives back there.
Q. Smith is your last name, correct?
A. Yes.
Q. The guy the Defendant was pointing the gun at, had you seen him before?
A. I never seen him in my life, first time I seen that man.
Q. How did he appear to be?
A. He's a smoker. He didn't have shoes on, whatever, he had a T-shirt on, some jeans.
Q. When you said he was a smoker, Mr. Smith, what do you mean?
A. He looked worn out looking. His hair was messed up and shirt was dirty, like if he was walking the streets all night. His feet had the crust stuff around from walking on the ground so long.
Q. And when you say smoker, smoking what?
A. Crack. He looked like a smoker that smoked crack.



Q. And that's based on his appearance not having the shoes, messed up shirt?
A. Yes.
Q. How old did he seem to you?
A. I don't know, probably his late 30s.
Q. And what, if anything, did you hear the Defendant say to this person?
A. I heard him say put your stuff on the step, I heard him saying it like that. Put everything on the steps or something like that.
Q. Before or after he took the gun out?
A. This was after he took the gun out.
Q. And did this man, the person you described as the smoker, put his stuff out on the steps?
A. Yeah, he was putting his stuff out on the steps.
Q. Did you hear the Defendant call him any kind of name?
A. Not that I remember.
Q. Do you remember telling the police that he called him Oldhead?
A. Yeah.
Q. Do you remember that?
A. Yes.

**Q.** What did he say?
**A.** He was like, Oldhead, don't touch the phone and all this other stuff. He was telling him not to touch the stuff. Didn't I tell you not to touch your phone or something he was saying to him. I was like what are you doing?
**Q.** Let me stop you for a minute. Oldhead, what does that mean?
**A.** Like an older person.
**Q.** What tone of voice is he saying it? Is it in the same tone you're telling me?
**A.** The same tone just a little louder.
**Q.** He's telling him not to touch the phone. Do you see what the victim is doing, if anything?
**A.** I see him taking stuff out his pocket and putting it on the steps.
**Q.** And I'm going to show you Commonwealth's Exhibit 8. Do you recognize what that is?
**A.** Yes, that's a packet of cigarettes and a knife and something else, ID or something.
**Q.** Is that the stuff you saw him take out and put on the steps?
**A.** Yeah.
**Q.** And where do those steps go? What do those



steps do?
**A.** That's the steps to the window of the store. Like the doorway is near the step were the door is blocked off at.
**Q.** Okay.
I'm going to show you those steps there, that's Commonwealth's Exhibit 6. All right.
And there's also -- I am going to show you Commonwealth's Exhibit 7. Do you recognize what that is?
**A.** A cell phone.
**Q.** And whose phone was that?
**A.** That was the victim's phone.
**Q.** And when you see -- let me back up. When you hear the Defendant say, you know, get your stuff out, Oldhead, give up your stuff, where are you?
**A.** I'm right there standing but on the side where the corner at. Right there where the traffic light at.
**Q.** Where the traffic light is at. C-2, I'm going to show you that. Does that show where you were, Commonwealth's Exhibit 2?
**A.** Yeah, right there where that chair is.



Right there standing right there.
**Q.** Indicating the chair in the store, that's where you are?
**A.** Yes.
**Q.** So the store, is it on an angle if you're standing in front of the store?
**A.** The front of the door is on Lehigh but the side of the building is on 30th Street. So it's like right there on the corner, like you can see the old phone booths and stuff right there.
**Q.** And where's the Defendant standing when the Defendant took the gun out and pointed it at the victim?
**A.** Right there in front of the chairs. Right here in front of them.
**Q.** Okay.
**A.** Right there where the window is at.
**Q.** All right.
Where's the victim in relation to the Defendant when he does this?
**A.** Say it again.
**Q.** The victim he's pointing the gun at, where's he in relation to the Defendant? How close is he to him?



**A.** He's standing in front of him.
**Q.** Do you want to point to something in front of you? If you're the victim, where would the Defendant be to you?
**A.** Right there where the post is at.
**Q.** Behind you indicating 2 feet, 3 feet?
**A.** Yeah.
**Q.** And if you're the Defendant, if you're Bam, where would I be if I'm you? How far? Am I this far from you?
**A.** Yeah, it will be where you're standing at.
**MS. FEENEY**: Does Your Honor have the chart of your room?
**THE COURT**: Yeah, it's right there on your table on the corner.
**MS. FEENEY**: It looks about 15 feet. Wait a minute, it's closer, 11 feet, for the record.
**BY MS. FEENEY**:
**Q.** So where I am here to you, this is how far you are from the Defendant when he's pointing the gun?
**A.** Yes.
**Q.** Did you see where Amin Vicks was when this

Page 133

was going on?
A. He was standing right there the whole time. He was standing there, but I was just looking to see what was going on. I was looking all around.
Q. Did you have a gun on you that night?
A. No.
Q. Did you know the Defendant had a gun on him?
A. No.
Q. Did you know he was going to take a gun out and try to rob somebody?
A. No.
Q. The first time when you saw the victim, was it when you first got to the store?
A. No, he wasn't there. When we first got to the store he walked up minutes later after we were standing out there.
Q. What were you guys doing when you first got there?
A. When we first got there somebody was outside sitting in the chairs playing the video game, but I don't remember who it was. Somebody was sitting right there in them chairs.
Q. And I think that's C-6.
A. Yeah, right there.

Page 134

Q. Okay.
So you and Amin Vicks were hanging out with the people with the video game at first?
A. Yeah, everybody was standing out there. Right there where them two chairs at and the telephone.
Q. Okay.
And the window is right over to the left of the door in this picture?
A. Yes, right over to the left.
Q. Can you see it in the picture?
A. You can see it a little bit, this little part right there.
MS. FEENEY: Indicating on the left side of C-16, the window.
BY MS. FEENEY:
Q. So you first get there and you're hanging out with the people with the video games and the victim comes up. Did you see him order anything at the window?
A. I wasn't paying him attention. I saw him get up and buying and getting because I was busy playing the game and looking around me.
Q. Mr. Smith, at that time when the victim came

Page 135

up, had you already got the Dutches?
A. Yes, I already bought my Dutches, I was the first one in line.
Q. How much time from the time the victim went up there to the time Defendant took the gun out and told him to take out his stuff?
A. I would say 25, 30 minutes before he did that.
Q. Twenty-five or 30 minutes that you guys were out there?
A. Yeah, beforehand. Because the store was a little packed that night, there was a lot of people pulling up in cars going in there and getting Dutches, getting sodas, and all types of stuff so we had to wait.
Q. Okay.
Was the victim there for the whole 25 minutes?
A. No, he came afterwards when the traffic started calming down a little bit. I was at the window and I looked back and I seen him back there.
Q. So from the time the victim got up to the store -- how much time from the time Mr. Smith

Page 136

arrives until the time that Bam takes out the gun and robs him?
A. It was like 25 minutes later because he was sitting there for a little while.
Q. He was standing there for a while, the victim was?
A. Yes.
Q. At the point you see the gun and point at him, where was he pointing the gun, at what part of the victim's body?
A. Like in the chest area.
Q. The chest area here?
A. Yes.
Q. Did the Defendant have anything covering his face, a mask, or anything like that?
A. No.
Q. So you could see his face?
A. Yeah.
Q. And did you hear the victim say anything back to him?
A. No, not that I recall.
Q. All right.
What's the next thing that happens after he takes the gun out and points it at him and the

victim take his stuff out?
A. He starts putting his stuff on the steps or whatever like that, he started bending down and touching stuff.
Q. Who did, the victim?
A. The victim was bending down touching stuff.
Q. And what happened next?
A. Didn't I tell you to not touch the phone, like that, and he went and grabbed the phone and shot.
Q. Who is telling him, didn't I tell you not touch phone? Bam told the victim, didn't I tell you not to touch the phone?
A. Yes.
Q. And then the next thing that happens is what?
A. He shoot him.
Q. He shoots him?
A. Yes.
Q. How many times did he shoot?
A. He only shot once.
Q. At that time, what was your reaction? You're watching this.
A. I ran.



Q. And what did the Defendant do?
A. They all ran, everybody ran.
Q. Okay.
Can you tell me where you ran, can you tell the jury?
A. To the corner and then turned down 30th Street.
Q. Okay.
May I approach to switch the diagram?
THE COURT: Yes.
BY MS. FEENEY:
Q. This is C-16 that we are looking at. This is the store, Lehigh, you guys run down 30th Street, this way south towards Oakdale?
A. Yes.
Q. Where do you run?
A. Turn.
Q. Down Oakdale?
A. Yeah.
Q. And you all stayed together?
A. No, when we got right there by the 29th Street store, we were across the street from store and we were talking and everybody went their own little separate ways.



MR. COARD: Can he face the microphone?
THE WITNESS: We all went our own separate ways as we got to the corner of 29th and Huntingdon.
BY MS. FEENEY:
Q. So you go east on Oakdale. Here's 30th Street and here's 29th, and then what happens at 29th and Oakdale?
A. Turn on 29th down to Huntingdon, right there, that's where we were at.
Q. By Amin Vicks' house?
A. Yeah, by his house.
Q. And when you got there what happened?
A. We were talking late night.
Q. You guys are at 29th and Huntingdon and you are all talking?
A. Yes.
Q. You, the Defendant, and Amin Vicks?
A. Yes.
Q. What is the conversation?
A. I said, he's a smoker, why you shoot him?
Q. You said this to the Defendant?
A. Yes.



Q. And you're referring to who?
A. Bam.
Q. You said he's a smoker, why you shoot him?
A. I was talking about the victim.
Q. And did the Defendant reply to you as to why he had done that?
A. He didn't say nothing. He just got in his car and left.
Q. He didn't say anything, he just got in his car and left. Did you see what direction he went in?
A. No.
Q. Now, you just witnessed this robbery and shooting, correct?
A. Yes.
Q. Do you call 9-1-1?
A. No.
Q. Why not?
A. Because, like, I was scared to for real, for real, to tell you the truth. I'm even scared to come here but I was forced to. It came to my PO officer and she came and got me from down there just to come in here and do this.
Q. All right.

I'm going to go into all that with you, I need you to keep speaking up.

The night that it happened you didn't call 9-1-1, you never told the police, you didn't tell anybody?

**A.** I didn't tell anybody.
**Q.** Why not? What are you scared of?
**A.** Because I didn't want any involvement in none of that. My name is always coming up anyway every time something happens around there they saying my name, every time.
**Q.** See, why didn't you want any involvement?
**A.** Because I was trying to change my life, for real, for real, to tell you the truth. I don't got time for that. I have a child on the way, I been through a lot of stuff with his mom and everybody else and I'm sick of it. I'm tired of this shit.
**Q.** When you say his mom, whose mom?

**MR. COARD**: Objection.

**THE COURT**: Overruled.

**THE WITNESS**: Pointing at me, there he go right there. When I came home she's pointing at me riding past in the car.



**BY MS. FEENEY**:
**Q.** Do you see his mom in the courtroom?
**A.** His mom is with the Kangoo hat.

**MS. FEENEY**: Indicating for the record the lady in the white shirt with the cap.

**THE WITNESS**: Yes.

**BY MS. FEENEY**:
**Q.** In that neighborhood is it considered good to talk to police or bad to talk to a police when something happens?

**MR. COARD**: Objection.

**THE COURT**: Sustained.

**THE WITNESS**: It's bad.

**THE COURT**: Sustained means don't answer.

You need to make your questions specific to this case.

**BY MS. FEENEY**:
**Q.** You didn't talk to the police.
**A.** No.
**Q.** Do you think it would be good or bad to talk to police?
**A.** Bad to talk to the police.



**Q.** You don't want any part of that?
**A.** No.
**Q.** Amin Vicks, did he call 9-1-1 to say what happened, to your knowledge?

**MR. COARD**: Objection.

**THE COURT**: Sustained.

**THE WITNESS**: No.

**BY MS. FEENEY**:
**Q.** You never went to the police to say what happened. Did the detectives come looking for you to see what happened?
**A.** Yes.
**Q.** That was in January of 2009?
**A.** Yes.
**Q.** That was a while after it happened?
**A.** A year-and-a-half after it happened.
**Q.** And at the times the detectives came to see if you knew what had gone on out there, were you on any kind of probation or parole?
**A.** Yeah, I was on probation. I was held on a new case and a violation of probation.
**Q.** Okay.

What I need you to do at this point before we go any further, I want you to explain what



probation is and what that means?
**A.** It's like some type of supervision where you have to report every month and there's rules to the probation like if you violate the rules they have a right to look you up, they give you random pee tests, all types of stuff. Basically, you are under supervision where as you got to report every month or every two weeks, whatever. If you don't they issue a warrant out for your arrest for absconding, for running.
**Q.** So in January 2007 -- when this happened in August of '07, were you on any probation or parole?
**A.** Yeah, I was on the run at that time, too.
**Q.** On the run for what?
**A.** Like, for probation. And it was for mistaken identity for a robbery because I just had bailed out and came home from a robbery.
**Q.** All right.

When you said bailed out and came home, where did you come home from?
**A.** They had me at the 9th District that's down by 2020 Pennsylvania Avenue. I was coming from court actually getting my bench warrant lifted

Page 145

going down to the CJC in the basement and coming out the Gallery. They grabbed me, I fit the description of somebody that robbed somebody. So they put me in the car and had me in the car and were waiting for the victim to come. They never came and they never showed and took me down to the police station and charged me anyway for it.
**Q.** And then what happened in that case, it got thrown out?
**A.** Yeah, it got thrown out because for some odd reason the person that claim, that said that I robbed him showed up to court and said it wasn't me.
**Q.** Okay.
Now, you had been -- you had a case as a juvenile for a car theft; is that right?
**A.** Yes.
**Q.** And you were on probation until August of '06, correct?
**A.** Yes.
**Q.** So you got arrested in 2001 for stealing a car and put on probation and finished your probation on August of 2006?
**A.** Yeah, but it was a span of time. It was a

Page 146

different span in time, like during that time when I got locked up for that kind of case it was in 2001, so I already served that time. I came home in 2002, I was on the same probation, but I came home from doing that time. And then from 2002 to 2003 I caught another case, a drug case and that's when they held me at southeast secure treatment in West Chester.
**Q.** Was that an adult case or juvenile case?
**A.** No, that was a juvenile case.
**Q.** When this robbery/murder happened in August of 2007, which case were you on probation for?
**A.** I was on probation that I am on now. The same probation I am on I have been on since '07.
**Q.** And that's for a drug dealing case?
**A.** Yes.
**Q.** But that's an adult case?
**A.** Yes, that's an adult case.
**Q.** Is that two cases together?
**A.** Yes, consolidated.
**Q.** And both of them for selling drugs, correct?
**A.** Yes.
**Q.** And you got put on probation?
**A.** Yes.

Page 147

**Q.** You did some time in jail first?
**A.** Yeah, I did like eight months and then probably a couple days during that time.
**Q.** So you did time in jail and was that here in Philadelphia on State Road?
**A.** Yes.
**Q.** So you get out of jail and you're on supervision?
**A.** Yeah, my supervision and all that.
**Q.** So as part of your supervision you explained to the jury you have to report?
**A.** Yes.
**Q.** You have to take a pee test, a urine test?
**A.** Yes.
**Q.** To make sure you're not doing drugs?
**A.** Yes.
**Q.** And correct me if I'm wrong, can your probation officer say, listen, I want you to come down here and report?
**A.** Yes.
**MR. COARD**: Objection. Relevance.
**THE COURT**: Sustained.
**MS. FEENEY**: Your Honor, it goes

Page 148

to cooperation.
**THE COURT**: Well, I don't get it so make it so I can understand it.
**BY MS. FEENEY**:
**Q.** Let me put it to you like this, sir, when the homicide detectives wanted to talk to you you already told us you didn't want nothing do with that. It's not good to talk to the police, right?
**A.** Yes.
**Q.** Because you're on probation. If the homicide detectives contact your probation officer and say they want to talk to you, can you just ignore that?
**A.** No, you can't. It's up to them, it's not your decision, sometimes they violate you and hold you in contempt until Homicide gets done with you. And when Homicide gets done with you and then they let you go or tell you what type of violation or time you're serving.
**Q.** So when the homicide detectives came to talk to you, did you feel as you if you were in a position to say I don't want to get involved with this any more?

**A.** I can't feel like that because they told my PO that. She told the detectives when they came up State Road and came and got me, she told them if I don't cooperate to let her know.
**Q.** And the PO, meaning your probation officer?
**A.** Yes.
**Q.** And was she a strict probation officer?
**A.** Yes.
**Q.** Do you still have the same lady?
**A.** I don't have her, I have somebody new.
**Q.** What is your status now with probation?
**A.** The probation officer I got right now she's on the tip, she don't want me in nothing at all. She don't want me in there so when they come down and put a subpoena in front of my face and tell me to sign it, she's just looking like what's going on. So they told her I ain't in any trouble and all that stuff like that, that's the reason she didn't say too much about it. But she still wants to know what goes on after it's over, still wants me to contact her.
**Q.** So she knows you're a witness in this case?
**A.** Yes.
**Q.** But when I say what's your status of



probation I mean are you complying with it?
**A.** Yeah, I'm complying with the rules. I go down there and report, whatever, anything she wants me to do I just do it.
**Q.** Did anybody, did I promise you anything about your probation for testifying here today?
**A.** No.
**Q.** Do you have any open cases or anything like that?
**A.** No, ma'am.
**Q.** The only thing you have is supervision with the Courts, is this probation for the two drug cases?
**A.** Yes.
**Q.** So when you testify here today are you expecting to get something out of it? Is your probation going to go away?
**A.** No.
**Q.** Now, when the detectives came to talk to you from Homicide in January of 2009, did you give them a statement?
**A.** Yes.
**Q.** Okay.
And in the statement that you gave to the



detectives, what did you tell them?
**A.** Everything they asked me. Everything they asked me as far as my address and how old I am and where I was at when this took place and all. I answered all the questions correctly to the best of my ability.
**MS. FEENEY**: Your Honor, may I use the laser pointer?
**THE COURT**: Yes.
**BY MS. FEENEY**:
**Q.** In the statement that you gave to detectives --
**MS. FEENEY**: I am going to mark this as C-19.
\- - -
(Statement marked Commonwealth's Exhibit 19 for identification.)
\- - -
**BY MS. FEENEY**:
**Q.** Is this a copy of the statement? Can you tell from here?
**A.** Yes.
**Q.** And the statement is three pages in length and some photos attached to it.



**A.** Yes.
**Q.** Do you recognize that?
**A.** Yes.
**Q.** That's the statement you gave?
**A.** Yes.
**Q.** Okay.
Directing your attention up there, is that your signature at the bottom?
**A.** Yes.
**Q.** That indicates it was taken by Detective McDermott, and Detective Booker was there as well?
**A.** Yes.
**Q.** And, again, going to this page, is that your signature down there?
**A.** Yes.
**Q.** And there's a date you gave it, January 15th, '09?
**A.** Yes.
**Q.** And in this they ask you questions about what happened. Is that your signature, sir?
**A.** Yes.
**Q.** That's Page 1 of the statement. Going to Page 2 of the statement, is that your signature

down there?
**A.** Yes.
**Q.** Going to Page 3, is that your signature?
**A.** Yes.
**Q.** Okay.
Now, in the course of the statement the detectives asked you to take a look at some photographs. All right. They showed you this photo array display, No. 1; do you remember being shown that photo array?
**A.** Yes.
**Q.** And you have a picture circled at the bottom, No. 6, with your signature?
**A.** Yes.
**Q.** And who is that a picture of?
**A.** The Defendant right there.
**MS. FEENEY**: Indicating the Defendant Dennis Johnson as the person you called Bam.
**THE WITNESS**: Yes.
**BY MS. FEENEY**:
**Q.** Is this the same Dennis Johnson that robbed the man outside of the store at 30th and Lehigh.
**A.** Yes.



**Q.** And what did you tell them?
**A.** I told them yeah.
**Q.** And they had you circle that. And I believe that was another photo display shown to you. There's a picture circled, No. 18; is that your signature?
**A.** Yes.
**Q.** Who is that a picture of?
**A.** Amin Vicks.
**Q.** And is that the same Amin Vicks that was there the night that happened?
**A.** Yes.
**Q.** Sir, I know you don't want to be here.
**MS. FEENEY**: I don't have any further questions. Thank you.
**THE COURT**: Cross-examine.
**MR. COARD**: May I?
\- - -
CROSS-EXAMINATION
\- - -
**BY MR. COARD**:
**Q.** The prosecutor just asked you about a statement you gave, it's C-19. That statement is dated January 15th, 2009; is that right?



**A.** Yes.
**Q.** And that's about a year-and-a-half after you said you saw the Defendant shoot and kill somebody; is that right?
**A.** Yes.
**Q.** Now, you also said when the prosecutor questioned you that, correct me if I'm wrong, I'm required to talk to Homicide when I'm on probation; is that right?
**A.** No.
**Q.** If your probation officer tells you that you need to talk to Homicide, do you comply with that?
**A.** No, because I didn't comply at first.
**Q.** And that's my point. So for a year-and-a-half you did not comply; is that right?
**A.** Yeah, it only took them numerous times to talk to me before, you know what I'm saying, said something.
**Q.** All right.
That's what I wanted to get to, sir. And when you did talk to them, you were brought down in custody from county jail and they brought you



in to talk to you; is that right?
**A.** Yes.
**Q.** And when they brought you in to talk to you they read you your rights and the prosecutor showed you the document with your initial and signature; is that right?
**A.** Yes.
**Q.** And what I'm telling you is you had the right to remain silent and a right to a lawyer and all that stuff.
**A.** Yes.
**Q.** And did they tell you they were reading you your rights because they thought you might be involved in the crime?
**A.** Yes.
**Q.** Okay.
Fair enough. Now, the prosecutor talked about your prior record. You were on probation in connection with a drug case; is that right?
**A.** Yes.
**Q.** And I believe you were arrested on March 15th, 2007?
**A.** Yes.
**Q.** Now, at the time you gave the statement, and

pardon me if I am redundant, at the same time you gave the statement you're on probation while you're talking to the homicide detectives?
**A.** No, I was in violation.
**Q.** But you were being held in connection with that violation?
**A.** No, I was held on a case. That's why I was in custody because I was locked up on the case.
**Q.** When you got locked up that constituted the violation of the probation you were on; is that right?
**A.** Yes.
**Q.** That's what I was trying to get to. But let me get away from that for a second and go straight to the statement you gave today.
Now, we are talking about C-19. And C-19 has numerous pages and I think the prosecutor showed up on the screen you're signature is on the bottom of each of these pages; is that right?
**A.** Yes.
**Q.** And your signature shows that you read the questions and the answers; is that correct?
**A.** Yes.
**Q.** And the answers that you gave were true from



your standpoint; is that correct?
**A.** Yes.
**Q.** Now, do you have C-19 in front of you?
**A.** Yeah.
**Q.** Is that it?
**A.** Yeah.
**Q.** I just want to ask you a few questions. There were several questions in connection with this. By the way, before we get to the statement, I think the prosecutor did touch on it. You had a conviction for a car theft; is that right?
**A.** Yes.
**Q.** And the car theft happened before the drug case; is that correct?
**A.** Yes.
**MS. FEENEY**: It's an adjudication; he was a juvenile.
**MR. COARD**: The prosecutor enlightened me.
**BY MR. COARD**:
**Q.** It wasn't a conviction, but it was an adjudication. You were found guilty and got a punishment or disposition; is that right?



**A.** No, it didn't happen like that.
**Q.** How did it happen?
**A.** When I got locked up for the case instead of fighting it I took a deal.
**Q.** And you took the deal and pled guilty, right?
**A.** Yeah, I pled guilty.
**Q.** And got some type of sentence or disposition or punishment?
**A.** Yeah.
**Q.** Okay.
That's what I was asking you, sir. Let's go to page -- I guess, that would be Page 2 of your statement; do you see that?
**A.** Yeah, I see it.
**Q.** And Page 2 starts off at the top with, "We went to the store," that's the page you're on?
**A.** Yes.
**Q.** By the way, before we begin the statement, did you ever brag to the neighborhood that you did the shooting?
**A.** No, I didn't.
**Q.** But when you were talking to the prosecutor you stated, "When stuff like this comes up my



name is always coming up. My name always coming up with stuff like this all the time;" is that what you said?
**A.** Yes.
**Q.** "Stuff like this all the time," you're talking about shootings?
**A.** Yeah or anything. It could be anything.
**Q.** I got you. Fine. But you're saying you did not brag about shooting anybody; is that correct
**A.** No.
**Q.** You had nothing to do with this incident; is that correct?
**A.** Yes.
**Q.** So why did you run?
**A.** Because what am I going to stand there for?
**Q.** Because you didn't have anything do with it.
**A.** Still, I am not going to do anything at a scene of a crime. When somebody is shooting a gun I'm moving out of the way so I don't get hit.
**Q.** So you ran thinking you were going to get shot?
**A.** I ran when I heard the gunshots, period.
**Q.** When you just said you ran because you

didn't want to get hit my question to you is. Did you run because you were going to get shot?

**A.** I run period. When I hear gunshots near me or behind me, if it's near me and close enough, I am running, point blank period.

**Q.** Excellent point. But you stated today when the prosecutor asked you about what happened that you heard a shot and you were around the corner when you heard the shot; isn't that correct?

**A.** Yeah, I was standing right there on the corner. The corner of the store is right here in an angle. If I'm standing right here and he's here, I can see what's going on right there (indicating).

**Q.** But you said to the prosecutor you were around the corner and heard the shot. You didn't say I was around the corner and saw the shooting, did you?

**A.** No.

**Q.** Just so we are clear, you didn't say I was around the corner and saw it, you said I was around the corner and heard it; is that right?

**A.** Yes.

**Q.** But then you testified that you saw it. My



question is, how could you see if it you were around the corner hearing it?

**THE COURT**: Do you understand the question?

**THE WITNESS**: Yes, I understand what he's saying. But he's saying it like he's trying to make it confusing to me to answer it.

**THE COURT**: That's why I asked do you understand it. Do you want it to be repeated?

**THE WITNESS**: I don't understand it, I want him to repeat it all over again.

**BY MR. COARD**:

**Q.** You first told the prosecutor that you were around the corner; is that correct?

**A.** No.

**Q.** So if the record happens to show that you did say around the corner, that would be wrong?

**MS. FEENEY**: I would object to the form of the question.

**THE WITNESS**: No.

**BY MR. COARD**:

**Q.** Just so I'm correct here, I just asked you



if you said that you were around the corner and you said no. You did not say you were around the corner; is that correct?

**A.** No, I didn't tell you that.

**MR. COARD**: Your Honor, could I ask for a read back?

**THE COURT**: Which question?

**MR. COARD**: The question of whether or not witness said that he was around the corner when the shooting took place.

**THE COURT**: That's about four question ago.

**MS. FEENEY**: On my direct.

**THE COURT**: Okay. Can you find that?

\- - -

(Court reporter read back question and answer requested by Defense counsel.)

\- - -

**BY MR. COARD**:

**Q.** Were you on the corner, around the corner? The corner of the store is right here so if you're on the corner of the store you're standing between Lehigh and 30th.



**A.** The end of the store is on 30th Street right there which is on a little slant so you can stand right there in the slant and see everybody going on around on the corner in the area right there. So basically I was around the corner right there, like, the store is right here where the microphone is at and I'm on the side of the store, but where the wall is at that's right around the corner, but right there. The store is slant against the corner. If you stand on the top of the block it's 30th Street. If you stand right there, it's Lehigh. So if I'm standing right here on the corner around the corner, right there on 30th and Lehigh, I can see him standing right there on the corner doing whatever he's doing. I can see it from right there.

**Q.** Go on.

**A.** Go, you can say what you got to say.

**Q.** Speaking of seeing it, you ran because you didn't want to get shot; is that right?

**A.** Yeah, but as soon as I heard BAM that's when I took off and started running. I didn't start running as soon as I saw the gun or nothing. I was standing right there. I was standing right

there after I seen the first shot. Everybody paused and ran their separate ways.
**Q.** And when you ran separate ways you ran away from the guy you saw shooting somebody, you never hooked up with him again, did you?
**A.** Yeah, we met up at the corner of 29th and Huntingdon.
**Q.** Why would you meet up with the guy you saw shoot somebody and run away from the shooting and meet up with the guy who did the shooting?
**A.** To ask him why he did the shit. That's what I asked him. Why he did that shit? Sitting on the corner of 29th and Huntingdon, why you do that shit, that's what I said to him.
**Q.** Why did you run? Why didn't you ask him, you saw him, he's right there, why run away and meet up with him later?
**A.** He met up with me. I was the first one to run off.
**Q.** And when you met up with him you don't say get the hell away and call the police?
**A.** I didn't call the police.
**Q.** You certainly walked away from him?
**A.** You asked me about the police earlier, which



one is it? Did I call the police after it happened? Did I dial 9-1-1? You asked me did I contact any police, I said no. So therefore what you're saying right now is not making any sense.
**Q.** Are you finished?
**A.** Yeah, I'm done.
**Q.** But just so I am clear, you see Mr. Johnson shoot somebody, you run away and then you meet up with him later; is that the sequence?
**A.** I didn't meet up with him basically. I was standing right there after it was done. After it happened, whatever happened on the corner of 30th and Huntingdon after I left and went to 29th Street, he happened to come around there because we all from that neighborhood. Some didn't meet up with him or nothing. He came around there on his own doing. I didn't walk around with him. When he said meet around the corner, I didn't say nothing, it wasn't none of that.
**Q.** Did you arrive at that location with Mr. Johnson?
**A.** Did I arrive at that location with him? No.
**Q.** Who got there first, you or him?
**A.** I did.



**Q.** And how long after you were there did he arrive?
**A.** He arrived probably like ten minutes afterwards.
**Q.** When you initially saw him, what did you see him doing?
**A.** Getting out of his vehicle.
**Q.** Okay.
A vehicle. So he arrives in a car?
**A.** Yes, because his car was parked around the corner from where we was at.
**Q.** On the corner, around the corner?
**A.** No, not around the corner where the scene was at. His car was parked on 2830 between Huntingdon -- between 29th and Huntingdon on the corner of Dover Street around the corner on Oakdale Street.
**Q.** How far away from the shooting scene was the car parked?
**A.** The car was parked like a block or two blocks away, it was all the way over. This is 29th, this is 30th, and this is Lehigh at the corner. 30th Street is right here so the car was parked a little away from there.



**Q.** And he drove up in a car. Did he run to the car after the shooting?
**A.** How would I know? I ran my way. How would I know?
**Q.** How long after the shooting did you see him?
**A.** I seen him 10 or 15 minutes afterwards. Afterwards he came rolling up in the car after everything was done.
**Q.** Okay.
So he does the shooting, he runs one way and you run another way?
**A.** Yes.
**Q.** How many people were in the store when you arrived?
**A.** It was about five people, six people.
**Q.** And how many people were in the store when Mr. Johnson arrived?
**A.** It was the same people still there.
**Q.** Okay.
Did he say anything to any of those people?
**A.** No.
**Q.** So did he say anything to you?
**A.** It wasn't nothing to say.
**Q.** Okay.

So he gets there, I believe, you said ten minutes after you; is that right?
**A.** Were you talking about after it happened of before it happened?
**Q.** I am talking about shortly before it happened?
**A.** Shortly before it happened we all went around there together. We all walked to the 24-hour store, that's what I said in my statement before. We copped Dutches, we were altogether. There is no apart or nothing, we all walked around there together.
**Q.** Didn't you just say you didn't arrive with him, he arrived ten minutes after you?
**A.** That's after the shooting was over. I didn't say that beforehand.
**Q.** My question is before the shooting took place, did you all arrive at the scene of the store before the shooting took place together or separately?
**A.** Together, yeah.
**Q.** Okay.
And it was you, him, and who else was present?



**A.** Amin Vicks.
**Q.** And at some point do you all go into the store together or one at a time; how does that work?
**A.** Ain't nobody go in the store, you can't even go in there.
**Q.** He never went inside?
**A.** You can't go inside the store. There's a window you buy stuff from. It's a 24-hour store and it's open at 3 o'clock in the morning and window. No, you never go in the store.
**Q.** Is there a door --
**THE COURT**: One second. You cannot speak over each other; do you understand? You wait for the lawyer to ask a question, a little pause, then you answer.
**MS. FEENEY**: I'll get the picture, this is C-5.
**BY MR. COARD**:
**Q.** Is this the store?
**A.** Yes.
**Q.** And is this the door to the store?
**A.** Yes, but it's boarded.
**Q.** Okay.



At any point from the time you arrived up until the time you left was this door ever opened?
**A.** No.
**Q.** And at the time of the shooting where was Mr. Johnson standing?
**A.** Right there in the front.
**Q.** Here?
**A.** No.
**Q.** Is there something he can --
**MR. COARD**: Does he have a pointer?
**MS. FEENEY**: Is that a better picture? This is C-2, for the record.
**BY MR. COARD**:
**Q.** Where's Mr. Johnson standing at the time you say he fired the shot?
**A.** (No audible response.)
**Q.** Would that be directly in front of the boarded up door?
**A.** Yeah, right in front of the door.
**Q.** Three feet, 5 feet, 10 feet, how far directly in front of the door would you say?
**A.** Right next door because the door is right



here and the window is right next door.
**MR. COARD**: Can we go to the previous photo so we can see the right and left side of the door?
**MS. FEENEY**: Sure. This is C-5.
**BY MR. COARD**:
**Q.** Just so we are clear, your testimony today is Dennis Johnson is standing directly in front of this door; is that right?
**A.** No, I did not say that.
**Q.** I'm asking where's he standing?
**A.** He's standing in front of the window, not in front of the door. You keep easing over by the door.
**Q.** He's not in front of the door, he's 2, 3, 4 feet to the right of the door. Was he half-a-block away?
**A.** I ain't even going to get into all that. Standing next to the door was not half-a-block away. Nothing about that feet stuff you talking about, he was standing right there diagonally right next to the door, to the abandoned door here, standing here in front where the guy was standing at.

Q. And where were you standing?
A. Right here where the chairs are at right on the corner where I told you I was standing at. It's a slant, it goes in a loop.
Q. Why did you say you were around the corner?
A. First, you said -- let's get this straight. First, you said how was I around the corner and heard him shooting? Now, you saying something else, so which one is it?
THE COURT: Okay. Look up here. You are the witness, you don't get to ask the questions. She'll object if she thinks it's inappropriate. You have to answer, you can't fight with him like that.
BY MR. COARD:
Q. Just so the jury can see this chair is on the corner, not around the corner; is that correct?
A. It's like in a slant. It's like between the corner and around the corner like on a slant because if you turn the picture to the side you'll see straight down 30th Street.
THE COURT: What if we move to a new point?



MR. COARD: Yes, we can. Certainly.
BY MR. COARD:
Q. So if Mr. Johnson is somewhere in this area to the right of the door, you're not sure how many feet. Where is the victim standing at the time of the shot?
A. (Indicating.)
Q. So the victim is standing between Mr. Dennis Johnson and the bike; is that correct?
A. Yes, but this bicycle, somebody rode up on this bicycle. I didn't see who it was that rode up on the bicycle. But all I know when the shot let off, that bicycle, they ran, I ain't see nothing else after that. I didn't even know there was a bike there until afterwards.
Q. So at the time of the shooting you did not see the bike; is that right?
A. No, I didn't see a bike.
Q. Now, how long -- let me phrase it this way. When Mr. Johnson arrived at the scene the person who ultimately was shot, was that person already there or did that person walk up on the scene?
A. He walked up on the scene.



Q. And your testimony today is that the victim -- well, let me state Mr. Johnson -- you said Mr. Johnson stated, "Oldhead, what are you grabbing;" is that right?
A. Yes.
Q. And was this the first thing Mr. Johnson said to him or was this after there was some other conversation?
A. I was too busy on the side watching them play the game, the video game and all that on the side where the chairs at because they were little. It was two people playing the video game right there so you can't hear. I can't hear what was said but I heard something was said.
Q. And the couple things you heard, what were those couple of things?
A. I heard "Oldhead, put everything down. Don't touch the phone", and some other things, I can't remember right now.
Q. All right.
Now, you also said something about the items were put on a step; is that correct?
A. Yes.
Q. Who put them on the step and what step?



A. The victim put them on the step right here (indicating). He put them on the step right here (indicating).
Q. So there's a step?
A. Right there in front of the abandoned building, 1, 2 steps that goes up in front of the door.
Q. How does the victim put it on the step when you testified two minutes ago the Defendant is right on the step and the victim is between the Defendant and where the bicycle is?
A. Say that again, I don't understand.
Q. I'd be happy to. This is the victim, where the victim puts his belongings down, but previous to that you said the Defendant was standing a couple feet away from the door to the right of the door in this area; is that right?
A. Yes.
Q. And I asked you where the victim was. You said the victim was between where the Defendant was to the right of the door and where this bicycle was. If the victim is over here, how is he putting items on the step over here?
A. I didn't tell you the victim was there, you

said how many feet was he away from the steps.
**Q.** Are you telling me the victim was standing in this area?
**A.** No, I said the victim walked up.
**Q.** That's fine. Let's get to the other questions. Just so we are clear, the victim was never between the Defendant and the bicycle?
**A.** No.
**Q.** Okay.
And you're standing near the chair which is about 5 feet away from where the victim is?
**A.** No. The victim is right here up here in this area, right here (indicating). I'm standing over, way over here.
**Q.** Didn't I just ask you if the victim was standing to the right of the door between this area and the bicycle and you said no. You said standing here on the front of the steps; didn't you say that?
**A.** That's when you were getting that -- that's when he was getting robbed. Stop interrogating me. Are you going to ask me questions?
**THE COURT**: One, you can't do that. You need to object on his behalf



because he's mischaracterizing his testimony so be aware and object. Let's give the jury a bathroom break. It's tiresome at this point.
**THE COURT CRIER**: Please remain seated as the jury exits the courtroom, please.

- - -

(Jury departs the courtroom at 3:05 p.m.)

- - -

**THE COURT**: We are going to take a break. You can come back in five minutes. When you come back be respectful.
**THE WITNESS**: Okay.

- - -

(Witness excused.)

- - -

**THE COURT**: The Defendant's mother, you make one more face in this courtroom you are out. You are doing a disservice to your son, too, because now they know who you are and you're making faces the whole time. You cut it out or you're out of the room. She shows incredulity about the witnesses.



We are going to take a break.
**THE COURT CRIER**: The Court stands in recess until the call of the crier.

- - -

(Short recess.)

- - -

**THE COURT CRIER**: This Court is back in session.
**MR. COARD**: Your Honor, before the jury comes out, Your Honor told the jury before they left that Defense counsel was mischaracterizing the witness's testimony. I would argue that I never at any point mischaracterized and for the jury to hear Your Honor tell them that they might hold that against me or my client. So I would ask for an instruction that the Defense did not, in fact, mischaracterize them.
**THE COURT**: I should have said a ridiculous question maybe. The whole point is you said he was standing over here but he put his stuff down on the steps over here. He walked over and put his stuff down over there is the simple answer. You're making it sound



like it's an inconsistency, it's a mischaracterization of what his testimony was. His testimony was at the point which he was shot that's where he was standing. Not at the point he put his stuff down at the steps, that's why I looked at the District Attorney and said why don't you object to it.
**MS. FEENEY**: I was going to deal with it at redirect. I think the way counsel was asking it people were standing in one place and when that's not true and people can move around at one point. I was going to deal with it on redirect. If I thought he was mischaracterizing, Your Honor, I would have objected.
**MR. COARD**: It certainly wasn't a mischaracterization, but to say it was a ridiculous question --
**THE COURT**: It was a mischaracterization because his testimony was the person shot -- this is where he was shot, not at the point he put his things on the steps, that's a different point in time.
**MS. FEENEY**: I think we need to

clarify that.
**MR. COARD**: My only concern is the jury heard Your Honor say Defense counsel was mischaracterizing the witness's testimony.
**THE COURT**: Because you were.
Bring the witness in.
**MS. FEENEY**: Your Honor, in terms of timing, I know there's going to be some more cross and I'm going to redirect and the witness that would be the other eyewitness, which is going to be lengthy if you want me to --
**THE COURT**: Yeah, you can follow up with the ballistics and then call the other witness tomorrow.
**MS. FEENEY**: I think it would be too much.
**THE COURT**: Okay. But in the meantime, we will proceed civilly. Meaning the attorney asks the question, there's a pause. The witness answers the questions, there's a pause, attorney ask the next question.
Okay.



**THE COURT CRIER**: Please remain seated as the jury enters the courtroom.
\- - -
(Jury enters the courtroom at 3:25 p.m.)
\- - -
**MR. COARD**: May we go back to the last photo?
**MS. FEENEY**: C-5.
**MR. COARD**: Yes.
**BY MR. COARD**:
**Q.** Mr. Smith, you said at one point during direct examination by the prosecutor there's a video game that you were playing. Would you show the ladies and gentlemen of the jury where that video is on the screen? Can you see it from this photo?
**MS. FEENEY**: Actually I have a better photo.
**MR. COARD**: Okay.
**BY MR. COARD**:
**Q.** Before we get to the other photo, would you say it's the video screen?
**A.** Yeah, I can see it.
**MR. COARD**: Do you have a closer



shot?
**MS. FEENEY**: C-6.
**BY MR. COARD**:
**Q.** Now, you indicated that during the confrontation between Mr. Johnson and the victim you were playing the video. Just so I don't mischaracterize what you're saying, sir, were you playing the video at the time of the initial contact between Mr. Johnson and the victim?
**A.** No, I wasn't.
**Q.** Okay.
What happened first? Did the contact between Mr. Johnson and the victim happen first or were you playing the video first?
**A.** The video game was going on during the whole time. The whole time when we walked up there were two people sitting there playing the video game.
**Q.** And you did mention you and Mr. Johnson and someone else arrived together at that location?
**A.** Yes.
**Q.** And did you, once arriving at that location, did you at some point -- you began to play the video; is that right?



**A.** No, I never touched the video game. I was standing there watching.
**Q.** Better stated, watching. When you are watching where are you standing when you are watching?
**A.** Right there where you are at.
**Q.** Next to the chair, behind the chair, in front of the chair?
**A.** Next to the chair.
**Q.** And the chair, there's two chairs here, right?
**A.** Yeah.
**Q.** So you're standing on the opposite side towards my right or to the opposite side being the left? There's a smaller looking chair, a metallic chair. Were you next to that metallic chair or the wooden chair?
**A.** Wooden chair.
**Q.** Okay.
And you're standing there watching the video so you're in this area, is that right, somewhere in this area? In fact, you have the pointer. Okay. So you're standing there.
**MS. FEENEY**: That's indicating

to the right of the wooden chair.
BY MR. COARD:
Q. That's to the right of the chair, right?
A. Yes.
Q. And although it's apparently off the screen, Mr. Johnson would be standing around the bottom area of this full photograph; is that correct?
A. Yeah, he would be standing like towards.
Q. Use your pointer showing the area he would be standing.
A. Down some like on an angle when he's standing over where the window at, closer where the window is at.
Q. So he would be standing in this area; is that right?
A. Yeah, but back.
Q. And you would be standing right here; is that correct?
A. Yes.
Q. I just have a few more questions for you, sir. Now, you said you approached or you arrived at the scene together; is that right?
A. Yes.
Q. And once you got there, Mr. Johnson walked



away from you towards the area where the shooting took place; is that right?
A. Yes.
Q. Just so I am clear, it's not as if you arrived at this area and then you walked over to the video. You walked to the video initially; is that correct?
A. No, we walked up to the window. I walked up to the window first and purchased my Dutches then moved onto the side, then in the course of time people was moving around. People are not going to stand in one spot so they are going move around, so people was moving all around. I'm looking all in the game, I'm not really looking over there. There's too many people moving around at the time.
Q. And at the time that Mr. Johnson is saying something, whatever he's saying to the victim, you're standing to the right of this chair; is that correct?
A. Yes.
Q. And at the time the shooting took place, where are you standing?
A. Right over in the same corner.



Q. Same place?
A. Yes.
Q. And after the shooting took place, which way did you run? Did you run up in this direction or did you run towards where the shooting took place, the opposite direction or up the street? Tell us which way you ran.
A. You see where I was standing up where the wooden chair, right, I ran down.
Q. So you ran up that way?
A. Not this way, straight down.
Q. And it was about ten minutes later you said that you saw Mr. Johnson?
A. Yeah, about 10 or 15 minutes later.
Q. And where was it 10 minutes later that you saw Mr. Johnson?
A. On the corner of 29th and Huntingdon between Huntingdon and Hollywood, but standing on the corner of Hollywood Street.
Q. Who arrived first, you or he did?
A. I was there first.
Q. And you're there and he arrives and did you say anything to him first or did he saying anything to you first?



A. I said something to him.
Q. And what did you say?
A. What you do that for?
Q. What did he say in response?
A. He didn't say nothing.
Q. Anything else stated after that?
A. No.
Q. And how long did you have this conversation with him, how long did this conversation last, just a few seconds?
A. Yes, just a few seconds; then he got in his car and left.
Q. Did you arrive with him at that location in his car?
A. No, we walked around there.
Q. And you say his car was how far away from this corner?
A. His car was about --
MR. COARD: Can we get a different shot?
MS. FEENEY: There's a map there, that's probably the best. I don't have a photograph of that area.
MR. COARD: That's fine. I'd

like to use that.
**MS. FEENEY**: Okay. That's C-1.
**BY MR. COARD**:
**Q.** Now, from this photograph, can you show the direction in which his car was parked? By his, I mean Mr. Johnson; does this photo show that?
**A.** No, because his car was parked on the other side. His car was parked across 29th Street on the other side on Huntingdon between 29th and 28th, which was parked right there on the curb of Dover Street.
**MR. COARD**: Can we go to the previous photograph?
**MS. FEENEY**: C-6.
**BY MR. COARD**:
**Q.** I want to talk about this and go back to the one you had before this. There was some question about the victim. You indicated the victim put -- while the Defendant as you say had the gun on the victim, the victim puts some belongings on the step; is that correct?
**A.** Yes.
**MR. COARD**: All right. Can we go to the previous picture?



**MS. FEENEY**: C-1.
**THE COURT**: C-5.
**BY MR. COARD**:
**Q.** When Mr. Johnson, as you testified, pulled the gun out, show us with your pointer where he was standing?
**A.** (Indicating.)
**Q.** And show us now with the pointer where the victim was standing?
**A.** The victim never stayed in one spot.
**Q.** Initially when Mr. Johnson pulled out the gun, where was the victim standing?
**A.** The victim was standing in front of him where the window is, putting the stuff on the steps.
**Q.** Is it your testimony that the victim was never standing between the Defendant here and the bicycle?
**A.** I ain't even see the bicycle, I didn't see it. The bicycle is in this film right here, but I didn't see it the time when that was going on, so I never seen it.
**THE COURT**: Maybe you can rephrase question.



**BY MR. COARD**:
**Q.** When you said the victim was moving around, tell us from where to where. At what point when you first saw him where he was and which way he went and then when he was shot.
**A.** He was standing right here in the back, it was people.
**MS. FEENEY**: Do you want to indicate for the record?
**MR. COARD**: Yes. Show me where that is.
**MS. FEENEY**: The Commonwealth agrees that's approximately 3 to 5 feet facing to the right of the door. It's the front of it.
**THE COURT**: There's a scale that tells you the sidewalk and tells you the measurement on these charts.
**MR. COARD**: That's fine. Thank you, Your Honor.
**BY MR. COARD**:
**Q.** But we do know that's where you identify that's where you first see the victim; is that right?



**A.** Yes.
**Q.** Now, you said he wasn't stationary in the place. Tell us his motions, tell us where he went before he was shot?
**A.** He went up to the window.
**Q.** Show us with the pointer.
**A.** (Indicating.)
**Q.** Okay.
So you first see him in the location initially mentioned and went up to the window?
**A.** Yeah, the window right here (indicating).
**Q.** When he goes up to the window where is Dennis Johnson?
**A.** Right here (indicating).
**Q.** So he pretty much stays stationary at that time?
**A.** Yes.
**Q.** And now the victim goes to the window, where does he go from the window?
**A.** I seen him go from the window right here, I seen him emptying his pockets putting stuff right here on his steps.
**Q.** You say you see him, you're standing to the right of this chair; is that right?

A. Yes.
Q. And you can see exactly what's going on because they are to your left; is that right?
A. Yes.
Q. So he's emptying his pockets at this location. You're standing to the right of the wooden chair and then what happened?
A. After that, I just heard a couple things was said, Oh, Oldhead, couple other things and a shot.
Q. Which way did Mr. Johnson run?
A. I didn't see where he ran at all, I was the first one that took off from the scene, I was gone.
Q. You said you were the first one?
A. Yes, I was the first one to take off.
Q. We know from your testimony that the victim from the time you saw him until the time he was shot was moving around in this general area. You, during the time that you first saw the victim on the sidewalk then saw the victim approach the window, then saw the victim putting some stuff on the step, then saw the victim engaging in some type of confrontation or



conversation with the Defendant while this victim was moving around, you remained at this spot to the right of that wooden chair throughout that entire incident; is that correct?
A. Yes, but I was looking at the game though. You know how you staying in the game, I am looking at the game.
Q. Regardless of what you're looking at you remain standing at that location; is that correct?
A. Yes, for a moment.
MR. COARD: No further questions.
THE COURT: Anything?
MS. FEENEY: Yes, if I may.

- - -

REDIRECT EXAMINATION

- - -

BY MS. FEENEY:
Q. At the time of the shooting how many people were out there, you, Amin Vicks, and the Defendant?
A. Yes, a couple other people.
Q. Were they the people playing the video game?



A. It was two people playing the video game, the man Ozzie from the store, the Oldhead.
Q. The victim?
A. Amin.
Q. And somebody else, so three other people?
A. Yeah, probably about seven or eight people out there at that time.
Q. So besides the people, you, the Defendant, Mr. Vicks, the victim, Mr. Clark, who runs the store, that's five people and maybe two people or three people playing the video game?
A. Yeah, two people playing the video game and the victim.
Q. And to your knowledge, did they ever contact the police and say what happened?
A. No, not to my knowledge.
Q. Now, you said -- well, let me ask you this. Was there anything -- I am going to show you C-6. When you're standing there by the chair, were you facing towards the video screen or towards Lehigh Street. Which way were you standing?
A. I was standing like towards down 30th Street because like the TV is right here in front, the



two chairs is right here, whatever, and I'm standing right here, the store is right here, this is the window. I mean the door then window next to it. The steps is right here and I'm standing right here.
Q. So when you see the Defendant robbing the victim, Mr. Smith, did you turn? If you are looking at the video game, did you turn to your left to see it?
A. I turned to my left to see it. The store how it's on an angle it looks like on an angle. It looks like it's on an angle but it's slanted so the store would be facing this way in an angle though, but facing this way to 30th Street to go down like this, Lehigh come across.
Q. Was there anything blocking your view to where you were to where the Defendant was when he shot the victim?
A. No, just the chairs and everything and all that, and there was like loud noise and stuff out there.
Q. And were the chairs about this height?
A. Yes, about the same height.
Q. And how tall are you?

Page 197

A. Five-nine.
Q. So the chair would have been a little lower to you than this?
A. Yeah, them chairs are like the same size as them, just a little bigger. One of them was a little high. The chair I was standing next to on the right was higher than the one on the left.
Q. So if you were standing on the chair and you're looking to your left the chairs don't come up this high, you can see clearly to where he is.
A. Yes.
Q. And the victim, Mr. Smith, when he got shot I know he was moving around and walked and put his stuff down on the steps. When he got shot where was he standing? Can you see it on this picture?
A. He was standing right there right in front of the window between the window and the steps. He was standing right here in this area. You know, the window is right here and he was standing right here in that area.
Q. And you showed us before that the Defendant was about 2 to 3 feet away from him when he was

Page 198

shot?
A. Yes.
Q. Now, up until this happened you said you had known the Defendant your whole life. Did you have any problems with him?
MR. COARD: Objection.
THE COURT: Sustained. You would have to rephrase that. Be more specific.
BY MS. FEENEY:
Q. Did you have a grudge against him or any hard feelings or anything like that?
A. No, we came up together. We went through stuff, but other than that there wasn't no grudge. His mom is the only grudge. His mom is constantly like --
MR. COARD: Objection.
THE COURT: Sustained.
BY MS. FEENEY:
Q. Forgetting about the mom, the night that this happened were you and he on good terms?
A. Yeah, at the time.
Q. And you testified that right after it happened you ran down 30th Street towards

Page 199

Oakdale?
A. Yes.
Q. And met up with him about ten minutes later, and said to him why you do that shit?
A. Yeah.
Q. What did you say, the smoker, whatever you said?
A. Yeah.
Q. And he didn't reply to you?
A. No.
Q. At this point in your mind you guys were still friends or not?
A. No, he was doing him and I was doing me. He wasn't coming down there like that after that happen, he wasn't coming down there like that.
Q. What do you mean he wasn't coming down?
A. He was home, he was home where he lived at.
Q. Let me back up. You said he was doing him and you were doing you, that's a slang expression, right?
A. Not slang, he was taking care of his personal business and whatever he does.
MR. COARD: Relevance.
THE COURT: Overruled. No one

Page 200

understood what he meant anyway.
MS. FEENEY: Some people.
THE COURT: He was doing him and I was doing me; is that the answer?
THE WITNESS: He was taking care of his whereabouts and I was taking care of mine. He was home doing whatever he was doing and I was doing whatever I was doing.
BY MR. COARD:
Q. So if do you think somebody is doing themselves I'm just taking care of myself, concerned with my own business. You do your thing and I do my thing; is that a fair way of saying it?
A. Yes, but we don't got to say it to each other. I just go. And say we come to the store and I see him, I might be like what's up. And I might go on about my business and do what I do and go get a car, lay on the couch or do something.
THE COURT: What was the original question? How was that responsive?
MS. FEENEY: He was explaining I do me, you do you.

**THE COURT**: I understand that. I understood that from the beginning.
**MS. FEENEY**: What happen after this happened, were you still friends with him?
**BY MS. FEENEY**:
**Q.** And you said he went home, but you testified that he had lived on --
**THE COURT**: I'm sorry. Mr. Coard, I know you're speaking to your client but you need to pay attention to what's going on here if you think it's important.
**MR. COARD**: Well, Your Honor, I'm questioning my client about some of the information.
**THE COURT**: I understand that but it's been going on for a lot. You can talk to your lawyer, you'll have all the time in the world, let me pay attention though. Keep a piece of paper, write down anything you want him to ask.
Go ahead.
**BY MS. FEENEY**:
**Q.** You testified earlier that you lived over by



28th and Harold?
**A.** Yes, that's when we were younger. He lived there when he was younger. His mom moved around the corner on Dover Street.
**Q.** So where did he go? Did you see him in the neighborhood anymore?
**A.** No, I didn't see him for a while.
**Q.** Up until this happened did you usually see him in the neighborhood?
**MR. COARD**: Objection.
**THE COURT**: Overruled.
**BY MS. FEENEY**:
**Q.** When was the last time you seen him before this date in the neighborhood?
**A.** I ain't seen him in a while after the incident and then he just came down.
**Q.** Where else -- you said he went home, where else does he stay?
**MS. FEENEY**: Objection.
**THE COURT**: Overruled. If you know.
**BY MS. FEENEY**:
**Q.** Do you know where else he would go to?
**A.** Yeah, Harrisburg.



**Q.** And what's in Harrisburg?
**A.** Family.
**Q.** What family?
**A.** His two kids and babymom.
**Q.** His babymom is in Harrisburg?
**A.** Yes.
**Q.** And after this happened when was to the next time you saw him?
**A.** I ain't see him for like a year. I didn't see him until like a year. I seen him like a year later after I came home. After I was locked up and I came home, I seen him. And he was saying something to me about my cousin and all this other stuff.
**Q.** And was that before or after you gave the statement to the Homicide detectives?
**A.** That was way before.
**Q.** So at that point you still did not cooperate with the police?
**A.** Nope.
**Q.** At that point what kind of terms did you with him?
**A.** He wasn't around.
**Q.** After you didn't see him around the



neighborhood.
**A.** I ain't never seen him until after I got rearrested. When I got rearrested and came home from doing my time I got rearrested in '07 and came home in '08, I didn't see him until then until after I came home from being incarcerated.
**Q.** And when you did see him, was everything okay with you and him?
**A.** He was acting funny. He was on some old, he seen us out there, he was just saying shit. Saying my cousin is ratting.
**MR. COARD**: Objection.
**THE COURT**: Sustained.
**BY MS. FEENEY**:
**Q.** You testified that the detectives had to look for you numerous times to try to take a statement from you, correct?
**A.** Yes.
**Q.** What were you doing? Did you know they were looking for you?
**A.** Yeah, I knew they were looking for me, but I didn't want to give a statement, for real, for real, to tell you the truth. I didn't want to say nothing, period. So during the course of the

time when they were looking for me I knew they were looking for me because my family was saying they keep showing up at my grandmom's house or showing up here and there. So I never took it upon myself to go down and get questioned or none of that.

**Q.** Were you trying to avoid the police at this point?

**A.** Yeah.

**Q.** Okay.

So why did you finally comply?

**A.** Because I was locked up. I was locked up and arrested at the time, whatever like that, so when I went down there, I was just sitting down there for hours before I even said anything.

**Q.** If you weren't --

**A.** And they kept cramming and saying they knew this and knew that, like, saying that to me.

**Q.** Let me ask you this, Mr. Smith. You explained to the jury you are on probation now and you have to report to your probation officer. If you weren't on probation -- when you're on probation do you have to tell your probation officer you have to give them a good



address of where you are?

**A.** Yes.

**Q.** And know where you are at all times?

**A.** Yes.

**Q.** So therefore, if they want to they can give that to place and the police can find out where you are?

**A.** Yes.

**Q.** If you weren't on probation; would you ever have cooperated in this case?

**A.** I don't know. I ain't going to say yeah or going to say no.

**Q.** Well, you didn't come forward on your own, correct?

**A.** No.

**Q.** Do you think you would have come forward?

**A.** No.

**Q.** And that's because you don't want the testify against your friend?

**A.** Yeah.

**MR. COARD**: Objection. Leading.

**THE COURT**: Sustained. I think it's beyond the scope of cross, too.

**MS. FEENEY**: No further



questions.

**MR. COARD**: Briefly.

\- - -

RECROSS-EXAMINATION

\- - -

**BY MR. COARD**:

**Q.** The prosecutor asked you on redirect if you ran down 30th Street, and what was your answer?

**A.** Yes.

**Q.** And did you run down 30th Street by yourself or did you run down with Dennis or Amin?

**A.** I ran by myself.

**Q.** Take a look at my statement the statement that's dated January 15th, 2009, C-19. Let's go to Page 2 of that statement. And I ask you in regard to running down 30th Street if you went by yourself or anybody else and you said alone.

**MS. FEENEY**: Which question?

**MR. COARD**: The first full question towards the top-half of Page 2.

**BY MR. COARD**:

**Q.** "QUESTION: Which way did you run?"

That question, sir, and correct me if I'm wrong, it says, "Which way did you run after



Dennis Johnson shot the male outside of the store?"

And what's your answer?

**A.** I put I ran down 30th Street.

**THE COURT**: You should read it verbatim.

**THE WITNESS**: "I ran down 30th Street and made a right on Oakdale Street."

**BY MR. COARD**:

**Q.** So you're telling the jury that it says, "I ran down 30th Street?"

**A.** It says "we," but I didn't say "we," I said "I."

**Q.** Is your signature there at the bottom?

**A.** Yes.

**Q.** And it doesn't say "I ran?"

**A.** It says "we."

**Q.** Now, when I asked you before about if you went alone or with anybody else and you said alone. How do you explain that your signed statement says "we ran?"

**A.** Because at the time when this statement was wrote I didn't write it. I didn't write, I didn't write it down or nothing. They were

asking how many certain questions when I was down there and that's how it went. So he went and took it upon himself and wrote whatever I wrote but they went on what I said. They asked me certain questions and I answered them and they wrote them on paper, but I don't remember them recalling me telling them "we."

**Q.** But they didn't sign your name; you signed your own name, right?

**A.** Yes.

**MR. COARD**: No further questions.

**MS. FEENEY**: If I may read it in its entirety.

**THE COURT**: That's what I told him to do. Go ahead.

\- - -

RE-REDIRECT EXAMINATION

\- - -

**BY MS. FEENEY**:

**Q.** Sir, when counsel asked when the Detectives questioned you about which way did you run after Dennis Johnson shot the male outside of the store. Do you remember saying, "We ran down 30th



Street and made a right down Oakdale Street and walked down to 29th and Huntingdon Streets and that's where we met up."

**A.** Yeah, I told them we met up there, but I didn't say we ran, I said I ran.

**Q.** You're saying that the first "we" is incorrect. You ran down 30th Street and you all met up at 29th and Huntingdon?

**A.** Yes.

**Q.** And you said it was Bam, me, and Amin, who met up there.

**A.** Yes.

**Q.** "I asked Bam why the fuck did you do that dumb shit. I told him the boy he shot was just a smoker." Is that what you told the detectives?

**A.** Yes.

**Q.** And that's what you testified to today, right?

**A.** Yes.

**MS. FEENEY**: No further questions.

**THE COURT**: Anything else?

**MR. COARD**: I have nothing. Thank you.



**THE COURT**: Mr. Smith, you may step down. You can't talk about your testimony with anyone, but you may be excused so that means you may leave.

\- - -

(Witness excused.)

\- - -

**MS. FEENEY**: I would call Officer Grandizio.

**THE COURT CRIER**: State your full name, badge number, and current assignment for record.

**THE WITNESS**: Police Officer Lewis Grandizio, G-R-A-N-D-I-Z-I-O, Badge No. 4140, assigned to Firearms Identification Unit.

POLICE OFFICER LEWIS GRANDIZIO, after having been first duly sworn, was examined and testified as follows:

\- - -

DIRECT EXAMINATION

\- - -

**BY MS. FEENEY**:

**Q.** Good afternoon, Officer.



**A.** Good afternoon.

**Q.** How long have you been a Philadelphia Police Officer?

**A.** Approximately 16 years.

**Q.** And you've been assigned to the Firearms Identification Unit for how long?

**A.** Six years.

**Q.** And if you would briefly tell the ladies and gentlemen, what does the Firearms Identification do?

**A.** Firearms Identification is responsible for all firearms and firearm latent components submitted to the Philadelphia Police Department. We identify firearms to make, model, caliber, and caliber of origin. Firearm components such as a bullet, a fired cartridge case to bullet specimen, we identify them to caliber and manufacturer. We test fire firearms for operability and do trigger pull tests and serial number restorations. We do microscopic comparison of the fired cartridge case or the bullet specimen to see if they were fired from one particular firearm.

We also help out Crime Scene when needed for

trajectory reconstruction. We do distance determination, shot pellet pattern testing, and we train other units within the Philadelphia Police Department and Firearms Identification.
**Q.** Officer Grandizio, what, if any, training do you have to have in order to be part of the Firearms Identification Unit?
**A.** Once you to come to the unit you receive two years of in-house training under supervision under senior examiners. By following the training manual of AFTE, the Association of Firearm and Toolmark Examiners, the training includes the history, development, and nomenclature of firearms as well as the history, develop, and nomenclature of cartridges. We take numerous practical written and oral examinations all related to firearms identification. We are also trained by outside agencies such as the Bureau of Alcohol, Tobacco and Firearms and serial number restoration. Crime scene reconstruction given by the Gloucester County Prosecutor's office. This all helps us within our training. We spend hundreds of hours of comparison microscope.



A comparison microscope is a microscope with one optical bridge, two microscopes connecting one optical bridge connecting that allows us to view fired cartridge casings and bullets simultaneously. We are responsible for taking tours for other laboratories around the country to see how their methods and procedures are. I have been to Tampa, New Jersey, and Connecticut State laboratory.

We are also required to take a forensic tour of firearm manufacturers. We do this for two reasons. One is to see how the firearm was manufactured. And two, is to see where the unique markings come from on the bullet and fired cartridge casing. I been in some of the big manufacturers in the country. I have been to Smith, Luger, just to name few.

Finally, our training is ongoing due to the new procedures and projects coming out every day.
**Q.** Officer Grandizio, have you been qualified as a expert in firearm identification?
**A.** That's correct.
**Q.** How many times have you qualified as an expert in the field?



**A.** 107 times.
**Q.** In which courts?
**A.** Court of Common Pleas state court and Federal Court.
**Q.** Has there been a time you have not been able to qualify as an expert?
**A.** No, ma'am.
**MS. FEENEY**: Your Honor, at this time I would offer Officer Grandizio as an expert in the field.
**MR. COARD**: No questions, no objection.
**THE COURT**: Okay. The officer will testify as an expert in firearm identification and ballistics.
**MS. FEENEY**: Okay.
**BY MS. FEENEY**:
**Q.** I know you did an examination. I would ask you to take a couple minutes and explain to the jury how guns work?
**A.** I do have a exemplar firearm.
**THE COURT**: Is it real?
**THE WITNESS**: Exemplar.
**THE COURT**: Go ahead.



**THE WITNESS**: I have an example of two types of firearms, a semi-automatic pistol and also a revolver. These are dummy rounds, they are not live, they are made of orange plastic. Also, these firearms do not have firing pins so they are not a live firearm.

Basically a semi-automatic pistol has a detachable magazine. Once that is done the magazine is then placed into the magazine well up like that. The firearm is still not ready to be fired. The cartridge from the magazine has to be chambered into the firearm. And to do that you pull the top portion which is this portion right here, the slide rearward, which is under spring tension and it will load a cartridge into the chamber. Now the firearm is ready to be fired. By pulling the trigger the firing pin strikes the primer igniting the propellent sending the bullet down and out the barrel. At the same the energy that pushes that bullet down and out the barrel is going to eject the cartridge by pushing the slide rearward.

So after that's been fired the slide is gonna go rearward by that energy of gases. That's going to extract and eject. Then another cartridge will be fed into the firearm itself. Now, this will happen as many times as you pull. If you pull the trigger once, it's going to fire once. If you keep it held down it's only going to fire down. That's for a semi-automatic firearm.

**THE COURT**: What does the bullet consistent of so the jury knows?

**THE WITNESS**: This is a plastic model, there's four components to this. You have the cartridge case, it holds all the components together. You have the bullet which goes down the barrel towards its target. You have the primer area, that's the silver portion, that's what the firing pin strikes. Once it does that it ignites the propellent that causes the explosion and sends the bullet down and out the barrel. There is four components there, the cartridge case, the propellent, and the primer.

**THE COURT**: Well, the part that



comes out of the semi-automatic is ejected out the back is --

**THE WITNESS**: The cartridge case or FCC.

Now, with a revolver the difference is you generally have that rotating cylinder. You place the cartridge in there, you close it to the frame. By pulling the trigger it's going to strike the primer of the cartridge sending the bullet down and out the barrel. The difference is it's not going to eject that cartridge case. In order to eject the cartridge case you have to open up the frame of the cylinder again and then hand eject it. So that's going to be the difference between a revolver and a semi-automatic pistol.

**BY MS. FEENEY**:

**Q.** The Judge asked you about a fired cartridge casing, is that also referred to as a shell casing?

**A.** Shell casings, yes, that's correct.

**Q.** Now, in this case did you receive items to analyze?



**A.** That's correct.

**Q.** Did you prepare a report?

**A.** Yes.

**Q.** Do you have a copy of that report with you?

**A.** Yes, I do.

**MS. FEENEY**: Your Honor, I would mark that as Exhibit 20.

\- - -

(FIU report marked Commonwealth's Exhibit 20 for identification.)

\- - -

**BY MS. FEENEY**:

**Q.** Now, did you ever receive a gun to examine in this case?

**A.** No, ma'am.

**Q.** What did you receive?

**A.** All I received in this case was one bullet. It would be this portion right here (indicating).

**Q.** And can you tell us where the bullet came from?

**A.** The bullet came from the medical examiner's office and the stated source was the left back of Kenyatta Smith.

**Q.** And when you received the bullet the report



section where it says remarks did you describe the bullet?

**A.** That's correct. When I get the projectile from the medical examiner's officer I'll sanitize it to make sure it's safe to examine then I do a report. What I'll do is do the caliber, which I knew was a .32 auto in caliber. I noted it was full metal jacket. That means the bullet was totally encased with some sort of metallic material, in this case it was copper. Generally the bullet is made out of lead, it's has a coating on it, a copper jacket. I noted the weight which was 70.7 grains. Grams is the unit of measure we use, the smallest we use in American. But grains, if you had a quarter it was 55 grains. It was 70.7 grains which was consistent with a .32 auto. The lands and grooves I noted there were five right. On each barrel on a handgun, the manufacturers put a series of spiral grooves inside the barrel. The reason they do this is to give the bullet it's gyroscopic spin. Same thing with the bullet, once it engages in those grooves it's going to start spinning. So once it leaves the barrel

it's going to have a spin to it. It's going help it's accuracy, trajectory, and velocity. If it doesn't have to those grooves in it the bullet would just tumble. It had a lands and grooves of five right. Lands and grooves are raised portions which are the lands and lower portions which would be the grooves, and it had five to the right hand.

I marked it with a case number and I noted bullet B1 had no major deformation, not too much damage, and had a blood and tissue-like substance attached to it.

**BY MS. FEENEY**:

**Q.** What does that mean blood and tissue-like substance?

**A.** Well, once a projectile is taken from a body there's going to be blood or tissue on the bullet.

**Q.** And you testified you sanitized that before the examination?

**A.** That's correct.

**Q.** If the Crime Scene technician in this case testified there were no fired cartridge casings at the scene, would that be consistent with a revolver or a semi-automatic?



**A.** If there is no fired cartridge casings, a revolver.

**Q.** And you indicated that even you didn't have a firearm that I was a .32 caliber bullet?

**A.** Right, a .32 caliber bullet, but it was in the .32 auto family. See, with .32 calibers there's a number of different types of families in that type of caliber. You have a .32 auto, .32 Smith & Wesson, and .32 Magnum. The difference between all four of those cartridges is they use different bullet weights. This bullet weight was consistent with being a .32 auto and a full metal jacket.

**Q.** That's how you're able to tell how it is in grains?

**A.** Correct, and the diameter of the bullet.

**Q.** Now, we know there was no cartridge casing at the scene, does that mean it had to be fired from a semi-automatic gun?

**A.** No. A .32 auto was designed for a small .32 auto semi-automatic pistol. However, because of the size of that cartridge it can be fired out of a .32 Smith & Wesson, which is a revolver; a .32 Smith & Wesson long, a revolver; and a .32 Smith & Wesson magnum, which is also a revolver. So a .32 cartridge can be fired out of a .32 revolver.



**Q.** So if a witness testified that a revolver was used, would that be consistent with the findings?

**A.** That's correct.

**Q.** And the lands and grooves that we determined to be on this bullet you have five right lands and grooves?

**A.** Yes, ma'am.

**Q.** Is that consistent with it coming from a revolver or a semi-automatic?

**A.** It would be consistent with coming from a revolver.

**Q.** Did you determine how many revolvers have that type of marking opposed to how many are semi-automatic?

**A.** Correct. At our lab we have a GRC file, general rifling characteristics. So we have a five right and we can look this up in the data base. So I can punch in .32 caliber, five right, and it come up with all types of firearms that would fire that type of projectile which is five right. In this case it came up with 87 different types of firearms. Out of all 87 of them 9 of them which were semi-automatic type pistols. So that would make 78 of them from revolvers.



**Q.** In your expert opinion based upon the lands and grooves and the type of ammunition and the findings at the scene, is this consistent with coming from a revolver or semi-automatic?

**A.** A revolver.

**Q.** Do you have an example of what a .32 revolver would look like?

**A.** This would be a .32 Smith & Wesson revolver.

**Q.** What would the barrel length be?

**A.** This one here is about 4 inches.

**MS. FEENEY**: I have no further questions. Thank you.

**THE COURT**: Cross-examine.

**MR. COARD**: Good afternoon, Officer. How are you today? That's my only question, thank you.

**THE COURT**: Okay. You may step down, Officer.

**THE WITNESS**: Thank you.

\- - -

Page 225

(Witness excused.)

- - -

**MS. FEENEY**: I have one more thing, I have a certificate of non-licensure I can read into the jury.

**THE COURT**: That's fine, you can read that in.

**MS. FEENEY**: Ladies and gentlemen, this is a self-authenticating document. I don't need anybody to come in here to testify to this. It comes from the State Police and has a seal on it that authenticates it as a business record. And what this is a document kept by the State Police. It's a certificate of non-licensure. And what that means is they do a check to see if someone had a license to carry a firearm during a particular time period. This particular certificate of non-licensure is for the Defendant Dennis Johnson. It contains his date of birth, address, and Social Security number.

For the date of the incident August 17th, 2007, this document certifies

Page 226

that he does not have a valid license to carry a firearm or did not have a valid sportsman firearm permit. And I entered that into evidence as Commonwealth's 21.

**THE COURT**: That will be marked as C-21, certificate of non-licensure.

- - -

(Certificate of non-licensure marked Commonwealth's Exhibit 21 for identification.)

- - -

**THE COURT**: Okay. Ladies and gentlemen, we are going to finish up for today and you'll report at 9:30 tomorrow morning. Remember you can't talk about the case with anyone. Have a good evening.

**THE COURT CRIER**: please remain seated as the jury exits the courtroom.

- - -

(Jury departs the courtroom at 4:15 p.m.)

- - -

(Court adjourned.)

- - -

Page 227

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the trial of the above case, and this copy is a correct transcript of the same.

______________________________

Samanda Rios
Court Reporter

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

Court Reporting System (Generated 2023/02/01 12:14:27)