# First Judicial District of Pennsylvania

*51CR00067312009, 51CR00073192009*
*Dennis Johnson*

---

*Trial (Jury) Volume 1*
*September 29, 2010*

Court Reporting System

---

*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000 FAX:(215) 683-8005*

*Original File COMVJOHNSON^9-29-10.txt, 209 Pages*
*CRS Catalog ID: 10110561*

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION
-----
COMMONWEALTH :
:
:
vs. : C.P.# 51-CR-0006731-2009
:
:
DENNIS JOHNSON :
-----
Room 1107, Criminal Justice Center
Philadelphia, Pennsylvania
-----
Wednesday, September 29, 2010
-----
**BEFORE**: THE HONORABLE ROSE MARIE DEFINO-NASTASI, J.
-----
JURY TRIAL
VOLUME II
-----



**APPEARANCES**:
MK FEENEY, ESQUIRE
Assistant District Attorney
For the Commonwealth
MICHAEL COARD, ESQUIRE
Attorney for the Defendant



INDEX

COMMONWEALTH'S EVIDENCE

| WITNESS | DR. | CR. | RDR. | RCR. |
|---|---|---|---|---|
| DR. GARY COLLINS | 16 | | | |
| OZZIE CLARK | 33 | 86 | 131 | 139 |
| DETECTIVE AARON BOOKER | 154 | 166 | 171 | |
| DETECTIVE JOHN McDERMOTT | 174 | 187 | 188 | |
| DETECTIVE JAMES BURK | 189 | | | |
| JOYCE SMITH | 197 | | | |

EXHIBITS

| NO. | DESCRIPTION | FOR IDENT. | IN EVD. |
|---|---|---|---|
| C-22 | ME report | 21 | |
| C-23 | Body chart | 21 | |
| C-24 | Statement 1 | 75 | |
| C-25 | Statement 2 | 75 | |
| C-26 | Police 75-229 | 186 | |



DEFENDANT'S EVIDENCE

| WITNESS | DR. | CR. | RDR. | RCR. |
|---|---|---|---|---|
| NONE | | | | |

EXHIBITS

| NO. | DESCRIPTION | FOR IDENT. | IN EVD. |
|---|---|---|---|
| D-1 | Preliminary hearing notes | 89 | |

\- - -

(The following occurred in the robing room:)

\- - -

**THE COURT**: Okay. Yes.

**MS. FEENEY**: Hi, Your Honor.

**THE COURT**: Did you come back to say hi?

**MR. COARD**: Your Honor, I wanted to state on the record yesterday after or during my cross-examination of Curtis Smith, Your Honor in the presence of the jury stated I was mischaracterizing what the witness said. After the jury left the courtroom I asked the Judge to instruct the jury it was not a mischaracterization. I would defer to the notes, but I believe Your Honor said maybe I shouldn't have said mischaracterization but it was ridiculous.

What I am asking at this point is Your Honor tell the jury what you implied early on should not have been said as a mischaracterization. That it was, in fact, not a mischaracterization and certainly not ridiculous. I'm not concerned about the



ridiculous part because they didn't hear it. Even the Commonwealth didn't object to my cross-examination as to the mischaracterization.

**MS. FEENEY**: I would be the first one yelling and screaming if I thought he was talking about apples and oranges. I was going to clean it up on redirect. I didn't think he was mischaracterizing, it just got out of control.

**THE COURT**: Well, let me just be clear. My job is to make sure the jury has clarity and make sure they understand what's going on and the jury is not confused. So when I was sitting there and listening to the interplay between you and the witness, the witness was out of control and disrespectful. But it was becoming very mucky and, as I said in the end yesterday I believe your question was a mischaracterization of the testimony.

Now, I stand by that because your question to him was, you said the victim was standing here, how could he put his things on the steps? I mean, I guess the objection



would be at what point? Maybe you should have said at what point because the jury you already suggested that his answer was at the time of the shooting or the time he put the things on the steps, that's where he was standing. That wasn't his testimony, you were mischaracterizing the testimony. His testimony was at the time of the shooting he was standing here. But it wasn't at the time he put the things on the step he was standing in that same position. So he was given you an answer and you were mischaracterizing it by twisting it around and suggesting to the witness.

And the reason I looked at you -- sometimes it's the heat of the trial. I don't mean anything personal against either one of you, I think you're both excellent lawyers. Just in protecting the jury and if I see it's getting confusing, I think it's not fair to them.

**MS. FEENEY**: I think counsel is just upset when you said mischaracterization now it sounds like it's intentional and I



don't think he meant it intentionally.

**THE COURT**: No, I didn't say you were intentionally doing it. I said you're miss characterizing his testimony, is what I said.

**MR. COARD**: Your Honor said maybe I shouldn't have used the word mischaracterized.

**THE COURT**: In the end I said, that was a little flip-it, maybe I should have said ridiculous. Because the simple answer was the witness -- you had him going so he was all over the place. He was so busy being mad at you, but the simple answer is because he moved. And then I said to you in the end, I said, I believe it was a mischaracterization of the testimony, so I'm not going to give a cautionary instruction, that's how it ended yesterday.

**MR. COARD**: Your Honor did say I was suggesting an answer. It's cross-examination so I can lead the witness.

**THE COURT**: You weren't suggesting an answer. What you were doing is

twisting what he said. You were suggesting that he answered in a different way that he did not suggesting an answer. In other words, you were taking from one statement that he made and you were twisting that, you were leaving out words, I guess, there's transition words. He was standing in one position at one time; you just said, okay, you said he was standing here, how could he put the things on the step? He was standing here at the point when he was shot. You left out "when he was shot" and that's misleading. But you have a witness who, you know, a witness isn't a lawyer. A witness isn't even necessarily -- we don't know what his level of intelligence is, but it's misleading a question to the witness and it's not fair to the jury.

**MR. COARD**: I understand that. I appreciate Your Honor indulging me with this. I wouldn't mischaracterize, certainly it's not the right thing to do. Two, I leave myself open to redirect. Even if I can fool the witness, I'm not going to fool the prosecutor to say, Mr. Coard said this, but he



didn't say that. I'm not going to expose myself to that so I wouldn't mischaracterize for no other reason than that.

**THE COURT**: You're taking mischaracterization in a negative context, you can innocently mischaracterize what a witness person says.

**MR. COARD**: But Your Honor said after this is ridiculous.

**THE COURT**: Not in front of the jury.

**MR. COARD**: Not in front of the jury, but you did say it. You are saying -- I'm saying you accused me of mischaracterizing and then accused me of a ridiculous question.

**THE COURT**: The ridiculous question is not relevant because no jury heard it so it doesn't matter.

**MR. COARD**: Your Honor said mischaracterization is not negative. It's not negative saying counsel you're mischaracterizing the evidence?

**THE COURT**: That's not negative. I'm not saying anything negative at



that point. I mean, what can I possibly say to make you happy? I can go out there and say yesterday I said counsel was mischaractering the evidence, and then I get into the facts, right?

**MS. FEENEY**: Yeah, I think your impinging on their --

**THE COURT**: But what I meant by that is this question was confusing.

**MR. COARD**: That's fair enough.

**THE COURT**: That's not bad, right?

**MR. COARD**: Not bad.

**THE COURT**: Let me write that down. That's not a negative connotation or legal term, I can tell them that.

**MS. FEENEY**: And can you say I was still doing my job?

**THE COURT**: Sort of like when you're on trial -- when I get caught up with the trial. It's not personal whatsoever, I can be a little more gentler. How's that?

**MS. FEENEY**: You left the jury with the impression that he's a sleaze bag and



I'm an idiot.

**MR. COARD**: Perfectly stated.

**MS. FEENEY**: Can you say Mr. Coard is not a sleaze bag and the DA is not incompetent?

**THE COURT**: You need to worry more about the Defendant's mother. She can at least take her hat off so they don't know who she is.

**MS. FEENEY**: She's a problem.

**THE COURT**: We can go off the record.

\- - -

(Whereupon, a discussion was held off the record, not reported.)

\- - -

**THE COURT**: I think I have something that will make both of you happy. I have to colloquy your client about Defense witnesses.

**MR. COARD**: I advised him strongly that based on my investigation those persons he suggested would not help, they would hurt, and he agreed that they would

hurt. So I don't think there's any problem saying, yeah, I gave my lawyer a list of witnesses, he checked them out, but we both agreed that they should not be called.

**THE COURT**: In case he doesn't say that then maybe what I would do, I'm not sure how appropriate this is, is clear the room and do an ex parte on the record with just the Defense attorney, the Defendant, and the Judge.

**MS. FEENEY**: I just had a case with Judge Sarmina and Rendine like that. Because the guy said something, but then it got more intense so she made everybody leave.

**THE COURT**: So I would make you leave because now he's talking about his Defense and he has a right to do that.

**MS. FEENEY**: Okay.

\- - -

(The following occurred in open court:)

\- - -

**THE COURT CRIER**: May I?

**THE COURT**: Yes.

**THE COURT CRIER**: Please remain seated as the jury enters the courtroom.



\- - -

(Jury enters the courtroom at 10:25 a.m.)

\- - -

**THE COURT**: Good morning, ladies and gentlemen.

Before we begin today, I have to just give you what we call a cautionary instruction about something that happened in here yesterday. Now, yesterday I said to the Defense attorney that he was mischaracterizing the testimony. Mischaracterizing the testimony in legal terms is not a negative inference. I wasn't saying anything negative towards the Defense attorney. What it meant was technically the question was confusing.

Now, I used this formula wherein if the question is confusing to me, I assume it's confusing to you because my job is to make sure the jury is not confused and there's clarity. Now, I can be over estimating my intellect so it may not be confusing to you. In other words, even though it's confusing to me when the Defense was



mischaracterizing the evidence, I merely meant it was a confusing question.

When I said to the District Attorney that she should object really the District Attorney at that point can just wait and clear it up on her redirect examination. So just to make it clear, I wasn't making a negative inference towards to the defense attorney by suggesting that he was doing anything that was sneaky or improper, and I wasn't attempting to insult the District Attorney by saying she wasn't acting as an advocate. They had it under control, it was my mistake.

Thank you.

You can call your next witness.

**MS. FEENEY**: Your Honor, thank you.

The Commonwealth calls Dr. Gary Collins.

**THE COURT**: It wasn't a mistake anyway, it just went too far.

**THE COURT CRIER**: State your full name for the record.



**THE WITNESS**: Gary Lincoln Collins, assistant medical examiner for the Philadelphia Medical Examiner's Office.

DR. GARY COLLINS, after having been first duly sworn, was examined and **testified as follows**:

\- - -

DIRECT EXAMINATION

\- - -

**BY MS. FEENEY**:

**Q.** Good morning, Dr. Collins.

**A.** Good morning.

**Q.** Dr. Collins, how long have you been a medical examiner?

**A.** I have been a medical examiner for about three-and-a-half years.

**Q.** And if you would tell the jury what are the duties of the medical examiner?

**A.** Certainly. The duties of the medical examiner is to investigate instances of when individuals die within the city of Philadelphia. And should those cases fall under our jurisdiction, we would then perform a further investigation which involves getting information

about the circumstances under which the individual died, performing an examination, and rely on results of toxicology to determine cause and manner of death. And the cause of death can be injury, diease, environmental factor or medical condition that results in the death of the individual and the manner of death is a one word statement which gives opinion as how it came about.

**Q.** And, Doctor, does the medical examiner's office do autopsies on everybody in Philadelphia or only certain types of cases?

**A.** Only certain types of cases.

**Q.** What case would be?

**A.** Cases where we would perform an autopsy is anybody who died a suspicious or violent death. Such as anyone who was involved in a homicide or somewhere where we are not sure the cause of death is and we will need to examine that body to come up with the cause.

**Q.** And how does a person go about becoming a medical examiner? What is the procedure by which one would become a medical examiner?

**A.** To become a medical examiner one must first



go to medical school and become a doctor. They will specialize in the field of pathology which is the science and study of disease and that's a four-year training program after you finish medical school. And to become a medical examiner it's recommended that you do a one-year specialty training in the field of forensic pathology.

So you go to medical school and learn how to diagnose diseases and treat patients. You study pathology and you learn how to make diagnosis of decease and medical conditions by learning how to interpret tests and biopsy specimens. But as a forensic pathologist training you spend a year and turn it backwards. So you learn how death and disease and injury is going to ultimately affect an individual that leads to their death and you learn how to interpret physical findings to come up with an opinion as to what would have caused the injury.

**Q.** And, Dr. Collins, what are your specific credentials and background?

**A.** Well, I obtained my medical degree at the University of the West Indies in Jamaica. I specialized in pathology and then I did my



fellowship training in forensic pathology here at the medical examiners office in Philadelphia. I have a license to practice medicine in the Commonwealth of Pennsylvania. I am board certified in anatomic and clinical pathology as well as forensic pathology and those board certifications are issued by the American Board of Pathology.

**Q.** How many autopsies would you say you've performed in your career as a medical examiner?

**A.** Over 5 or 600 autopsies.

**Q.** And have you qualified as an expert in the field of forensic pathology?

**A.** Yes, I have.

**Q.** How many times have you qualified?

**A.** Fifty or 60 times.

**Q.** And how many courts have you been qualified in?

**A.** This court, the Court of Common Pleas.

**Q.** Has there been a time when you failed to qualify as an expert in the field?

**A.** No, I haven't.

**MS. FEENEY**: At this point the Commonwealth would offer Dr. Collins as an



expert in the field of forensic pathology.

**THE COURT**: Any questions, Mr. Coard?

**MR. COARD**: No cross.

**THE COURT**: Okay. The doctor will testify as an expert in the field of forensic pathology.

**BY MS. FEENEY**:

**Q.** Dr. Collins, I would like to turn your attention to an autopsy that was performed by the city of Philadelphia Medical Examiners Office on a man named Kenyatta Smith. Did you yourself perform that autopsy?

**A.** No, I did not.

**Q.** Who performed the autopsy?

**A.** The autopsy was performed by Dr. Gregory McDonald.

**Q.** Is Dr. Gregory McDonald still a member of the Philadelphia Medical Examiners Office?

**A.** No.

**Q.** Do you know where he is?

**A.** He took a faculty position at the Philadelphia College of Osteopathic Medicine.

**Q.** Did you have a chance to review

Dr. McDonald's report and his findings and photographs that may have been taken during the autopsy?
**A.** Yes, I did.
**Q.** Do you have a copy of the report with you today?
**A.** Yes, I do.
**MS. FEENEY**: For the record, the Commonwealth will mark this as Commonwealth's Exhibit No. 22.
- - -
(Medical examiners report marked Commonwealth's Exhibit 22 for identification.)
- - -
**MS. FEENEY**: Your Honor, additionally I would mark this as Commonwealth's Exhibit No. 23.
**THE COURT**: What is that?
**MS. FEENEY**: It's just a body chart.
- - -
(Body chart marked Commonwealth's Exhibit 23 for identification.)
- - -



**BY MS. FEENEY**:
**Q.** We are going to put C-23 behind you, there's a marker there.
**A.** I have markers.
**Q.** So I want to direct your attention to the first page of the report. The person upon whom the autopsy was performed was Kenyatta Smith?
**A.** Yes, it was.
**Q.** Could you give us his age and vital statistics?
**A.** He was verified as a 36-year-old African-American man, who was 5 feet 7 inches, and the weight of 202 pounds.
**Q.** And did you have information about where and when Mr. Smith was pronounced dead?
**A.** Yes. He was pronounced at Temple University Hospital, Philadelphia, Pennsylvania on August 17th, 2007, at 4:04 in the morning.
**Q.** What were the findings in regard to the death of Mr. Smith?
**A.** The finding was Mr. Smith was a well nourished middle aged African-American man who sustained a single penetrating gunshot wound to the right side of the chest.



**Q.** And would you be able to show us that on C-23 where the wound was?
**A.** Yes, absolutely (indicating).
**THE COURT**: Yeah, go ahead.
**THE WITNESS**: Just for the jury because I often get mixed up with this. When you're looking at this, this side of the body represents the right side and this side is the left. And on the other we are looking at the back, this is the left side and this is the right side.
So on the right side of Mr. Smith's body on the right side of his chest under the armpit he sustained a single penetrating gunshot wound.
**BY MS. FEENEY**:
**Q.** And when you say penetrating, what is a penetrating gunshot wound?
**A.** A bullet can do one of two things when it enters the body or when it hits somebody. I can go in and out and as a result it produces two wounds, an entrance wound and exit wound. And we attempt to refer to those wounds as perforating as in through and through, two holes. The second



one is a bullet can go in and stay in and penetrated. When you hear that there's only one wound, the entrance wound and we should recover the bullet in the body unless it was taken out during surgery. And the third is if the bullet grazed against the body and leaves a graze wound. So in this case he sustained a single entry wound and the bullet was recovered in his body, hence, it's described as penetrating gunshot wound.
**Q.** When the autopsy was performed upon Mr. Smith was a bullet removed from him?
**A.** Yes, a bullet was recovered on the left side of his back in the soft tissue. So somewhere in the region over here to the back left side a bullet was recovered.
**Q.** And when the medical examiners office recovers a bullet, what, if anything, is done with that evidence?
**A.** Those bullets are recovered and a notation is made of where the bullet was recovered and it's put in a separate envelope labeled with the case number and turned over to the Firearm Unit for testing.

**Q.** And was that bullet turned over to the Firearms Unit so they can examine it?
**A.** Yes, it was.
**Q.** Did the autopsy find any soot or stippling near the wound or around the wound?
**A.** No, they did not.
**Q.** Can you explain for the jury what that means?
**A.** Certainly. Whenever a gun is fired in addition to the bullet coming off and leaving the body, you can get soot which is the smoke that comes from the explosion inside the gun. And then sometimes you have partially burned gunpowder which is a solid particle which is usually at the end of the gun. And based on the range of fire, meaning how close the end of the weapon is from the victim, you can see evidence of soot or stippling.
So if you see soot on the skin or stippling, it's an indication of close range. That means the end of the gun was within 2 no more than 3 feet of the victim. In this case none was seen on the skin and none was described on the clothing.



**Q.** So that would mean the gun would be more than 2 feet away?
**A.** I like to use the word "undetermined." I can't tell. It could be a shot greater than 2 or 3 feet or a close range, but some object that allowed the bullet to go through and allow the stippling end up on the clothing, so it could be within 2 feet. So we can't tell you the range of fire. Usually it's beyond 3 feet but it could be if it's an intermediate time.
**Q.** Okay.
So because there's no soot or stippling there's no contact against the person's skin, correct?
**A.** That's correct.
**Q.** So that's what you can determine?
**A.** Yes.
**Q.** Dr. Collins, I'm going to ask you if there was a toxicology screening done?
**A.** Yes, we did a toxicology. Toxicology is -- every body that comes to our office we take samples for toxicology. The samples we take is blood, urine, fluid from the eye and gastric content if it's available and test it for the



presence of drugs and alcohol.
**Q.** Now, a toxicology screen was done on Mr. Smith.
**A.** Yes, it was.
**Q.** And can you tell us if there were any substances found in his blood or his urine that would indicate, you know, any drugs, medication in the person?
**A.** Yes. Mr. Smith was positive for cocaine, actually the parent drugs as well as the metabolite and alcohol.
**Q.** On my toxicology screen I have I see seven different substances, I'm going to ask you about them if I can. The first one is?
**A.** First is called Benzoylecgonine and the second one is cocaethylene. Both of those are metabolites of cocaine. So it indicates recent use of the drug. In addition, the third drug on the list is cocaine and that's also positive because that shows that he also recently took the drug and probably under the influence. But it does show that he does have cocaine so he did use cocaine recently.
**Q.** Doctor, can you tell if it's crack cocaine



or powder cocaine?
**A.** No, I can't tell.
**Q.** It can be either?
**A.** Either, yes.
**Q.** And when you say "recently used" you testified that he, according to this, would have been under the influence at the time of his death?
**A.** Could have, yes. And by that I mean, how he would have reacted I really can't say, but it's in his system, but for lack of a better word he might have been high.
**Q.** And then there's the one after the cocaine?
**A.** Diltiazem is a drug that's giving at a hospital or during therapeutic procedures and he did go to the hospital so it was quite possible they gave that to him.
**Q.** So that could have been something given in an attempt to revive him?
**A.** That's correct.
**Q.** And then substance after that?
**A.** The next one, ecgonine methylester is also a metabolite of cocaine.
**Q.** So that goes along with the cocaine use?

A. Yes.
Q. And then we have ethanol is that alcohol?
A. Yes.
Q. And what was his level of alcohol?
A. His level was 721 per deciliter. So in simple terms his level of alcohol was below the legal limit for driving.
Q. So if he got in the car and drove, that would have been fine?
A. Absolutely.
Q. And then the last substance?
A. The remasol, that was present in his urine. I'm not exactly sure what that compound is right now, but it could be a substance that was used to cut the cocaine or given at the hospital, I'm not certain.
Q. Doctor, if you can tell us what the actual, -- say the bullet was penetrating what, if any, organs did it penetrate?
A. This bullet entered on the right side and traveled across his body and was found or recovered on the left side. So on it's way through the body it went through the skin, the right lobe of the liver, it went through the



lung. Going across the body it went to the liver, the right lobe of the lung, through the heart, and passing through the left lobe of the lung and lodged in the back under the skin.
Q. And the liver, the lungs, and the heart, are those considered to be vital organs?
A. Yes, they are. As matter of fact going through all of those organs would produce significant internal bleeding because all of those organs have a lot of blood.
Q. What is the mechanism of death here?
A. Mechanism of death, what would have resulted in Mr. Smith's death was hemorrhage or heavy internal bleeding. In this case it would be internal because the lungs and the heart and abdomen sit in a cavity. So once they are injured he's going to bleed a lot internally. As a result if the blood is not in his blood vessel for his brain and heart he's going to die. So the mechanism is going be hemorrhage or sharp or heavy bleeding.
Q. Doctor, did you note there was any evidence of medical intervention on Mr. Smith's behalf?
A. Yes, there was. When he went to the



hospital there was a thoracotomy incision on the left side of his chest. It's an incision that allows the doctors to visualize the heart and the lung to see if there is any injury, maybe they can try to repair it. Also, with the heart being exposed it's a lot easier for them to perform compressions to allow to the blood to circulate versus pressing on the chest. In addition, you have some IV lines to provide fluid to maintain blood pressure.
Q. Did it appear from your review of the report and findings that everything that possibly could have been done from Mr. Smith was done for him?
A. Yes, it was.
Q. Do you have an opinion as to whether or not he could have survived this injury?
A. This is an insurvivable injury simply because just going through the heart the way it did, unless he got shot inside an hospital and were able to crack his chest open and repair it, that it's a survivable injury.
Q. If there's evidence that this happened at 3:19 in the morning and he was pronounced at 4:04 in the morning, that's 45 minutes, is that



consistent with the amount of damage?
A. Yes.
Q. Doctor, do you have an opinion to a reasonable degree of medical certainty as to the cause of death for Mr. Smith?
A. The cause of death is a gunshot wound to the chest.
Q. And have an opinion as to the manner of death?
A. Yes. The manner of death is homicide.

MS. FEENEY: Those are all the questions I have. Thank you.

THE COURT: Cross-examine.

MR. COARD: Good morning, sir. How are you? I have no questions for you.

THE COURT: Thank you, Doctor, you may be excused.

\- - -

(Witness excused.)

\- - -

THE COURT: You may call your next witness.

MS. FEENEY: Thank you, Your Honor. The Commonwealth calls Mr. Ozzie

Clark.
**THE COURT CRIER**: State your full name, spell your first and last name for the record.
**THE WITNESS**: Ozzie Clark, O-Z-Z-I-E C-L-A-R-K.
OZZIE CLARK, after having been first duly sworn, was examined and testified **as follows**:
- - -
DIRECT EXAMINATION
- - -
**BY MS. FEENEY**:
**Q.** Good morning, Mr. Clark.
**A.** Good morning.
**Q.** Mr. Clark, if you can start off by telling us how old you are?
**A.** Twenty-eight.
**Q.** And how are you employed now?
**A.** Professional driver.
**Q.** Okay.
I might need you to speak up a little bit.
**THE COURT**: You can move the chair up to the microphone.



**BY MS. FEENEY**:
**Q.** How long have you been a professional driver?
**A.** Three years.
**Q.** What is a professional driver?
**A.** A truck driver.
**Q.** Sir, prior to being a truck driver, how were you employed?
**A.** I was the store clerk or cashier.
**Q.** And in what store was that?
**A.** Lehigh Variety, 30th and Lehigh, on the corner.
**Q.** I'm going to show you what's been marked as C-1. Is this the store here, 2950?
**A.** Yes.
**Q.** C-1, is that the store where you worked?
**A.** Yes.
**Q.** Can you tell the ladies and gentlemen, how it came to be that you worked at this Lehigh Variety? Do you call it Lehigh Variety or Lehigh store?
**A.** Either or. At one point in time it was Lehigh Discount and my mother changed the name to Lehigh Variety.



**Q.** How did it come that you started working at the store?
**A.** My father started working out at the store when he was 15. And he got out of college and couldn't go back to the store because he was working, and being that I'm one of his children I started to work in it.
**Q.** And how old were you when you started working in this store?
**A.** Seven.
**Q.** And you would work with your dad?
**A.** Yeah.
**Q.** By 2007, how many years had you worked at the store?
**A.** Too many to count.
**Q.** Well, let's see if you are 29 so you were 25 in 2007, correct?
**A.** Yes.
**Q.** So from 2005 you worked continuously at that store?
**A.** Yes.
**Q.** Did you and your family live in the neighborhood at that time?
**A.** No, we spent most of our time working in the



neighborhood at that time.
**Q.** When you said working at the store, how many days a week would you work at the store?
**A.** Seven.
**Q.** And how many hours a day would you work?
**A.** Between eight and 12.
**Q.** Did other members of your family worked there as well?
**A.** Yes, my mother.
**Q.** And your father as well?
**A.** Yes.
**Q.** Were your mother and father working there August of '07?
**A.** My mother was, my father was sick.
**Q.** Tell us about the store. What kind of store was it, what did you sell?
**A.** A convenient store, cigarettes, tape, toilet paper, pampers, candy.
**Q.** What were the hours that the store was open?
**A.** For a long time the store was open 24/7.
**Q.** When you said for a long time, did that change at one point?
**A.** Yes. The last couple of years it started closing during daylight hours and just open from

like in the afternoon until 4:00 in the afternoon til or 5:00 or 6:00 in the morning.
**Q.** All right.
And in August of 2007, what hours did the store have?
**A.** Not many at all after, you know, this incident.
**Q.** Okay.
Now, I guess let me clarify the question. What I'm trying to say is going to the month of August of 2007, what would the hours have been during month of August of 2007?
**A.** The same, from sun down to sun up.
**Q.** So it was a 24-hour store?
**A.** Yes.
**THE COURT**: Well, no, sun down to sun up. Prior to this incident you were open 4:00 p.m. to 5:00 or 6:00 a.m.?
**THE WITNESS**: Yeah.
**THE COURT**: It wasn't 24-hours a day.
**BY MS. FEENEY**:
**Q.** So you were closed during the daylight hours?



**A.** Daylight hours.
**Q.** So you were open in the evening from 4 o'clock until the sun came up?
**A.** Yeah.
**Q.** I guess, I said 24-hour store because it was in the middle of the night that somebody could come and get something.
**A.** Yeah.
**Q.** Were people allowed to come in and shop?
**A.** No.
**Q.** When you started working initially did people come in the store?
**A.** Yes.
**Q.** At some point did that change?
**A.** Yes.
**Q.** Do you know when that is?
**A.** Not offhand.
**Q.** Why did that change?
**A.** The neighborhood went down and business went out. We were serving through the window so nothing could be stolen. It was a business decision to serve through the window.
**Q.** And when you say "window," I am going to show you Commonwealth's Exhibit No. 5. Now, C-5,



does that show the front of your family store?
**A.** Yes.
**Q.** And there's a door here; is that boarded up?
**A.** Yes.
**Q.** And when you say "window" there's a lot of windows here. The one right next to the door, this one here?
**A.** Yeah.
**Q.** How did you get in the store if the door was boarded up?
**A.** Through that same door.
**Q.** So it was an operational door?
**A.** Yes.
**Q.** Did it lock from the inside?
**A.** Yes.
**Q.** And what about the window, was it locked or unlocked?
**A.** It's locked in that picture.
**Q.** This thing here?
**A.** There's actually a padlock, that little silver thing is an intercom system.
**Q.** This thing here between the door and window is an intercom?
**A.** Yes.



**Q.** C-6, we are talking about this little box here?
**A.** Yes.
**Q.** And going back to C-5, the window you served people through, was it clear glass?
**A.** Yes.
**Q.** But all these other windows, were they clear glass as well?
**A.** They had writing on them.
**Q.** So which, if any, windows could you see out of?
**A.** The one we served through, the one above it, the middle windows.
**Q.** These windows here (indicating)?
**A.** Yes.
**Q.** So which windows had writing?
**A.** The ones up top.
**Q.** What about on the bottom?
**A.** They were like frosted.
**Q.** Okay.
So your visual would have been the three middle windows, the top window, and this window?
**A.** Yes, and that one, too.
**Q.** So basically like a T, right? The top part

of it and the middle, correct?
A. Yes.
Q. Okay.
Now, I want to ask you if you know the person sitting at counsel table?
A. Yes.
Q. And how is it that you know him?
A. From coming to this store.
Q. All right.
And do you know his name?
A. Dennis.
Q. Do you know his last name, what's the other name you know him as?
A. I called him Bam.
Q. And you say you call him Bam, you've had conversations with him before?
A. Well, he was a customer at the store.
Q. And how long have you known him?
A. Five or six years.
Q. Five or six years as we sit here today or five or six years going back to 2007?
A. Back in 2007.
Q. So as we sit here today it's eight or nine years that you've known him?



A. Yes.
MR. COARD: Objection. Leading.
THE COURT: Overruled.
BY MS. FEENEY:
Q. At the time of 2007 when you knew him five or six years, how often would you see him during your work week?
A. Once or twice a week.
Q. In what context?
A. As a customer buying, you know, chips, soda, cakes. You know, in the summertime I would put a video game outside and sometimes anybody could walk up and play the video game.
Q. Did he ever walk up and play the video games outside the store?
A. No.
Q. So your dealings with him were mostly as a customer?
A. Yes.
Q. And that was through the window like you showed us?
A. Yes.
Q. And when you would wait on him, you would speak with him or not?



A. Yes, I would speak with everybody that I waited on.
Q. So if you saw him once or twice a week and this is -- it's fair to say you work 8 to 12 hours a day for seven days a week usually?
A. Yes.
Q. So you would see him possibly 14 times in one week?
A. Possibly, yes.
THE COURT: Wait. I'm sorry. I got confused.
THE WITNESS: She said 8 to 14 times so if somebody comes to the store twice a day, two times in the same day.
THE COURT: But you said you would see him once or twice a week.
THE WITNESS: But she said possibly.
BY MS. FEENEY:
Q. If he came, would he come once or twice?
A. Once or twice or more.
Q. If he came twice a week so that would be eight times a month you would see him?
A. Yeah.



Q. And then you would multiply that by the number of years you've been working there?
A. Yes.
Q. Did you know the person that was the victim, Mr. Kenyatta Smith?
A. I have seen him at the store also.
Q. And what, if anything, would you tell us about him?
A. He would just purchase stuff and leave and he worked security at night at the area pool.
Q. And where's that located?
A. 27th and Indiana or 27th and Clearfield.
Q. And how is it that you knew the Defendant's nickname was Bam?
A. Everybody calls him Bam.
Q. When you say everybody, who is that?
A. People from the neighborhood.
Q. Do you see people from the neighborhood here today in court?
A. Yes.
Q. Where?
A. Sitting behind the Defendant.
MS. FEENEY: Indicating this side of the room over here.

THE WITNESS: Yes.
BY MS. FEENEY:
Q. And do you know them from the store as well?
A. Yes.
Q. And is that store still operational?
A. No.
Q. Tell us about that, what happened?
A. After this incident here, business really really died. People stopped coming at night and I had to find a different job to support my family.
Q. Okay.
So when did the store shut down?
A. Probably about seven months after this incident.
Q. And at that point did you have any reason to go back to the neighborhood then?
A. No.
Q. And your family is not working anywhere near there anymore?
A. No.
Q. Did you know someone named Curtis Smith?
A. From coming to the store.
Q. And how long had you known Curtis Smith?



A. Maybe about a four-and-a-half years as of today.
Q. And did you know someone named Amin Vicks?
A. Yes.
Q. And how did you know him?
A. From coming to the store.
Q. And for what amount of time did you know him?
A. Five or six years.
Q. Did you ever know this Defendant who you know as Bam to socialize or associate with Curtis or Amin?
A. Amin.
Q. Okay.
I want to take you to the night we are talking about, 3:19 in the morning, August 17th, 2007, you were working that shift?
A. Yes.
Q. Did anybody work with you in the store or were you just by yourself?
A. By myself.
MS. FEENEY: If I can -- I'm going to go through the photographs, if I can have the lights down, please?



BY MS. FEENEY:
Q. Now, the store had a street light in front of it, correct?
A. Yes.
Q. All right.
C-14 on this sketch, the street light is depicted here.
THE COURT: Can all the jurors see? If there's glare, just raise your hand.
BY MS. FEENEY:
Q. The street light that's depicted on the map here, was that working the night of this incident?
A. Yes.
Q. And going to C-1, that's the same street light here with the 30th Street sign on it?
A. Yes.
Q. And this picture indicates there's lights out front of the store?
A. Yes.
Q. Was that part of your building?
A. Yes.
Q. And in this picture they are shown to be working, were they working at the time of the



incident?
A. Yes.
Q. Does that picture show the condition of that store the night of this incident?
A. Yes.
Q. All right.
And then this is a photograph looking at your store from across 30th Street. You see the lights here; is that correct?
A. Yes.
Q. Now, I'm going to go to C-6 and I'm going to ask you to explain what we see in this picture, if we would.
C-6, can you tell the ladies and gentlemen, what is shown here in this picture?
A. Two chairs where I had the video game hooked up to the television right there.
MR. COARD: Which one is this?
MS. FEENEY: This is C-6.
BY MS. FEENEY:
Q. So we see two chairs, milk crates or soda crates?
A. Pepsi-Cola.
Q. So you're telling us that you're the person

that set this up?
**A.** Yes.
**Q.** And you testified earlier you used to do this in the summertime.
**A.** Yes.
**Q.** Was this for you or people in the neighborhood?
**A.** Just to get out the store, get out the heat, have some fun with people in the neighborhood.
**Q.** The store was not air conditioned?
**A.** It didn't put out too well.
**Q.** And so during your shift, I guess, your shift would have started Thursday on the 16th at 4 o'clock; is that correct?
**A.** Yes.
**Q.** So do you remember at what time you would have put out the chairs and the video game?
A. Right around 9:30, 10 o'clock.
**Q.** So you waited to until it got dark and came out?
**A.** Yeah.
**Q.** Now, sir, tell the ladies and gentlemen of the jury, if you would, and we'll go through the rest of the photos later, if you could tell us



what happened? I want you to tell us, the jury, about what happened at the store that night.
**A.** I was outside playing the video game and three people walked up. And, you know, I got up to get whatever everybody wanted out of the store. And a guy rode up on a bicycle and I went in the store and I waited on everybody. And as I am waiting on the guy on the bicycle last, you know, somebody else says let me get a soda. When I turned back around, he was being robbed.
**Q.** You first said three people came up to the store, who are the three people?
**A.** Curtis, Bam, and Amin.
**Q.** Okay.
So Curtis, Bam, the Defendant, and Amin came up to the store?
**A.** Yes.
**Q.** Do they all come to the window to buy anything?
**A.** Yes, like, chips, sodas, you know, all different sort of snacks.
**Q.** Of those three people, did Curtis or the Defendant come up?
**A.** Just one person out of those three brought



everything for everybody.
**Q.** Do you remember which of the three of them came to the window to purchase things for you?
**A.** Well, I actually never got their stuff because, you know, the guy on the bicycle came and, you know, I went to get what he wanted first. And when I went back to get the soda and turned back around, the guy was being robbed.
**Q.** Let me stop you for a second. Did somebody place an order with you?
**A.** Yes.
**Q.** Who was it?
**A.** It was Amin, Curtis, and Bam.
**Q.** But which of those three people came up to you?
**A.** We were all -- it was all of them so I asked them what they wanted physically. I never got a chance to get them what they wanted.
**Q.** So if Curtis testified that he bought stuff from you that had not happened yet?
**A.** No.
**Q.** Now, the man that comes up on the bicycle -- Commonwealth's Exhibit 9, do you know what that is?



**A.** The victim's bicycle, I meant to say.
**Q.** The bicycle that's laying there is the bike the victim had?
**A.** Yes.
**Q.** So the person on the bicycle was who?
**A.** Kenyatta.
**Q.** At this point how long had you been waiting on him or seeing him at your store?
**A.** Well, I had been waiting on him -- it took like all of 30 or all of 35 seconds.
**Q.** No, I mean in a month or a year.
**A.** About two years.
**Q.** So when you see the man come up in the bicycle, do you recognize him as Kenyatta?
**A.** Yes.
**Q.** What does Kenyatta order, if anything?
**A.** He wanted a few items, some that I didn't have. So he wound up purchasing a juice and two blunts.
**Q.** Did he ask you for any other items?
**A.** Yeah, he asked me for like Dutch masters, he asked me if I had any bags.
**Q.** Bags for what?
**A.** Cocaine.

Page 53

Q. What is a cocaine bag?
A. It's a resold brand bag, a little 1 by 1
bag.
Q. Those square things you see on the sidewalk?
A. Yeah.
Q. A paraphernalia?
A. Yes.
Q. And do you know what they are used for?
A. Yeah, I mean, to put all sort of things in
them, but they are supposed to be used for coins
and stamps. And if you have little rock stones
to make jewelry or screws or nuts or bolts.
Q. What terminology did he use to ask you for
that?
A. Do you have any coke bags?
Q. And did your store sell those?
A. No.
Q. And did you get whatever you did have in
stock that he wanted?
A. Yes.
Q. This is Commonwealth's Exhibit No. 11, do
you recognize this?
A. That's what I sold Kenyatta.
Q. Now, tell us what happened after you waited

Page 54

on Mr. Smith?
A. Like I said, somebody said let me get two
sodas and I turned my back and looked at the
sodas from the distance. From me to you is the
distance of the refrigerator --
MS. FEENEY: Indicating 11 feet
from where you are to where I am.
THE WITNESS: -- and this guy
was being robbed.
BY MS. FEENEY:
Q. This guy is who?
A. Kenyatta. And he was kind of resistant in
giving up certain things.
Q. Certain things like what?
A. His cell phone.
Q. And you know he was like, "you want to get
popped, Oldhead?"
THE COURT: I'm sorry. I didn't
hear that.
THE WITNESS: Oldhead.
THE COURT: Who said that?
THE WITNESS: The Defendant.
BY MS. FEENEY:
Q. You're saying he was being robbed, I was

Page 55

going to go back to ask you that. Since we got
interrupted, I'm going to ask you when you say,
"being robbed," physically what observations did
you make? What did you see?
A. I saw the Defendant brandishing a weapon and
he stick his hand in the guy's pockets and the
guy didn't want to give up his cell phone.
Q. Let me stop you. Brandishing a weapon, what
type of weapon?
A. A handgun, a revolver.
Q. Did you see the color of the revolver?
A. It was chrome.
Q. When you say he was brandishing it,
Mr. Clark, what he was doing with it?
A. Holding it at his side. If I'm standing
next to you and holding a gun at your side or the
person recording or the person standing is next
to her.
MS. FEENEY: May I approach,
Your Honor?
THE COURT: Go ahead.
BY MS. FEENEY:
Q. If I were to stand behind you and hold the
gun at your side and go in your pockets, you're

Page 56

indicating the gun?
A. Yeah, right about here.
Q. And this would be brandishing the weapon if
I was going in your pockets, going in with one
hand?
A. Yeah, the gun here and going in with the
other hand.
Q. Did you see ever him point to the gun at any
part of the victim?
A. His torso.
MR. COARD: Objection. Leading.
THE COURT: Sustained.
Did you see him point the gun at
the victim?
THE WITNESS: Yes.
THE COURT: Oh, overruled.
BY MS. FEENEY:
Q. What part of the victim did you see him
point the gun?
A. After he said, "Do you want to get popped,
Oldhead." But before that he was holding it.
Q. I missed your answer. What part of the body
was he pointing the gun at?
A. When the robbery first started, his side.

**Q.** What about after that, somewhere else?
**A.** Yes, as they took steps away, mid torso.
**Q.** So indicating this area here (indicating)?
**A.** Yes.
**Q.** I want you to repeat for us what you heard the Defendant say to Mr. Smith?
**A.** "You want to get popped, Oldhead."
**Q.** Is he saying it in the voice you're saying here?
**A.** A little louder.
**Q.** And "you want to get popped," means what?
**A.** You want to get shot to the older male.
**Q.** And using the term older male, does the victim respond to him in any way?
**A.** No, he's just trying to run away at this point.
**Q.** All right.
And I'm going back to C-5. Did you see Mr. Curtis Smith out there when this was going on?
**A.** Yes.
**Q.** Where was he?
**A.** Standing on the corner, maybe 2 feet behind the chairs.



**Q.** So we are looking at C-5 here. Is this a good picture for us to ask you these questions?
**A.** Yes.
**THE COURT**: Can you give him the pointer? Thank you.
**BY MS. FEENEY**:
**Q.** Now, while you're witnessing the Defendant robbing Mr. Smith, are you right at the window there?
**A.** Yes.
**Q.** Do you want to just show us? It's tricky with that pointer.
**A.** Yeah, I'm at this point in the window.
**Q.** And where's Mr. Smith?
**A.** Right about here (indicating).
**MS. FEENEY**: Indicating on the corner of 30th Street by the chairs there.
**THE WITNESS**: Yeah.
**BY MS. FEENEY**:
**Q.** Do you see where Mr. Amin Vicks is, if you can?
**A.** When I walked in he was sitting on the chair that's on the left which you can't see because of the light pole.



**Q.** And where was the Defendant standing when he robbed Mr. Smith?
**A.** (Indicating.)
**Q.** Right in front of the window?
**A.** Yes.
**MS. FEENEY**: Indicating in front of the Crime Scene tape in front of the window.
**THE WITNESS**: Yeah, right there.
**BY MS. FEENEY**:
**Q.** And what about the victim, Mr. Smith, did you see where he's was?
**A.** Yes. First, he's here and as he's asking him, does he want to get popped, he ends up here when the shot is fired.
**Q.** So you're indicating he's over by the window and closer to where the bike is there?
**A.** Well, right about here (indicating).
**Q.** In between, right in front of the window towards the left of the window?
**A.** Yes.
**Q.** It looks like there is some kind of rug or something out front.
**A.** That would be a gate for loading and



unloading supplies.
**Q.** A pull-up basement door?
**A.** Yes.
**Q.** Before the robbery happens when the Defendant first got to the store, did he say anything to you?
**A.** What's up, O.?
**Q.** What's up, O?
**A.** Yeah, everybody says what's up.
**Q.** And did the Defendant use -- are you called O?
**A.** O or OJ. Some people didn't like calling me OJ, some people call me little Ozzie.
**Q.** And the O would be for Ozzie?
**A.** Yes.
**Q.** And OJ would be for what?
**A.** Ozzie, Jr.
**Q.** Okay.
There is another picture I want to show you, C-8. Commonwealth's Exhibit 8, do you recognize what that is?
**A.** Defendant's knife, cigarette packet, and matchbook. I'm sorry, I misspoke, the victim's.
**Q.** That's the victim's stuff?

A. Yes.
Q. And what is it on?
A. The steps that go to the front door.
Q. Did you see how those items got placed on the steps of the store?
A. No.
Q. And then there's -- and then you said that you heard them arguing or you heard conversation about a cell phone?
A. Yes.
Q. Do you recognize that item there that's C-7?
A. Yes.
Q. What is that?
A. The victim's cell phone.
Q. And, specifically, do you know what the conversation was about the phone?
A. He didn't want to give it up.
Q. And at that point what happens? I know you said the Defendant said, "you want to get popped, Oldhead," and that was in the context of the phone.
A. Yes.
Q. And what's the next thing that happened?
A. A shot rang out, everybody ran. All the



kids ran south on 30th Street and the Defendant made it approximately a house down in between two parked down before he fell out.
Q. The Defendant or decedent?
A. No, the decedent.
Q. This is at the time when you're witnessing the robbery. Okay.
I know you said you went to turn and get some sodas from the fridge and the fridge was about this far from where the window was. At the time when you see Bam pull the gun on Mr. Smith, how close are you to where they are? I know you're behind the window, right?
A. From me to her.
Q. So indicating just if this was your window here and they would be here?
A. (No audible response.)
MS. FEENEY: Indicating 3 feet, 4 feet.
THE WITNESS: About three-and-a-half feet between me and her.
BY MS. FEENEY:
Q. Is there anything obstructing your view out that window to see whether he's robbing



Mr. Smith?
A. No.
Q. And at the time, if you know, at the time when he shoots Mr. Smith, how far is he standing from Mr. Smith?
A. Approximately from me to the table there, your table.
Q. All right.
So you indicated he had the gun and he was going through his pockets, correct?
A. Yes.
Q. At some point how does Mr. Smith -- because at that point you were close.
A. As he's asking him, "Do you want to get popped, Oldhead," like taking two steps away from him, like resisting.
Q. Mr. Smith is?
A. Yes.
Q. So initially he said he's up here and got the gun and going through his pockets and saying, "You want to get popped, Oldhead," and Mr. Smith starts going like this?
A. Yes.
Q. Indicating stepping back?



A. Yeah.
Q. And he's stepping back towards Lehigh Avenue?
A. Well, they are already on Lehigh Avenue, he's going towards 29th Street.
Q. So at the point when Mr. Smith gets shot by the Defendant, the Defendant is where and is he standing where, Mr. Smith?
A. Right about here (indicating).
Q. You're indicating right to the right of where his bicycle would be?
A. Yes.
Q. In front of the white side of the building?
A. Yes.
Q. And the Defendant, Bam, is where when he shots him?
A. Right about here (indicating).
Q. He's still in front of the window there?
A. Yes.
Q. And so that would be the distance you said from where you are to where?
A. To where you are.
Q. So about 11 feet way he got shot?
A. Yes.

**Q.** Do you see one shot or more than one shot?
**A.** Just one.
**Q.** And then you said, what happens next, everybody runs?
**A.** Everybody runs, I call the cops. Go looking for the guy that got shot and try to give him some help. I called the cops and waited for the cops and the paramedics.
**Q.** When you said you tried looking for him to try to get him some help, where was he, where did he go?
**A.** He was laying in the middle of the street. There's a bicycle side, he's right about here laying in the street.
**Q.** Indicating in between those cars there?
**A.** Yes.
**THE COURT**: What number is that?
**MS. FEENEY**: C-4.
**BY MS. FEENEY**:
**Q.** You're indicating the two parked cars like in the bike lane?
**A.** Well, his head is across the line and his feet are right here (indicating).



**Q.** Did you go over to Mr. Smith?
**A.** Yes.
**Q.** And what condition is he in when he comes in?
**A.** Barely breathing.
**Q.** I want to show you Commonwealth's 16, if I can.
**MS. FEENEY**: May I approach, Your Honor?
**THE COURT**: Yes.
**BY MS. FEENEY**:
**Q.** Mr. Clark, this is C-16. This is an expanded map of the area. I don't know if you've seen this before, but this is 30th and Lehigh. So if this is where your store is, 30th and Lehigh, can you show us on here which way you see -- did you see Curtis run, Mr. Smith?
**A.** Yes.
**Q.** Which way did he run?
**A.** They all ran down 30th Street south.
**Q.** South on 30th Street?
**A.** Yeah.
**Q.** Where are you when you see them running? Are you still in the store or coming out the



store?
**A.** Coming out the store looking for the guy that got shot.
**Q.** The victim?
**A.** Yeah.
**Q.** Once they go down 30th Street, do you see what direction they go in?
**A.** I make the assumption they go down Oakdale because by the time I walk out the store and look around they are already gone.
**Q.** Okay.
So you don't see them any farther down 30th Street?
**A.** Yes.
**Q.** And Oakdale is the first street?
**A.** Yes.
**Q.** And based on the fact you don't see them farther down here on 30th Street you assumed they turned?
**A.** Right.
**Q.** So you called 9-1-1.
**A.** Yes.
**Q.** Was there a time when the police come?
**A.** Yes.



**Q.** Do you remember who the first officer was that you saw?
**A.** No, I don't.
**Q.** Did you give the officers any information?
**A.** I told them the guy got shot and he needs a paramedic to get to the hospital.
**Q.** Did you tell the officer that you had information, that you had seen what happened, and you knew the person that did this?
**A.** No.
**Q.** You're laughing, why are you laughing?
**A.** I'm not laughing.
**Q.** I mean, explain your reaction. You didn't say you knew the person that did it, why not?
**A.** Because I still worked there at this point. I'm playing video games with these people and for this to happen in front of me, you know, it's like I still got to come to work here the next day and the day after.
**Q.** Okay.
So how did you feel about witnessing this incident?
**A.** I wish I never witnessed it.
**Q.** Okay.

Page 69

Were you afraid to get involved?
**MR. COARD**: Objection.
**THE COURT**: Sustained.
**BY MS. FEENEY**:
**Q.** How did you feel about getting involved?
**A.** I didn't want to be involved.
**Q.** But yet I think you did speak to detectives, right? Didn't you speak to detectives after this happened?
**A.** Yes.
**Q.** So if you didn't want to tell the police you didn't see it, how did it come about that you ended up talking to the detectives from Homicide?
**A.** I no longer worked at the store.
**Q.** I mean, that night.
**A.** Well, before this all happened approximately five minutes before all this happened, I was playing the video games with a Philadelphia officer and he went to go answer a call. So he knows I am working in the store and he also knows that, you know, I seen what happened because of where it happened. And they put me in the car and immediately sent me to detectives at first. By the time we made it to 22nd and Montgomery the decedent was pronounced dead and they took me to Homicide.

Page 70

**Q.** So at that point did you have a choice whether you wanted to cooperate or not?
**A.** No.
**Q.** And that was based on the officer that had just been there?
**A.** I think I would have been an accessory to this murder if I don't say what I saw.
**Q.** I guess what I am saying is, did you volunteer or did the officer say, I know this guy who works here?
**A.** Well, he knows me so he knows I'm there all night long. He knows I didn't leave and he just left and he comes back in the next five minutes. So he says, hey, put him in the car. Take him down 27th, don't go down 29th, don't go down 28th. Head a few blocks down before we start heading south.
**Q.** And why not go down 28th and 29th?
**A.** Because those are streets that are right in the same neighborhood.
**Q.** All right.
So what you're telling us is basically this officer knew you were involved and directed the other officers to take you to Homicide?

Page 71

**A.** Yes.
**Q.** And at that point now you are in the situation where you have to go to Homicide and talk to them; do you give an interview?
**A.** Yes.
**Q.** Now, when you give that interview to Homicide, I believe, at 5:15 in the morning, what if anything, do you tell those detectives? I believe it was Detective Baker.
**A.** Yes. I told them the chain of events that happened and who was outside, you know.
**Q.** Did you say it was Dennis Johnson, it was Bam, I know him?
**A.** No.
**MR. COARD**: Objection. Leading.
**THE COURT**: Overruled.
**THE WITNESS**: No.
**BY MS. FEENEY**:
**Q.** Why not?
**A.** Because I still have to go to work to this place the next day and the day after.
**Q.** So everything you told them about what happened was it the truth at that point except for that you knew who did it?

Page 72

**A.** Yes. And, you know, it's like I told them everything to my recollection of what happened except for, you know, giving them specific names.
**Q.** Okay.
So everything was true and accurate except for giving up the names of the people?
**A.** Yes.
**Q.** Did they show you photographs that night?
**A.** No.
**Q.** Did there come a time when Detective Baker came by to show you photographs to see if you could identify somebody?
**A.** Yes.
**Q.** Do you know how long that was after you first got interviewed?
**A.** No.
**Q.** A week, months, years?
**A.** I want to say months.
**Q.** At that point did you look at photos?
**A.** Yes.
**Q.** Did you look at photos individually or in what they call a photospread?

A. It was eight pictures on one sheet of paper.
Q. Did you see the photo of the person there that did it, of the Defendant?
A. Yes.
Q. Did you then say at the time, okay, here he is, this is the guy that did it?
A. No.
Q. You did not?
A. No.
Q. And why not?
A. The first time I did not.
Q. And explain to the ladies and gentlemen, why did you not? If you're looking at the person who did it and come to the picture, why didn't you tell them?
A. Because I am still going back and forth to this store a few days a weak to go to work.
Q. And how did you feel about making an identification at that point?
A. I didn't think of making an identification at that point either.
Q. What were you afraid would happen?
A. I could easily be shot, my mom, my sister, anybody.



Q. All right.
Now, I want to take you forward about a year-and-a-half after this happens. I want to take you to February of 2009, homicide detectives, do they come and try to talk to you again at that point?
A. Yes.
Q. Okay.
And do you remember the name of the detective that came to talk to you?
A. Not right offhand.
Q. If I said Detective McDermott, does that sound familiar to you?
A. Yes.
Q. Where does Detective McDermott find you?
A. Actually he left a message with my wife and he left a business card.
Q. When you get the message from your wife that Detective McDermott from Homicide wants to talk to you now a year-and-a-half later, what do you do?
A. I go to the detectives and I give them another statement.
Q. What's different now?



A. I'm no longer working in the store, the store is closed. I'm working as a truck driver and no longer have to go back to the same place.
Q. Now, in that statement what is different about that statement that you gave than the other statement?
A. The identification of the shooter.
Q. I'm going to mark both of your statements to make sure you identify it because I know counsel is going ask you questions about it, so I'll mark them now.
MS. FEENEY: I'm marking the first statement as C-24 and the second statement as C-25.
- - -
(Statement marked Commonwealth's Exhibit 24 for identification.)
- - -
(Statement marked Commonwealth's Exhibit 25 for identification.)
- - -
BY MS. FEENEY:
Q. Do you have your two statements there, sir?
A. Yes.



Q. The first one which was marked C-24, that was taken 8/17/07, 5:15 in the morning.
A. Yes.
Q. And that does not contain photos attached to it, correct? If you look at it, it's just two pages.
A. Correct, no photos.
Q. And that's your signature down at the bottom?
A. Yes.
Q. This is your first statement and is that your signature down at the bottom?
A. Yes.
Q. Okay.
And then that's your signature there as well, correct?
A. Yes.
Q. Now, going to your second statement. On your copy it should have your place of employment at the time was what on your statement?
A. The first one?
Q. Yeah.
A. 2951, 2950 West Lehigh Avenue.
Q. And it says name of employment?

Page 77

A. Lehigh Variety.
MR. COARD: Your Honor, may I have a second with the Commonwealth?
THE COURT: Yes.
- - -
(Short pause.)
- - -
BY MS. FEENEY:
Q. This is your second statement and it was given to Detectives McDermott and Cruz, correct?
A. Yes.
Q. And it's really hard to see up here, but the date of your second statement is 2/19/09, correct?
A. Yes.
Q. And that's your signature as well, right?
A. Yes.
Q. And Page 2 of your statement, your signature is down there?
A. Yes.
Q. All right.
Then we have finally Page 3; is that your signature?
A. Yes.

Page 78

Q. Okay.
This statement is different because there's the last page where you had signed something. This is attached to your statement, a statement adoption attestation. It says, "The above written statement the verbatim statement giving to Detective McDermott, Officer Cruz, who recorded my answers to the questions that Detective McDermott and Officer Cruz asked me. I hereby adopt the verbatim statement and hereby verify by my signature below that the facts set forth in this statement are true and correct to the best of my knowledge, information, and belief."
And that's your signature, correct?
A. Correct.
Q. And that was Detective McDermott's signature?
A. Correct.
THE COURT: What date was that?
MS. FEENEY: 2/19/09.
BY MS. FEENEY:
Q. They showed you photographs as a result of that?

Page 79

A. Correct.
Q. And this indicates that you chose this photo here, Photo No. 8 in photo display 1. Who is this a photograph of?
A. Amin.
Q. Amin Vicks?
A. Yes.
Q. And it says, "On Saturday 17th of May, 2008, 5:15 a.m., array shown to witness Ozzie Clark. He signed beneath photograph and stated he was standing outside the store prior to the robbery with male with tattoo."
And this is Amin Vicks?
A. Yes.
Q. And this is the photo display you picked out, Photo No. 6 here, who is that a photograph here?
A. The Defendant.
MS. FEENEY: Indicating the Defendant Dennis Johnson.
BY MS. FEENEY:
Q. It states, "On Saturday 17th of May, at 5:15 a.m., array shown to witness Ozzie Clark. No identification made."

Page 80

But you made this identification here; is that correct?
MR. COARD: Objection. That's not what it says, Your Honor.
THE COURT: Sustained.
BY MS. FEENEY:
Q. Sir, is this your signature?
A. Yes.
Q. And did you circle this photograph?
A. Yes.
Q. Okay.
Do you know who typed this here?
A. No.
Q. Okay.
You did not type that, did you?
A. Okay.
THE COURT: It's a different date than on the bottom?
MS. FEENEY: This is 2/19/09.
BY MS. FEENEY:
Q. This says Saturday, May 17th, 2008, is that the date when Detective Baker showed you the photo and you failed to make the identification?
A. Yes.

Q. So now a little less than a year later, is this the same photo array you first saw and you said I don't know anybody?
A. Yes.
Q. So they indicate here you did not make the identification back in May of '08. At that time were you still working at the store, May of '08?
A. Yes.
Q. Now, it's 2/19/09, and you signed your name beneath the photograph of this Defendant. At that time in February of '09, were you still working at the store?
A. No.
Q. So 2/19/09, you make that identification, correct?
A. Correct.
Q. The photo display of Amin Vicks, did you identify him in May? You had identified Amin Vicks back in May.
A. Yes.
Q. And why did you identify him as being outside the store in May, you weren't afraid of identifying him?
A. He wasn't brandishing the weapon and he was



outside.
Q. In other words, he did identify the person outside the store.
MR. COARD: Objection.
MS. FEENEY: And I'm asking him why is identifying him in May and not your client.
BY MS. FEENEY:
Q. Explain it to the jury.
A. He wasn't holding the weapon and he was outside, so I identified him because he was outside.
Q. So you just let the police know he was out there?
A. Yes.
Q. You didn't tell them that's the person you saw do anything?
A. No.
Q. This is a photograph of a tattoo, I believe. And this is photo identified No. 3, there's no narrative here but it indicates you circles photograph No. 6, and did that on February 19th, '09, correct?
A. Yes.



Q. And that's your signature?
A. Correct.
Q. Who is this a picture of?
A. Curtis.
Q. And in your statement you indicate that you saw him outside at the time of the shooting, correct?
A. Correct.
Q. Did you remember back in May of '08, were you shown any pictures of Curtis at that time?
A. No.
Q. So this is the first time you were asked to see if you can identify him?
A. Yes.
Q. And then we have another photo display here, there's a man who is circled.
A. Yeah, they asked me if I knew anybody else in the photo lineup.
Q. That's the same photo with Curtis's picture?
A. Yes.
Q. So you knew somebody else besides Curtis?
A. Yes.
Q. Was he involved in any way?
A. No, he was just another customer.



Q. So they happen to have another picture you recognized from the neighborhood in the same photo array?
A. Correct.
Q. But he has nothing to do with this?
A. Correct.
Q. But you let the detective know you knew him?
A. Yes.
Q. Now, this is the photograph of who?
A. The decedent.
Q. And that's Kenyatta Smith?
A. Yes.
Q. And detectives asked if you recognized him as well?
A. Yes.
Q. And that's your signature?
A. Yes.
Q. And that's February 19th, 2009, correct?
A. Yes.
Q. Is that the first time you were ever shown a photograph of him?
A. Yes.
Q. And I believe that's the end of your statement, correct?

A. Yes.
MS. FEENEY: Sir, I don't believe I have any further questions. Thank you.
THE COURT: Before we get started on cross-examination, I'm going to give the jury a comfort break.
THE COURT CRIER: Please remain seated as the jury exits the courtroom.
- - -
(Jury departs the courtroom at 11:45 a.m.)
- - -
THE COURT: Mr. Clark, the break should last about ten minutes. You can step down and take a comfort break. In ten minutes you'll be back on the stand. You can't discuss your testimony with anyone at all; do you understand that?
THE WITNESS: I understand.
- - -
(Short recess.)
- - -
THE COURT CRIER: This Court is back in session.



Please remain seated as the jury enters the courtroom.
- - -
(Jury enters the courtroom at 12:05 p.m.)
- - -
THE COURT: You may cross-examine.
MR. COARD: Thank you.
- - -
CROSS-EXAMINATION
- - -
BY MR. COARD:
Q. Good afternoon, sir.
A. Good afternoon.
Q. I just a few questions for you. The prosecutor asked you about a couple of statements that you gave. One statement is dated August 17th, 2007, the date of the incident, and the other is dated February 19th, 2009. Do you have those documents in front of you?
A. Yes.
Q. Do you have those documents in front of you?
A. Yes.
Q. I want to ask you a few questions in



connection with that. Now, let me ask you this question. Have you ever told a police officer that you had never seen the shooter before the incident of August 17th, 2007?
A. Yes, in my first statement.
Q. So in your first statement -- in fact, let's go to your first statement, again which is dated August 17th, 2007. In that statement you said you had never seen the shooter before the incident of that same date; is that's correct?
A. Correct.
Q. In addition to that statement, August 17th, 2007, you gave information about this case at the preliminary hearing. And that preliminary hearing was on June 3rd, 2009, in this building; do you recall that?
A. Yes.
MR. COARD: And for the Commonwealth I'm going to Page 18, line 16 to 25.
BY MR. COARD:
Q. I just want to ask you a few questions in connection with that statement.
Now, in your first statement to the police



you told them you had never seen the shooter before. When you testified at the preliminary hearing on June 3rd, 2009, you said the same thing, that you had not seen the shooter before this incident; is that correct?
A. I don't remember that, I may have misspoken.
Q. All right.
Let me ask you if you remember this question and your answer. Again, this is the notes of testimony, 2/3/2009, in the Criminal Justice Center, Courtroom 306.
The question posed to you, sir, is --
MR. COARD: This is on the bottom of Page 18.
BY MR. COARD:
Q. "QUESTION: And then, finally, you're asked this question, have you ever seen the shooter prior to this incident? What is your answer?"
And your answer was "No." Do you recall that?
A. No, I don't recall the lawyer then, he was screaming and yelling at me.
MR. COARD: Your Honor, may I approach and show him a copy?

**THE COURT**: We'll mark it and hand it to him. Do you want to mark that as an exhibit?

**MR. COARD**: Yes, Your Honor.

**THE COURT**: Just the relevant portions we'll mark D-1.

**MR. COARD**: Yes.

- - -

(Preliminary hearing notes marked Defense Exhibit 1 for identification.)

- - -

**BY MR. COARD**:

**Q.** We are on Page 18. So we are showing you Page 18, do you see at the top, the very top, preliminary hearing, volume 1, June 3rd, 2009; do you see that?

**A.** Yes.

**Q.** And under that Page 18, let's go about halfway down. The lines are numbered, I'm beginning at line 16; do you see that?

**A.** Yes.

**Q.** By the way, before I even go there, when you testified at that preliminary hearing, just like you're testifying at this hearing, you put your



hand on the bible and swore to tell the truth, the whole truth and nothing but the truth; is that correct?

**A.** Correct.

**Q.** Now, Page 18, line 16.

"QUESTION: And then finally you're asked this question. Have you ever seen the shooter prior to this incident? What was your answer?"

What does that say there as your answer on line 20?

**A.** "No."

**Q.** And then the question beginning on line 22 "Was that the truth?"

What is your answer on line 23?

**A.** "Yes."

**THE COURT**: Well, you have to read the actual answer.

**BY MR. COARD**:

**Q.** I'll read the exact question and answer, and you correct me if I'm wrong.

The question starts on line 21, "No."

Follow up question, "Was that the truth?"

Your answer, "Correct, it was the truth."

"QUESTION: It was?



"ANSWER: Yes."

Is that right?

**A.** That's correct.

**Q.** Okay.

Let's go down to Page 19. Page 19 is on the same page but on the left-hand side; do you see that

**A.** Yes.

**Q.** Let's begin at the top.

"Line 1: So you had never seen the shooter before this incident; is that correct?"

The answer on line 3 is, "Correct."

Is that what it says?

**A.** Yes.

**Q.** All right.

Next question. "Now, the gentleman to my left, that being Mr. Johnson, you have known him for ten or eleven years, right?"

What's your answer?

**A.** "Correct."

**Q.** Just so you we are clear, you say you have known him for more than ten years and you also testified that the shooter you never seen before the incident; am I correct?



**A.** Correct.

**Q.** Okay.

I just have some stuff I want to ask you, sir, and most of it is from this preliminary hearing.

Now, let's jump back to your statement on August 17th, 2007. Do you have that in front of you?

**A.** Yes.

**Q.** In that statement of August 17th, 2007, you never identified Dennis Johnson as the shooter; is that right?

**A.** Correct.

**Q.** And in regard to that statement dated August 17th, 2007, there's a signature at the bottom of the first page; whose signature is that?

**A.** Mine.

**Q.** There's a second page and there's a signature at the bottom of that second page; is that right?

**A.** Correct.

**Q.** Now, let's go to Page 26 of the notes of testimony from June 3rd, 2009. Now, at some point at that preliminary hearing you did

identify Dennis Johnson as the person who did the shooting; is that right?
A. Correct.
Q. All right.
Having said that, let's go to Page 26, beginning line 15.
"QUESTION: You didn't say, hey, I kind of saw the body of the shooter" --
MS. FEENEY: I object. Can you clarify who is asking the question?
MR. COARD: Certainly.
BY MR. COARD:
Q. The question is coming from the attorney for the Defendant and the answer is coming from you; is that correct?
A. Correct.
Q. Thank you.
Now, did you actually see the face of the person who was firing?
A. Yes.
Q. So you did see the face of the person who did the shooting; is that correct?
A. Correct.
Q. And you are able to identify that person to



who did the shooting to the police based on his face and what he looked like; is that right?
A. Right.
Q. Now, let's go to Page 26 beginning line 15. This is the attorney asking you questions.
"QUESTION: You didn't say, hey, listen, I saw kind of the body of the shooter but I didn't see the face. You didn't say that to the homicide detectives, did you?
"ANSWER: I did.
"QUESTION: You did?
"ANSWER: Yes.
"QUESTION: And they didn't put it in here?
"ANSWER: Correct.
"QUESTION: So homicide detectives were told by you that you didn't see the face of the shooter and they left it out of both statements, these homicides detectives?
"ANSWER: Correct."
So is that what it said? Did I read that correctly?
A. Could you do it one more time?
Q. We are reading from Page 26 of the notes of testimony beginning line 15 to 25. And the court



crier will show you exactly. In that statement, on that page the attorney is asking you beginning line 15; are you with me there?
A. Yeah.
Q. The attorney is asking, "You didn't say, hey, listen, I saw kind of the body of the shooter, but I didn't see the face. You didn't say that to the homicide detectives, did you?
"ANSWER: I did.
"QUESTION: You did?
"ANSWER: Yeah.
"QUESTION: And they didn't put it put in here?
"ANSWER: Correct.
"QUESTION: So homicide detectives were told by you that you didn't see the face of the shooter and they left it out of both statements, these homicides detectives?
"ANSWER: Correct."
Did I read that right?
A. Yes.
Q. So a few minutes ago I asked you if you saw the face of the shooter and you said, yes, you did see the face of the shooter, but that's not



true. Your identification was based on the body of the shooter, not the face; isn't that correct?
A. No, it was based on both.
Q. Okay.
Let go to the same page, line 18. Same page being 27. Let's go down to question on line 18.
"QUESTION: When you didn't see the shooter's face."
Let me back up because that's not clear. I need to go to the question before that. Let's start with line -- in fact, let's do the whole page so we can put it all in context.
"QUESTION: I thought you told us a moment ago under direct examination that the Defendant was out there with you playing video games before the incident. Did I hallucinate that?
"ANSWER: No.
"QUESTION: Well, was he?
"ANSWER: Yeah, he was standing around while we were playing video games.
"QUESTION: Is that how you got it in your mind that because he was must have been out there earlier that he must have been the shooter?
"ANSWER: Well, three people were out there

and I go in the store, and there was three people still outside, yeah.
"QUESTION: When you didn't see the shooters face?
"ANSWER: No.
"QUESTION: Was he wearing anything on his head?
"ANSWER: A baseball cap."
Did I read that right?
**A.** Correct.
**Q.** So it's your testimony now under oath that you indicated that you identified the Defendant based on both his face and his body; is that right?
**A.** Correct.
**Q.** Page 23, that's small 23, we are going to begin at the bottom of Page 23 at line 25. And then we are going to go to the right of that for Page 24, but let's start at the bottom of 23, line 25.
"QUESTION: You just said to me under" --
**MS. FEENEY**: It's by Brian McMonagle, Defense attorney.
**MR. COARD**: Thank you very much.



**BY MR. COARD**:
**Q.** All of these questions coming up is from the Defense attorney and all these answers are coming from you; is that correct?
**A.** Correct.
**Q.** "QUESTION: You just said to me under oath a moment ago that when this incident happened you kind of knew who it was and you kind of didn't know who it was; is that the answer you want to stick with?"
What's your answer to that?
**A.** Line 4, "Correct."
**Q.** And after you say correct, "QUESTION: How is that?
"ANSWER: Well, you know, the identity came through talk, speech, not visual."
Was that what you said at the preliminary hearing under oath?
**A.** Yes.
**Q.** So if it was not visual, how are you telling this jury that you identified him by his face?
**A.** Repeat that one.
**Q.** Yes, I'll repeat the question, too. Let's go back to Page 24, line 5.



"QUESTION: How was it that?
"ANSWER: Well, you know, the identity came through talk, speech, not visual."
That's your answer under oath at the preliminary hearing; is that right?
**A.** That's my answer.
**Q.** So if it's not visual, how are you telling the ladies and gentlemen of the jury, that you identified him by his face?
**A.** Because I'm identifying by his face when he walked up and said, what's up, O.
**Q.** Isn't that visual?
**A.** Yes.
**Q.** But you say here "not visual;" isn't that what it says?
**A.** Yes.
**Q.** In fact, let's go on.
"QUESTION: The identity came from walk, talk, speech, not visual."
Follow me on this part.
"So you didn't see the shooter's face?"
What's your answer?
**A.** Line 10 says "No."
**Q.** So when that question was posed under oath



you said, "No, I didn't see the shooter's face?"
**A.** Correct.
**Q.** As a matter of fact it goes on.
"QUESTION: What part of the shooter's body did you see?
"ANSWER: Hands, the body, the shoulders."
Is that right?
**A.** Correct.
**Q.** Now, this preliminary hearing is June 3rd, 2009; is that right?
**A.** Correct.
**Q.** And this is well after the shooting on August 17th, 2007, correct?
**A.** Yes.
**Q.** And you moved out of the neighborhood; is that right?
**A.** I never lived in the neighborhood.
**Q.** You didn't work in the neighborhood anymore?
**A.** Correct.
**Q.** And this young man here, Dennis Johnson, you indicated that you knew him for more than a decade prior to the incident; is that correct?
**A.** Right.
**Q.** I have a few more questions for you, sir.

Now, what was the person who did the shooting, what was he wearing at the time of the shooting?
A. White T-shirt, blue jeans, baseball cap.
Q. Okay.
Let's go to the baseball cap. Let's go to your statement of August 17th, 2007. And again in that statement, August 17th, 2007, that is your signature at the bottom of the first page, Ozzie Clark; is that right?
A. Yes.
Q. And that's a signature on the second page of the two-page document; is that right?
A. Yes.
Q. And the question posed here, "Can you tell us how the shooter was dressed?
"ANSWER: He was wearing a white T-shirt, blue jeans, and was wearing a watch on his left wrist."
Where's the part about the baseball cap?
A. It's not there.
Q. It's not there. In fact, so I don't get confused I'll stay on the statement and then I'll wrap things up with your testimony from the preliminary hearing. Let's stay on the August



17th statement since that's where we are.
So you indicate that there's nothing in the August 17th, 2007 statement of a person wearing a baseball cap, is that right, you'll agree with me on that?
A. What was the question?
Q. The question is you just told the jury that the person was wearing a baseball cap. And I'm asking you, did you tell the police when you spoke to them on August 17th, 2007, that the person was wearing a baseball cap? You talked about the white tee, you talked about the blue jeans, the white sneakers and the watch. But there's nothing here about a baseball cap; is that right?
A. That's right.
Q. Okay.
Now, can we go to the photo, the one that shows the chairs on the corner and the bicycle. At the time that the shooting took place -- you have your pointer?
THE COURT: For the record, is this C-5?
MS. FEENEY: Your Honor, it is



C-5.
BY MR. COARD:
Q. Now, at the split second that the shooting took place, with your pointer, show us where the Mr. Johnson was standing?
A. (Indicating.)
Q. And would you say that's slightly to the -- that's about what, 3 feet away from the door approximately?
A. A foot-and-a-half, 2 feet.
Q. And if you're facing the door it would be what, about a foot to the left of the door?
A. As far as?
Q. If he's standing here facing the door, would he be directly in front of it or about a foot or more away from it?
A. About a foot-and-a-half, 2 feet.
Q. Okay.
He's standing there as you say when the shot was fired. The decedent, where's he standing at the time the shot was fired?
A. He's running and he's right about here at the time the shot is fired.
Q. Okay.



MS. FEENEY: Indicating for the record, in front of the white on the left-hand side.
BY MR. COARD:
Q. But you would say that's about what, 5 or 10 -- how far away from the door would you say the decedent was standing at the time the shot was fired? What is your estimation?
A. Seven-and-a-half, 8 feet.
Q. And the bike was what, maybe a foot or two to the left of him?
A. Yes.
Q. So the decedent is between the shooter and the bicycle; is that right?
A. Correct.
Q. Now, looking at this photograph, there's -- in fact, let's go to the one that shows the chairs closer.
MS. FEENEY: C-6.
BY MR. COARD:
Q. These chairs were out there the morning of the shooting; is that right?
A. Yes.
Q. In fact, they were there at the time of the

shooting; is that correct?
**A.** Yes.
**Q.** And as far as you know those chairs were never moved; is that right?
**A.** That's right.
**Q.** There's a metallic chair and a wooden chair that's slightly taller; is that right?
**A.** Actually the chair on the left is taller than the chair on the right.
**Q.** The metallic is taller?
**A.** Yes.
**Q.** So the metallic chair is taller, the wooden chair is smaller; is that right?
**A.** Right.
**Q.** Both chairs, are they on the corner or around the corner?
**A.** On the corner.
**Q.** So if anybody is standing to the right of the wooden chair, that person would be right there on the corner; is that right?
**A.** Correct.
**Q.** And these items here, it looks like a cigarette packet and something else, do you know where they came from?



**A.** The decedent.
**Q.** How far is the decedent from the person standing next to the chair?
**MS. FEENEY**: Objection.
**MR. COARD**: Let me rephrase that.
**BY MR. COARD**:
**Q.** How as far is the location of the cigarette packet as we see right now to the immediate right to the chair? What would you say that distance is?
**A.** The first or second chair?
**Q.** The second chair, the wooden chair. How far would you say if somebody is standing next to the wooden chair, how far are they in distance from that cigarette packet?
**A.** Three-and-a-half feet.
**Q.** Let's go to the second page of this statement. I'll make it a little more orderly. So we are still on the August 17th, 2007, statement and we are on the second page. I did ask you before about whether or not you had indicated you had seen or not seen the shooter before, but let's go to the top of the second



page.
"QUESTION: Have you ever seen the shooter prior to that incident?"
Your answer was "No," as you testified before; is that right?
**A.** Here?
**Q.** Yes, it says, "No, you had never seen the shooter prior;" is that right?
**A.** That's what it says here, yes.
**Q.** Now, three questions down, "Is there anything else that you can tell us that might assist us in this investigation?
"ANSWER: There were two kids playing a video game outside the store when this happened. One, is a kid they call Johnny. And the other male has a tattoo on his right arm, Certified Gangster. I know he just got that tattoo on Tuesday night on Stanley Street at a tattoo party."
Is that correct?
**A.** Correct.
**Q.** Now, in regards to this August 17th, 2007 statement, you indicated that the only thing that you left out was the identity of the shooter.



And you identified him now as Dennis Johnson; is that right?
**A.** Correct.
**Q.** So everything else you said in this August 17th, 2007 is true; is that right?
**A.** Correct.
**Q.** Let's go back to that answer you gave. You said, "There were two kids playing the video game. One, is the kid called Johnny. And the other male has a tattoo on his right arm, Certified Gangster."
Did you ever find out who that male was that has the tattoo, Certified Gangster, on his right arm?
**A.** Yes. If you look in my second statement that's the guy I identified.
**Q.** And that was Amin Vicks?
**A.** Yes.
**Q.** So far we got Dennis Johnson, we got -- well, forget Dennis Johnson in the August 17th statement because you didn't identify him, but you did identify Johnny and Amin. Johnny is not Dennis Johnson; is that correct?
**A.** Correct.

Page 109

**Q.** Was there anybody else out there either at or near the video game?
**A.** Yes.
**Q.** Who?
**A.** Before the robbery there was the Defendant, there was Curtis, then the customer came up.
**Q.** Okay.
**A.** And Amin was playing the video game that I was playing. He took the joystick from me.
**Q.** You just mentioned Curtis; is that Curtis Smith?
**A.** Yes.
**Q.** Can we go back to C-5? In this August 17th, 2007 statement, did you mention Curtis Smith?
**A.** No.
**Q.** Just so I am clear, because I asked you couple minutes ago, apart from not identifying Dennis Johnson everything else was true, and you said yes; is that right?
**A.** Correct.
**Q.** But you didn't include Curtis Smith who you say now was there?
**A.** Because I didn't know his name.
**Q.** But you didn't even describe him, did you?

Page 110

**A.** In my first statement, no.
**Q.** So you didn't say his name, no description, not even some other guy, nothing at all about him; is that right?
**A.** It's not recorded in my first statement.
**Q.** Not recorded, are you saying the police didn't include it or you didn't tell them?
**A.** Well, I said there were a few people out there.
**Q.** Well, let's go back to C-5. We are looking at the chairs on the corner and you just testified as to what you saw during the shooting.
Was there anybody standing to the right of this chair at the time of the shooting?
**A.** I couldn't tell you.
**Q.** What do you mean you couldn't tell me?
**A.** Because I'm inside the store, I can only see what's directly in front of me.
**Q.** So you couldn't see off to the right or off to the left, just directly in front of you.
**A.** Yes.
**Q.** Are you looking straight out of this window or the other window you can look out of?

Page 111

**A.** I am looking out the window that people are being served out of, and also the other three middle windows.
**Q.** Curtis Smith, the person you didn't name in the August 17th, 2007 statement, how did he manage to leave? Did he walk away, run away, did he stay there? What did Curtis Smith do after the shooting?
**A.** Everybody ran.
**Q.** Now, when you say "everybody," you mean -- how --
**A.** Everybody that wasn't me.
**Q.** At the time of the shooting apart from you and the victim, how many other persons were there at the time of the shooting?
**A.** Four.
**Q.** Okay.
So apart from you and the victim, there's four other persons?
**A.** Yes.
**Q.** And Curtis Smith is one of those four; is that right?
**A.** Right.
**Q.** Now, when you say they all ran, did they run in different directions or in the same direction?

Page 112

**A.** They all ran in the same direction.
**Q.** Curtis Smith ran in the same direction as the person you said fired the shot?
**A.** Yes.
**Q.** Let's go to your preliminary hearing testimony and I'll wrap things up with your final statement. I had asked you a few minutes ago about your description of the shooter and you told us what you said back on August 17th, 2007, but you didn't mention anything about a baseball cap. But later at a preliminary hearing you did mention the baseball cap; is that right?
**A.** Correct.
**Q.** And was it because of the baseball cap that you couldn't identify the face of the person?
**A.** I'm not understanding your question.
**Q.** Did the baseball cap affect your ability to see the face of the shooter?
**A.** No.
**Q.** Let's go to Page 27 to get clarification. Page 27, line 18, question from the Defense attorney. "When you didn't see the shooter's face --

"ANSWER: No.
"QUESTION: -- was he wearing anything on his head?
"ANSWER: Baseball cap."
And you're saying that although he the baseball cap on, that baseball cap did not affect your ability to see his face; is that right?
**A.** That's right.
**Q.** In fact, I think you mentioned on direct that it was well-lit; is that correct?
**A.** It was lit.
**Q.** There was light on the corner.
After this shooting on August 17th, 2007, you did not see Dennis Johnson in the neighborhood or anywhere else ever again after August 17th, 2007; is that right?
**A.** Correct.
**Q.** Now, at some point and the prosecutor pulled this out on direct examination, there was a photo array where there was a group of photos and you identified the Defendant, Dennis Johnson, by his photograph; is that correct?
**A.** Correct.
**Q.** So tell ladies and gentlemen of the jury,



how you could pick out the photograph if you said that your identification was not visual but based on walking and talking?
**A.** Come again.
**Q.** Okay.
When you picked out in this photo array of Dennis Johnson it wasn't a voice ID. The police didn't play an audiotape for you to listen to, did they?
**A.** No.
**Q.** It wasn't a videotape where they showed you height, weight, or movement, was it?
**A.** No.
**Q.** It wasn't a photograph of the body, was it?
**A.** No.
**Q.** It was a photograph of the face; is that correct?
**A.** Correct.
**Q.** So how do you pick him out based on his face in a photograph if you testified at the preliminary hearing that the identification was not visual?
**A.** Because I know the Defendant.
**Q.** So why didn't you say that the first time?



**A.** That guy was screaming and yelling and people were behind him making gestures.
**Q.** So you were confused?
**A.** Yes.
**Q.** You just testified that you didn't see Dennis Johnson after the shooting. What about Curtis Smith, did you see him after the shooting?
**A.** No.
**Q.** What about somebody by the name of Maurice Stokes?
**A.** No.
**Q.** What about Amin Vicks?
**A.** Yes.
**Q.** You did see Amin Vicks?
**A.** Yes.
**Q.** And how long after the incident did you see Amin Vicks? And by the way, Amin Vicks was one of the guys who was present when the shooting took place; is that correct?
**A.** Correct.
**Q.** And he's one of the guys that ran away after the shooting took place; is that correct?
**A.** Correct.
**Q.** And he's the guy who came back to your store



after the shooting; is that correct?
**A.** Correct.
**Q.** And how long after the shooting did Amin Vicks come back to the store?
**A.** I don't know what day he got shot but he had a cast on his arm.
**Q.** And without telling us what he said, did you have a conversation with him?
**A.** No.
**Q.** So you didn't say anything to him, he didn't say anything to you?
**A.** He ordered stuff from the store.
**Q.** Okay. Fair enough.
Instead of me jumping back on the preliminary hearing, I'll stay on that and wrap things up on the final statement.
Let's go quickly go to Page 26. I did ask you about this before and I'm not sure of what your answer was or what it meant. Let's start on Page 26, line 15. Line 15 begins with a question from the attorney.
"QUESTION: You didn't say, hey, listen, I saw kind of the body of the shooter, but I didn't see the face. You didn't say that to the

homicide detectives, did you?
"ANSWER: I did.
"QUESTION: You did?"
**MS. FEENEY**: Your Honor, I'm going to object at this point, it was asked and answered.
**THE COURT**: Sustained.
**MR. COARD**: It was and I apologize about that. Let me move onto the statement on February 19th, 2009.
**BY MR. COARD**:
**Q.** In your statement of February 19th, 2009, this was what, about a year-and-a-half after the incident on August 17th, 2007; is that correct?
**A.** Correct.
**Q.** All right.
And let's go to the second page. I don't know if it's numbered in the group you have, but there's a group of photographs at the end of the document; do you have that?
**A.** Yes.
**Q.** And let's go to the next of the last page of that document; do you have that?
**A.** Yes.



**Q.** And that's the document the prosecutor put up on the screen and it says here "On Saturday," this is typewritten, correct me if I am wrong.
"On Saturday, 17th of May, 2008, 5:15 a.m., an array was shown to witness, Ozzie Clark. No identification made."
Is that what it says?
**A.** The one that was displayed on the board, yes.
**THE COURT**: Are you on the right page? Let me see it.
**THE WITNESS**: Yes, I'm on the right page.
**MS. FEENEY**: I can put it up on the screen.
**MR. COARD**: That's fine, yes.
**BY MR. COARD**:
**Q.** And that document there, "On Saturday, 17th of May 2008, at 5:15 a.m., array shown to witness, Ozzie Clark. No identification made."
So there was no identification of Dennis Johnson on August 17th, 2007, and again on May 17th, 2008 again there was no identification made; is that right?



**A.** That's correct.
**Q.** And after the August 17th, 2007 incident you had no contact with Dennis Johnson; is that correct?
**A.** Correct.
**Q.** And underneath the typewritten portion it says, "Ozzie L. Clark Jr.," and just a date there, February 19th, 2009, but nothing else written there apart from the Defendant's photograph being circled; is that right?
**A.** That was the day I did make the identification.
**Q.** Okay.
That was the day you did make the identification and that is February 19th, 2009, well after -- let met rephrase that.
February 19th, 2009, is the first time since this case began that you identified Dennis Johnson as the shooter; is that right?
**A.** Correct.
**Q.** And this is the same Dennis Johnson that you said you been knowing for ten years but you didn't identify him by face, it was by body; is that correct?



**A.** I'm not understanding. We are going in circles here.
**Q.** Okay.
Did you ever testify or sign a statement indicating that the identification was not based on the face, but was based on something else? Did you ever write that, sign that, or say that?
**A.** Sign that.
**Q.** You signed it. But here is clearly based on the face; is that right?
**A.** Correct.
**Q.** And this is the first time on February 19th, 2009, that it was based on the face; is that correct?
**A.** Correct.
**Q.** Now, even at the preliminary hearing which came even later than that date, preliminary hearing on June 3rd, 2009, let me go to Page 38.
**MS. FEENEY**: Are you talking about the second statement?
**MR. COARD**: Yes.
**MS. FEENEY**: What Page?
**MR. COARD**: Page 38.
**BY MR. COARD**:

Page 121

Q. Now, I asked you about the baseball cap and you acknowledged that in the later statement you didn't mention anything about the baseball cap; is that right?
A. Come again.
Q. I asked you earlier if you omitted the baseball cap from the first statement and you said, yes, you did omit that; is that correct?
A. Did I?
Q. I'm asking you, did you?
A. Did I?
Q. Let me ask you now. Did you include the baseball cap in your first statement?
A. No.
Q. Okay. That's my point.
And then I asked you at some point later did you mention the baseball cap and you said yes you did; is that right? Today you mentioned it, correct?
A. Today, yes.
Q. And I asked you in connection with the baseball cap, did that affect your ability to identify the Defendant, and what did you say?
A. What did I say?

Page 122

Q. I don't know, I'm asking you.
THE COURT: Do you mean today, Counsel?
MR. COARD: Today.
BY MR. COARD:
Q. I asked you today maybe 15 minutes ago, did this baseball affect your ability to identify the face of the Defendant. What was your answer?
A. No.
Q. It did not affect it; is that right?
A. Correct.
Q. So let's go to Page 38 of the notes of testimony again from June 3rd, 2009. It begins at the bottom of Page 37, line 35. Question from the Defense attorney.
"QUESTION: Why is it that before you did not identify him in the picture? The Defendant, in the pictures.
"ANSWER: Because they asked me did I recognized anybody from that night without a reasonable doubt.
"QUESTION: When you say that, what do you mean?
"ANSWER: Well, he had on a baseball cap.

Page 123

"QUESTION: And so that gave you reason to pause?"
What's your answer?
A. Where are you at with this?
THE COURT: Page 38. Do you have Page 38? Did you follow along?
THE WITNESS: No.
THE COURT: You have to follow along with him and if you can't you have to ask him to please start again.
BY MR. COARD:
Q. Let's start at the bottom of Page 37. Before you testified there, you testified that the baseball cap did not affect your ability to identify his face; is that correct?
A. Correct.
Q. Bottom of Page 37, Line 25.
"QUESTION: And why is it that before you did not identify him in the picture? The Defendant in the pictures.
"ANSWER: Because they asked me did I recognize anybody from that night without a reasonable doubt.
"QUESTION: When you say that, what do you

Page 124

mean?
"ANSWER: Well, he had on a baseball cap.
"QUESTION: And so that to you gave you a reason to pause?"
What's your answer.
A. "Yes."
Q. So how is it that you testified under oath at the preliminary hearing that the baseball cap did give you reason to pause, but you just testified to the jury that it doesn't affect your ability to identify his face?
A. Because he was having a screaming match with me instead of asking me questions. And people were behind him making gestures and everything else.
Q. So are you saying you didn't understand the question?
A. Correct.
Q. Why didn't you say, sir, I don't understand the question?
A. I was nervous.
Q. Well, were you nervous when you said "Because they asked me did I recognize anybody from that night without a reasonable doubt?"

A. No.
Q. But you were nervous on the baseball cap part?
A. No.
Q. Just so we are clear, did the baseball cap affect your ability, yes or no?
A. No.
MS. FEENEY: It's been asked and answered like five times.
MR. COARD: Two different answers, Your Honor.
THE COURT: Overruled. He answered it.
BY MR. COARD:
Q. Let me go back to the statements on direct examination and I'm finished with your preliminary hearing testimony and the two statements from February 19th, 2009, and August 17th, 2007.
Let's talk for a minute about your testimony today. You mentioned the name or nickname of Dennis Johnson as Bam; is that correct?
A. Correct.
Q. And you stated you had been knowing him ten



years or eleven years before this incident; is that correct?
A. Correct.
Q. So you would know then that he was an amateur light-weight boxer from the neighborhood?
MS. FEENEY: Objection.
THE COURT: Overruled.
BY MR. COARD:
Q. So you would know that he's an amateur light-weight boxer with many trophies and championships in that neighborhood; is that correct?
A. Correct.
Q. So they called him Bam because he was a boxer; is that right?
A. Correct.
Q. Fair enough.
Now, correct me if I'm wrong, but I thoughts that on direct examination you stated that Curtis and that would be Curtis Smith. Curtis was 2 feet behind the chair; did you say that at any point? I'll get to the specific time in a second, but at anytime was Curtis standing 2 feet behind the chair?



A. When they all walked up they were right next to the chairs to the right of the chairs.
Q. And once you went inside you could not see where Curtis was because of the angle in the window; is that right?
A. Correct.
Q. And you also testified on direct examination that if you're looking straight out of the window the person you say is the shooter, Dennis Johnson, is about a foot or two to the left of the door; is that right?
A. The shooter is.
Q. The shooter is a foot or two to the left of the door?
A. Right.
Q. And the decedent is moving away from him at the time; is that correct?
A. Correct.
Q. And moving away towards the left; is that right?
A. East.
Q. East. To where the bicycle was in the opposite direction of the steps?
A. Yes.



Q. And when you say east, I believe you said on direct examination, that's backing up towards 29th Street; is that right?
A. Right.
Q. Now, you said before the shooting there was police officer present?
A. Yes, about five minutes prior to them walking up.
Q. And you know this police officer personally?
A. He would stop by, you know.
Q. And how long had you known him approximately?
A. About three months.
Q. Okay.
And at some point after the shooting, did that officer come back?
A. Yes.
Q. How long after the shooting, did that officer come back?
A. Ten minutes, 11 minutes.
Q. And did you say to him, hey, I just saw the shooting and this guy, Bam, Dennis Johnson, shot somebody?
A. No.

Q. You did not?
A. No, I didn't.
Q. Now, you said here today that it was Dennis Johnson who did the shooting and obviously if Dennis Johnson did the shooting then it wasn't Curtis Smith; is that correct?
A. Correct.
Q. In your first statement on August 17th, 2007, and I believe this came out when the prosecutor asked you, you didn't identify Dennis Johnson because Dennis Johnson just killed somebody and you were still working in that neighborhood; is that correct?
A. Correct.
Q. Why didn't you tell them about Curtis Smith?
A. Like I told you earlier, I didn't know his name.
Q. But you didn't say anything about another guy with Dennis Johnson, did you?
A. I only spoke of the people I knew that weren't involved with the incident.
Q. How many times before August 17th, 2007, had you seen Curtis Smith?
A. Five, six times within that month.



Q. So within that month?
A. Before the incident.
Q. So five or six times within that month. How many total times all together have you ever seen him before the incident?
A. I couldn't calculated how many times.
Q. More than hundred, less than a hundred?
A. Less than a hundred, more than a hundred, it's a 24-hour store.
Q. All right.
So you seen him a lot?
A. Yes.
Q. So you knew his height?
A. His face, his stature.
Q. You knew his height, his face, his stature, his weight, his complexion, the clothes he had on that night, right?
A. Yes.
Q. Did you tell the cops about this guy's height?
A. The shooter?
Q. No, Curtis Smith.
A. No.
Q. Weight?



A. No.
Q. Complexion?
A. No.
Q. Stature?
A. No.
Q. That you had seen him maybe 50 to 100 times before?
A. No.
Q. No description whatsoever of Curtis Smith?
A. No.
Q. Who is the same guy who ran away after the shooting?
A. No.
MR. COARD: No further questions.
THE COURT: Do you have redirect?
MS. FEENEY: Just briefly, Your Honor.
\- - -
REDIRECT EXAMINATION
\- - -
BY MS. FEENEY:
Q. I know you didn't give up the identity of



the shooter in the first statement. But when the detectives were asking you questions that night, were you focused more on the person who killed Mr. Smith or on the other people standing around?
A. Well, who was holding the gun.
Q. When they were asking you the questions?
A. Yes.
Q. All right.
And Amin Vicks and the Defendant, what, if any, relationship do they have based on your observations of them?
A. They were always together.
Q. Okay.
And when you identified the photograph in second statement -- counsel asked you about the people out there, Johnny, Amin, the guy with the Certified Gangster tattoo on his arm.
A. Yes.
Q. You signed this photograph, that's your signature, right?
A. Yes.
Q. And the person whose arm that we see that says Certified Gangster, who is that?
A. Amin Vicks.

Page 133

**Q.** Thank you.
Had you at anytime had any kind of bad blood with this Defendant, Bam?
**A.** No.
**Q.** And at the preliminary hearing counsel asked you about some discrepancies in your preliminary hearing testimony with your second statement. I want you to explain to the ladies and gentlemen of the jury, what that's all about? What was going on at the preliminary hearing?
**A.** Well, not only was counsel yelling at me, you know, there were people in the crowd making gestures and it was hard to focus.
**MR. COARD**: Objection.
**THE COURT**: Overruled.
**BY MS. FEENEY**:
**Q.** Well, today we have a ten or so people from the neighborhood. At the preliminary hearing when you testified, were there people from the neighborhood like there are here today?
**A.** Yes.
**Q.** This many, more or less?
**A.** Probably more, four or five.
**Q.** Was the Defendant's mother there?

Page 134

**A.** Yes.
**Q.** What, if anything, was she doing?
**A.** Throwing her hands up.
**Q.** At what point?
**A.** While counsel is asking me questions and screaming and yelling.
**Q.** While you're on the witness stand testifying and trying to answer questions she's making --
**A.** Yes, gestures in the background.
**Q.** Do you see her in court today?
**A.** Yes.
**Q.** Can you point her out?
**A.** The lady with the tan hat.
**Q.** Sitting in the back row?
**A.** Yes.
**Q.** As a matter of fact, didn't she get thrown out at the preliminary hearing by the Judge?
**MR. COARD**: Objection.
**THE COURT**: Sustained. It's called leading.
**MR. COARD**: Your Honor, I would move to strike. May we go to sidebar?
**THE COURT**: No.
Did you see anything happen with

Page 135

the Defendant's mother at the preliminary hearing? Did you see anything?
**THE WITNESS**: Yes, gestures.
**THE COURT**: Okay. Other than that?
**THE WITNESS**: Other than that, yeah, the Judge throwing her out.
**THE COURT**: Did you see that?
**THE WITNESS**: Yeah, he ordered her to get out.
**BY MS. FEENEY**:
**Q.** I would like to direct you to Page 32 of your preliminary hearing notes, if you have them in front of you. Do you see the top of Page 32 where it says "The Court," that's the Judge?
**A.** Yes.
**Q.** "Hold on. Ma'am in the pink, you're to go outside, please."
Do you remember the Judge saying that to her?
**A.** Yes.
**Q.** And then Mr. McMonagle who was the Defense attorney at the time, "QUESTION: Are there any surveillance video cameras in that store at all?"

Page 136

And your answer is?
**A.** "No."
**Q.** At the preliminary hearing, was I there?
**A.** Yes.
**Q.** I was? At the preliminary hearing when you testified back in '09, was Mr. Coard the attorney?
**A.** No.
**Q.** Was I the attorney?
**A.** The Defendant's attorney?
**Q.** Was I the attorney asking you questions or did you meet me this trial portion?
**A.** I just met you for this trial portion.
**Q.** When did we meet, sir?
**A.** At the preliminary hearing.
**Q.** The preliminary hearing was in June of '09?
**THE COURT**: Why did you ask that question, it's not important.
**MS. FEENEY**: It was Ms. Wechsler, small and blond, Katie Curick, nothing like me.
**BY MS. FEENEY**:
**Q.** The District Attorney was Christine Wechsler, short blonde?

A. I don't remember who it was.
Q. In any event, she asked you questions after the incident with the Defendant's mother.
"QUESTION: Was there a woman in the audience just gesturing to you?"
What was your answer?
A. I turned the page, but I'm almost quite sure it was yes.
Q. Go back to Page 32 and I'll take you to line 14. Do you see there it says By Ms. Wechsler, redirect?
A. All right.
Q. "QUESTION: Was there a woman in the audience just gesturing to you?"
What was your answer.
A. "ANSWER: Yeah."
Q. "QUESTION: How many other people do you know in this courtroom?
Your answer?
A. "ANSWER: Several."
Q. "QUESTION: How do you know these people?"
Your answer?
A. "ANSWER: From working at the store."
Q. "QUESTION: How long have you known these people?
A. "Years."
Q: "QUESTION: How many years?"
A. "Six or seven."
Q. You said minimum of six or seven, correct?
A. Yes.
Q. Next page. "QUESTION: What was she gesturing to you?"
Answer?
MR. COARD: Objection.
THE COURT: Overruled.
BY MS. FEENEY:
Q. What was your answer, sir?
A. "She was just putting her hands up and down."
Q. "QUESTION: Who is she?"
A. "I suppose the Defendant's mother."
Q. And then counsel objects. And counsel says, "Do you know her to be the Defendant's mother?"
A. "Yes."
Q. "QUESTION: Who shot Kenyatta Smith that night?"
What was your answer?
A. "The Defendant."





Q. "QUESTION: How do you feel sitting here and telling everybody in front of all these people that you know from the neighbor?"
What's your answer?
A. "It's my civil duty. I'm doing my civil duty."
Q. "QUESTION: How do you feel answering questions from Mr. McMonagle who was yelling at you?"
And Mr. McMonagle objects and it's sustained.
THE COURT: That doesn't come in.
BY MS. FEENEY:
Q. As you sit here today tell the jury, who is the person that robbed Kenyatta Smith that night?
A. Bam.
Q. Who is the person that shot and killed Kenyatta Smith that night?
A. The Defendant.
MS. FEENEY: Sir, I have no further questions.
MR. COARD: Brief recross.
- - -



RECROSS-EXAMINATION
- - -
BY MR. COARD:
Q. Let's go to over what Ms. Wechsler, the prosecutor, asked you in connection with Page 38. Let's go to Page 38, line 8. Are you with me?
A. I'm with you.
Q. Question from Assistant District Attorney Wechsler; "As you sit here today," and today being the preliminary hearing, June 3rd, 2009. "As you sit here today, are you sure who killed Kenyatta Smith?
"ANSWER: Well, yes.
"QUESTION: Who is that?
"ANSWER: The Defendant."
But then it goes on.
MS. FEENEY: I'm going to object to that, it's beyond the scope.
MR. COARD: I'm not dealing with that part.
BY MR. COARD:
Q. Let's stay on Page 38 and go down where you see line 19. Immediately after the Assistant

District Attorney asked you those questions and you gave those answers, the next question this time not from the prosecutor, but from the Defense attorney.

"QUESTION: So you had a reasonable --

**MS. FEENEY**: I object, Your Honor. I ask to see counsel at sidebar with Your Honor.

**THE COURT**: Sidebar.

\- - -

(The following a discussion was held at sidebar:)

\- - -

**MS. FEENEY**: Finance fen the reason that I am making this objection, Your Honor, is because, No. 1, at a preliminary hearing we often all the time receive testimony, which means we don't object to questions but we don't waive our objections at the trial. We don't object because if he gets killed we want to keep the record so that they can ask as much as possible. The reason I'm objecting in this case is because Ms. Wechsler had she been allowed to object or whatever --

**THE COURT**: She was allow to



object.

**MS. FEENEY**: We don't, that's our policy. We let them ask whatever they want and then at time of trial that's a legal conclusion for jury to make. He can't ask that.

**THE COURT**: There's testimony here that the words came out from the witness, I think.

**MS. FEENEY**: But he already asked him about the homicide and asked him if he had a reasonable doubt, but --

**THE COURT**: Well, let's just see because that may change. I have everything marked.

**MS. FEENEY**: Because if he said that's it the jury's province to decide reasonable doubt. Are you sure beyond a reasonable doubt? He would object and correct it because I could not ask him. That's for the jury to decide.

**THE COURT**: I understand that argument, however, what I am saying to you is there was some wording used here. I think



your witness brought it up.

**MS. FEENEY**: But I didn't think that affects Defense asking.

**MR. COARD**: I have a strenuous objection to that. You left the jury with the final question, are you sure who killed Kenyatta Smith. I have a right to follow up after that.

**MS. FEENEY**: Not if counsel asked something we are not allowed to ask at the preliminary hearing.

**THE COURT**: You brought it up here. Your policy doesn't affect his rights here today.

**MS. FEENEY**: If I got up and said something impermissible in the hearing if, hearsay is allowed in a motion, you can't use it at trial because it's on the record.

**THE COURT**: I heard your argument. You're just arguing with each other while I'm trying to read.

It's Page 38, it starts on 37.

"Why is it that before you did not identify him in the pictures," this is from Defense



counsel Mr. McMonagle.

"ANSWER: Because they asked me did I recognize anyone from that night without a reasonable doubt."

And then it goes on down here.

It's on the bottom of Page 38, Mr. McMonagle.

"So you had a reasonable doubt on the 17th, 2007, that is your sworn testimony, correct?

"ANSWER: Yes.

"QUESTION: In fact, on August 17th, 2007, not only did you have a reasonable doubt you didn't even tell homicide detectives that the Defendant was there, did you?

"ANSWER: Correct."

Overruled. He can ask it.

**MS. FEENEY**: I am going to ask to follow up.

\- - -

(The following occurred in open court:)

\- - -

**MR. COARD**: May I, Your Honor?

**THE COURT**: Yes.

**BY MR. COARD**:

**Q.** Mr. Clark, the prosecutor read to you Page 38 of the notes of testimony. Take a look at that, sir, do you have that?
**A.** Yes.
**Q.** And the prosecutor asked you what was asked at the preliminary hearing by the other prosecutor. The prosecutor at the preliminary hearing asked the following question. Let's begin at the bottom of Page 37. Are you with me?
**A.** Yes.
**Q.** "QUESTION: Why is it that before you did not identify him in the pictures? The Defendant in the pictures.
"ANSWER: Because they asked me did I recognize anybody from that night without a reasonable doubt?"
That's what you said; is that right?
**A.** Correct.
**Q.** Next question. "When you say that, what do you mean?
"ANSWER: Well, he had on a baseball cap.
"QUESTION: And so that to you gave you a reasonable doubt reason to pause?
"ANSWER: Yes.



"QUESTION: As you sit here today, June 3rd, 2009, as you sit here today, are you sure who killed Kenyatta Smith?
"ANSWER: Well, yes.
"QUESTION: Who is that?
"ANSWER: The Defendant."
But then we go onto line 19. Line 19 begins with question from Defense attorney. Are you with me?
**A.** Yes.
**Q.** "So you had a reasonable doubt on August 17th, 2007, that is your sworn testimony, correct?"
Tell the jury what your answer was?
**A.** "Yes."
**MR. COARD**: No further questions.
**MS. FEENEY**: If I may follow up, Your Honor?
**THE COURT**: Yes.

- - -
RE-REDIRECT EXAMINATION
- - -

**BY MS. FEENEY**:



**Q.** Sir, let me clear this up. August 17th, 2007, you were not shown photographs, correct?
**A.** Correct.
**Q.** So when Ms. Wechsler was asking you about identifying the Defendant in the pictures that was May of 2008 when you were shown the photo array?
**A.** Yeah, and my mother was still working at the store.
**Q.** Did you not identify him because your mom was still working at the store or because you had reasonable doubt and thought, oh, maybe that's not him?
**A.** No, it was because I was still at the store. I wasn't, but my mother was.
**Q.** In the testimony at the preliminary hearing it appears you say you didn't pick him out because I didn't recognize anybody without a reasonable doubt. Why did you say that? Do you know what I am saying?
**A.** Say it again.
**Q.** Your testimony here today is in May of 2008 when you got shown those photos, your mom was still working at the store in that neighborhood.



**A.** Yeah.
**Q.** In the preliminary hearing when you're asked why you didn't pick him out of the pictures, you're saying because they asked me if I recognized anybody from that night without a reasonable doubt and he had a baseball cap. So what I am trying to get out so we understand is, when you got shown the photographs in May of 2008, I know it wasn't in August of '07, did you not pick him out because I'm not sure it's him or because I'm afraid?
**MR. COARD**: Objection. Leading.
**THE COURT**: Sustained.
You can ask him why he didn't pick him out?
**THE WITNESS**: Because my mother was still working at the store at that time. Even though I wasn't and employed by somebody else, my mother was still going to that neighborhood every day and it could easily be the same as if the decedent got shot, they could shoot my mother.
**BY MS. FEENEY**:
**Q.** So when they asked you at the preliminary

hearing did I recognize anybody without a reasonable doubt, was that an accurate answer?
A. No, highly inaccurate.
Q. Why did you say that?
A. I was just trying to answer the questions.
Q. And this is at the end of the notes, correct, the last page?
A. Yeah.
Q. So is this after the Defense attorney was screaming at you and the mom got thrown out for making the gestures?
A. Yes.
Q. In fact, when you came to court that day to testify, what, if any, contact did the Defendant's mother have with you before you took the stand?
A. She was talking to me while sitting in the back waiting for the preliminary hearing to start.
Q. And how much time did she spend talking to you before you got up to testify?
A. About three to five minutes.
Q. Okay.
Did her coming over and talking to you



before getting up on the stand, did it or didn't have any affect on your testimony there?
A. Probably more than likely made me nervous.
Q. And, sir, just so we are clear. As we sit here today and your under oath, tell the ladies and gentlemen of this jury, are you sure beyond a reasonable doubt that this is the person that robbed and killed Kenyatta Smith?
A. Yes.
Q. And were you sure on February 19th when you were showed his photograph and circled it?
A. Yes.
MS. FEENEY: No further questions.
MR. COARD: Briefly, Your Honor.
- - -
RE-RECROSS-EXAMINATION
- - -
BY MR. COARD:
Q. But it says you had a reasonable doubt on the August 17th, 2007, that is your sworn testimony.
A. Yes.
Q. Where's the part about your mom still living



out there?
MS. FEENEY: I would object.
THE WITNESS: My mom never lived out there.
THE COURT: Overruled. rephrase it.
BY MR. COARD:
Q. Apart from the reasonable doubt where's the part about your mom here?
A. It's not there.
Q. In regard to the Defendant's mom, you never told the prosecutor here or the prosecutor at the preliminary hearing or the police that the Defendant's mother threatened you, did you?
A. No.
Q. Did you never said that the Defendant threatened you, did you?
A. No.
MR. COARD: No further questions.
THE COURT: Okay. Ladies and gentlemen, I know it's late but quickly before we go to lunch. I allowed some questions when they were talking about reasonable doubt. The



only reason that came in is because this witness used the word reasonable doubt, but it has nothing to do with the reasonable doubt that I'm going to explain to you as a legal term. Like the witness can't tell you reasonable doubt or the police can't tell you reasonable doubt, you decide reasonable doubt.
So I just want to make that clear. That word has been thrown around here, but when I give you the legal definition of reasonable doubt it's for you to make the decision. Ten people can say I know that beyond a reasonable doubt, that has no meaning in the case, you have to decide based on the evidence. Does everybody understand that?
Okay. We'll break for lunch until 2:30. Enjoy your lunch.
THE COURT CRIER: Please remain seated as the jury exits the courtroom.
- - -
(Jury departs the courtroom at 1:20 P.m.)
- - -
THE COURT: You're excused and

you can't discuss your testimony with anyone.
- - -
(Witness excused.)
- - -
(Lunch recess.)
- -
**THE COURT**: Are we ready?
**MR. COARD**: Yes, Your Honor.
**MS. FEENEY**: Yes, Your Honor.
**THE COURT CRIER**: Please remain seated as the jury enters the courtroom.
- - -
(Jury departs the courtroom at 2:45 p.m.)
- - -
**THE COURT**: Good afternoon, ladies and gentlemen.
You may call your next witness.
**MS. FEENEY**: Thank you, Your Honor. We call Detective Aaron Booker.
**THE COURT CRIER**: State your full name, last name, badge number, and current assignment for the court.
**THE WITNESS**: Detective Aaron Booker, B-O-O-K-E-R, Badge No. 795, is signed



to Philadelphia Police Department, Homicide Division.
DETECTIVE AARON BOOKER, after having been first duly sworn, was examined and **testified as follows**:
- - -
DIRECT EXAMINATION
- - -
**BY MS. FEENEY**:
**Q.** Good afternoon, Detective.
**A.** Good afternoon.
**Q.** Can you tell the ladies and gentlemen, how long you have been a Philadelphia Police Officer?
**A.** Twenty-eight years.
**Q.** And how long have you been assigned to the Homicide Unit?
**A.** Fifteen.
**Q.** And in 2009, were you working with a Detective Jack McDermott?
**A.** That's correct.
**Q.** And do you still work with Detective McDermott presently?
**A.** Yes.
**Q.** I want to ask you about the investigation of



the murder of Kenyatta Smith. Did you and Detective McDermott become involved in the investigation?
**A.** That's correct.
**Q.** Was this your investigation or another detectives investigation?
**A.** No, it wasn't.
**Q.** Whose investigation was it?
**A.** A Detective David Baker.
**Q.** Can you tell the jury how you came to take over Detective Baker's investigation.
**A.** Myself and Detective McDermott we are a part of the Homicide Divisions Special Investigation Unit, which handles special jobs, old cases, some new or unsigned cases. And this particular incident here was one especially assigned by our supervisor.
**Q.** Now, this case to your knowledge happened in August of '07.
**A.** That's correct.
**Q.** And do you recall when you and Detective McDermott became involved?
**A.** Some time in '08, I'm not really sure.
**Q.** In the course of you getting involved in



this investigation, did you attempt to interview a young man by the name of Curtis Smith?
**A.** That's correct.
**Q.** And how did that come about?
**A.** Well, during the course of the investigation it was found out or revealed that this Curtis Smith was present during the homicide. So obviously we set out to find Curtis Smith and speak to him.
**Q.** And can you tell the jury how you tried to find Mr. Smith?
**A.** Well, there were several addresses that he had. I don't remember specifically, you know, one address was a couple blocks away from the murder scene. And his home address at the time he was living with his mother, and I think there was a third address. So each time we went there it was, you know, we left messages and tried to contact other family members. And no one would admit to him being present or knowing where he was at at the time, so in vain, in other words, we could not find him.
**Q.** And were you aware of the fact that he may have been on probation at the time?

A. I believe my partner had looked that, but we still couldn't make contact with Mr. Smith.
Q. You ended up taking a statement from Mr. Smith; is that correct?
A. That's correct.
Q. And I believe that statement was taken in January of 2009?
A. Correct.
MS. FEENEY: And, Your Honor, I'll ask that if the detective could be shown Commonwealth's Exhibit No. 19.
BY MS. FEENEY:
Q. Do you recognize that, Detective Booker?
A. Yes, I do.
Q. And what is that?
A. A copy of the interview conducted by myself and Detective McDermott of Curtis Smith.
Q. And how did it come about that you finally got an interview from Mr. Smith?
A. We received information that Smith at the time of this interview was incarcerated.
Q. And he was incarcerated in state prison or local?
A. Local.



Q. So what do you to talk to him?
A. We obtain a writ to bring him down and speak to him about the incident or to see if he's willing to speak to us about it, which we get that officially. We obtained it, brought him down, and we did take him in.
Q. And what was his demeanor like when you interviewed him?
A. Well, when I spoke to him he was cooperative but he was a bit apprehensive, I will say.
Q. And how did this apprehension show itself or how did you become aware of it?
A. I remember him specifically telling me that he didn't want to be involved because it was a street thing.
MR. COARD: Objection.
THE COURT: Sustained.
MR. COARD: Move to strike.
THE COURT: Stricken.
BY MS. FEENEY:
Q. Detective, I'm going to actually show you the statement that you've identified taking from Curtis Smith. Can you see the screen there? Despite his apprehension you were able to get him



to talk to you?
A. That's correct.
Q. Did you threaten him or promise him anything to talk to you? In other words, you said he was incarcerated at the time, did you bring him to Homicide to take the statement?
A. That's correct.
Q. And where's Homicide located?
A. 8th and Race.
Q. So when you bring him to 8th and Race he's handcuffed?
A. Yes, when we bring him in because he's a prisoner.
Q. What happens at 8th and Race?
A. We bring him to 8th and Race to detention unit, he's searched because he's a prisoner. And at that time he's uncuffed and comfortably seated.
Q. Do you make any promises to him such as hey, I know your locked up right now, if help us out in this homicide, we'll get you out of jail or anything like that?
A. I did not.
Q. Now, this is the first page of the statement



that you took?
A. That's correct.
Q. And it says it was taken at 4:40 in the afternoon on January 15th, 2009 inside of 750 Race Street, Homicide, correct?
A. Correct.
Q. You're asking questions about shooting death Kenyatta Smith that occurred on 8/17/07, at 30th and Lehigh. It has your badge number and partners name and badge number.
Now, this page is a little bit different than the page in most witness's statements, correct, this first page because there's some --
A. Yes, it is. This is the first page of his Constitutional warnings.
Q. This was marked as Commonwealth's Exhibit No. C-24, and this is the first statement of Ozzie Clark; can you see this?
A. Yes.
Q. The first statement is different than first page, correct?
A. Yes.
Q. And the second statement that was taken from Ozzie Clark, which I believe is by your partner

Page 161

also has the same type of configuration. And I'll hold that up, that's C-25. I believe and you can see that the two Mr. Clark statements has this page and Mr. Smith has that page?
**A.** That's correct.
**Q.** Explain to the jury what the difference is and why that page is there?
**A.** Well, the difference is, as I said, this is the first of a two-page Constitutional warning. And we thought it necessary to warn Mr. Smith because we received information that he was present during the killing. And in the case I assumed Mr. Smith I didn't take his interview but they didn't feel it was necessary for him to have his warnings.
**Q.** Mr. Smith or Mr. Clark?
**A.** I'm sorry Ozzie Clark.
**Q.** So the first page of the warnings for Mr. Smith indicate, you have a right to remain silent and you don't have to say at all.
And are those his initials there, CS?
**A.** Yes.
**Q.** And did he write those or did you write them?

Page 162

**A.** He wrote them.
**Q.** And it basically says anything he says can and will be used against him in court. Has a right to have a lawyer with him. If he can't afford to hire and wants a lawyer, you can get a layer provided to him free of charge. And if he was willing to give a statement, he could stop it at any time he wish; is that correct?
**A.** That's correct.
**Q.** And I'm paraphrasing but that was all of the A, B, C, and D says. And this is his initials next to each of the warnings?
**A.** Correct.
**Q.** And is that his signature?
**A.** Yes, it is.
**Q.** So he indicated -- we'll go to the second page of his statement. Again, these were more detailed warnings, I guess, you asked him if understand he has a right to remain silent and he answers yes?
**A.** That's correct.
**Q.** Did he write the yes?
**A.** Yes.
**Q.** And those are his initials there?

Page 163

**A.** Yes.
**Q.** And he understood anything he said could and would be used against him. He said he understood that and initialled that. And you asked him if he wanted to remain silent, he said no. And you explained to him again he has a right to speak to an attorney before you and he spoke and he understood that.
**THE COURT**: Let him answer for the record.
**THE WITNESS**: All of that is accurate, yes.
**BY MS. FEENEY**:
**Q.** Now, you asked him if he understood if he cannot afford an attorney and wanted one, you wouldn't ask him any questions until he had a lawyer appointed to him free of charge, and what was his answer to that?
**A.** His answer was yes.
**Q.** And those were his initials?
**A.** Yes.
**Q.** And you then ask him, do you want to talk to a lawyer at this time or have a lawyer with you while we ask you questions?

Page 164

**A.** It's no.
**Q.** And then finally, are you willing to answer questions of your own free will without force or fear and without promises having been made to you, and what does Mr. Smith say?
**A.** Yes.
**Q.** And that's his signature at the bottom?
**A.** Correct.
**Q.** And then Mr. Smith goes onto make this statement?
**A.** Correct.
**Q.** And that's his signature down there, sir?
**A.** Yes, it is.
**Q.** And on Page 2, is that his signature at the bottom?
**A.** It is.
**Q.** And Detective Booker, Page 3, is that his signature down there?
**A.** Yes.
**Q.** All right.
Now, you had shown him some photographs and this is photo display No. 1, and you referenced this on Page 3 where you asked the third question from the top; do you see that?

A. Yes.
Q. The second question, Curtis, I am going ask a questions. Curtis, we are showing you a photo display; do you recognize anyone here? What was his answer?
A. "ANSWER: Yeah, No. 6, it's Dennis Johnson, the one we call Bam."
Q. And the next question you ask is, "Is this the same Dennis Johnson you are telling us robbed and shot the male outside of the store at 30th and Lehigh Avenue on 8/17/07?"
And his answer?
A. "Yes."
Q. And he proceeds to circle this picture and sign his name?
A. That's correct.
Q. Do you see the person here today in court that he identified as the person that robbed and shot Mr. Smith?
A. That's correct.
Q. Can you point him out?
A. It's the gentleman beside Mr. Coard.
MS. FEENEY: Indicating the Defendant Dennis Johnson.



BY MS. FEENEY:
Q. You also showed him a second photo display, correct?
A. That's correct.
Q. And with regard to Mr. Johnson you asked him to circle the photo and sign underneath. We are going to go to the next question.
"QUESTION: We are now showing you a second photo display; do you know anyone here?"
What's the answer?
A. "Yeah, No. 8 is Amin Vicks."
Q. "QUESTION: Is this the same Amin Vicks who was with you on 8/17/07 when Dennis Johnson shot and killed the male on 30th and Lehigh?"
And his answer?
A. "Yes."
Q. And that's No. 8 and he circled it. Is that his signature and date?
A. Correct.
MS. FEENEY: Detective Booker, I don't have any further questions. Thank you.
THE COURT: Cross-examine.
MR. COARD: Briefly.
- - -



CROSS-EXAMINATION
- - -
BY MR. COARD:
Q. Good afternoon, Detective.
A. Good afternoon, Mr. Coard.
Q. Just a few have a questions. Just so we are clear, the witness, referring to was Mr. Curtis Smith, was in jail at the time he gave you the statement; is that right?
A. That's correct.
Q. Did you come to find out he was in jail because he was arrested for one case and had a parole violation on another case?
A. I forget what the exact charges were.
Q. Okay.
Would it refresh your recollection if I told you that he was on parole for dealing drugs?
A. I believe that's accurate.
Q. You also said, Detective, that the reason why you read Mr. Smith his rights is because, and correct me if I'm wrong, is because he was present during the killing; is that right?
A. That's correct.
Q. But Mr. Ozzie Clark, who was also present,



as far as you know his right were not read; is that correct?
A. That's correct.
Q. And is that because Mr. Mr. Curtis Smith at the time was a suspect?
A. A potential suspect, yes.
Q. A potential suspect in connection of the murder of Kenyatta Smith?
A. Correct.
Q. And the robbery of Kenyatta Smith?
A. Correct.
Q. Okay.
Now, in regard to the statement that Mr. Curtis Smith gave, I think the Commonwealth covered this but I have to make sure, after reading him his rights he actually initialled and wrote yes or no where applicable and initialled each answer; is that right?
A. Correct.
Q. And at the bottom he signed it?
A. Correct.
Q. And then when he went to the next page where he gave the statement he actually signed the bottom of each page; is that right?

A. That's correct.
Q. All right.
And did you actually write this or did you partner write this?
A. My partner.
Q. And you were present when your partner wrote it?
A. Correct.
Q. And your partner accurately wrote every single thing that Curtis Smith told him; is that correct?
MS. FEENEY: Objection.
THE COURT: Overruled.
MR. COARD: Let me rephrase that.
BY MR. COARD:
Q. In regard to the statement that Curtis Smith gave, your partner didn't write anything different than what happen Curtis Smith said; is that correct?
A. That's correct.
Q. So if Curtis Smith said "we ran from the scene" that's because your partner wrote that down because that's what Curtis Smith said,



right?
A. I'd agree with you.
Q. Fair enough.
And towards the end of the statement, I believe, it's the third page of the statement Mr. Clark -- towards the bottom of the third page, Mr. Smith, there's a part that asked him if he told the entire truth; is that correct?
A. That's correct.
Q. And read that question and answer for the jury.
A. "QUESTION: Curtis, have you told the entire truth here in this statement?
"ANSWER: Yes, I have."
Q. And that's written down there because that's what he said?
A. Correct.
Q. Next question. After he said what he said you guys didn't just take that document and run away, you gave him a chance to read it and to make corrections in case there was some mistake; is that right?
A. That's correct.
Q. Is there a part on that same page which



indicates that he was given the opportunity to read it?
A. The final question, yes.
Q. Would you read that question and answer?
A. "QUESTION: Curtis, I now ask you to read over what I have typed here and to read it aloud."
Q. Go on.
A. Please sign the bottom of each page if all is true and correct.
Q. Did you give him a chance to read it?
A. Yes.
Q. Did he, in fact, read it?
A. Yes.
Q. Did he, in fact, sign it?
A. That's correct.
Q. And every single page he signed?
A. Correct.
Q. And he corrected nothing or changed nothing that's typed on there?
A. That's correct.
MR. COARD: No further questions.
- - -



REDIRECT EXAMINATION
- - -
BY MS. FEENEY:
Q. Detective Booker, can you clarify something for the jury. When counsel ask you why you read his rights, it's because he was a potential suspect. What made him a potential suspect? Did someone identify him as being the shooter?
A. No one identified him as being the shooter, but he was identified as being one of the three males that was outside of the store other than the decedent.
Q. Okay.
And so in your mind why would that make him a potential suspect?
A. Well, because obviously with my experience these three gentlemen, we had information that they were together, and after the shooting they fled. So I would read each one of the gentlemen their rights if we came in contact with them.
Q. And you read them their rights -- before you start talking to him, do you know what he's going to tell you?
A. No.

**Q.** So you read him his rights basically to do what?
**A.** Well, for his protection and our protection in terms of doing the correct thing.
**Q.** Because that's what the Constitution requires?
**A.** That's correct.
**MS. FEENEY**: I have no further questions. Thank you.
**MR. COARD**: I have nothing else. Thank you.
**THE COURT**: Thank you, Detective. You may step down.
- - -
(Witness excused.)
- - -
**THE COURT**: You can call your next witness.
**MS. FEENEY**: The Commonwealth calls Detective Jack McDermott.
**THE COURT CRIER**: State your full name, badge number, and current assignment.
**THE WITNESS**: Detective John



McDermott, M-C-D-E-R-M-O-T-T, Badge No. 9005, assigned to the Homicide Unit.
DETECTIVE JOHN McDERMOTT, after having been first duly sworn, was examined and **testified as follows**:
- - -
DIRECT EXAMINATION
- - -
**BY MS. FEENEY**:
**Q.** Detective McDermott, you've been a police officer for how long?
**A.** Thirty years.
**Q.** And you've assigned to Homicide how many of those years?
**A.** Fifteen years.
**Q.** In August of '07, were you partners with a Detective Aaron Booker?
**A.** Yes.
**Q.** Now, I understand that you and Detective Booker took over the investigation into the murder of Kenyatta Smith?
**A.** That's correct.
**Q.** And if you would explain to the ladies and gentlemen of the jury the state that the



investigation was in when you guys took it over. We already know you are part of Special Investigations and went to you to do follow up.
**A.** Detective Baker had been the assigned, he had been working on it. And I believe he had Amin Vicks in and he was uncooperative. And at that time the lieutenant appointed us to see if we could get any more information.
**Q.** Did you read any statements that you had taken before you got the witnesses?
**A.** That's correct, I read everything.
**Q.** At that time do you recall, what, if any, statements you from any witnesses?
**A.** We had a statement from Ozzie Clark, the male who was working in the store.
**Q.** And there was no identification from that statement; is that correct?
**A.** That's correct. He identified the arm of Amin Vicks, he had Certified Gangster tattooed on his arm.
**Q.** And based on that you indicated that Amin Vicks was brought in?
**A.** That's correct.
**Q.** And what do you do with the investigation;



what do you do with it?
**A.** At one point we reinterviewed Amin who gave us information that Curtis Smith was there, Dennis Johnson was the shooter, and this Amin Vick was also there.
**Q.** And based on that who do you try to interview or who do you attempt to go find?
**A.** Among others we attempt to find Curtis Smith.
**Q.** And tell us about that?
**A.** We found out he was in custody and brought him down from CFCF and interviewed him.
**Q.** And I believe Detective Booker already testified to the statement that he made. You were part of that statement as well, correct?
**A.** Yes.
**Q.** And that was in January of 2009?
**A.** That's correct.
**Q.** Based on Mr. Smith's statement, what, if anything, do you do from there?
**A.** We went out and looked and tried to make contact with Ozzie Clark, the male in the store.
**Q.** Ozzie Clark had already been interviewed you testified.

**A.** We was interviewed once and we wanted to reinterview him after speaking to Curtis Smith.
**Q.** Why was that?
**A.** Curtis Smith gave us information that Dennis Johnson was the shooter, among other things he said. We wanted to go out and confirm that through Ozzie Clark to see if he told us the truth.
**Q.** Were you aware at this time that in May of 2008 photos were shown to Mr. Clark and he did not make an identification?
**A.** Yes.
**Q.** And you know those photos included a photo of the Defendant?
**A.** That's correct.
**Q.** Why did you decide to try again?
**A.** I find often times witnesses are reluctant, especially witnesses like Mr. Clark.
**MR. COARD**: Objection.
**THE COURT**: Overruled.
**THE WITNESS**: Someone like Mr. Clark is not involved in the street and we were going out to see --
**MR. COARD**: I'm going to object to that. The detective can't know that.
**THE COURT**: She's just asking why he did what he did, not that it's true or not, but asking this detective what his thinking was.
Go ahead overruled.
**MS. FEENEY**: May he continue, Your Honor?
**THE COURT**: Yes.
**THE WITNESS**: Basically we wanted to reinterview Mr. Clark to see if he told us the truth about what happened.
**BY MS. FEENEY**:
**Q.** So do you go out and find him, what happens?
**A.** That's correct. I left a message at his mother's house and he contacted us and came in on his own.
**Q.** And when he came in on his own, what happened then?
**A.** We sat down and reinterviewed him and he made several identifications.
**Q.** And I'm going to ask you to look at C-25, which is Mr. Clark's second statement. Do you recognize that Detective McDermott?





**A.** That's correct. That's the statement we took from Mr. Clark on the second day he was interviewed, 2/19/09.
**Q.** At the end of the statement you had him read it and to sign it if he agreed with it?
**A.** That's correct.
**Q.** And that appears on the bottom of each page?
**A.** Yes, it does.
**Q.** Now, in regards to the photos you showed him -- actually, I want to ask you about the last page which is the statement adoption attestation. Can you explain for the jury what that is?
**A.** It's basically a statement adoption that he signs that he confirms everything he said within the statement was the truth.
**Q.** Okay.
Now, are these done on every single statement?
**A.** I try make it a practice to use it, yes.
**Q.** Now, we have photo display No. 1 that you showed him. Is there an identification made in this photo display?
**A.** That's correct.
**Q.** And who does he identify? It says, "QUESTION: Mr. Clark, do you recognize anyone here?"
Do you see that?
**A.** I see photo display No. 2. Oh, No. 1, he identified Amin Vicks in that photo display.
**Q.** And what's his answer to that question?
**A.** "Yes, the guy here is Amin. I signed underneath his picture the last time."
**Q.** And that's Amin Vicks there?
**A.** That's correct.
**Q.** And when he says "last time," it indicates typewritten information here that says, "On Saturday, the 17th of May, 2008 at 5:15 a.m. array shown to Ozzie Clark. And he signed beneath the photograph of male he stated was outside the store just prior to robbery male with tattoo."
Do you know who typed that?
**A.** That's where the confusion came to me, Detective Baker typed that.
**Q.** So you showed the same photo array?
**A.** That's correct, for Amin Vicks.
**Q.** We have photo display No. 2 and that's in referenced on page 2 of the statement.

"QUESTION: Mr. Clark, we are now showing you photo display No. 2; do you recognize anyone here?"
A. His answer, "Yes, No. 16, Bam."
Q. "Is this the same Bam that shot and killed Kenyatta Smith on 8/17/07?"
A. "ANSWER: Yes."
Q. "QUESTION: Would you circle the photograph and sign underneath this photo?"
A. "ANSWER: Yes."
Q. And he circled this photo here?
A. Yes.
Q. And that's of this Defendant here?
A. Yes.
Q. Now, this is a picture, not a photo display, but its a picture of someone with a tattoo and it says Certified Gangster down the arm. Who is this a picture of?
A. Amin Vicks.
Q. And do you reference that in the statement as well?
A. Yes.
Q. And, again, I'm going to direct you to page 2.



"QUESTION: Is Amin the same male you stated had the tattoo, Certified Gangster on his arm?"
And what his answer?
A. "Yeah, on his right arm. I was working at the store the night he got that done. He came down to show me."
Q. And that's his signature, correct?
A. Yes.
Q. Okay.
We now have a third photo display. And you ask him the question, "QUESTION: We are now showing you photo display No. 3; do you know anyone here?"
What does Mr. Clark answer?
A. "I know two guys here, No. 8 and No. 6. No. 6 is one of the guys who hangs out with Amin and Bam. He hangs on the corner of Hollywood and Huntingdon Streets with them. I think he was the guy outside the store when Bam shot Kenyatta. I know No. 8 from around the neighborhood, he lives around 27th and Silver Street."
Q. "QUESTION: The male in the No. 6 slot, you are saying you saw him at the time of the shooting?"



A. "ANSWER: Yeah, he's the one who was with them."
Q. And he identifies No. 6, and that belongs to who?
A. Curtis Smith.
Q. "QUESTION: Do you know his name or anything about by him?
A. "ANSWER: Not really, just that he hustles with that group."
Q. And he also identified No. 8 as someone he knew from the neighborhood of 27th and Silver?
A. That's correct.
Q. And then finally, I believe it's the last question of your statement.
It says, "QUESTION: Mr. Clark, I'm showing you a single photo; do you recognize this male?
What was his answer?
A. "ANSWER: Yeah, that's the boy that was killed. I found out later that his name was Kenyatta."
Q. Who was that a photograph of?
A. Kenyatta Smith, the deceased.
Q. And he signed his name there?
A. Yes.



Q. Now, after you took the statement from Mr. Clark, did you know what his work situation was?
A. I knew he was no longer working at that store.
Q. Okay.
Based on the statement that you took from him, the statement you took from Mr. Smith, what, if anything, do you do with the case?
A. Eventually I applied for an arrest warrant for Mr. Johnson.
Q. All right.
And how do you do that?
A. I type an affidavit of probable cause and submit it to the District Attorney's Office along with all the supporting documents. It's reviewed by the District Attorney's Office and a decision is made whether an arrest warrant is going to be issued.
Q. And once an arrest warrant is made, who has to sign that?
A. The bail commissioner.
Q. And who was that arrest warrant for?
A. Mr. Johnson.

Q. And was that arrest warrant approved?
A. Yes.
Q. Once you have that arrest warrant, what is the time frame when you obtain that warrant for the Defendant?
A. I obtained the warrant on 2/27/09.
Q. And what do you do once you get an arrest warrant for the Defendant?
A. It varies. In this case I gave it to our fugitive squad within Homicide.
Q. And at that point is it their responsibility to go out and find the Defendant?
A. Yes.
Q. Now, did there come a time when the Defendant was actually arrested?
A. That's correct.
Q. And do you know when he was arrested?
A. He was arrested on 3/10/09.
Q. When the Defendant was arrested, did the fugitive squad contact you to let you know?
A. Yes.
Q. And were you able to do what's called a 75-229 of the Defendant?
A. I believe I did, yes.



MS. FEENEY: I'm going to mark this as Commonwealth's Exhibit 26. Counsel has a copy.
- - -
(Police 75-229 marked Commonwealth's Exhibit 26 for identification.)
- - -
BY MS. FEENEY:
Q. Just explain what a 75-229 is?
A. It's just biographical information that someone provides. It's a witness or a Defendant, anyone you come in contact with, we ask them for the information.
Q. All right.
So this information on the 75-229 was provided to you by whom?
A. Dennis Johnson.
Q. And you asked him his height, his weight. Do you ask him that or does he get weighed and measured?
A. I ask him.
Q. So whatever he tells you you put down?
A. That's correct.
Q. Date of birth. There's a section for



nicknames, did you ask him what his nickname is?
A. That's correct. He stated Bam, B-A-M.
Q. And that's what you recorded on the 229?
A. Yes.
Q. As far as residence, where was he living?
A. 709 Broad Street, Chambersburg, Pennsylvania.
Q. And who did he indicate he lived there with?
A. His fiance.
Q. And what's her name?
A. Dorae Semft, S-E-M-F-T.
MS. FEENEY: Detectives McDermott, I have no further questions. Thank you.
THE COURT: Cross-examine.
- - -
CROSS-EXAMINATION
- - -
BY MR. COARD:
Q. You did say that when you attempted to question Amin Vicks he was uncooperative?
A. That's correct. Detective Baker had him down and was uncooperative at that time.



Q. And this is the same Amin Vicks that had Certified Gangster tattooed on his arm?
A. That's correct.
Q. Did the name Maurice Stokes come up in your investigation?
A. Yes. Detective Baker had interviewed Maurice Stokes, and myself and Detective Booker reinterviewed him at a later date.
Q. Was it determined that Maurice Stokes was present during the shooting?
A. No.
Q. I believe I just have one final question, Detective. In connection with your interview of Mr. Ozzie Clark, when you did the photo arrays or whoever did photo arrays, these photo arrays were of the face of Dennis Johnson, it wasn't of the build of Dennis Johnson or the voice of Dennis Johnson or anything other than the face; is that correct?
A. That's correct. The shoulders and face.
MR. COARD: Thank you. No further questions.
MS. FEENEY: If I may follow up.
- - -

REDIRECT EXAMINATION

\- - -

**BY MS. FEENEY**:

**Q.** When you interviewed Mr. Clark, did he ever tell you he could not make an identification?

**A.** No.

**MS. FEENEY**: No further questions.

**THE COURT**: Thank you, Detective.

\- - -

(Witness excused.)

\- - -

**MS. FEENEY**: Detective James Burk.

**THE COURT CRIER**: State your full name.

**THE WITNESS**: Detective James Burk, Badge No. 8007, assigned to the Homicide Division.

DETECTIVE JAMES BURK, after having been first duly sworn, was examined and **testified as follows**:

\- - -



DIRECT EXAMINATION

\- - -

**BY MS. FEENEY**:

**Q.** Good afternoon, Detective.

**A.** Good afternoon.

**Q.** Detective Burk, how long have you been a Philadelphia Police Officer, for how many years?

**A.** Five years.

**Q.** And you're assigned to the fugitive squad of the Homicide Unit?

**A.** Yes.

**Q.** How long have you been doing that kind of work?

**A.** Fourteen years.

**Q.** Just so the jury understands, can you outline the duties of the fugitive squad to them?

**A.** When a detective from a homicide investigates and obtain an arrest warrant, they turn it over to the fugitive squad and it's our main objective to follow up on the case from there and make an arrest.

**Q.** And what, if any, methods do you try to do this?



**A.** Review the file and try to determine what the best place is to start out.

**Q.** And you do this by how?

**A.** Checking records and files for an address to go to.

**Q.** And in this particular case, what did you do?

**A.** In this particular case there was information that the person that was wanted on the arrest warrant, Dennis Johnson, was outside of the city in Chambersburg, Pennsylvania. So myself and other members of my squad and the Marshall from the squad that we work in, we traveled up there and executed the arrest warrant.

**Q.** Do you recall how far Chambersburg is from here?

**A.** It's about three hours away from here.

**Q.** And when you said Marshalls, is that the United States Marshalls?

**A.** Yes.

**Q.** How many people went with you to Chambersburg to try to locate this Defendant?

**A.** There were about 12 of us.



**Q.** And what, if anything, do you bring with you to effectuate this?

**A.** We bring the arrest warrant and we bring photographs of the person we are looking for.

**Q.** Did you have specific address information in Chambersburg?

**A.** I did. The address that was on the warrant I had and that's where I was going to up there to investigate. Once I got up there and contacted the locals which you do when you're in another jurisdiction, they came up with a different address and that's where we went.

**Q.** So you had one address and then the local police were able to provide you with a separate address?

**A.** Yes.

**Q.** Now, did you go to the first address?

**A.** No, we didn't because they told me it would not be worth going.

**Q.** Did you go to the second address they provided you with?

**A.** Yes.

**Q.** Tell the jury what happens as you get there?

**A.** It was early in the morning around

6:00 a.m., we were altogether, getting ready to go to the house. We were pulling onto the block. There was a vehicle running in the driveway, somebody noticed that and said standby a moment. And I saw Dennis come out, he was holding a small child. He went to that vehicle and he was putting the child in the rear seat. The guys got of their vehicles and approached him from all sides and apprehended him. Because of the child, I went to the door and a white female I don't recall her name, came out. She was the mother of the child and she took control of the child, and Dennis came with us.

**Q.** And at that point was he arrested on this warrant?

**A.** Yes.

**Q.** And what, if any, legal procedure do you have to follow at that point because now you're in a different jurisdiction?

**A.** We have to go to the local police department and in this case Mr. Johnson signed a waiver of extradition. Normally if someone doesn't want to come back with you because you're outside of your jurisdiction, they can request a court hearing.



In this case it didn't happen, he signed a waiver of extradition and came back to Philadelphia.

**Q.** And if he had not signed a waiver and requested a court hearing, do you know what happens then?

**A.** Yeah, he would have been placed in the county prison there in that county. And there would have been a court gearing in front of a Judge and who would determine a date for me to go up and pick him up.

**Q.** Okay.

Does that's delay the inevitable?

**MR. COARD**: Objection. If it's a court proceeding, you don't know the outcome of the court proceeding.

**THE COURT**: Sustained.

**BY MS. FEENEY**:

**Q.** Do you know how the court proceeding --

**THE COURT**: He just said it, go in front of a Judge.

**BY MS. FEENEY**:

**Q.** Did you ever had someone not sign a waiver and not get sent back?

**MR. COARD**: Objection. Those



facts could have been different from the facts of this case.

**BY MS. FEENEY**:

**Q.** Is there anything about this case that if he requested a hearing that would have prevented a hearing in Philadelphia?

**MR. COARD**: He's not a lawyer, he's not a Judge.

**MS. FEENEY**: He's been doing this for --

**THE COURT**: Sustained.

You can ask him the procedure, I guess, if he knows.

How long have you been on the fugitive squad?

**THE WITNESS**: Four years.

**THE COURT**: So if somebody says they don't want to come back with you and remand them to local custody, do you know what the next step is?

**THE WITNESS**: Normally before there's a hearing they decide to come back.

**THE COURT**: Do you know what happens if they don't decide to come back with



you?

**THE WITNESS**: There's a hearing and they are ordered back.

**MR. COARD**: Objection. He can't know that, it's a hearing, a Judge makes that determination.

**THE COURT**: Overruled. That's enough.

Have you ever had a case in 15 years where the Judge say -- just leave it. It's ridiculous, there's that words again. My question was ridiculous.

**MS. FEENEY**: I don't think it was ridiculous.

**THE COURT**: Go ahead.

**MS. FEENEY**: I have no further questions. Thank you.

**MR. COARD**: I have nothing, Your Honor.

Thank you, Detective.

**THE COURT**: Thank you, Detective.

- - -

(Witness excused.)

- - -

**THE COURT**: I mean, what you could do if you didn't have him answer it is call people from the extradition hearing.

Any more witnesses?

**MS. FEENEY**: The Commonwealth calls Joyce Smith.

**THE COURT CRIER**: State your name for the record.

**THE WITNESS**: Joyce Ann Smith.

JOYCE ANN SMITH, after having been first duly sworn, was examined and **testified as follows**:

- - -

DIRECT EXAMINATION

- - -

**BY MS. FEENEY**:

**Q.** Good afternoon, Ms. Smith.
**A.** Hi.
**Q.** Ms. Smith, can you tell the ladies and gentlemen of the jury, how old you are?
**A.** I am 58 years old.
**Q.** Can you tell us what, if any, relationship you had to victim, Mr. Kenyatta Smith?



**A.** I am the deceased mother.
**Q.** And how old was your son in August of 2007?
**A.** He was 36 years old.
**Q.** Ma'am, prior to August 17th, 2007, when was the last time you had seen your son?
**A.** August 16th.
**Q.** And where was that?
**A.** A couple of my friends decided to stop and have a drink at a bar and he was in there shooting pool. At the time that I walked in I didn't see him, he spotted me. And he walked up and hugged me and kissed me, he always do.
**Q.** And that was the last time you saw your son, ma'am?
**A.** Yes, that was the last time.
**Q.** And I don't mean to be disrespectful, but had your son, to your knowledge, had any issues with cocaine use prior to that?
**A.** He had a problem years ago, it's been quite a few years and he cleaned himself up. I think he had a relapse.
**Q.** Okay.
Around that time?
**A.** No, he had been off for a while, a long



time.
**Q.** When did you think he had a relapse into the drugs?
**A.** About --
**Q.** In relation to the time of his death?

**THE COURT**: Does it make a difference in the case?

**MS. FEENEY**: No.

**BY MS. FEENEY**:

**Q.** Ma'am, did there come a time after you last saw your son at the bar that you received information that something happened to him?
**A.** I found out Friday morning about 6 o'clock in the morning that he was dead.
**Q.** And how did you become aware of this?
**A.** Some people knew before I did and then a detective came and told me.

**MS. FEENEY**: Ma'am, I have no further questions. Thank you.

**MR. COARD**: Thank you. I have no questions for the young lady. Thank you.

**THE COURT**: Thank you, ma'am.

- - -

(Witness excused.)



- - -

**THE COURT**: Commonwealth.

**MS. FEENEY**: At this time the Commonwealth has a motion to move C-1 through C-26 into evidence.

**THE COURT**: The Crime Scene service report --

**MS. FEENEY**: I didn't mark that as evidence.

**THE COURT**: It just mentions the pictures that you have.

**MS. FEENEY**: Before I rest, I would like them to be published.

**THE COURT**: Okay. You can publish these pictures, C-1 through C-13.

C-1 through C-26 will be admitted into evidence, the relevant portions thereof.

**THE COURT CRIER**: The exhibits have been published.

**THE COURT**: Okay.

**MS. FEENEY**: Your Honor, after the publication of photos if Your Honor would allow the Commonwealth to move our exhibits

into evidence, the Commonwealth rests.

**THE COURT**: Okay.

The exhibits have been already been permitted to be moved in so that's fine.

Okay. Ladies and gentlemen, what we are going to do since it was a long day and a lot of testimony and you really had to wait a long time for lunch, we are going to break. Tomorrow we are going to finish up probably in the morning and you'll hear closings and you'll hear my charge. So I'm going to give you a break this afternoon and let you go early. You need the report at 9:45.

**THE COURT CRIER**: Please remain seated as the jury exits the courtroom.

\- - -

(Jury departs the courtroom at 3:40 p.m.)

\- - -

**THE COURT**: So as far as the charge is concerned, we have murder, it's first, second, and third.

**MS. FEENEY**: Your Honor, I think second is the most applicable.



**THE COURT**: So you don't want him charged on first.

**MR. COARD**: The Commonwealth and I spoke and we agreed to second only.

**MS. FEENEY**: We came the conclusion that the applicable one was second degree murder, in the course of the felony.

**THE COURT**: So you're not asking for third?

**MR. COARD**: That is correct, Your Honor.

**THE COURT**: So you both agree that it's only second?

**MR. COARD**: Yes, Your Honor.

**THE COURT**: I don't know, think about that because --

**MS. FEENEY**: Your Honor, wanted to give all three?

**THE COURT**: No, I wanted to give third.

**MS. FEENEY**: If you give third, I'm going to ask for first.

**MR. COARD**: I think we agreed on second only, we discussed it this morning.



Okay.

**THE COURT**: Okay. Defense counsel can do that. You understand the difference, right, Mr. Johnson? Because remember I told you the difference the other day?

**MR. COARD**: I'm reminding him at this point, Your Honor.

**THE COURT**: You can chat with him a little more.

\- - -

(Discussion held between Defendant and Defense counsel.)

\- - -

**MR. COARD**: I did explain, Your Honor, everything and reminded the Defendant of what you mentioned earlier on and he does understand.

**MS. FEENEY**: And let the reflect that counsel took about two minutes or so to confer with his client.

**THE COURT**: Mr. Johnson, you understand that ordinarily the Court would charge on first degree murder, second degree murder, and third degree murder. First and



second degree murder if you are found guilty the penalty is life. Remember I told you that?

**THE DEFENDANT**: Yes.

**THE COURT**: Third degree murder, on the other hand, is a maximum of 40 years but I can give you, the Court, if you were found guilty of that would have to give you five. Have to, couldn't give you more than 20, that's the way that that works.

Now, your attorney has requested of this Court that I only charge on second degree murder. That's a strategic move in a sense because the jury can believe that it's was a robbery murder, a murder committed in the course of a robbery or not. And if they don't believe a robbery as part of it, since there's no third degree murder to fall back on, then they can't find you guilty of anything. They would have to find you not guilty. Some Defendants might want that, other Defendants might say, well, I'm worried that if they don't have a choice of something lesser than second degree murder where I can

get life, they might give me second degree murder. Whereas if they have third degree murder charge in there, maybe for any reason they might decide third degree murder. Even if their reason is not a reason legally accepted. A jury in the back we don't listen to what they say and deliberate about. So that gives them sort of an out where they can find you guilty of a lesser offense where you wouldn't get life.

But your attorney discussed that with you and you decided that either they believe you committed second degree murder or find you not guilty and not give them that third degree murder, sort of a lesser degree of murder. Do you understand that?

**THE DEFENDANT**: Yes.

**THE COURT**: Do you agree with your attorney on that?

**THE DEFENDANT**: Yes.

**THE COURT**: I'm not going to do it until tomorrow so if anything changes you need to talk to me about it tomorrow.

Now, the other thing is at the



beginning of the case your attorney handed up a list of witness names. And those witnesses, I mean, the Defense, didn't start their case yet but tomorrow --

**MS. FEENEY**: Do you want to it before --

**THE COURT**: I'm doing it now for a reason. There's three witness names you gave, Tyrik Quinley, Charles Riley, and Carmen Roberts.

**THE DEFENDANT**: Yes.

**THE COURT**: Did you discuss with your attorney whether or not you're going to call those witnesses?

**THE DEFENDANT**: Yes.

**THE COURT**: And has a decision been made between you and your attorney regarding those witnesses?

**THE DEFENDANT**: Yes.

**THE COURT**: Mr. Coard, what is it?

**MR. COARD**: The decision, Your Honor, is that the witnesses will not be called.



**THE COURT**: Now, your attorney told you that; is that right?

**THE DEFENDANT**: Yes.

**THE COURT**: Now, you realize that you have the right, if you want those witnesses called, to call those witnesses. Are you satisfied with your attorney's decision?

**THE DEFENDANT**: Yes.

**THE COURT**: Are you satisfied with your attorney's representation thus far in this case?

**THE DEFENDANT**: Yes.

**THE COURT**: Is there anything you want to see done that you haven't seen done for you?

**THE DEFENDANT**: No.

**THE COURT**: And tomorrow I'm going to talk to you again about whether or not you wish to testify.

All right.

**THE COURT CRIER**: Court is adjourned until 9:30 tomorrow morning.



\- - -

(Court adjourned.)

\- - -

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the trial of the above case, and this copy is a correct transcript of the same.

______________________________

Samanda Rios
Court Reporter

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

Court Reporting System (Generated 2023/02/01 12:15:12)

# Lawyer's Notes