# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DENNIS JOHNSON | : | |
| PETITIONER | : | |
| V. | : | CIVIL ACTION NO. 15-4965 |
| | : | |
| SCOTT NICKELSON, *ET AL.* | : | |
| RESPONDENTS | : | |

## OFFICE OF ATTORNEY GENERAL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Pennsylvania Office of Attorney General ("OAG") respectfully submits the following Proposed Findings of Fact and Conclusions of Law for the Court's consideration.

## I. PROPOSED FINDINGS OF FACT

### The Petition for Writ of Habeas Corpus, the Response, and the Report and Recommendation

1. On September 2, 2015, Petitioner Dennis Johnson ("Johnson") filed a Petition for Writ of Habeas Corpus. Dkt. No. 1. Eventually, on May 31, 2022, a supporting memorandum of law and exhibits were filed. Dkt. No. 80.

2. On November 4, 2022, a "Response to Petition for Writ of Habeas Corpus" was filed. Dkt. No. 86 ("Response"). The Response was signed by former Assistant District Attorney Jaclyn Mason ("Mason"). In summary, the Response conceded relief on Johnson's ineffective assistance of counsel claim.

3. On February 3, 2023, the Honorable Lynne A. Sitarski, United States Magistrate Judge, submitted a Report and Recommendation recommending that the Petition for Writ of Habeas Corpus be granted with respect to Johnson's claim asserting ineffective assistance of counsel. *See* Dkt. No. 89.

**Preparation and Filing of the Response**

4. Mason started at the Philadelphia District Attorney's Office ("DAO") in the Federal Litigation Unit in July 2021. Notes of Testimony ("N.T.") 7/17/26 at 13. Matthew Stiegler ("Stiegler") was her supervisor. N.T. 7/17/26 at 13. When Mason started at the DAO, she had no criminal litigation experience and received no training on how to handle cases. N.T. 7/17/26 at 14.

5. In early December 2021, Stiegler assigned Mason to work on the *Johnson* case. Ex. OAG-1 (12/6/21 e-mail from Stiegler to Mason assigning *Johnson* case); N.T. 7/17/26 at 16. At the time, Matthew Stiegler was the Supervisor of the Federal Litigation Unit at the DAO. N.T. 7/17/26 at 64. His current position is Supervisor of the Conviction Integrity Unit, which is outside the Law Division and reports to the District Attorney. N.T. 7/17/26 at 63.

6. Stiegler first became aware of the *Johnson* case when he was contacted by counsel for the petitioner. N.T. 7/17/26 at 65. Prior to assigning the case to Mason, Stiegler had been "working" with the Innocence Project and the federal defenders, and Mason participated in a Zoom meeting with them around the

time she began working on the case and before the amended petition was filed. N.T. 7/17/26 at 16-17 (Mason); 66-68 (Stiegler assigned case to Mason and described discussing aspects of the case with opposing counsel). In his e-mail assigning the case to Mason, Stiegler stated, "We've agreed to waive exhaustion to allow the case to proceed in federal court." Ex. OAG-1; N.T. 7/17/26 at 20. Stiegler also stated that Johnson appeared to have a "strong Brady claim and an at-least-substantial innocence claim," and that the "key decision" was whether to "agree to relief and file a joint stipulation" or "agree to an evidentiary hearing." Ex. OAG-1; N.T. 7/17/26 at 21.

7. Mason noted that Stiegler had "already made the assessment and the decision here that this is going to be a case that should be conceded." N.T. 7/17/26 at 21; *cf.* N.T. 7/17/26 at 73 (Stiegler recalled a collaborative decision between Mason and Stiegler). At the time Stiegler assigned the case to Mason, he had reviewed only the most recent PCRA filing by the petitioners. N.T. 7/17/26 at 68. Despite this, the email purported to summarize the evidence in the case, relying heavily on new evidence that had been submitted by the petitioner without investigating that evidence or suggesting that a challenge was appropriate. Ex. OAG-1.

8. Mason and Stiegler did not discuss ways they should be investigating the case. N.T. 7/17/26 at 26-27. Mason explained that Stiegler told

her that if it is good enough for the Innocence Project, it is good enough for [Stiegler]. N.T. 7/17/26 at 23; 42.

9. Mason did not review the notes of testimony from the trial or the prosecutor's trial file. N.T. 7/17/26 at 22-23. She did not review the detective's file (the "H-File"). N.T. 7/17/26 at 23. She did not make any effort to interview the affiants. N.T. 7/17/26 at 23. While drafting the Response, Mason met with Stiegler, the federal defenders, and the Innocence Project "many, many times." N.T. 7/17/26 at 24; *see* Ex. OAG-2 (9/27/2022 e-mail from Stiegler to Mason referring to "ongoing communication" with counsel for petitioner). Mason was just the "conduit" for drafting and thought everything had already been done by Stiegler and the Innocence Project and the federal defenders. N.T. 7/17/26 at 23.

10. But Stiegler had not done any independent investigation either. N.T. 7/17/26 at 77.

11. Stiegler stated that it was not "our practice" to interview witnesses, even if a witness had recanted. N.T. 7/17/26 at 73-77.

12. Stiegler did not review the notes of testimony. N.T. 7/17/26 at 79.

13. Stiegler did not instruct Mason how to obtain an H-File. N.T. 7/17/26 at 90-91.

14. Stiegler did not recall asking whether Mason had spoken to the trial prosecutor. N.T. 7/17/26 at 91. Stiegler did not have a practice of talking to the trial prosecutor if the case involved a *Brady* claim. N.T. 7/17/26 at 92.

15. On September 15, 2022, Mason sent Stiegler an email attaching notes. N.T. 7/17/26 at 80-85; *see* Exs. R-1 and R-2. Stiegler testified it was not a "mystery" at that point that there would be a concession. N.T. 7/1726 at 89. As discussions progressed, Mason explained, "Everybody was coming together to reach a decision as to which claim would be the best claim to concede on. And that decision was made with [Stiegler], with the federal defenders, and with the Innocence Project." N.T. 7/17/26 at 29; *see* Ex. OAG-3 (e-mail chain from 9/30/22 to 10/3/22 beginning with e-mail from opposing counsel attaching letter from Attorney Michael Coard,[1] followed by discussion between Mason and Stiegler regarding impact of letter on potential hearing). Mason confirmed that it was a collaboration with the defense about what the DAO would do with respect to the concession. N.T. 7/17/26 at 31.

16. During September 2022, Mason put together a draft of the Response. N.T. 7/17/26 at 34. Stiegler and Mason made several rounds of edits, and Mason accepted any edits Stiegler made. N.T. 7/17/26 at 34 (Mason); 78 (Stiegler); Ex. OAG-4 (e-mail chain from 11/1/22 to 11/4/22 between Mason and

[1] Attorney Michael Coard was petitioner's trial counsel. N.T. 7/17/26 at 29.

Stiegler). Because it was a concession, Nancy Winkelman, then head of the Law Division, also reviewed it. N.T. 7/17/26 at 35-40; Ex. OAG-5 (e-mail chain from 10/26/22 through 11/3/22 discussing draft Response with Winkelman).

17. When Stiegler reviewed Mason's draft Response, he had no materials other than her draft Response. N.T. 7/17/26 at 78.

18. On November 4, 2022, Mason filed the Response. Dkt. No. 86. Mason was the only person who signed the Response. Stiegler did not sign it. N.T. 7/17/26 at 97-98.

**<u>Order Scheduling Evidentiary Hearing</u>**

19. After the Report and Recommendation was submitted, on May 7, 2026, this Court ordered that it would conduct an evidentiary hearing on the Petition on June 18, 2026. Dkt. No. 97. The order also asked OAG to participate in the hearing. Dkt. No. 97. OAG attorneys promptly entered their appearance on the docket. Dkt. Nos. 99-100.

20. As of May 2026, David Napiorski ("Napiorski") was the head of the Law Division and previously had been the Assistant Supervisor of the Law Division, Supervisor of the Federal Litigation Unit, and Assistant Supervisor of the Federal Litigation Unit. N.T. 8/27/26 at 144. As of May 2026, Steven Wildberger ("Wildberger") was the Assistant Supervisor of the Law Division. N.T. 8/27/26 at 113. As of May 2026, Peter Andrews ("Andrews") was the Supervisor of the Federal

Litigation Unit and previously was an Assistant District Attorney in the Federal Litigation Unit from about October 2021 to December 2023. N.T. 9/1/26 at 17-18. As of May 2026, Katherine Ernst ("Ernst") was Chief of Training of the Law Division; she became Supervisor of the Federal Litigation Unit in about 2022 and Chief of the Law Division in about 2024. N.T. 8/27/26 at 5-7.

21. Soon after the Court issued its May 7, 2026 Order, which directed a hearing and brought OAG into the case, supervisors in the DAO's Law Division, Napiorski, Wildberger, Andrews, and Ernst, planned to meet with Mason to discuss their response to this development. N.T. 8/27/26 at 8 (Ernst); 114 (Wildberger); 145 (Napiorski); N.T. 9/1/26 at 19 (Andrews). Mason previously had brought the case to Ernst's attention when the Report and Recommendation was issued in 2023, but Ernst had not worked on it at that time. N.T. 8/27/26 at 8; *see* N.T. 8/27/26 at 145-46 (Napiorski proofread the Response but had no involvement in preparing the filing).

22. Prior to the meeting, Ernst read the Response, the Report and Recommendation, and the Superior Court opinion. N.T. 8/27/26 at 8. During her review of the Response, Ernst observed that the Response "left out" some relevant aspects of the Superior Court opinion and referred to preliminary hearing testimony that a witness had not seen the defendant's face but did not specify whether the witness testified at trial that he had seen the defendant's face. N.T. 8/27/26 at 9-10.

Ernst testified that her review led her to think that "maybe something really strange happened in this case" and "made [her] wonder why we had described the testimony that way." N.T. 8/27/26 at 10.

23. At the meeting, the supervisors and Mason discussed various tasks related to preparing for the evidentiary hearing, such as locating witnesses, reviewing the H-File, and reviewing prison communications. *See* N.T. 8/27/26 at 11 (Ernst); 146-47 (Napiorski).

24. A few days after this meeting, Mason asked Ernst to assist her with the case and prepare for the hearing. N.T. 7/17/26 at 43-44 (Mason); N.T. 8/27/26 at 13 (Ernst). Mason told Ernst that she was Stiegler's "pawn" when she wrote this and described the "collusive process." N.T. 7/17/26 at 43-44; *cf.* N.T. 8/27/26 at 108 (Ernst did recall Mason telling her that she was Stiegler's "pawn"). Ernst explained that "the response on the face of it didn't seem very strong," and she was "concerned" about reference to a recanting witness. N.T. 8/27/26 at 9; *see* N.T. 8/27/26 at 13 (Ernst testified that she was "concerned about this just from having read the face of the response"). Mason said that, with the benefit of five additional years of experience, she felt similarly. N.T. 8/27/26 at 13; *see* N.T. 7/17/26 (Mason testified she told Ernst "this is just not a piece of work product that I would produce now"). Mason went on to say that she still thought the DAO "took the right position" but would feel better if Ernst reviewed it. N.T. 8/27/26 at 13.

25. Ernst proposed to Napiorski that she review the record and that Napiorski focus on reviewing the H-file and tracking down witnesses, and Napiorski agreed. N.T. 7/17/26 at 44-45 (Mason); N.T. 8/27/26 at 13-14 (Ernst); 147 (Napiorski).

26. During the second half of May 2026, Ernst read the transcripts and became "even more concerned" about the accuracy of the office's prior filing. N.T. 8/27/26 at 14. In late May 2026, Ernst prepared a memorandum laying out the facts and analyzing the 11 claims that she sent to Napiorski, Mason, Wildberger, and Andrews. N.T. 7/17/26 at 45-46 (Mason); N.T. 8/27/26 at 14-15 (Ernst); 115 (Wildberger); 147-48 (Napiorski); N.T. 9/1/26 at 20 (Andrews). The memorandum "described that there were facts in our response that were inconsistent with the record, that we had gotten facts wrong." N.T. 8/27/26 at 15; 115 (Wildberger noting that the memorandum "identified some of the errors in our office's prior response"); 148 (Napiorski stated "the memo did mention there were errors in the response"). Ernst testified that at that point she did not think her review "destroyed" the DAO's position, but she recommended further review. N.T. 8/27/26 at 15.

27. Ernst testified that, as she continued to think about her memorandum, she acknowledged that it was "not a close call, this was not a winning claim" and that there seemed to be "very significant errors." N.T. 8/27/26 at 16. She concluded that it was necessary "to immediately file a correction with the Court

describing the errors that we have found and explaining that we no longer believe that the defendant is entitled to relief." N.T. 8/27/26 at 16.

28. On Thursday, May 28, 2026, Ernst spoke to Wildberger about the memorandum, and Wildberger agreed with Ernst's assessment that the errors needed to be corrected. N.T. 8/27/26 at 17 (Ernst); 115-16 (Wildberger).

29. On Friday, May 29, 2026, Ernst, Wildberger, and Napiorski met to discuss the errors in the Response and withdrawing the response. N.T. 8/27/26 at 18; 149. Napiorski was initially "resistant." N.T. 8/27/26 at 149; *see* N.T. 8/27/26 at 116 (Wildberger described Napiorski as "somewhat dismissive"). Ernst presented Napiorski with an annotated version of the Response showing the errors and repeatedly writing "false," "false," "false." N.T. 8/27/26 at 19-21 (Ernst); 117 (Wildberger); 149 (Napiorski); Ex. OAG-6. Napiorski reviewed the Report and Recommendation and observed that some of the errors in the Response had been repeated there. N.T. 8/27/26 at 117; 149. By the end of the meeting, Napiorski agreed with Ernst and Wildberger about filing a correction with the Court and withdrawing the Response. N.T. 8/27/26 at 20-21; 117; 149.

30. Later on Friday, May 29, 2026, Ernst, Wildberger, Napiorski, and Mason met. N.T. 7/17/26 at 47; N.T. 8/27/26 at 22; 117; 150. Napiorski explained that there were errors in the Response that had been included in the R&R, and that it was necessary to withdraw the response and file a new response. N.T.

7/17/26 at 47 (Mason); N.T. 8/27/26 at 22 (Ernst); 118 (Wildberger); 150 (Napiorski). Ernst still had her annotated version of the Response (Exhibit OAG-6), and the errors in the Response were discussed with Mason. N.T. 8/27/26 at 35. Ernst suggested that it would be "best" if Mason would correct the error and "apologize to the court." N.T. 8/27/26 at 22-23 (Ernst); 118 (Wildberger); *see* N.T. 8/27/26 at 152 (Napiorski stating that it might be a "good idea to take some ownership of the mistakes that were made here, take some responsibility").

31. Ernst and Napiorski also mentioned the *Lavar Brown* case, in which Napiorski had signed joint stipulations in federal court that had been prepared with his supervisor, Stiegler, Paul George, and the defense. OAG subsequently entered the *Lavar Brown* state court litigation casting significant doubt on many of the DAO's representations. Ernst and Napiorski testified that Napiorski thereafter signed a motion to withdraw the federal court concession and apologized, and that this change of position seemed well-received by the Court. N.T. 8/27/26 at 23-24 (Ernst); 152-54 (Napiorski); *see* N.T. 7/17/26 at 48 (Mason describing how she learned that Napiorski acknowledged making mistakes in the document even though Stiegler was his supervisor). *See Brown v. Wetzel,* Civil Action No. 10-5553 (E.D. Pa.), Dkt. No. 62 (Motion for Leave to Withdraw Joint Motion); Dkt. No. 77 (transcript from motion hearing).

32. Later in the meeting, Mason stated that Stiegler "should be taking responsibility for this." N.T. 7/17/26 at 48; N.T. 8/27/26 at 24 (Ernst stated that Mason "start[ed] trembling," said that she was "furious because this is all Matthew Stiegler's fault," and that this has "been a long time coming and [Stiegler] deserves to be thrown under the bus"); 118 (Wildberger saw that Mason was "visibly upset" and that she said "we had to throw Stiegler under the bus" and it "was a long time coming"); 156 (Napiorski observed Mason was "upset" at Stiegler and the situation). Ernst agreed that it was "unfair" that only Mason's name was on the Response even though Stiegler had supervised it. N.T. 8/27/26 at 25. Ernst said that any filing would acknowledge that "Mr. Stiegler did, in fact, supervise the response," but made no promise to say anything more about Stiegler's level of involvement or responsibility. N.T. 8/27/26 at 25.

33. During the meeting, Wildberger said that "you'll find no Matt Stiegler apologists here." N.T. 8/27/26 at 118. Stiegler did "not have the best reputation" in the Law Division and was "not tremendously well liked" because he "basically ran everyone out of the federal litigation unit." N.T. 8/27/26 at 119 (Wildberger); *see* N.T. 8/27/26 at 151 (Napiorski agreed that Wildberger's description of Stiegler's reputation was "largely accurate" and many people who worked for Stiegler quit); *cf.* N.T. 9/1/26 at 28 (Andrews had different experience and had friendly relationship with Stiegler).

34. Wildberger personally did not have a good relationship with Stiegler because, early in his time at the DAO, Wildberger refused Stiegler's request to "say something that occurred before the grand jury was okay when I didn't feel that it was." N.T. 8/27/26 at 120. Wildberger said that Stiegler should sign it, and Stiegler declined. N.T. 8/27/26 at 120.

35. Before the meeting concluded, Mason asked whether a new response opposing relief on all claims would need to be filed, and Ernst and others said yes. N.T. 8/27/26 at 25; 156-57.

36. On Saturday, May 30, 2026, Mason called Napiorski and asked if they would "throw her under the bus" if she quit, and Napiorski said they would not. N.T. 7/17/26 at 50 (Mason); N.T. 8/27/26 at 157-58 (Napiorski). Mason also told Napiorski that Stiegler should take responsibility by executing an affidavit acknowledging that he was responsible for the brief. N.T. 7/17/26 at 51 (Mason); N.T. 8/27/26 at 160 (Napiorski).

37. On Monday, June 1, 2026, Mason met with Napiorski and Andrews. N.T. 7/17/26 at 52 (Mason); N.T. 8/27/26 at 160 (Napiorski); N.T. 9/1/26 at 21 (Andrews). Mason claimed that Stiegler would not take responsibility, and Andrews responded that he would. N.T. 7/17/26 at 52; *see* N.T. 9/1/26 at 25-26 (Andrews believed it was possible that Mason would feel that she was going to be blamed because she was asked to sign the withdrawal and nobody was blaming

Stiegler). Mason disagreed. N.T. 7/17/26 at 52. Napiorski again suggested Mason sign the withdrawal motion and take some responsibility while making it clear that she was not "wholly at fault" and that she had been supervised by Stiegler. N.T. 8/27/26 at 162.

**Mason Resigns**

38. On June 2, 2026, Mason submitted a resignation letter that explained what was happening.[2] N.T. 7/17/26 at 52-53. Among other things, Mason stated that Stiegler "used [Mason] to further his personal agenda of conceding in federal habeas cases regardless of the merits." N.T. 8/27/26 at 41. Mason also stated that she had "no assurances or confidence" that she would be protected if she prepared a response changing position, and that she had "been asked to 'fall on my sword' in front of the Court and acknowledge mistakes were made." N.T. 8/27/26 at 42. She requested that Stiegler "submit and swear in an affidavit that he erred and that he was responsible for what was filed in the case." N.T. 8/27/26 at 42.

39. The law division supervisors acknowledged that they had asked Mason to admit mistakes, although they testified that this did not mean she was being asked to take all the blame. *See* N.T. 8/27/26 at 30 (Ernst); 121 (Wildberger); 155 (Napiorski); N.T. 9/1/26 at 27 (Andrews). When the motion to withdraw the concession was later filed, it identified Mason as the signatory on the error-filled

[2] Ernst read Mason's resignation letter in Court. N.T. 8/27/26 at 39-43.

concession, and in a footnote stated that, "[a]lthough Stiegler did not sign the response, he supervised its preparation." Dkt. No. 118 at 3 n.1.

**Stiegler Discussed the Motion to Withdraw Response with DA Krasner and Others**

40. On June 2, 2026, after Mason resigned, Andrews spoke to Stiegler about the proposal to file a Motion to Withdraw Response. N.T. 9/1/26 at 28; *see* N.T. 7/17/26 at 99 (Stiegler discussed the Motion to Withdraw Response with Andrews and others). Andrews described the errors in the Response; Stiegler seemed like he "wasn't totally listening." N.T. 9/1/26 at 29.

41. Stiegler also discussed the Motion to Withdraw Response with Ernst. *See* N.T. 7/17/26 at 99. Specifically, during the middle of the week of June 1, 2026, Stiegler called Ernst and asked her to explain the errors in the Response to him. N.T. 8/27/26 at 37. Ernst identified some of the errors. N.T. 8/27/26 at 37. Stiegler said that he hadn't decided in his own mind what really happened" and asked if he could send Ernst versions of the Response with edits. N.T. 8/27/26 at 37. Later that week, early on the morning of Friday, June 5, 2026, Ernst received a text message from Stiegler asking her to speak with him. N.T. 8/27/26 at 45.

42. When Ernst met with Stiegler, Stiegler alleged that Mason purposefully inserted false facts into the Response, and that there were no procedures to "catch purposefully inserted falsehoods." N.T. 8/27/26 at 45. Stiegler went on to say that "this was one hundred percent [Mason's] fault, zero percent his fault." N.T.

8/27/26 at 45. Stiegler suggested that "what we should do would be to file something with the Court preemptively before the hearing explaining that we had gone through Ms. Mason's cases, that we found mistakes in other cases too, and that, therefore, this was all her fault." N.T. 8/27/26 at 45. When Ernst indicated that looking into Mason's past cases might show a "pattern of [Stiegler's] bad supervisory work" and not "exculpate" him, Stiegler agreed that was a "good point." N.T. 8/27/26 at 46.

43. However, Stiegler continued to suggest looking into Mason's past work to "get out ahead of this" and that the judge would view this "as one rogue ADA" as opposed to thinking of this as "all Matthew Stiegler's fault." N.T. 8/27/26 at 46. Ernst testified that she responded that assigning fault or protecting reputations would be inconsistent with doing a "full investigation" that is "necessary to properly handle a case." N.T. 8/27/26 at 47.

44. Stiegler also discussed the Motion to Withdraw Response with Napiorski. N.T. 8/27/26 at 163; *see* N.T. 7/17/26 at 99. Stiegler suggested that the way to approach this was to "look through old filings or old documents that Ms. Mason prepared and find more mistakes and to kind of paint her as a rogue actor." N.T. 8/27/26 at 163.

45. Stiegler recalled having "individual conversations," including with Ernst, Napiorski, and "possibly twice" with District Attorney Lawrence

Krasner ("DA Krasner"). N.T. 7/17/26 at 101. DA Krasner was "interested," as Stiegler testified, in Stiegler's

> input about the office's handling, and that what I was saying to him was that my view was that we had information about what had happened here, that this was – I think I said something to the effect of this was not a who done it, that we had information about how these errors had occurred and that we should act – and that information primarily was the drafts that had resulted in the ultimate filing. And that the office should make a decision on the basis of the information that it had, if there were errors that had occurred, it should acknowledge those errors and go forward. My position was that the errors that occurred here were not intentional, not an effort to deceive the Court, and that the information that the office had showed that and that that's how I believed that the office should proceed.

N.T. 7/17/26 at 101-02.

46. On June 5, 2026, Ernst, Wildberger, Napiorski, Andrews, and Thomas Gaeta ("Gaeta"), Supervisor of Civil Litigation, discussed the situation, and Ernst thought she was "definitely conflicted" because Stiegler was "lobbying" her on how to handle the case, and she testified that Napiorski said Stiegler had been lobbying him as well. N.T. 8/27/26 at 50. Andrews had spoken to Stiegler, but Andrews testified that Stiegler had not said anything about how to handle the case, and Wildberger had not spoken to Stiegler at all. N.T. 8/27/26 at 50.

**Meeting with DA Krasner on June 5, 2026**

47. On June 5, 2026, Ernst, Wildberger, Napiorski, and Andrews met with DA Krasner. N.T. 8/27/26 at 51. During the meeting, DA Krasner reviewed a printed version of the proposed Motion to Withdraw Response. N.T. 8/27/26 at 51; 122; N.T. 9/1/26 at 30. DA Krasner edited a footnote to provide less information about Stiegler's role in the case. The original footnote indicated that Stiegler edited several drafts of the Response. DA Krasner changed it to say that Stiegler supervised its preparation. N.T. 8/27/26 at 51.[3] DA Krasner approved the filing of the motion.

48. DA Krasner then said that "someone gave me a really good idea." N.T. 8/27/26 at 52 (Ernst). DA Krasner clarified that it was Stiegler, and that Stiegler suggested going through Mason's cases to find mistakes that she made in other cases, say that this was a pattern with her, and then file something with the Court saying that. N.T. 8/27/26 at 52 (Ernst); 122-23 (Wildberger testified that DA Krasner said that Stiegler gave him a "great idea" to review Mason's cases and find errors, which Wildberger took to mean "an effort to lay blame solely on her"); 165 (Napiorski testified that DA Krasner said he talked to Stiegler and there was an "idea" of going through Mason's cases and seeing if she had made mistakes); N.T. 9/1/26 at 35-36 (Andrews stated that it sounded correct that DA Krasner brought up reviewing

[3] *See* Motion to Withdraw Response, Dkt. No. 118, at 3 n.1 ("Although Stiegler did not sign the response, he supervised its preparation.").

Mason's cases, and that Stiegler had suggested this and that he thought it was a pretty good idea); *see also* N.T. 8/27/26 at 106 (Ernst testified during cross-examination that she knew DA Krasner had "consulted with ADA Stiegler" because DA Krasner said that Stiegler gave him a "great idea"). Wildberger testified that he believed this was "tremendously inappropriate." N.T. 8/27/26 at 123. Ernst responded that they would also have to review Stiegler's cases, and DA Krasner said that was a good point. N.T. 8/27/26 at 53.

49. After that, the supervisors suggested to DA Krasner that the case be referred to OAG due to a conflict because Stiegler had been "lobbying" Ernst and Napiorski about how to handle the case. N.T. 8/27/26 at 53 (Ernst); 124 (Wildberger testified that it was explained to DA Krasner that there were conflict issues); 166 (Napiorski testified he had an "apparent conflict" because Stiegler had been lobbying him). DA Krasner was "very opposed" and said the case could not be sent to OAG because "essentially they're all evil" and it seemed to DA Krasner that OAG is conflicted. N.T. 8/27/26 at 53-54; 124 (Wildberger said DA Krasner "outright refused").

50. DA Krasner elaborated that OAG are "always terrible and always conflicted, we should never want the case to go to them." N.T. 8/27/26 at 54.

51. Ernst then indicated that the DAO and OAG likely would be making the same arguments in the case. N.T. 8/27/26 at 54. Andrews also believed

that the case should be referred to OAG as a "practical matter" and because Mason and Stiegler had offered different accounts. N.T. 9/1/26 at 31.

52. DA Krasner then said that "we have to have somebody in the room, in the courtroom to protect the office." N.T. 8/27/26 at 54 (Ernst); 57 (Ernst explained that "the person needed to be in the room to protect the office, to essentially, like, object if someone said something bad for the office"); 124 (Wildberger testified that DA Krasner also said that "someone had to be in the case from our office to protect the office"); N.T. 9/1/26 at 31-32 (Andrews stated that DA Krasner does not trust OAG and wanted there to be someone from the DA's office in the room at future proceedings; Andrews believed it was "entirely possible" that DA Krasner said "protect the office" but Andrews did not have a specific recollection). After Ernst expressed that that was the conflict, DA Krasner suggested hiring someone from outside the office to handle the case. N.T. 8/27/26 at 55. Ernst's initial response was that she did not see why DA Krasner could not do that. N.T. 8/27/26 at 55.

53. DA Krasner also suggested showing Stiegler the Motion to Withdraw Response before it was filed, but Ernst, Wildberger, Napiorski, and Andrews declined. *See* N.T. 8/27/26 at 56. At that point, Ernst and Wildberger left the meeting, and Wildberger asked to have the printed version of the Motion to Withdraw Response to make edits. N.T. 8/27/26 at 58.

54. Later on June 5, 2026, Napiorski, Andrews, DA Krasner, Stiegler, and Chief of Staff Jennifer Lin ("Lin") then met. N.T. 8/27/26 at 168 (Napiorski); N.T. 9/1/26 at 32 (Andrews). Stiegler "reiterated his idea" of reviewing Mason's old cases, but that idea was rejected. N.T. 8/27/26 at 168-69 (Napiorski); N.T. 9/1/26 at 33-34 (Andrews believed that Stiegler's strategy was to "pin blame for this incident on Ms. Mason").

55. Stiegler then asked to see the Motion to Withdraw Response but was declined. N.T. 8/27/26 at 169 (Napiorski); N.T. 9/1/26 at 32 (Andrews declined to show Stiegler because he didn't want Stiegler to have "any influence over what we filed"). Stiegler was also against referring the case to OAG, due to his own reputational interest and a general lack of trust of OAG. N.T. 8/27/26 at 169. Stiegler also asked if they could wait to file the Motion to Withdraw Response until Monday but was declined. N.T. 8/27/26 at 170; N.T. 9/1/26 at 33.

**Filing of Motion to Withdraw Response**

56. On June 5, 2026, the Motion to Withdraw Response (Dkt. No. 118) was filed. It was signed by Napiorski, Wildberger, Andrews, and Ernst.

**Meeting with DA Krasner on June 8, 2026**

57. On Monday, June 8, 2026, Ernst and Wildberger spoke to others in the DAO about the conflict issue and referring the case to OAG.[4] While they

[4] Around this time, Wildberger and Ernst consulted an ethics advisor. N.T. 8/27/26 at 126.

were speaking with Lin, DA Krasner walked by and joined the meeting. N.T. 8/27/26 at 61 (Ernst); 125 (Wildberger). When Ernst encouraged DA Krasner to send the case to OAG, DA Krasner "went on a long rant about how everyone in the AG's office is evil and that he didn't want to do that." N.T. 8/27/26 at 61.

58. DA Krasner again said that "someone had to be in the case from our office to protect the office and prevent it from becoming a shadow Rule 11 hearing," which Wildberger understood to mean that DA Krasner "didn't want people poking around in what occurred."[5] N.T. 8/27/26 at 125-26. DA Krasner indicated he would decide by the end of the week. N.T. 8/27/26 at 61.

**<u>Meeting with DA Krasner in Mid-June 2026</u>**

59. On June 11, 2026, OAG filed a Motion to Establish a Briefing Schedule, advising the Court that the DAO's Motion to Withdraw Response "only tell[s] part of the story." Dkt. No. 119.

60. After that, Ernst, Wildberger, and Gaeta met with DA Krasner, along with Lin and another person. N.T. 8/27/26 at 62. Prior to DA Krasner's arrival, Lin indicated that she earlier overheard Stiegler encouraging DA Krasner not to refer the case to OAG. N.T. 8/27/26 at 62-63.

---

[5] DA Krasner had been the subject of Rule 11 sanctions in another concession case, *Wharton v. Vaughn*, 2022 WL 4133291 (E.D. Pa. 2022), *aff'd,* 95 F.4th 140 (3d Cir. 2024).

61. When DA Krasner arrived, he asked about filing a response to OAG's Motion to Establish a Briefing Schedule. N.T. 8/27/26 at 63. Ernst responded that she could not file anything more because she believed she had a conflict of interest. N.T. 8/27/26 at 63.

62. In discussing whether to refer the case to OAG, DA Krasner "went on a long, extended rant yet again about how he hated the OAG," that "everybody in the OAG are Nazis," and that "he didn't like the idea of the case going to them." N.T. 8/27/26 at 64. DA Krasner then said that we "need to protect the office" and "need somebody in the room so that they can control the proceedings." N.T. 8/27/26 at 64.

63. Ernst stated that any response to the habeas petition or to OAG would require a full investigation into the case, and that investigation might further undermine the prior concession. N.T. 8/27/26 at 65. She testified that a "person can't both protect the office and competently handle the case." N.T. 8/27/26 at 65. DA Krasner responded that he would just tell the person handling the case not to do any investigation, and that OAG is in the case anyway and can do the investigation. N.T. 8/27/26 at 65. The person could "sit there and they'll just object if OAG does

something we don't like." N.T. 8/27/26 at 65. Ernst responded that Paul George was disbarred for failing to do a full investigation. N.T. 8/27/26 at 66.[6]

**Memorandum with Questions for Ethics Advisor**

64. DA Krasner stated that he needed to speak to an ethics advisor. N.T. 8/27/26 at 66. Ernst and Wildberger prepared a memorandum about the issues with questions to pose to the ethics advisor. N.T. 8/27/26 at 66; 127. Ernst and Wildberger prepared the memorandum and gave it to Lin. N.T. 8/27/26 at 67; 127.

**June 18, 2026 Meeting with DA Krasner**

65. On June 18, 2026, DA Krasner sent a text message to Ernst, Wildberger, Andrews, and Lin requesting a meeting on a "narrow issue." N.T. 8/27/26 at 69; 128; N.T. 9/1/26 at 39-40.

66. During the meeting,[7] DA Krasner indicated that he had spoken to an ethics advisor who disagreed that the DAO had a conflict, although the ethics advisor agreed that Stiegler had a conflict. N.T. 8/27/26 at 69. DA Krasner did not name the ethics advisor. N.T. 8/27/26 at 70. Wildberger and others again "implored" DA Krasner to refer the case to OAG, but DA Krasner refused and said someone should "be in the case to protect the office." N.T. 8/27/26 at 129. DA

[6] Paul George was a prior supervisor in the Law Division who was subject to federal bar discipline due to his actions in the *Wharton* case, *see* fn. 5, *supra*, as was the then-head of the law division, Nancy Winkelman. Both disciplinary matters are now on appeal.

[7] Ernst participated by phone. N.T. 8/27/26 at 69. Wildberger and Andrews were present.

Krasner did not want to refer the case to OAG because he "referred to the Office of the Attorney General as Paraguay and refers to the people that work there as Nazis." N.T. 8/26/27 at 130.

67. DA Krasner then said that someone had to respond to OAG's Motion for a Briefing Schedule and state that the DAO did not want a hearing. N.T. 8/27/26 at 70; 128-29 (Wildberger stated that DA Krasner "wanted an opposition, and [DA Krasner] said that it did not matter what it said as long as it expressed opposition"). Ernst disagreed with this approach and questioned how it was appropriate for her to be consulting with DA Krasner because she had a conflict. N.T. 8/27/26 at 72. Eventually, Andrews suggested that Gaeta could file something to indicate the DAO was still identifying who would handle the case and request more time. N.T. 8/27/26 at 73-74; N.T. 9/1/26 at 41.

**Conflict Memorandum**

68. After the June 18, 2026 meeting, Ernst and Wildberger considered alerting the Court to the conflict issue but decided to write a memorandum to DA Krasner explaining the conflict and why they believed DA Krasner was conflicted. N.T. 8/27/26 at 76; 129.

69. On Monday, June 22, 2026, Napiorski met with DA Krasner and Lin. N.T. 8/27/26 at 172. Napiorski told DA Krasner that he thought there was a "serious concern" that there was an "apparent conflict with the office," but DA

Krasner disagreed. N.T. 8/27/26 at 172. DA Krasner said that he wanted to have somebody in the room to protect the office. N.T. 8/27/26 at 172. DA Krasner said he would talk to his own ethics advisors but did not name them. N.T. 8/27/26 at 173. DA Krasner again rejected the suggestion that he refer the case to OAG. N.T. 8/27/26 at 173-74.

70. During the week of June 22, 2026, Wildberger began drafting a memorandum to DA Krasner laying out the conflict issue. N.T. 8/27/26 at 77; 129-30. Andrews reviewed and commented on the memorandum but did not sign it. N.T. 9/1/26 at 41-43. Gaeta supported sending the memorandum and said that he believed the office had a conflict or at least the appearance of a conflict. N.T. 8/27/26 at 77.

71. The memorandum was addressed to DA Krasner and signed by Napiorski, Wildberger, and Ernst. Ex. OAG-6. The memorandum stated, "In short, we believe District Attorney Krasner is conflicted in the case of *Johnson v. Nickelson, et al.*, No. 15-cv-4965 (E.D. Pa.) and, consequently, the case must be referred to the Office of Attorney General (OAG)." Ex. OAG-6 at 1.

72. The memorandum then went on to describe Stiegler's conflict: if he were involved in the case, he would have "competing interests" because he would be "obligated to develop evidence that might cast further doubt on the 2022 response

he supervised." Ex. OAG-6 at 1; N.T. 8/27/26 at 79 (Ernst explained that Stiegler would have a "reputational interest in not doing a full investigation").

73. Next, the memorandum asserted that DA Krasner is conflicted because he conferred with Stiegler about the case. Ex. OAG-6 at 2; N.T. 8/27/26 at 80 (Ernst testified that Krasner had suggested adopting Stiegler's suggestion about finding errors in Mason's cases).

74. The third section of the memorandum stated that DA Krasner "is conflicted because his litigation directives are potentially contrary to the underlying litigation." Ex. OAG-6 at 2; N.T. 8/27/26 at 80.

75. The memorandum further stated that DA Krasner's refusal to refer the case to OAG to "protect the office" was "incompatible with representing the Commonwealth on the merits case here." Ex. OAG-6 at 2; N.T. 8/27/26 at 80 (Ernst stating that DA Krasner "doesn't really care about the merits, he said that he would want the person handling the case to not do a full investigation, and he seemed to be caring more about the reputation of the office than about competently handling the case").

76. Finally, the memorandum discussed referral to the OAG and discussed *Commonwealth v. Breighner*, 684 A.2d 143 (Pa. Super. 1996) (*en banc*), which was attached to the memorandum. Ex. OAG-6 at 3; N.T. 8/27/26 at 80-81.

77. On June 24, 2026, Napiorski emailed the memorandum to DA Krasner and copied Ernst, Wildberger, Gaeta, Lin, and Regina Purtell, an administrative support person. N.T. 8/27/26 at 175; *see* Ex. R-4. The email was sent to both DA Krasner's work email address and his private email address because he "typically didn't use" his work email. N.T. 8/27/26 at 110; Ex. R-4. Later on June 24, 2026, DA Krasner responded – via Lin's email address – disputing portions of the memorandum. *See* Ex. R-4. Among other things, DA Krasner's response referred to unnamed "ethics experts" whose opinions were based on ethical rules not referenced in the conflict memorandum; disputed the meaning of his phrase "protect the office"; described his communications with Stiegler and Stiegler's counsel as "straightforward" and pertaining to matters like representation; and noted that it appeared "Mason is radically changing her story now to shift blame." Ex. R-4.

78. Napiorski was "surprised" that DA Krasner responded in writing. N.T. 8/27/26 at 176-77. Ernst explained that it "stuck out" to her that DA Krasner said he had only communicated with Stiegler and Stiegler's counsel about "prosaic matters." N.T. 8/27/26 at 81-82. DA Krasner's response also claimed that the statement "protect the office" was being taken out of context and that he had consulted "with a number of respected ethics experts" who analyzed "ethical rules" that were not mentioned in the memorandum. *See* Ex. R-4; N.T. 8/27/26 at 82; 83 (Ernst testified that Krasner admitted he said "protect the office" but tried to

recharacterize it); 177-78 (Napiorski believed that DA Krasner's statement "protect the office" created a conflict because protecting the office was not his job in the habeas matter, might be inconsistent with his obligation to the Court, and probably referred to DA Krasner protecting himself).

**Meeting with DA Krasner after Sending Conflict Memorandum**

79. Later on June 24, 2026, Napiorski and Wildberger met with DA Krasner. N.T. 8/27/26 at 83; 132; 178. During the meeting, DA Krasner was angry that Napiorski had put the memorandum in writing and sent it via email because it was "discoverable," N.T. 8/27/26 at 132, as well as disagreeing with the content of the memorandum. N.T. 8/27/26 at 178-79; N.T. 9/1/26 at 5.

80. DA Krasner agreed that there was "at least an apparent conflict" but wanted to speak with his own ethics advisors. N.T. 9/1/26 at 5; *see* N.T. 8/27/26 at 132 (Wildberger stated that DA Krasner was "very clear" and said "I recognize I have an apparent conflict – not an actual conflict, but an apparent conflict of interest, and [DA Krasner] said someone else would have to supervise the litigation of the case" before turning to look at Lin).

81. Ernst had requested that Napiorski and Wildberger ask DA Krasner to show them a written ethics opinion. N.T. 8/27/26 at 84. DA Krasner never provided an ethics opinion. N.T. 8/27/26 at 84; N.T. 9/1/26 at 5.

82. After the meeting, Ernst spoke to Napiorski, Wildberger, and Gaeta via phone. Ernst stated that she believed the "whole office" is conflicted and that nothing should be filed. N.T. 8/27/26 at 84.

83. On June 24, 2026, the DAO filed a response to OAG's Motion to Establish a Briefing Schedule. The response, signed by Gaeta, stated that the DAO did not think a hearing was required to be held on the DAO's Motion to Withdraw Response. Dkt. No. 122.

**Referral Letter**

84. On June 25, 2026, Napiorski, Wildberger, and Gaeta met with DA Krasner and presented a draft referral letter to OAG. N.T. 8/27/26 at 133-34; N.T. 9/1/26 at 8. Wildberger testified that he believed it was "absolutely necessary" to refer the case to OAG because "there were very significant conflict of interest issues, I felt that the District Attorney's espoused litigation strategy was improper, presented a conflict, and I felt that it would be – I did not believe the conflict would be remedied by hiring an outside person which [DA Krasner] had suggested previously." N.T. 8/27/26 at 134.

85. When presented with the referral letter, DA Krasner was "apoplectic" and "furious." N.T. 8/27/26 at 136; *see* N.T. 9/1/26 at 8 (DA Krasner was "annoyed" that they had brought something written).

86. DA Krasner was advised that Ernst planned to inform the Court if the case were not referred to OAG. N.T. 8/27/26 at 136; N.T. 9/1/26 at 8-9. DA Krasner said that if any of you do that without my approval, there will be "consequences" and repeated the phrase "consequences" several times. N.T. 8/27/26 at 136; N.T. 9/1/26 at 9. Wildberger understood DA Krasner's use of the term "consequences" to mean "termination from my employment." N.T. 8/27/26 at 136-37. Napiorski understood that to mean that "people could lose their jobs." N.T. 9/1/26 at 9. After the meeting, Ernst was informed of DA Krasner's reference to "consequences." N.T. 8/27/26 at 91.

**Withdrawal of Appearances**

87. On June 25, 2026, Ernst and Wildberger filed a "Withdrawal of Appearances." Dkt. No. 123. The filing stated that Ernst and Wildberger withdraw their appearances "due to an actual or apparent conflict of interest." Dkt. No. 123. The filing also stated, "Undersigned counsel also believe, based on their best professional judgment, that the Philadelphia District Attorney's Office may have a conflict of interest in this case." Dkt. No. 123. Finally, the filing stated, "Undersigned counsel understand that the office is seeking to remedy this conflict." Dkt. No. 123.

88. Ernst and Wildberger included the statement about remedying the conflict because Napiorski told them that Chief of Staff Lin had conveyed to him

that "jobs may be salvageable." They understood that "salvaging" their jobs would depend on including the statement about the office remedying the conflict. N.T. 8/27/26 at 93-94 (Ernst); 140 (Wildberger).

89. On June 26, 2026, Napiorski filed a "Withdrawal of Appearance." Dkt. No. 125. Napiorski testified that he believed he had a conflict and had to withdraw. N.T. 9/1/26 at 9.

90. On June 26, 2026, Andrews filed a "Notice of Withdrawal of Appearance." Dkt. No. 126.

**July 17, 2026 Hearing and Notice of Conflict (Dkt. No. 135)**

91. After Gaeta represented the DAO at the July 17, 2026 hearing, Ernst and Wildberger on July 20, 2026, filed a "Notice of Conflict" to explain the ongoing conflict in more detail. Dkt. No. 135; *see* N.T. 8/27/26 at 98-99, 141-42.

92. On July 20, 2026, Wildberger left his position as Assistant Supervisor of the Law Division, stating that he had "lost faith" in the administration of the DAO during the handling of the *Johnson* case. N.T. 8/27/26 at 113. He continues to be employed by the office.

## II. CONCLUSIONS OF LAW

1. “The prosecutor’s duty is to vindicate the interest of the Commonwealth not the interest of any particular individual.” *Commonwealth v. Price*, 684 A.2d 640, 642 (Pa. Super. 1996). A prosecutor must be “‘an administrator of justice with his mind on the public purpose, not [] an advocate whose judgment may be blurred by subjective reasons.’” *Commonwealth v. Eskridge*, 604 A.2d 700, 701 (Pa. 1992) (quoting *Commonwealth v. Dunlap*, 335 A.2d 364, 368 (Pa. Super. 1975) (Hoffman, J. dissenting)).

2. The Pennsylvania Rules of Professional Conduct apply here. Eastern District of Pennsylvania Local Rule 83.6, entitled “Rules of Attorney Conduct,” provides “Standards for Professional Conduct.” Specifically, Rule IV -- Standards for Professional Conduct, provides, “The Rules of Professional Conduct adopted by this court are the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania, as amended from time to time by that state court, except as otherwise provided by specific rule of this Court . . . .”

3. Under Pennsylvania Rule of Professional Conduct 1.1, “A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.”

4. Likewise, "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Pa.R.P.C. 1.3.

5. The Pennsylvania Rules of Professional Conduct also address conflicts of interest. With regard to current clients, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or, (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."[8] Pa.R.P.C. 1.7(a).

6. "The lawyer's own interests should not be permitted to have an adverse effect on representation of a client." Pa.R.P.C. 1.7, cmt. [10].

7. Lawyers owe a duty of candor to the tribunal. Pa.R.P.C. 3.3. Among other things, "[a] lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]" Pa.R.P.C. 3.3(a).

[8] Pa.R.P.C. 1.7(b) provides that a lawyer may represent a client notwithstanding the existence of a concurrent conflict of interest if certain conditions are met. Those conditions are not met here because, among other reasons, there has not been – and likely cannot be – informed consent. "Consentability is typically determined by considering whether the interests of the clients will be adequately protected if the clients are permitted to give their informed consent to representation burdened by a conflict of interest. Thus, under paragraph (b)(1), representation is prohibited if in the circumstances the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent representation." Pa.R.P.C. 1.7 cmt. [15].

8. In June 2026, in *Commonwealth v. Brown*, the Pennsylvania Supreme Court stated:

> Our rules of professional conduct impose on lawyers a duty of candor toward the tribunal. *See* Pa.R.P.C. 3.3. Lawyers are "officers of the court" who are duty bound "to avoid conduct that undermines the integrity of the adjudicative process." Pa.R.P.C. 3.3 exp. cmt. [2]. A lawyer's lack of candor to the court does just that. The duty of candor applies with special force to prosecutors, who are not mere advocates but also ministers of justice. *See* Pa.R.P.C. 3.8 exp. cmt. [1]. Moreover, as the United States Court of Appeals for the Third Circuit recently explained in another concession case involving the DAO, "[c]andor is especially critical when proceedings are non-adversarial." *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 149 (3d Cir. 2024). "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective" of justice. *United States v. Cronic*, 466 U.S. 648, 655, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), *quoting Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). When only one side is presented to the court because the parties agree, for whatever reason, then "the court is entitled to expect an even greater degree of thoroughness and candor." *Wharton*, 95 F.4th at 149, *quoting Me. Audubon Soc'y v. Purslow*, 907 F.2d 265, 268 (1st Cir. 1990).

358 A.3d 469, 510-11 (Pa. 2026) (footnote omitted).

9. "Candor is especially critical when proceedings are non-adversarial." *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 149 (3d Cir. 2024).

10. In *Commonwealth v. Eskridge*, the Pennsylvania Supreme Court addressed when a conflicted district attorney must withdraw from a case or refer the case to OAG based on a conflict of interest. In *Eskridge*, the defendant was charged with homicide by vehicle while driving under the influence, and the victims retained a law firm to represent them in civil litigation. 604 A.2d 700, 701 (Pa. 1992). Because the district attorney was a member of the same law firm, he delegated it to his assistant, who nevertheless "remained subject to the district attorney's guidance, control, and supervision." *Id*. The successful criminal prosecution "would have facilitated the prosecution of the civil actions," and the district attorney had a "direct financial interest" in the outcome. *Id*. The Supreme Court of Pennsylvania held that "a prosecution is barred when an actual conflict of interest affecting the prosecutor exists in the case; under such circumstances a defendant need not prove actual prejudice in order to require that the conflict be removed." *Id*. at 702.

11. After *Eskridge*, in *Commonwealth v. Breighner*, an *en banc* panel of the Superior Court held that "once a conflict arises, it is improper for the conflicted district attorney to engage in any decision-making in the case, including choosing who will handle the prosecution." 684 A.2d 143, 147 (Pa. Super. 1996) (*en banc*). After the district attorney disqualified himself due to a conflict, he "appointed" the district attorney of a neighboring county to prosecute the case. *Id*.

at 145.[9] *Breighner* held, however, that "once a conflict arises, it is improper for the conflicted district attorney to engage in any decision-making in the case, including choosing who will handle the prosecution." *Id*. at 147.

12. Finally, *Breighner* considered the appropriate outcome and determined that the "conflicted district attorney must refer the matter to the Attorney General." *Id*. at 144. The *Breighner* Court elaborated:

> The Commonwealth argues that referral to the Attorney General is not always the preferred option because of the manner in which the Attorney General may proceed. We reject this argument. The fact that a conflicted district attorney chooses not to refer a matter to the Attorney General because he or she opposes, for whatever reason, the manner in which the Attorney General may handle the case, presents the very danger we seek to avoid here. Consideration of the conflicted district attorney's discretionary preferences is no longer appropriate once a conflict arises.

*Id*. at 147 n.6.

13. In sum, "where a district attorney has a conflict in a case, he or she cannot designate another county's district attorney as a temporary assistant in an effort to cure the conflict. In such cases, all decision-making duties of the conflicted

---

[9] Although *Eskridge* analyzed supervision, guidance, and control of the conflicted district attorney, that analysis was not dispositive because an "assistant district attorney will of necessity be under control of his superior, the district attorney." *Breighner*, 684 A.2d at 147. Indeed, "even where a conflicted district attorney attempts to cure a conflict by temporarily naming another district attorney as his assistant, some amount of supervision, guidance and control on the part of the conflicted district attorney is unavoidable." *Id*.

district attorney must cease and the matter must be referred to the Attorney General." *Id*. at 148.

14. In *Commonwealth v. Sims*, the Superior Court again considered when a district attorney is disqualified based on a conflict of interest. 799 A.2d 853 (Pa. Super. 2002). In *Sims*, after an assistant public defender was elected district attorney and hired a former assistant public defender as an assistant district attorney and a secretary from the public defender's office, the chief public defender moved to disqualify the district attorney's office in all cases being defended by the public defender's office and refer the cases to OAG. *Id*. at 855. In assessing these issues, the Superior Court pointed out that a district attorney is disqualified from prosecuting a case in which he or she has an actual conflict of interest but that a "mere allegation of impropriety is insufficient to establish an actual conflict of interest." *Id*. at 856-57 (collecting cases showing potential, as opposed to actual, conflicts of interest).

15. Importantly, *Sims* noted:

> In *Breighner,* this Court held that where the conflict of interest lies with the chief prosecutor (*i.e.,* the District Attorney), the prosecution is barred and the conflict cannot be resolved by delegating the matter to an assistant DA. *Id.* at 147; *see also, Stafford,* 749 A.2d at 495. If the conflict of interest lies with an assistant DA, the entire DA's Office is not necessarily disqualified. *Stafford,* 749 A.2d at 495.

*Id*. at 857. In short, *Sims* reiterates that where a district attorney has an actual conflict of interest, the prosecution is "barred," and cannot be resolved be delegation, and must be referred to OAG. *Id*. at 857-58.

16. Pursuant to Section 732-205 of the Commonwealth Attorneys Act, a district attorney can refer a case to the Office of Attorney General if "there is the potential for an actual or apparent conflict of interest on the part of the district attorney or his office." 71 P.S. § 732-205(a)(3); *see Commonwealth v. Mayfield*, 247 A.3d 1002, 1006 (Pa. 2021).[10]

17. DA Krasner has an actual conflict of interest, for several reasons.

a. First, there is a "significant risk" that the representation of the Commonwealth would "be materially limited . . . by a personal interest of a lawyer." Pa.R.P.C. 1.7. Here, DA Krasner was provided with information demonstrating that the office's concession had been based on significant factual misrepresentations. He did not contest that information or make any independent effort to investigate it. He knew that the concession, although drafted by Mason, had been closely reviewed and edited by Stiegler. Yet he prevented his attorneys from informing the Court of the full facts, and instead urged them to divert blame

[10] Pursuant to a 2017 statute, 18 Pa.C.S. § 9201, "[i]f a district attorney requests that the Attorney General exercise the power to prosecute in a county criminal court or juvenile delinquency court under [the Commonwealth Attorneys Act], and the Attorney General declines to accept or act on the request," then the district attorney may refer the matter to another district attorney subject to certain conditions.

from Stiegler and put it completely on Mason. He did so in order to protect Stiegler, who he had repeatedly hired and promoted, and avoid accountability. *See, e.g., Johnson v. Mahanoy,* 144 F.4th 178, 187 (3d Cir. 2025) ("Johnson's case is one in a striking pattern of state-court murder convictions that have been overturned in recent years using similar alleged stratagems."); *Commonwealth v. Brown*, 358 A.3d 469, 532 (Pa. 2026) ("in Philadelphia County . . . there has been a pronounced, documented pattern of highly problematic prosecutorial concessions"). Indeed, this was precisely Mason's concern: that she would be asked to "fall on her sword" as the DAO would "prioritize protecting Mr. Stiegler over her professional reputation." *See* N.T. 8/26/27 at 42; 159. Nor did this proposed strategy stop there. DA Krasner passed on this suggestion to Ernst, Wildberger, Napiorski, and Andrews, stating that he received a "great idea" from Stiegler to review Mason's cases and find errors. N.T. 8/27/26 122-23. Stiegler *himself* proposed this idea during a June 5, 2026 meeting with DA Krasner and others. *See* N.T. 8/27/26 at 168-69. Of course, Mason has since resigned while Stiegler remains the Supervisor of the Conviction Integrity Unit and reports directly to DA Krasner. N.T. 7/17/26 at 63. The interests of the Commonwealth would have been to fulfill its duty of candor to the Court. The DA placed his personal interest in protecting the office above the Commonwealth's interest.

b. That same calculus was evidenced by DA Krasner's repeated exhortations to "protect the office." DA Krasner subsequently suggested that this phrase was intended only to convey his belief that the office had acted properly and could properly attempt to defend itself. But that ex post facto rationale is inconsistent with the full record. *See, e.g.,* Ex. R-4; N.T. 8/27/26 at 64 (DA Krasner said that we need to "protect the office" and have "somebody in the room so that they can control the proceedings."); N.T. 8/27/26 at 57 (DA Krasner explained that "the person needed to be in the room to protect the office, to essentially, like, object if someone said something bad for the office"); N.T. 8/27/26 at 125-26 (DA Krasner again said that "someone had to be in the case from our office to protect the office and prevent it from becoming a shadow Rule 11 hearing," which Wildberger understood to mean that DA Krasner "didn't want people poking around in what occurred."). Of course, if DA Krasner believed in good faith that the office had done nothing wrong, he could properly have asked his attorneys to defend it. But in meeting after meeting with his subordinates, he did not argue the validity of the concession or the factual representations on which it was premised. Instead, he urged the lawyers to "protect the office," regardless of its conduct in relation to the concession.

c. DA Krasner sealed the conflict question by directing that the person "handling the case" for the DAO should not do any investigation, but

should leave that for OAG. Their only role was to "sit there and . . . object if OAG does something we don't like." N.T. 8/27/26 at 65. He then doubled down by repeatedly threatening "consequences" – clearly including termination – for attorneys who did not follow his instructions. *See, e.g.*, N.T. 8/27/26 at 136-37. These acts were directly contrary to the Commonwealth's duty and interest, which was to provide the Court with accurate information. DA Krasner's instructions, if followed, would have had the effect (and apparently the intent) of preventing the Commonwealth from carrying out that duty.

d. Finally, a prosecutor may evidence a conflict of interest when his judgment is "blurred by subjective reasons," *Eskridge*, 604 A.2d at 701 (quotations and citations omitted), such as personal animus. *See* Pa.R.P.C. 1.7 (concurrent conflict of interest exists if there is a "significant risk" that representation will be "materially limited . . . by a personal interest of the lawyer"); Pa.R.P.C. 1.7, cmt. [10] ("The lawyer's own interests should not be permitted to have an adverse effect on representation of a client."). The DAO could have avoided any conflict question by following the Commonwealth Attorneys Act and referring the case to OAG. DA Krasner repeatedly refused to do so based on his view that "essentially they're all evil . . . ." N.T. 8/27/26 at 54. He "went on a long, extended rant yet again about how he hated the OAG," that "everybody in the OAG are Nazis," and that "he didn't like the idea of the case going to them." N.T. 8/27/26 at 64. He

"referred to the Office of the Attorney General as Paraguay and refers to the people that work there as Nazis." N.T. 8/26/27 at 130. At one point, DA Krasner attempted to justify his refusals by asserting that OAG was itself conflicted. But that assertion, even if credited, would not have eliminated the DAO's own conflict. Pennsylvania law provides procedures for referrals when both a district attorney and OAG have a conflict. Had DA Krasner's refusals been based in good faith on such a belief, he could have attempted to invoke those procedures. He never did so. His actions, and his words, thus demonstrate that he acted on the basis of personal animus, not the interests of the Commonwealth.

18. In these circumstances, because DA Krasner has an actual conflict, the prosecution is "barred." *Eskridge*, 604 A.2d at 702; *see Sims*, 799 A.2d at 856-57. Moreover, "once a conflict arises, it is improper for the conflicted district attorney to engage in any decision-making in the case, including choosing who will handle the prosecution." *Breighner*, 684 A.2d at 147.

19. DA Krasner's actual conflict of interest goes beyond the "mere allegation or appearance of impropriety [that] is insufficient to establish an actual conflict of interest." *Sims*, 799 A.2d at 857. The prosecutor representing the Commonwealth in the ongoing habeas proceeding before this Court must investigate and prepare for an evidentiary hearing involving multiple witnesses, and apply complicated legal concepts to the facts developed. As the supervisors of the law

division explained, this process likely will cast further doubt on the DAO's prior Response, including the circumstances of its preparation and the interests of those involved, and will subject the DAO to further inquiry and potential critique.

20. But prosecutors must vindicate the interests of the Commonwealth even when they depart from the interests of the District Attorney. Furthermore, any prosecutor now assigned to this case must vindicate the interests of the Commonwealth while DA Krasner remains district attorney and while Stiegler remains Supervisor of the Conviction Integrity Unit. Of course, an "assistant district attorney will of necessity be under control of his superior, the district attorney." *Breighner*, 684 A.2d at 147. Indeed, "even where a conflicted district attorney attempts to cure a conflict by temporarily naming another district attorney as his assistant, some amount of supervision, guidance and control on the part of the conflicted district attorney is unavoidable." *Id.*

21. The DAO's attempt to "screen" a conflicted attorney does not cure the conflict. The conflicted attorney here, ultimately, was DA Krasner himself, as described above. He repeatedly made clear that he wanted to blame Mason, to protect Stiegler, and to "protect the office," and that any attorney who did not implement his wishes would face "consequences." At that point, any attorneys working under DA Krasner would themselves be subject to the conflict, knowing

that they were required, on the one hand, to do what the boss wanted, and, on the other hand, to do what professional ethics required.

22. The DAO states that the "habeas petition has been assigned to Assistant District Attorney Jean Peters-Baker, who was recently hired by the DAO." Dkt. No. 138 at 9 n.16. Neither the DAO's filing nor evidence presented at the hearing describe the timing, process, or circumstances of ADA Peters-Baker's hiring or assignment to this case. Regardless, *Breighner* holds that "once a conflict arises, it is improper for the conflicted district attorney to engage in any decision-making in the case, including choosing who will handle the prosecution." 684 A.2d at 147. Indeed, "even where a conflicted district attorney attempts to cure a conflict by temporarily naming another district attorney as his assistant, some amount of supervision, guidance and control on the part of the conflicted district attorney is unavoidable." *Id*.

23. For the foregoing reasons, OAG respectfully submits that DA Krasner has an actual conflict of interest, requiring that the DAO be disqualified from this case.

Respectfully submitted,

*/s/ Susan E. Affronti*
SUSAN E. AFFRONTI
Chief Deputy Attorney General

*/s/ John J. Boscia*
JOHN J. BOSCIA
Senior Deputy Attorney General

Office of Attorney General
Criminal Law Division
Appeals Section
1000 Madison Avenue, Suite 300
Norristown, PA 19404
Phone: (717) 437-6727
saffronti@attorneygeneral.gov
jboscia@attorneygeneral.gov

Date: September 8, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DENNIS JOHNSON | : | |
| PETITIONER | : | |
| V. | : | CIVIL ACTION NO. 15-4965 |
| | : | |
| SCOTT NICKELSON, *ET AL.* | : | |
| RESPONDENTS | : | |

CERTIFICATE OF SERVICE

I, John J. Boscia, Senior Deputy Attorney General, hereby certify that on September 8, 2026, the foregoing was served through this Court's electronic filing system.

*/s/ John J. Boscia*
JOHN J. BOSCIA
Senior Deputy Attorney General