**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DENNIS JOHNSON, | : | |
| *Petitioner*, | : | |
| | : | |
| v. | : | Civ. No. 15-4965 |
| | : | |
| SCOTT NICKELSON, et al., | : | |
| *Respondents* | : | |

**PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

The Philadelphia District Attorney's Office ("DAO") recently discovered errors in an old filing that supported defense efforts to overturn a nearly twenty-year-old homicide conviction.[1] The DAO promptly and publicly sought to correct those errors and changed its position from supporting to opposing that conviction being overturned based upon the corrections needed. The prior errors were first discovered and revealed by the DAO. The DAO now opposes overturning that conviction.

Any healthy, ethical institution that seeks justice with integrity should seek to correct its own errors and should do so promptly once they are discovered. Sadly, that approach was not the legacy of some people employed by prior DAO administrations, including some people who violated their constitutional duties to give the defense the information the defense was constitutionally owed under *Brady v. Maryland.*. The current DAO administration will

[1] Motion to Withdraw Response, ECF No. 118.

continue to do its duty under *Brady* and to self-correct moving forward, regardless of how the instant matter resolves.

Since this administration took office in 2018, about sixty people have been exonerated by judges who determined prior administrations had wrongfully convicted and incarcerated people for decades, many of whom are innocent and nearly all of whom were robbed of a fair trial or fair post-trial proceedings. These roughly sixty exonerations account for well-under 2% of cases in which the DAO has litigated a defense request for post-trial relief. More than 98% of the time, the DAO has opposed the relief the defense sought. Judges sometimes disagree with the position the current DAO takes—as they have under prior administrations, and as they should given their independent role in our justice system—either by granting relief that the DAO opposed or denying relief that the DAO supported.

Roughly four years ago, and prior to her recent resignation, an experienced attorney working as ADA in the DAO's Federal Litigation Unit, Jaclyn Mason, signed and filed a brief rife with errors that supported the defense's request for a new trial. ("Commonwealth's Brief") Mason has admitted that she did not review the relevant records, including the trial transcripts, before supporting overturning a murder conviction; she may have simply cribbed and modified the filings of the defense attorneys.[2] Her immediate supervisor at the time, Matthew Stiegler, failed to prevent the inadequate preparation of the flawed response and did not detect her negligence of the errors in the brief she prepared. The Magistrate Judge to whom the matter was assigned caught and

[2] Tr. 8/27/26, 95.

corrected some of the errors, she ultimately accepted other misstatements and recommended that relief be granted consistent with Commonwealth's erroneous brief.

The Court has now heard extensive testimony regarding the circumstances under which the Commonwealth's Brief was both prepared and withdrawn, as well as legally baseless claim that the DAO is conflicted. It has requested additional briefings regarding whether the DAO should be disqualified from representing the Respondents in this matter.[3]

There is no conflict so removal of the DAO would be an abuse of discretion. The DAO's mission is animated by the need for accountability. As an institution, it is trusted to hold those who commit crimes accountable for their actions. And it is trusted to hold itself accountable for its own errors. That has often required conceding errors in cases prosecuted by earlier administrations that resulted in wrongful convictions, but it also requires an equivalent willingness to admit when the current administration gets things wrong. The DAO does not dispute that the brief it submitted conceding that Johnson was entitled to a new trial contained serious errors. Within a week of realizing the gravity of its error (and prior to OAG communicating any concerns about the DAO's filing), the DAO sought to withdraw it altogether and intends to submit

---

[3] The Court has provided only one week to address the disqualification issue, which was not among those described in the Court's June 30, 2026, Order, ECF No. 127, or referenced by the Court during the three-day evidentiary hearing. While the DAO has endeavored to address the issue as fully as possible in the time provided, the holiday weekend and emergent health issues affecting one primary author have impacted its ability to do so. It therefore reserves the right to amend or submit a supplemental pleading.

a replacement that corrects the deficiencies in its prior submission.[4]

Accountability also means taking care and engaging in introspection when the DAO is criticized, even when it disagrees with that criticism. Several supervisors from the DAO's Law Division advised DA Krasner that they felt that they had personal conflicts of interest and were concerned that the DAO itself may have an actual or apparent conflict of interest. The DAO has taken their concern seriously. In addition to conducting its own internal review of the issue, it has sought and received consistent advice from multiple ethics experts.[5] No office-wide conflict exists stemming from the continued employment of an attorney whose quality of supervision has been questioned. Nevertheless, the DAO has screened the lawyer from the case, has permitted all attorney who feels personally conflicted to recuse themselves from participating in the case, and has assigned the underlying merits of the case to an experienced assistant district attorney who has had no prior involvement in the matter nor any relationship with the ADAs who have previously handled any aspect of the case.

The DAO erred in conceding relief in 2022 and recognizes the gravity of its mistake. But that error does not preclude the DAO from moving forward.

---

[4] The record reflects that DA Krasner approved the filing of the Motion to Withdraw the Response on the same day a draft of the same was presented to him. Tr. 8/27/26, 51-52.

[5] *See e.g.*, September 8, 2026, Declaration of Prof. Bruce Green, Exhibit A. At the August 27, 2026, hearing, ADA Katherine Ernst expressed concern that while the DAO had consulted with several ethics experts, it had not obtained a *written* ethics opinion confirming its position. Tr. 8/27/2026, 83-84. Accordingly, the DAO requested that Professor Bruce Green, a nationally recognized expert in the field of legal ethics, provide one.

The law is clear that the DAO should not be disqualified. It is duty bound to continue to represent the Commonwealth in this matter.

## I. Proposed Findings of Fact

1. This case arises from the August 2007 murder of Kenyatta Smith and Dennis Johnson's subsequent conviction for the crime. In 2015, Johnson filed a petition for a writ of habeas corpus challenging that conviction in this Court. Years and considerable litigation later, the Court appointed the Federal Community Defender Office for the Eastern District of Pennsylvania ("FCDO") to represent him.

2. The FCDO filed an amended petition raising numerous claims, and the Respondents, represented by Philadelphia District Attorney's Office, submitted a brief conceding that relief was due as to a single claim of ineffective assistance of trial counsel without addressing any other issues in the petition. The Commonwealth's brief was seriously deficient and included numerous misstatements of fact which went to the heart of the argument that relief was warranted.

3. The Court has heard testimony from former Assistant District Attorney Jaclyn Mason and her former supervisor, Assistant District Attorney Matthew Stiegler regarding the circumstances by which the Commonwealth's Brief was prepared and submitted.

### *a. Findings of fact regarding the preparation and filing of the Commonwealth's Brief.*

4. ADA Stiegler testified that he was alerted in 2021 by former Assistant Federal Defender Arianna Freeman (now a judge on the United States

Court of Appeals for the Third Circuit), who wished to discuss the case with the DAO.[6] Stiegler testified to his recollection that now-Judge Freeman's message that she wanted to get across was that this was a serious case that merited a close look, and "one that you're going to want to assign to an experienced ADA."[7]

5. Consistent with his general practice as supervisor of the DAO's federal litigation unit, Stiegler conducted a limited review of Johnson's petition for a writ of habeas corpus and decided to assign the case to Mason, who he considered to be an experienced attorney. Although Mason had only joined the DAO a few months earlier, she had been a practicing attorney for nineteen years with what appeared to be solid, relevant experience.[8] Mason also had "exceptionally strong credentials," including two clerkships with Third Circuit judges that he "hold[s] . . . in the highest regard," and a term as a staff attorney for Third Circuit, which he "regarded" "as being the best training ground that there was in terms of being prepared to do habeas cases."[9] When Mason applied to work as an ADA, she specifically highlighted that experience in a letter she sent Stiegler in support of her application:

> When I worked in the Staff Attorney's Office, I saw firsthand the need for such reform. I made recommendations on the disposition of pro se prisoner appeals, requests for certificates of appealability and habeas petitions. To say that the cards are stacked against prisoners seeking post-conviction relief is an understatement. Not

---

[6] Tr. 7/17/2026, 65.

[7] *Id.*

[8] *Id.* at 55.

[9] *Id.* at 92-94. Mason specifically highlighted her experience as a Staff Attorney reviewing habeas corpus petitions when she applied to be an ADA. *Id.* at 96.

> only are they navigating a highly technical and specialized area of the law, they are also fighting against a system that is designed to convict and keep them in jail. To that end, I always carefully and objectively scour the trial record without any bias towards the government or against the prisoner before making my recommendations. I think it is important to do the same as an Assistant District Attorney."[10]

6. When he assigned cases to Mason, Stiegler expected that Mason "would carefully and objectively scour the trial record without any bias towards the government or against the prisoner before taking positions[.]"[11]

7. Stiegler sent Mason an email informing her that the case was being assigned to her and outlined his preliminary thoughts.[12] He noted "From my initial review, it appears to me that Johnson has a strong *Brady* claim and an at-least-substantial innocence claim. Our key decision may come down to whether to (a) agree to relief and file a joint stipulation, or (b) agree to an evidentiary hearing."[13]

8. Mason testified that she viewed this email as "an order to concede" that Johnson was entitled to a new trial even though, as the OAG correctly noted, "[i]t doesn't say that, of course."[14]

9. Mason further testified that at some unstated point in time, she was in a Zoom meeting with Stiegler and defense counsel, including former no-judge Arianna Freeman, Legal Director of the Pennsylvania Innocence Project

---

[10] *Id.* at 103 (quoting Respondent's Exh. 3).

[11] *Id.* at 105.

[12] *Id.* at 106–07, 68–70.

[13] Email from ADA Matthew Stiegler to ADA Jaclyn Mason (Dec. 6, 2026), OAG Exh. 1.

[14] Tr. 7/17/2026, 21.

("PIP") Nilam Sanghvi, former PIP Staff Attorney Amelia Maxfield, and Assistant Federal Defender Aren Adjoian.[15] Mason suggested that it was in part because of this meeting that she felt she couldn't push back on what she claims to have interpreted as a directive to concede: "I was almost intimidated when I was in the meetings with them."[16] Notably, the Court expressed no interest in hearing testimony from defense counsel Sangvhi, Adjoian, Maxfield or (former defense counsel) Freeman, that might address Mason's version of that "almost intimidate(ing)" meeting or any other.

10. Mason testified that at the time Stiegler assigned the case to her, she "thought everything that should have been done in a case like this had already been done by him and the Innocence Project and the federal defenders."[17] She testified that Stiegler allegedly told her, "'if it's good enough for the Innocence Project, it's good enough for me.' And I trusted him."[18]

11. She testified that she believed her role was just "the conduit for drafting" the Commonwealth's Brief.[19] She testified to her own extreme negligence, telling the Court that she conducted essentially no review of the case:

- she did not review the notes of testimony from Johnson's trial;[20]

---

[15] *Id.* at 22.

[16] *Id.*

[17] *Id.* at 23, 27("[B]ecause of the way I was brought into the case and the way that he was working with the federal defenders and the Innocence Project, that must have all been done, you know, to reach the conclusion of, hey, help me draft this concession.").

[18] *Id.* at 23.

[19] *Id.*

[20] *Id.* at 22, 45.

- she did not review the DAO's trial file;[21]
- she did not attempt to interview "the affiants in the case;"[22]
- she did not review the H-file compiled by the Philadelphia Police homicide detectives investigating the murder or even know what an "H-file" was;[23] and
- she "may have" read the state court opinions from Johnson's prior appellate proceedings but could not recall.[24]

12. Mason testified that the reason for her confessed total failure to do her job and review the trial notes of testimony, the DAO trial file, and the PPD H-file,[25] was "[b]ecause Matt didn't tell me to."[26] Mason did not explain why she chose not to "scour the trial record" as she promised in her application letter, which did not indicate that she required specific direction to do so in each and every case.

13. Despite apparently reviewing none of the records in the case, in September 2022 Mason emailed Stiegler a "report summarizing her review of the case and her assessment of the case" in advance of a meeting to discuss the case with him.[27] Stiegler testified that he believed Mason had completed an

[21] *Id.* at 23.

[22] *Id.*

[23] *Id.* The investigative files prepared by Philadelphia Police Department's homicide detectives are frequently referred to as "H-files" *See Commonwealth v. Natividad*, 200 A.3d 11, 17 (Pa. 2019).

[24] Tr. 7/17/2026, 23.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 71, 79–90; Resp. Exhs. 1, 2. Mason contested that this was a "report," saying that these were merely "notes" she took at a "meeting" she attended. Tr. 7/17/2026, 123. The file name of this document includes the phrase "JMM notes." JMM are Mason's initials.

appropriate review in part because she had provided him with a detailed summary of the case.[28]

14. Both Stiegler and Mason testified that at some point in September 2022, the decision was made to concede that relief was warranted on an ineffective assistance of counsel claim ("IAC") rather than the claims Steigler highlighted in his assignment email.

15. Mason testified that, although she believed she had already been "ordered" to concede relief, and had done none of the work necessary to evaluate any of the claims, "the thinking shifted" as to *which* claim should be conceded by the Commonwealth, and that "the Innocence Project, the federal defenders, and Matt" agreed to concede the IAC claim.[29] Mason offered no explanation how or why the "thinking shifted." She also testified more broadly that the "joint decision to concede relief" was made by petitioner's counsel and "just Matt," "only Matt."[30]

16. Stiegler denied this repeatedly and testified that the decision to

---

[28] *Id.* at 85, 79–82 ("I certainly understood from that that what she was telling me was that she had reviewed the notes of testimony."). The document Mason sent was divided into several sections, such as "Strategy for response," "Notes," "Facts," "Investigation", and "Trial." Resp. Exh. 2. It included names and information about the people involved in the case, such as witnesses, the prosecutor, the trial judge, and defense counsel, a description of the basic facts of the crime and the police investigation of the crime; information about an eyewitness testimony at the preliminary hearing and a summary of the trial testimony, and a description of post-conviction investigation, which appears to describe the petitioner's investigation. *Id.* Mason contested this characterization of the summary, and instead claimed the document was "just notes from a meeting we were in that I then gave to him." Tr. 7/17/2026, 123.

[29] *Id.* at 29–31.

[30] *Id.* at 61.

concede, and the decision about which claim to concede, was made solely by Mason and himself.[31] Stiegler testified that his recollection is that arriving at this "was a collaborative decision between Ms. Mason and by me . . . she came to me and said here's what I found. And we talked through it and–the upshot of that was a decision for her to draft the answer on the basis of the ineffective assistance of counsel claim."[32]

17. Mason testified that she "had put together a draft [of the Commonwealth's Brief] at least in September of 2022."[33] There were several rounds of edits between her and Stiegler, and she alleged that accepted any edits made by Stiegler.[34] She did not testify that she told Stiegler that she was accepting his suggestions uncritically. Edits continued between Stiegler and Mason from late October into early November 2022.[35] Mason testified that then-supervisor of the Law Division, Nancy Winkelman, also reviewed and made edits to the draft as her approval was required prior to filing.[36] This occurred in late

[31] *Id.* at 73 (question posed by DAG Affronti), 78 (question posed by the Court), 86 (question posed by the Court), 87 (question posed by the Court), 89 (question posed by the Court).

[32] *Id.* at 73, *see also Id.* at 89–90 ("[Mason] believed that the correct position for us to take was to agree to relief, and that was consistent with what I understood about the case at that point. I wasn't the assigned ADA, I hadn't reviewed everything that she had, but it was consistent with what I already knew about the cases.").

[33] *Id.* at 34.

[34] *Id.*

[35] *Id.* at 34–36; OAG Exh. 4. Stiegler testified that during these rounds of edits, he "did not review the notes of testimony. She [Mason] had the notes of testimony." Tr. 7/17/2026, 79.

[36] *Id.* at 35, 38–40.

October of 2022.[37]

18. After the brief was finalized, Mason filed it with the Court. She was the only attorney who signed it.[38]

19. The record currently before the Court does not support Mason's account, but it also does not demonstrate that she bears sole and complete responsibility for the errors in the Commonwealth's brief.

20. The Court should not credit Mason's testimony that she interpreted the December 2021 assignment email as a directive to concede the case or confirmation that the matter had already been fully reviewed. The email did not include such a directive. It specifically noted Stiegler's preliminary opinion that the Commonwealth's position might be limited to agreeing to an evidentiary hearing as to another of Johnson's claims, not the one for which Mason ultimately submitted a brief conceding warranted relief.

21. Mason had nearly two decades of experience at the time she filed

[37] *Id.* at 38–40; OAG Exh. 5.

[38] Response to Petition for Writ of Habeas Corpus, ECF No. 86, 22. In her resignation letter of June 2, 2026, Mason reiterated that Stiegler "did not sign his name to or efile our brief, despite being the supervisor of the Federal Litigation Unit." OAG Exh. 7. Mason suggested that Stiegler's failure to sign was notable because he had "reviewed several drafts" "including the final one, as our office requires" and was "the supervisor of the Federal Litigation Unit," Tr. 8/27/2026, 41. She also stated: "Matt fell far short from [sic] his duties. Matt must submit and swear in an affidavit that *he* erred and that *he* was responsible for what was filed in the case." *Id.* at 42 (emphasis added). Andrews testified that when he was a line ADA under Stiegler, it was not unusual (in Andrews's recollection) for Andrews to be the only signatory on a case where he was the assigned ADA, notwithstanding that Stiegler had been his supervisor. Tr. 9/1/26, 25.

the Commonwealth's Brief. She was doubtless aware of her responsibilities to "provide competent representation . . . . [which] requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation,"[39] to "act with reasonable diligence and promptness in representing a client,"[40] and her duty of candor to the Court, *i.e.*, not to knowingly "make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."[41]

22. It is not credible that someone with her level of experience, including a number of prestigious federal clerkships would accept an email from a supervisor setting forth his "initial review" as demonstration that "everything that should have been done in a case like this had already been done by him and the Innocence Project and the federal defenders."[42] It is even less credible that an attorney of Mason's experience would think it appropriate to sign a brief claiming to have conducted "careful review of the record" when she had not done so.[43]

23. Mason's credibility is further undercut by her testimony that she did not believe at any time prior to her resignation on June 2, 2026, that there were any errors in the Commonwealth's Brief.[44] She was notified of the errors and their seriousness by four of her supervisors immediately before she chose

---

[39] Pa. R. Prof. Conduct R. 1.1.

[40] Pa. R. Prof. Conduct R. 1.3.

[41] Pa. R. Prof. Conduct R. 3.3.

[42] Tr. 7/17/2026, 23.

[43] Response to Petition for Writ of Habeas Corpus, ECF No. 88, 1.

[44] Tr. 7/17/2026, 47.

to resign from the DAO.[45]

24. As Mason's supervisor, Stiegler had the same obligations to his client and the Court, but he did not have the same role. Supervisors are not expected to re-do all the work they assign to lawyers whom the supervise any more than judicial clerks and judges are expected to re-do the work of litigants. However, they should review enough records in the case to ensure that their supervisee has done proper work.[46] Although Stiegler testified that he believed that Mason had conducted an appropriate review, he apparently did not sufficiently confirm that she had done so. Mason's recent hiring and impressive credentials may have harmed him in this regard by leading him to place greater trust in her work than her performance deserved.

*b. Findings of fact regarding the preparation and filing of the motion to withdraw.*

25. On February 3, 2023, Magistrate Judge Sitarski issued a Report and Recommendation ("R&R") that a new trial be granted on the ineffective assistance of counsel claim which the Commonwealth's Brief incorrectly conceded warranted relief.

26. On May 7, 2026, the Court ordered an evidentiary hearing in this case and invited the Pennsylvania Office of Attorney General ("OAG") to participate as amicus curiae.[47]

27. On June 5, 2026, the Commonwealth moved to withdraw the

[45] Tr. 8/27/2026, 22 (Ernst), 152 (Napiorski), 118 (Wildberger); Tr. 9/1/2026, 24-26 (Andrews).

[46] Tr. 7/17/2026, 89–90.

[47] May 7, 2026, Order, ECF No. 97.

Commonwealth's Brief because the brief contained errors and incorrectly conceded that relief was due.[48]

28. The Court has heard testimony from the four attorneys who signed the motion to withdraw: ADAs Katherine Ernst, Steven Wildberger, David Napiorski, and Peter Andrews ("Law Division Supervisors").[49]

29. Before the Court's May 7 Order for an evidentiary hearing, none of the Law Division Supervisors had taken any substantive role in Johnson's habeas proceedings.[50]

30. In mid-May, the Law Division Supervisors attended a preliminary meeting with Mason to discuss the logistics of the hearing the Court had ordered.[51] Ernst testified that in preparation for that mid-May meeting, she read the Commonwealth Brief, the R&R, and the Superior Court opinion, annotated the Commonwealth Brief in red ink, and as a result of her review felt concerned about the position taken in the Commonwealth Brief.[52]

[48] Motion to Withdraw Response, ECF No. 118.

[49] ADA Napiorski is the Supervisor of the Law Division, ADA Wildberger was the Assistant Supervisor of the Law Division, ADA Andrews is the Supervisor of the Federal Litigation Unit, and ADA Ernst is the Law Division's Director of Training.

[50] Tr. 8/27/2026, 8 (Ernst), 113–14 (Wildberger), 145 (Napiorski); Tr. 9/1/2026, 18 (Andrews).

[51] *Id.* at 10–11 (Ernst), 114 (Wildberger);146 (Napiorski); Tr. 9/1/2026, 19 (Andrews).

[52] *Id.* at 8. Ernst testified she "felt that the response on the face of it didn't seem very strong to me and I was also concerned that we made reference to a recanting witness" but the Commonwealth Brief did not indicate that the DAO had interviewed the witness. *Id.* at 8–9. Ernst also testified that the Commonwealth's Brief omitted discussion of portions of the state courts' opinion that she felt was relevant, and described preliminary hearing testimony in detail but didn't explain whether the trial testimony was the same. *Id.* at 9–10.

31. Ernst testified that a few days after meeting, Mason requested that she help her prepare for the hearing and review the case herself.[53] Mason and Ernst both testified that Mason stated that she would have done a better job on the Commonwealth Brief had she written it "now."[54]

32. Ernst testified that she told Mason of her concerns with the response, but Mason told her she still thought "we took the right position, but [she] would just feel better if [Ernst] looked at it."[55]

33. During her testimony, Mason claimed that she also told Ernst that she "was basically Matt's pawn" when the Commonwealth's Brief was written.[56] Ernst categorically denied this.[57]

34. Ernst began her review by reading the trial transcripts.[58] When she finished reading them, she wrote up a memo summarizing the case and sent it to Mason and the other Law Division Supervisors on May 27.[59]

35. In her memo, Ernst noted that there were facts in the Commonwealth's Brief "that were inconsistent with the record, that we had gotten facts wrong."[60] At the time, she didn't believe the errors "destroyed" the position

[53] *Id.* at 12–13.

[54] *Id.* at 13, Tr. 7/17/2026, 44

[55] Tr. 8/27/2026, 13

[56] Tr. 7/17/2026, 43-44.

[57] Tr. 8/27/2026, 108 ("Q. But suffice it to say, to your recollection, did Ms. Mason ever mention being a pawn of ADA Stiegler? A. No.").

[58] *Id.* at 14.

[59] *Id.* at 14–17.

[60] *Id.* at 15. Mason acknowledged that she saw this memo, but continued to deny that she was ever advised that the Commonwealth's Brief contained errors.

taken in the Commonwealth's Brief, but she felt the need to more closely review the concession.[61]

36. But upon further reflection later that day, Ernst came to the conclusion that "this was not a close call, this was not a winning claim, and in fact, there are all of these errors and they seem to me to be very significant errors."[62] Ernst resolved to speak to the other Law Division Supervisors regarding the need to correct the record.[63]

37. Ernst brought her concerns to Wildberger on May 28, and they scheduled a meeting with Napiorski for Friday, May 29, 2026.[64] At the meeting, Ernst presented Napiorski with an annotated print-out of the Commonwealth's Brief highlighting the errors she had identified.[65] When Napiorski reviewed both the Commonwealth's Brief and Magistrate Sitarski's R&R, he saw that errors from the Mason Response had been included in the R&R, which convinced him that the Commonwealth Brief had to be withdrawn.[66] "I didn't have any hesitation about correcting the errors that were in the response, I think we all knew immediately that would have to happen, but there's a difference between filing something correcting errors and wholesale withdrawing

---

[61] *Id.* at 15, *Id.* at 115 (ADA Wildberger testifying that Ernst's memo identified some of the errors in our office's prior response). Mason reiterated in her testimony that even by the time she resigned on June 2, whether the Commonwealth's "contained errors" "was never discussed" and "[n]obody ever said anything about there being material misstatements in the brief." Tr. 7/17/2026, 58–59.

[62] Tr. 8/27/2026, 15-16.

[63] *Id.* at 16.

[64] *Id.* at 116.

[65] *Id.* at 18, 117.

[66] *Id.* at 18, 117, 150.

a prior response and changing a position[,] which requires some pushback, some testing, and my own review."[67]

38. Ernst then asked Mason to join them to discuss the case with her, and the supervisors advised Mason that there were errors in the Commonwealth Brief that had made their way into the R&R.[68] Ernst testified that she told Mason that the DAO had to "file something correcting the errors" but that "we're obviously going to do it in the most sensitive way we can," and recommended that Mason also sign the filing that corrected the errors.[69]

39. Ernst testified that she told Mason that when Ernst had become supervisor of the Law Division, Ernst had decided that it was "appropriate" to withdraw the DAO's outstanding "stipulations to penalty relief," and that one of the four such case's stipulations had been signed by Napiorski and Stiegler.[70] Ernst testified that she told Mason that Napiorski had been nervous but had personally signed the withdrawal of the stipulations in that case and had apologized to Judge Pappert in that case, and that Napiorski's transparency seemed like it "went a long way with Judge Pappert and I assumed that it

---

[67] Tr. 9/1/2026, 11.

[68] Tr. 8/27/2026, 20 (Ernst), 118 (Wildberger), 150 (Napiorski). Mason testified differently: that Napiorski told her that, after "vociferous conversations" with Ernst, "we think that we need to write a new response in this case and oppose relief on all of the claims." Tr. 7/17/2026, 47.

[69] Tr. 8/27/2026, 22 (Ernst), 152 (Napiorski). Wildberger testified at that at the May 29th meeting, Napiorski explained that the Commonwealth's Brief contained errors that appeared in the R&R, that Ernst "took over" and "started talking to Ms. Mason about the errors" and explaining that the DAO needed to withdraw the Commonwealth's Brief. *Id.* at 118.

[70] *Id.* at 23 (Ernst); see also *Id.* at 152–54 (Napiorski corroborates that Ernst told Mason about his withdrawal before Judge Pappert).

would go a long way with Judge Diamond."[71]

40. According to Ernst, Mason began visibly trembling and blamed Stiegler for the situation; she suggested that "we should throw him under the bus."[72] Ernst testified that she did not know what Mason meant by "throw him under the bus," but assured Mason that any withdrawal motion would acknowledge that Stiegler supervised the preparation of the Commonwealth's Brief.[73]

41. The Court explicitly asked Ernst if Mason had said "Mr. Stiegler was the one who made these representations, I was his scribe; and he should be the one thrown under the bus because he's the one who misrepresented to the Court, not me. Do you recall that?" Ernst testified that "she did not say that in this meeting."[74] When the Court asked Ernst if "Ms. Mason refused to

---

[71] *Id.* at 23–24 (Ernst); *see also id.* at 152–54 (Napiorski).

Mason's account of this exchange differed markedly. She claimed Ernst told her that Napiorski had withdrawn the earlier concession to avoid any sort of sanctions hearing or disciplinary action: "if we do that, the Court might get really angry, but it won't find out how this concession got put together, which is what we really want to avoid." Tr. 7/17/2026, 48–49. Napiorski and Wildberger, like Ernst, disputed Mason's account. Tr. 8/27/2026, 118-19 (Wildberger); *Id.* at 155–56 (Napiorski: "[T]"o the extent that fulfilling our ethical obligations protects the office and being honest protects the office, I suppose, but that's – no, that is not the intent. The intent is to fulfill our duty of candor to the court.").

[72] *Id.* at 24; *see also id.* at 118 (Wildberger: "I could see that Ms. Mason was visibly upset. And I recalled her saying that Mr. Stiegler – that we had to throw Mr. Stiegler under the bus and that it was a long time coming."); *Id.* at 150–51 (Napiorski: "Ms. Mason just became very angry at Mr. Stiegler, saying . . . I'm furious that he's put me in this position, this is all Mr. Stiegler's fault. That was generally her response.").

[73] *Id.* at 25.

[74] *Id.* at 26–27.

say she made mistakes because she told you she wasn't going to say she made mistakes because she hadn't made any mistakes, she did what Mr. Stiegler told her to do. Didn't she say that?," Ernst testified again, "She did not say that in this meeting."[75]

42. Ernst testified that she told Mason during this meeting that a new response, opposing relief on all eleven claims would have to be prepared.[76]

43. Napiorski testified that, at the May 29 meeting, Mason was "upset at Mr. Stiegler, upset at the situation, was nervous about her own professional reputation because she had signed this thing that we had identified a bunch of problems in."[77]

44. Ernst, Napiorski, and Wildberger all testified that Mason was offered the weekend to think about signing the filing that would seek to withdraw the Commonwealth's Brief, and they disagreed with Mason's testimony that hiding the circumstances by which the Commonwealth's Brief[78] came to be submitted was in any way their intent or even an ancillary goal.[79]

---

[75] *Id.* at 28.

[76] *Id.* at 25.

[77] *Id.* at 156.

[78] Tr. 8/27/2026, 22 (Ernst); *Id.* at 118 (Wildberger); *Id.* at 156 (Napiorski: "she was going to take the weekend")

[79] *See generally, e.g.*, *id.* at 156 (Napiorski denying that he suggested to Mason a "way to avoid the Court finding out about how a concession got prepared," stating, "I had no knowledge of how the brief in this case was prepared. There is no impetus to try and cover up something I'm ignorant of."). Mason testified that after the May 29 meeting, she thought to herself, "I'm not going to go to court and lie to a judge to protect the District Attorney's Office. Like, how come telling the truth isn't an option?" Tr. 7/17/2026, 50. Mason did not indicate in her testimony how or when anyone suggested she lie to a judge, nor did she explain what lie she felt encouraged to tell.

45. The next day, Mason called Napiorski and asked him, "What if I quit?"[80] Specifically, she wanted to know whether, if she quit, would Napiorski "throw [her] under the bus," and Napiorski assured her that they would not, and that Ernst would talk to Stiegler. Mason testified that she told Napiorski she did not believe him and that she thought she needed a lawyer.[81]

46. Napiorski testified that Mason indicated during this conversation "that the idea of having to do a replacement response and prepare for this hearing was just a lot and she didn't – she was unsure if she had the bandwidth to do that much additional work," also given "a lot of things happening in her life, her daughter was graduating, and she wanted to focus on those things."[82]

47. On Monday, June 1, Mason and Napiorski met with Mason's immediate supervisor, Andrews, to inform him about the situation.[83] Napiorski explained to Andrews that there were "serious errors" in the Commonwealth's Brief and that the DAO had to correct them and withdraw the response. Napiorski again suggested that Mason may want to sign the withdrawal motion to "take some responsibility, while still making it clear that she was not in any way wholly at fault, that she was being supervised by somebody who had much more experience in this area of law and was driving the train[,]" i.e., Stiegler.[84]

48. According to Napiorski, Mason "was uncomfortable with that

[80] *Id.* at 50; Napiorski corroborated that this was Mason's first question. Tr. 8/27/2026, 157.

[81] Tr. 7/17/2026, 50–51.

[82] Tr. 8/27/26, 157-58.

[83] *Id.* at 52. Tr. 8/27/2026, 160–62; Tr. 9/1/2026, 21–26.

[84] Tr. 8/27/2026, 161–62. Napiorski did not testify as to what he meant by his characterization of Stiegler as having been "driving the train."

suggestion, she didn't want to take any responsibility, that she really–she thought it was entirely . . . Stiegler's fault."[85] Andrews's account of this meeting was consistent with Napiorski's.[86] He confirmed that Mason blamed Stiegler for the errors and wanted to know if Stiegler was losing sleep; he told her he believed Stiegler would.[87]

49. The Court later asked Andrews whether anyone in the meeting told Mason, "this is all Stiegler's fault," and he confirmed that "in that meeting no one said this is all Stiegler's fault."[88]

50. The Court then asked Andrews whether it was possible that when nobody agreed with Mason that it was *entirely* Stiegler's fault, and Mason was asked to sign the motion to withdraw acknowledging her own mistakes, that she "felt that she was going to be blamed for all this before the Court? . . . Is it possible because nobody blamed Stiegler and asked her to sign it, she took that – she took from that the sense that she was going to be blamed, not Mr. Stiegler? Is that possible?"[89] Andrews agreed that that was possible.[90]

51. Mason submitted her resignation letter the following morning. She testified that she resigned because she "refused to participate in a cover-up

---

[85] *Id.* at 162.

[86] Tr. 9/1/2026, 21.

[87] *Id.* at 22–23. Andrews testified that he said this because he felt the only way the Commonwealth's Brief could have been filed with the significant errors Napiorski had just informed him about was if Stiegler had been "asleep at the wheel at a minimum. I don't know what happened, but in the moment that was what my thought was." *Id.* at 23.

[88] *Id.* at 24–25.

[89] *Id.* at 25-26.

[90] *Id.* at 26.

that [she] was being asked to participate in by the four supervisors."[91]

52. All four Law Division Supervisors strenuously disputed the notion that there was any sort of "cover up."[92] A cover up involves hiding, rather than disclosing, error or impropriety, as the DAO promptly did here after discovering it.

53. After he received Mason's resignation letter, Andrews had a phone call with the other Law Division Supervisors and Chief of Staff Jennifer Lin, and they agreed that Stiegler should be told about the situation."[93] DA Krasner was also first apprised of the situation a few days after Mason had submitted her resignation letter and left the DAO.

54. Andrews testified that he advised Stiegler that "we thought there were mistakes, errors. And he said something like, well, okay, if there are

[91] Tr. 7/17/2026, 52–53; *see also* Tr. 8/27/2026, 39–43; OAG Exh. 7.

[92] Ernst testified in response to Mason's accusation: "I certainly never suggested that there be any sort of cover-up. And in fact, my initial thought when I found the errors in the response was, wow, it seems like people were being overly solicitously [sic] of defense counsel, so I can't imagine how alerting the Court to the errors would cover anything up." Tr. 7/17/2026, 15. Wildberger stated in response to the same accusation by Mason: "I do not know why she resigned, but I know that we never asked her to participate in any cover-up, so I deny it." Tr. 8/27/2026, 121. Napiorski stated in response to the same accusation by Mason: "My response is that that's just not accurate. There is no ask to participate in any kind of cover-up, there is no cover-up. We had planned to file a motion that we did file that pointed out the errors and guaranteed a very public proceeding where we would all testify." *Id.* at 155. Andrews responded to the accusation in Mason's resignation letter "that she was being asked to 'fall on the sword'" by saying: "I didn't ask Ms. Mason to fall on her sword. I would not ask someone to take responsibility for something they didn't do." Tr. 9/1/2026, 27.

[93] *Id.* at 28.

errors, you know, I was the supervisor so I'm responsible."[94] He told Stiegler that Mason "had resigned and she says it's a hundred percent–you know, she says you directed her to do this: but Andrews could tell "he didn't remember this case."[95]

55. Andrews then began drafting a motion to withdraw, which the other Law Division Supervisors helped to edit.[96]

56. Over the next few days, Stiegler spoke to both Ernst and Napiorski about the motion to withdraw. Ernst testified that Stiegler asked her what the errors were, and, after she detailed them, "he said that he wasn't reacting, he didn't want to say anything in response because he still hadn't decided in his own mind what had really happened here, and he asked me if he could send me versions of the response with edits on them so that I could look at that.[97] The Court did not seek these drafts and volleys of edits between the lawyers despite overruling the DAO's work product objection.

57. Ernst testified that she was "encouraged" by that conversation "because in my mind he didn't try to make any suggestions about what we should do . . ."[98]

58. Napiorski testified that he and Stiegler had a "brief talk" at

---

[94] *Id.* at 29.

[95] *Id.*

[96] *Id.*, Tr. 8/27/2026, 122

[97] *Id.* at 37.

[98] *Id.* at 38. Ernst did not explain why she believed it would have been appropriate for Mason to be involved in drafting and sign the Motion to Withdraw, but it would have been inappropriate for Stiegler to be involved in preparing that pleading.

Stiegler's initiation in Stiegler's office, where Stiegler suggested that the DAO review Mason's filings in other cases to "find more mistakes and to kind of paint her as a rogue actor."[99] Napiorski rejected that suggestion.

59. On June 5, the Law Division Supervisors met with DA Krasner about the motion to withdraw the Commonwealth's Brief, and they gave him a copy of the motion to withdraw.[100] The DA made minor, non-substantive edits, and approved promptly submitting the filing.[101]

60. The Law Division Supervisors testified credibly regarding their preparation of the motion to withdraw. None had any prior substantive involvement with the case, and all acted quickly in alerting the Court to the errors in the Commonwealth's Brief. While it's always possible that there are additional errors in the Commonwealth's Brief that were not identified in the motion to withdraw, it was not submitted with any intent to mislead the Court. Clearly, it was submitted by these attorneys and the DAO for the opposite reason—to uphold their and the DAO's duty of candor to the Court.

*c. Findings of fact regarding alleged conflicts of interest.*[102]

61. The supposed conflict alleged under consideration in this case

[99] *Id.* at 163.

[100] Tr. 9/1/2026, 30.

[101] *Id.* at 30 (Andrews' account); Tr. 8/27/2026, 51–52 (Ernst's account); *Id.* at 165 (Napiorski's account); *Id.* at 122 (Wildberger's account).

[102] The DAO has asserted that testimony regarding its internal deliberations regarding referral of this case to the OAG are protected by the deliberative process privilege. That privilege applies to predecisional deliberations into agency policies and decisions. *N. L. R. B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). "The ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions. It recognizes that were

centers around Stiegler, who supervised the preparation of the erroneous response that Mason submitted to the Court. According to Ernst, Wildberger, and Napiorski, there is a "a significant possibility" that as Johnson's habeas petition is litigated, competent representation of the Commonwealth will require developing evidence or presenting arguments that further call Stiegler's work in supervising the Commonwealth's Brief into question. Under those circumstances, they believe that Stiegler's personal reputational interest may conflict with his duty to represent the Commonwealth.[103]

62. The Law Division Supervisors further opined that because DA Krasner conferred with Stiegler about the case—specifically that he briefly entertained Stiegler's proposal of investigating Mason's work in other cases—

---

agencies forced to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer." *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 854 (3d Cir. 1995) (cleaned up).

Here, at the behest of ADAs Ernst, Wildberger, and Napiorski, the DAO considered whether it was required or advisable to refer the merits of Johnson's habeas petition to the OAG for prosecution. The testimony and documents to which the DAO objected were plainly deliberative in nature—they were not simply factual recitations—regarding its internal deliberations prior to determining that referral was unnecessary. The DAO identified those deliberations in its July 23, 2026, Response to Notice of Conflict and reiterated its objections repeatedly during the evidentiary hearing. While the DAO participated in the hearing and submitted an exhibit that was also privileged deliberative process material, it did so only after the Court had ruled that the privilege did not apply.

The Court's overruling of the DAO's proper, lawful assertion of deliberative process privilege was in error. All evidence obtained via that ruling should be stricken from the record. Unfortunately, the permanent damage to the free exchange of ideas in the DAO caused by this Court's erroneous ruling on deliberative privilege is not so easily reversed.

[103] *See* OAG Exh. 9 (citing Pa.R.P.C. 1.7(a)(2)); Tr. 8/27/2026, 78.

Stiegler's conflict infected DA Krasner and thereby the DAO as a whole.[104]

63. Ernst, Wildberger, Napiorski and Andrews have also testified that they advised DA Krasner of this purported conflict of interest but he told them that he did not wish to refer the case to the OAG because he wanted someone from DAO in the courtroom to protect the office. *E.g.*, Tr. 8/27/2026, 54.

64. The Law Division Supervisors noted at the June 5, 2026, that they believed the case could be reassigned to an ADA who had not previously worked on it, but they had not identified anyone in the Law Division that they felt was experienced enough to do so.[105]

65. On June 24, 2026, Ernst, Wildberger, and Napiorski sent DA Krasner a memorandum describing the conflict of interest they perceived and again recommending referral to the OAG under the Commonwealth Attorney's Act. It referenced no Rules of Professional Conduct that might be violated if DA Krasner failed to refer the case, and principally relied upon a Pennsylvania Superior Court opinion that has no application here. They case upon which they relied involved a direct financial benefit to the chief prosecutor, who was a partner in a private law firm that represented victims in a civil suit regarding the same vehicular homicide his office was prosecuting).

66. The same day, DA Krasner—writing from Lin's computer—responded with a lengthy email. In it, DA Krasner reminded Ernst that she was reversing her prior approval of the DAO's approach—she had previously

---

[104] OAG Exh. 9, 2.

[105] Tr. 8/27/2026, 54; *id.* at 55 ("I guess if they're completely walled off from Mr. Stiegler and they're just told to focus on the merits, I didn't see why you couldn't do that.").

agreed that assigning the case to a prosecutor who had not previously worked on the case and had no contact with them. DA Krasner also explained his prior comment regarding protecting the office:

> Your quoting me as saying I want to "protect the office" misses the point and the context of that discussion entirely, which was about preventing outside bias and outside conflict from unjustly impacting the office's justice work and the nearly 700 people who try hard every day here to carry out their oath to seek justice and uphold the law inside the office, a giant group that includes you. Equating protecting the office and all its personnel and its mission to seek justice with protecting one individual in the office inaccurately conflates the two concepts. That conflation overstates the value of the Superior Court opinion you cite, which is factually very different and unpersuasive in my view.[106]

67. Later that day, the DAO filed a response to the OAG's motion to set a briefing schedule concurring in the OAG's motion. It also alerted the Court to the various ADAs' supposed potential conflicts of interest and the DAO's intention to ensure that the case would be handled appropriately: "[S]ince the filing of its motion to withdraw, it has recognized that some of the assistant district attorneys involved in the case may now have an actual or apparent conflict of interest, and the matter is in the process of being assigned or referred to non-conflicted counsel."[107]

68. On June 25, 2026, Ernst and Wildberger withdrew their appearances. In their notice of withdrawal, they stated (without authority or, by all indications, any reasonable ethical or legal basis to do so) that they "believe[d],

---

[106] Resp. Exh. 4.

[107] Response to Office of the Attorney General's Motion to Establish Briefing Schedule, ECF No. 122, at 2 n.1.

based on their best professional judgment, that the Philadelphia District Attorney's Office may have a conflict of interest in this case. Undersigned counsel understand that the office is seeking to remedy this conflict."[108]

69. Napiorski and Wildberger withdrew their appearances the following day.[109]

70. On June 30, 2026, the Court partially granted the Attorney General's motion, noting that it would not address the merits of Johnson's habeas petition until it had resolved the issue of the Motion to Withdraw the Response, including potential conflicts of interest.[110] The Court ordered that the previously-scheduled evidentiary hearing on the merits of Johnson's petition would instead address those ancillary issues and "[would] not address the substantive merits" of the habeas petition.[111] The Court also directed Mason, Stiegler, Napiorski, Andrews, Ernst, and Wildberger to appear and testify.[112]

71. On July 17, 2026, the Court began the hearing on the Motion to Withdraw the Response by orally reaffirming that the substance of Johnson's petition was not at issue in the proceeding—it was limited to the issue of the Motion to Withdraw the Response and potential conflicts of interest.[113] At the

---

[108] Notices of Withdrawal of Katherine Ernst and Steven Wildberger, ECF Nos. 123, 124.

[109] Notices of Withdrawal of David Napiorski and Peter Andrews, ECF Nos. 125, 126.

[110] June 30, 2026, Order, ECF No. 127.

[111] *Id.* at 5.

[112] *Id.*

[113] Tr. 7/17/2026, 5 ([W]e're not going to address the merits, the substantive merits of the 2254. I imagine we'll be discussing it to some extent in talking about—I'm just anticipating—possible errors in the motion to withdraw and why they were erroneous and things of that nature, but only—my interest at

hearing, the Respondents were represented by ADA Thomas Gaeta.

72. On July 20, 2026, Ernst and Wildberger (again without authority or a reasonable legal basis to do so) filed a Notice of Conflict expressing that because "an Assistant District Attorney in the [DAO] participated in questioning witnesses" at the hearing, it appeared to them that the conflict they believed burdened the DAO had not been remedied.[114]

73. On July 23, 2026, Gaeta and DA Krasner filed a Response to the Notice of Conflict explaining that Ernst and Wildberger had been screened from the case (at their own urging) for over a month and had not been privy to ongoing deliberations regarding their asserted conflict or the DAO's determination, after consultation with multiple ethics experts, that there was no disqualifying conflict of interest.[115]

74. The Response to the Notice of Conflict also indicated:

> To avoid even an arguable appearance of impropriety in its handling of the underlying habeas petition, the DAO has assigned an experienced prosecutor to represent the Commonwealth respondents in the underlying habeas petition. That prosecutor has had no prior involvement in the matter nor any relationship with the ADAs who have previously handled any aspect of the case.[116] And in order to ensure that she remains free from bias or the

this particular time is only in what was represented to me and why people did certain things, people being lawyers, did certain things."); *Id.* at 10 ("I did want to address the attorney conduct issues here.").

[114] Notice of Conflict, ECF No. 135.

[115] Response to Notice of Conflict, ECF No. 138, 6-7.

[116] The habeas petition has been assigned to Assistant District Attorney Jean Peters-Baker, who was recently hired by the DAO. ADA Peters-Baker has over twenty-five years' experience as a prosecutor and chief prosecutor, including as the thrice elected District Attorney of Jackson County, MO, which encompasses Kansas City and contains nearly half the population as Philadelphia.

appearance of bias, that ADA is not participating in the hearing on the Motion to Withdraw the Response or any related litigation (including this pleading)—her assignment is limited to the underlying habeas petition.[117]

75. On August 27, 2026, Ernst and Wildberger testified that they believed ADA Gaeta's participation in the July 17, 2026, hearing confirmed that "the conflict was ongoing," though neither took any steps to determine whether the DAO had screened Stiegler or done anything else to ensure that the merits of Johnson's habeas petition would be appropriately litigated.[118]

76. Notably, neither the Court, the OAG, or defense counsel raised any objection to ADA Gaeta's participation. No one claimed there was a conflict. The Court permitted him to make objections, examine witnesses, and present exhibits into evidence that would not otherwise have been available for the Court's review. It placed no limitation on Gaeta's or the DAO's ability to prepare and file these findings of fact and conclusions of law.

## II. Proposed Conclusions of Law

### *a. Conclusions of Law regarding the preparation and filing of the Commonwealth's Brief.*

77. It is unreasonable to prepare or file a response to a § 2254 petition that asserts that a state court unreasonably applied the law to the facts of what happened at trial without a thorough and searching review of the record. That

[117] *Id.* at ¶20. The Response to Notice of Conflict identified the prosecutor as ADA Jean Peters-Baker. ADA Peters-Baker has continued her work the underlying habeas petition consistent with her directive to independently evaluate the merits of Johnson's claims. *See* Exhibit B (September 4, 2026, Declaration of Jean Peters-Baker).

[118] Tr. 8/27/2026, 98, 99-100, 141-43.

is particularly so in a case in which the prosecution recommends relief is due, where the defense is required to, but may not want to highlight errors or omissions in a prosecution brief that undercut the defense's claim. The preparation and filing of the Commonwealth Brief in this case fell below the standards of diligence and candor the Court expects and requires.

78. However, there has been no testimony regarding which portions of the Commonwealth's Brief were authored by Mason and which were authored by Stiegler, so it is unclear where or by whom the errors in the brief originated. Stiegler testified that the DAO "had information about how these errors had occurred," but that information was not presented to or requested by the Court.[119]

79. More importantly, neither Stiegler nor Mason have had notice and opportunity to defend against allegations of misconduct, so the Court should refrain from apportioning blame between them. At this juncture, it suffices to hold that the Commonwealth's Brief was deficient and grant the DAO's motion to withdraw.

*b. Conclusions of law regarding the motion to withdraw the Commonwealth's Brief.*

80. Upon discovery of the years' old errors in the Commonwealth's Brief, the DAO appropriately sought to withdraw its erroneous and deficient response to Johnson's petition for a writ of habeas corpus.

[119] Tr. 7/17/2026, 102.

*c. Conclusions of law regarding conflicts of interest.*

81. The District Court for the Eastern District of Pennsylvania has adopted the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania as its own Rules of Professional Conduct.[120] Accordingly, those Rules govern here. Under Pennsylvania Law, a prosecutor must recuse him or herself when "an actual conflict of interest affecting the prosecutor exists in the case."[121] A conflict of interest exists if "there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or the personal interest of the lawyer."[122] But *only* the conflicted prosecutor should be disqualified, not the entire prosecutor's office; to do otherwise would interfere with the Commonwealth's right to "prosecute the matter through counsel of its choice."[123] Mere allegations of a conflict of interest are insufficient to require replacement of a district attorney's office.[124] Rather, to disqualify an entire office, the moving party must demonstrate that the acts of a conflicted prosecutor

[120] L. Civ. R. 83.6, Rule IV(B). Accordingly, those rules govern the Court's analysis of the alleged conflict of interest in this case. *See United States v. Shah*, 43 F.4th 356, 362-63 (3d Cir. 2022).

[121] *Commonwealth v. Eskridge*, 392, 604 A.2d 700, 702 (Pa. 1992).

[122] Pa. R. Prof. Conduct 1.7(a)(2).

[123] *United States v. Whittaker*, 268 F.3d 185, 193–94 (3d Cir. 2001) (noting that court's considering disqualification of prosecutor must "balance proper considerations of judicial administration against the United States' right to prosecute the matter through counsel of its choice, i.e., the duly appointed United States Attorney.").

[124] *Commonwealth v. Stafford*, 749 A.2d 489, 494 (Pa. Super. Ct. 2000) (citing *Commonwealth v. Mulholland*, 702 A.2d 1027, 1037 (Pa. 1997)).

have "actually tainted the proceedings."[125]

82. There has been no such showing here. The question before the Court is whether DA Krasner—and therefore the DAO itself—has a conflict of interest.

1. Prosecutors' offices are permitted to litigate cases in which their employees are alleged to have committed misconduct.

83. As one nationally recognized ethics expert consulted by the DAO, Fordham Law School Prof. Bruce A. Green, put it:

> The cases are innumerable in which state or local prosecutors, federal prosecutors, or their offices have been accused of misconduct or themselves acknowledge prior error or misconduct, but neither prosecutors' offices nor the courts expect prosecutors' offices to recuse themselves in such circumstances. Rather, prosecutors are entitled to defend their conduct or confess error as they think appropriate.[126]

84. DA Krasner has no personal stake in the outcome of Johnson's habeas proceedings,[127] only an overarching obligation as District Attorney to fulfill his sown oath to see that justice is done.[128] He did not personally participate

---

[125] *Shah*, 43 F.4th at 362 (citing *Commonwealth v. Harris*, 460 A.2d 747, 749 (Pa. 1983) and *Commonwealth v. Miller*, 422 A.2d 525, 529 (Pa. Super. 1980) (*en banc*)); *Commonwealth v. Breakiron*, 729 A.2d 1088, 1092 (Pa. 1999); *cf. Commonwealth v. Balenger*, 772 A.2d 86, 93 (Pa. Super. Ct. 2001) (discussing the inherent difficulty of attempting to adjudicate prosectors' subjective motives).

[126] Green Declaration at 6, Exh. A.

[127] *Cf. Commonwealth v. Breighner*, 684 A.2d 143 (Pa. Super. 1996) (*en banc*) (requiring disqualification of prosecution office where elected District Attorney was a partner in a law firm suing defendant regarding the same conduct for which he was being prosecuted).

[128] *Berger v. United States*, 295 U.S. 78, 88 (1935).

in the erroneous concession the DAO presently seeks to withdraw; he was not informed of Johnson's habeas proceedings until ADA Mason had already submitted her resignation letter and departed the office. And, though not legally required, DA Krasner reassigned the case to counsel who took no part in the preparation or withdrawal of the initial erroneous brief and had no connection to Mason, Stiegler, or the Law Division Supervisors. Whatever allegations may be levied regarding that initial error do not create an office-wide disqualifying conflict of interest.

85. While ADA Stiegler may have competing interests that prevent him from representing the Commonwealth in this case, he has already been screened from further participation in the case.[129] The fact that ADA Stiegler and the Law Division Supervisors were consulted during initial discussions regarding the need to correct the record and withdraw the erroneous response does not "taint the proceedings" as required to disqualify the office under Pennsylvania and Third Circuit precedent.[130]

86. Prosecutors frequently participate in proceedings in which their or their colleagues' professional reputations are at stake—nearly every defendant's appeal or petition for collateral review involves some allegation that the Commonwealth erred. Pennsylvania Courts have expressly rejected the notion that recusal is required in those circumstances.

87. In *Commonwealth v. Brown*, the Pennsylvania Superior Court

---

[129] *See* Response to Notice of Conflict, ECF No. 138 at 4.

[130] *Breakiron*, 729 A.2d at1092 (disqualification of OAG unnecessary despite assigned prosecutor consulting with conflicted prosecutor and requesting that conflicted prosecutor review PCRA pleadings).

considered an appeal from, among other things, a motion to disqualify the OAG from participating in his PCRA petition because "he alleged that the OAG violated *Brady*" and "any attorney who violates *Brady* is subject to disciplinary action and/or criminal penalties. Thus, according to Appellant, the OAG attorneys have a personal interest in ensuring his *Brady* claim fails which conflicts with their professional obligation to expose any *Brady* violations."[131]

88. The Superior Court rejected this argument for two reasons: First, it reaffirmed that "individual rather than vicarious disqualification is the general rule."[132] Instead, the pertinent question was whether the individual attorney representing the Commonwealth had a conflict of interest.[133] Because the prosecutor assigned to the PCRA petition had played no role in the trial in which the *Brady* violation was alleged to have occurred and therefore faced no consequences regardless of the outcome of the proceedings, he was not conflicted.

89. Second, and more importantly, the Superior Court rejected the claim that the OAG should be disqualified because the case involved an allegation of misconduct by an individual employed by that office.[134] It adopted the Supreme Court of New Jersey's holding that "the fact that [movant] alleges misconduct in prior proceedings cannot entitle him to disqualify counsel for the

---

[131] *Commonwealth v. Brown*, 141 A.3d 491, 497 (Pa. Super. Ct. 2016) *allocatur denied at* 235 A.3d 1068 (Pa. 2020).

[132] *Id.* (quoting *Commonwealth v. Ford*, 122 A.3d 414, 418 (Pa. Super. Ct. 2015)).

[133] *Id.*

[134] *Id.*

State."[135]

90. This conclusion is also consistent with courts' general practices. For example, in *Commonwealth v. Kareem Johnson*, there was no question whether the Philadelphia District Attorney's Office could represent the Commonwealth in criminal proceedings despite egregious errors that resulted in a wrongful conviction and death sentence.[136]

91. In that case, the crux of the prosecution's theory of the case was that Kareem Johnson had killed Walter Smith, and a cap had been recovered at the scene of the crime splattered with the victim's blood.[137] The trial prosecutor, ADA Michael Barry, counter-factually argued in closing:

> Do you know who says the killer wore the hat? Walter Smith says the killer wore the hat. He says it with his blood. . . .
>
> DNA evidence . . . says, hey, this is Kareem Johnson's sweat on the sweatband, he is the major contributor, the very hat that has Walter Smith's blood on the brim.[138]

92. Barry's argument was false. *Two* hats had been recovered, one belonging to Kareem Johnson, and one belonging to the victim. The victim's blood was found only on his own hat, not Johnson's.[139]

93. After Kareem Johnson was convicted and sentenced to death due in part to Barry's factual misrepresentation, his post-conviction counsel

---

[135] *Id.* (quoting *New Jersey v. Marshall*, 690 A.2d 1, 99 (N.J. 1997) (brackets omitted)).

[136] *Commonwealth v. Kareem Johnson*, 231 A.3d 807 (Pa. 2020).

[137] *Id.* at 812–13.

[138] *Id.* (quoting N.T. June 22, 2007, 66-68, 89).

[139] *Id.* at 813.

alleged ineffective assistance and prosecutorial misconduct based on the false narrative that a single hat was recovered. The DAO agreed that he was entitled to a new trial only as to defense counsel's ineffective assistance of counsel for failing to adequately investigate the evidence.[140] It sought an agreement from Kareem Johnson to withdraw all other claims, "including claims alleging prosecutorial misconduct of District Attorney Michael Barry."[141] Notably, Barry had been promoted to a supervisory role in the DAO at the time of the agreement. ADA Susan Affronti, then the Chief of the DAO's Federal Litigation Unit, notified the district court of the terms of the DAO's concession, which rendered his habeas petition moot.[142]

94. The DAO sought to retry Kareem Johnson, who in turn moved to dismiss the charges on double-jeopardy grounds, alleging that the trial prosecutor's conduct amounted to bad faith and precluded retrial.[143] While the issue was being litigated, the trial prosecutor was promoted to Deputy District Attorney. Former ADAs Hugh Burns and Ronald Eisenberg supervised the appeal challenging the trial court's rejection of the motion to dismiss. Burns and Eisenberg, along with Affronti and Barry himself, went on to high-ranking roles at the OAG after departing the DAO either shortly before DA Krasner was elected District Attorney or after being separated by DA Krasner from the DAO on his fifth day in office.

95. Throughout the Kareem Johnson litigation, no court or party

---

[140] *Id.*

[141] *Johnson v. Beard*, E.D. Pa. Civ. No. 11-4401, ECF No. 13, Exh. A, 23.

[142] *Johnson v. Beard*, E.D. Pa. Civ. No. 11-4401, ECF No. 13.

[143] *Kareem Johnson*, 231 A.3d 807.

questioned the propriety of the DAO's personnel representing the Commonwealth even though the central focus of litigation was the character of its own personnel's misconduct.[144] No conflict of interest disqualified the DAO despite the case's focus on misconduct which had led to a wrongful conviction and death sentence by a lawyer who was by that time a high-level DAO supervisor.

96. The same rule applies here. While Mason has testified that her preparation of the original brief was woefully inadequate and she has alleged wrongdoing on the part of other DAO personnel, no disqualifying conflict of interest prevents the DAO from fulfilling its duty to represent the Commonwealth respondents.

97. The DAO also notes that, even assuming that the need to protect another prosecutor's reputation could create an institutional conflict of interest, OAG is burdened by the same conflict here.

98. The DAO erroneously agreed that Johnson's trial counsel was ineffective for failing to object to hearsay testimony from a detective who indicated that a non-testifying witness Amin Vicks told him that that Johnson was the shooter. The DAO, represented by then-ADA Catherine Kieffer, conceded that Vicks made that statement to the detective.145

99. But the trial judge indicated that statement was most likely a

[144] The Pennsylvania Supreme Court ultimately determined that the trial prosecutor's conduct amounted to "a reckless disregard for consequences and for the very real possibility of harm stemming from the lack of thoroughness in preparing for a first-degree murder trial" and barred retrial on double-jeopardy grounds. *Id.* at 827-28.

[145] *Commonwealth v. Johnson*, CP-51-CR-0007319-2009, May 20, 2013, Motion to Dismiss.

stenographer's error:

> I think it was typed incorrectly. I had problems with that Stenographer before. That stenographer had written things that were incorrect, that I know were incorrect and when I read it, I thought I would never let that get in but I don't know and the statement, itself, doesn't make sense and it says Amin Vicks was there or something like that. It just didn't make sense but anyway, we don't have to get into all of that but I felt compelled to say it for some reason. When I read the statement, I thought to myself I didn't think it came out this way.[146]

100. On appeal, the prosecution again conceded that the statement was made.[147]

101. In these proceedings, Johnson alleges that Vicks did not actually implicate him, and the Commonwealth's failure to correct the detective's testimony or disclose that Vicks was not actually reinterviewed form the basis of Johnson's Napue and *Brady* claims.[148] And the state court's evidentiary rulings, which appear to have stemmed in part from the PCRA prosecutor's concession, are owed considerable deference.

102. The PCRA prosecutor who conceded that Vicks' statement occurred was ex-ADA Catherine Kieffer. She is now a Senior Deputy Attorney General and has been participating in the Johnson proceedings as part of the team of attorneys representing OAG as amicus curiae. The appeal at which the concession was repeated was supervised by Burns and Eisenberg, who are

---

[146] N.T. 7/9/13, 3-4.

[147] *Commonwealth v. Johnson,* Pa. Super. Ct., 2706 EDA 2013, Jan. 16, 2015, Br. for Appellee, 2015 WL 718282.

[148] *See* Memorandum of Law in Support of Amended Petition for Writ of Habeas Corpus, ECF No. 80, 32-28.

likewise ex-ADA's as of this DAO administration's first several days in office, and are now senior prosecutors at OAG.

103. While further litigation might cast doubt on those prosecutors' earlier work in the case and require their being screened, no conflict prevents the OAG itself from participating here. The same is true for the DAO.

2. DA Krasner's response to legally baseless allegations of an institutional conflict is not an independent ground to disqualify the DAO.

104. DA Krasner plainly did not appreciate the Law Division Supervisors' repeated, unsolicited, and wavering advice to refer this case to the OAG for two reasons. First, he believed they were legally incorrect with no rules or law offered to support their position that the DAO was conflicted and that referral was therefore not required—they had previously indicated that they believed assigning the case to a new ADA charged with independently evaluation Johnson's claims was acceptable. Their inexpert and legally unsupported advice that it was necessary to refer the case to OAG directly conflicted with the clear and consistent advice of the ethics experts he consulted. Second, as the elected chief prosecutor, the decision on whether or not to refer the case was entrusted to him. It was not a decision for his employees to make or attempt to force him into making via unauthorized and legally inappropriate public pleadings.

105. For the reasons explained above, there was no conflict of interest when the Law Division Supervisors urged that the case be referred to OAG, so DA Krasner correctly rejected their advice. And given the certainty that the Court would order hearings regarding the preparation, filing, and subsequent

withdrawal of an erroneous brief, his inclination to remain in the case to "protect the office" was and is entirely appropriate.[149] The DAO believes that it was critical to do so to make and preserve its evidentiary objections, including potential hearsay or conjecture objections, as well as objections to testimony and evidence elicited in violation of its deliberative process privilege (and the permanent institutional harm that undermining that privilege will cause), to inform the Court of relevant information and exhibits no other participant in the proceedings had or was interested in presenting, and to attempt to manage the degree to which its confidential work product was passed to the defense. Most importantly, the Office is best protected by correcting its errors and continuing to litigate the cases that have been entrusted to it.

106. DA Krasner also expressed frustration that, despite the then-ongoing deliberations regarding the purported conflict of interest and potential assignment to a new prosecutor or referral to the OAG, and despite the DAO

[149] ADA Ernst and Wildberger's assertion that the DAO's participation in the recent evidentiary hearing was somehow improper is particularly puzzling. *See* Notice of Conflict, ECF No. 135; Tr. 8/27/26, 98, 99-100, 141-43. The conflict of interest they believe burdened the DAO—a concern that litigating the merits of Johnson's claims might cast further doubt on ADA Stiegler's work—was of no moment at the hearing. The Court repeatedly affirmed that the merits of Johnson's claims would not be considered. *E.g.*, Tr. 7/17/2026, 5, 10 (hearing limited "attorney conduct issues" rather than merits). No conflict prevents the DAO from participating in litigation regarding the conduct of its attorneys. For example, Ronald Eisenberg represented ADAs Thomas Malone, Gina Smith, and the DAO itself in proceedings before the Third Circuit in *Odd v. Malone*, 538 F.3d 202 (3d Cir. 2008), a case in which the prosecutors were accused of egregious wrongdoing resulting in the wrongful incarceration of two witnesses. Even assuming the DAO were conflicted from litigating the merits of the underlying habeas petition, that conflict would not prevent the DAO's participation in evidentiary hearings regarding the conduct of its attorneys.

already having alerted the Court to the possibility of a conflict in its own submissions to the Court, ADAs Ernst and Wildberger felt compelled to repeatedly submit unauthorized legally baseless and therefore legally unreasonable *pro se* filings "alerting" the Court to a supposed conflict.

107. DA Krasner was also concerned that the OAG might labor under its own conflicts. As Justice Donohue recently noted in her separate opinion in *Commonwealth v. Lavar Brown*, "the OAG is populated by attorneys who were part of DAO's prior administration. After District Attorney Larry Krasner was elected, many former prosecutors from DAO relocated to the OAG. . . . The [participation] of an office staffed with attorneys with a potential bias in favor of upholding convictions they procured raises a question about the neutrality of perspective that would be provided[.]"[150]

108. In any event, DA Krasner's confidential, internal comments regarding the OAG also have no bearing on this case. His opinion and general mistrust of some of the lawyers now employed by the OAG are based upon decades of observing their work while DA Krasner was a defense attorney, as well as nearly nine years of reviewing their troubled pre-2018 trial and post-trial work since he became the DAO's chief prosecutor. DA Krasner's view (i.e. that illegally and willfully acting to convict and incarcerate an innocent person for decades is akin to kidnapping, torture, or other war crimes) is well known. But any animus he may have towards individual employees of that office based upon their own actions and inactions has nothing to do with whether he correctly declined to refer a case to the OAG in the absence of a disqualifying

[150] 358 A.3d 469, 566 n.11 (Pa. 2026) (Donohue, J., concurring in part and dissenting in part).

conflict.[151] Pennsylvania Courts have held that a prosecutor's animosity toward a defendant is insufficient to warrant disqualification; [152] animosity towards individuals employed by another prosecuting agency that is based upon their prior professional activity has even less bearing.

109. Critically, even if it had been appropriate for the DA's staff to disclose the contents of their discussions with the DA (and it wasn't), there is not even an allegation that DA Krasner took any inappropriate *action* in this case. As outlined above, DA Krasner took the Law Division Supervisors' concerns seriously despite believing their claimed conflict of interest to be legally baseless. At their suggestion, DA Krasner screened ADA Stiegler from any role in litigating Johnson's petition going forward. Since the Law Division Supervisors expressed concern that DA Krasner was considering a more sweeping review of Mason's other filings in the interest of transparency and correcting any other possible error, he chose at that time not to move forward with that review. When they informed DA Krasner that they felt they were personally conflicted, he screened them from the case even though he was unsure if they were actually conflicted. And to ensure that there could be no question whether the case would be litigated by someone with a professional relationship to any supposedly conflicted attorneys, DA Krasner specially assigned the merits of Johnson's petition to an experienced prosecutor with instructions to independently evaluate the merits of Johnson's claims without contacting any screened ADAs. At every step, DA Krasner indulged the Law Division Supervisor's concerns

---

[151] *See In re Office of Philadelphia Dist. Attorney*, 244 A.3d 319, 340 (Pa. 2020) (Wecht, J. concurring).

[152] *Commonwealth v. Stafford*, 749 A.2d 489, 494–95 (Pa. Super. Ct. 2000).

beyond what was legally required and took steps to ensure that Johnson's habeas petition would be litigated with competence and integrity.

110. DA Krasner has taken no action inconsistent with his obligation to fairly represent the Commonwealth on behalf of the people of Philadelphia, despite the intemperate comments witnesses claimed he made. There is no conflict here, and there never was.

## III. The DAO should not be disqualified from this case.

111. Consistent with its ethical obligations, the DAO ensured that any ADAs who have become fact witnesses in the hearing on the Motion to Withdraw the Response or asserted that they are individually conflicted have been screened from any further participation in the case, including the assignment of the matter to a new prosecutor.

112. Because there is no disqualifying conflict of interest and because the record does not establish considerations of judicial administration outweigh the Commonwealth's right to prosecute the matter through counsel of its choice, it would be an abuse of discretion for the Court to disqualify the DAO.[153] The law requires that the DAO remain counsel of record for the respondents.[154]

---

[153] *Whittaker*, 268 F.3d at 193–94.

[154] The DAO hereby specifically reserves the right to amend or supplement this filing in light of the Court's extremely short briefing deadline of only four business days and an emergent, very serious health concern affecting a primary author of this brief and that author's ability to simultaneously address health and work in the short time provided by the Court.

Respectfully submitted,

*/s/Thomas Gaeta*
THOMAS GAETA
Assistant District Attorney
Supervisor, Civil Litigation
LAWRENCE S. KRASNER
District Attorney of Philadelphia

**CERTIFICATE OF SERVICE**

I, Thomas Gaeta, certify that on September 7, 2026, I served a copy of this response on all counsel of record via the Court's CM/ECF system.

*/s/Thomas Gaeta*
THOMAS GAETA
Assistant District Attorney
Supervisor, Civil Litigation