**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DENNIS JOHNSON,** <br> **PETITIONER,** | : | |
| **V.** | : | **CIV. NO. 15-4965** |
| **SCOTT NICKELSON, ET AL.,** <br> **RESPONDENTS.** | : | |

---

Diamond, J. September 15, 2026

**MEMORANDUM**

In this habeas matter arising from a 2007 murder, supervisors in the Philadelphia District Attorney's Office have urged that because of disabling conflicts of interest, I must disqualify the DAO. The Pennsylvania Office of the Attorney General urges me to disqualify District Attorney Lawrence Krasner and the DAO. Having conducted a lengthy evidentiary hearing at which the supervisors testified, I will disqualify Mr. Krasner, although I decline to disqualify the DAO. I will also disqualify Matthew Stiegler, Chief of the DAO's Conviction Integrity Unit. I will deny the Motion for Admission *pro hac vice* submitted by the prosecutor Mr. Krasner very recently assigned to this case and strike her recent filing, again on conflict grounds. Moreover, the record confirms that what the supervisors deem a "conflict" is also evidence of possible criminal wrongdoing by Mr. Krasner and Stiegler. In these circumstances, I am compelled, with the issuance of this Memorandum, to refer the DAO, Mr. Krasner, and Stiegler to this District's United States Attorney's Office for investigation and other appropriate action.

**BACKGROUND**

On September 30, 2009, a Philadelphia jury convicted Petitioner Dennis Johnson of second-degree murder, robbery, and a firearms offense for the murder of Kenyatta Smith. See Commonwealth v. Johnson, No. 2706 EDA 2013, 2015 WL 6169417, at *2 (Pa. Super. Ct. Feb.

23, 2015); 18 Pa. Cons. Stat. §§ 2502(b), 3701, 6101–6127. Two trial witnesses identified Johnson as the shooter: Curtis Smith (no relation to the victim) testified that he had known Johnson all his life; Ozzie Clark testified that he had known Johnson for five to six years. Johnson, 2015 WL 6169417, at *2. Johnson frequented the North Philadelphia convenience store where Clark worked. Id. at *1. Both Curtis and Clark testified that on the night of August 27, 2007, Johnson, Curtis, Amin Vicks, and Kenyatta were in the store. Id. Both Curits and Clark further testified that Johnson held the victim at gunpoint, went through his pockets, and then shot and killed him. Id.

Although Vicks did not testify, Philadelphia Detective John McDermott told the jury (without objection) that Vicks had identified Johnson during a police interview. Id. at *2, *7; N.T. 9/29/10, 176. Vicks' hearsay identification was not again mentioned during trial.

## PROCEDURAL HISTORY

I set out here only those events directly related to the attorney conduct questions before me.

### I. Johnson Seeks Post Conviction Relief

On November 10, 2010, the trial court sentenced Johnson to life imprisonment for second-degree murder, and concurrent terms of five to ten years for robbery and three and one-half to seven years for the weapons offense. 2015 WL 6169417, at *2. Johnson discontinued his direct appeal and filed a counselled PCRA petition, which the court dismissed on September 9, 2013. Id. On August 19, 2015, the Pennsylvania Supreme Court denied allocatur. Commonwealth v. Johnson, 121 A.3d 495 (Pa. 2015). On September 10, 2015, Johnson filed a *pro se* PCRA petition, which the court dismissed on January 18, 2017. Commonwealth v. Johnson, No. 1069 EDA 2017, 2018 WL 258903, at *2 (Pa. Super. Ct. Jan. 2, 2018). On July 25, 2018, the Supreme Court again denied allocatur. Commonwealth v. Johnson, 189 A.3d 991 (Pa. July 25, 2018).

On September 2, 2015, while his second PCRA petition was pending, Johnson filed in this Court a *pro se* Petition for Writ of Habeas Corpus, which was assigned to me. (Doc. No. 1); 28 U.S.C. § 2254. On May 31, 2016, now represented by appointed counsel, Johnson amended his Petition. (Doc. No. 12.) On September 13, 2016, I referred the matter to Magistrate Judge Lynne A. Sitarski for a Report and Recommendation. (Doc. No. 20.) On May 19, 2017, the DAO responded, and on May 31, 2017, filed an Amended Response. (Doc. Nos. 33, 34.) On September 29, 2017, I approved and adopted Judge Sitarski's Report and Recommendation and stayed this matter pending resolution of Johnson's second PCRA petition. (Doc. No. 51.) On October 1, 2019, Johnson filed a second, counselled Amended Petition. (Doc. No. 64.) For the first time since Johnson's 2009 conviction, the DAO did not oppose the granting of relief. I again approved and adopted Judge Sitarski's second Report and Recommendation (Doc. No. 62) and stayed the matter. (Doc. No. 66.)

On January 10, 2022, Johnson moved unopposed to file a Third Amended Petition and to lift the stay. (Doc. No. 68.) I vacated the stay and Judge Sitarski ordered briefing. (Doc. Nos. 71, 72.) On May 31, 2022, Johnson filed a counselled Memorandum of Law in support of his thrice-amended Petition, attaching Affidavits from Clark, Vicks, Maurice Stokes (Curtis' cousin), and Ronnie Jordon (Curtis' cellmate). (Doc. No. 80-1, at Ex. 23; Ex. 25; Ex. 17; Ex. 28.) Fifteen years after the murder, Clark recanted his prior identification of Johnson as Kenyatta Smith's murderer. (Id. at Ex. 23.) Vicks averred for the first time that he did not tell Detective McDermott that Johnson was the shooter. (Id. at Ex. 25.) Stokes and Jordon both averred that Curtis confessed to them that he had committed the murder. (Id. at Exs. 17, 28.)

On November 4, 2022, the DAO filed its Response to the Third Amended Petition. (Doc. No. 86.) Signed by Assistant District Attorney Jaclyn Mason, the DAO conceded that Johnson

was entitled to habeas relief because his trial counsel ineffectively failed to object to Vicks' hearsay identification of Johnson. (Id. at 1–2.) On February 3, 2023, Judge Sitarski issued a third Report and Recommendation, this time recommending the grant of habeas relief on ineffectiveness grounds. (Doc. No. 89.)

On May 7, 2026, I scheduled an evidentiary hearing, ordering the presentation of live testimony from the identifying trial witnesses. (Doc. No. 97.) In the same Order, I asked the Pennsylvania Office of Attorney General to participate as an amicus. (Id.) It agreed to do so. See Johnson v. Mahanoy, 144 F.4th 178, 184 (3d Cir. 2025) ("[B]ecause the proceeding was no longer adversarial, [the court] invited the state Attorney General to express her views as amicus curiae.") (quotation omitted).

## II. DAO Withdraws its Concession Brief

On June 5, 2026, the District Attorney's Office moved to withdraw its November 2022 Concession because it contained "material misstatements." (Doc. No. 118 at 3–4.) Unusually, four ADAs—Katherine Ernst, Steven Wildberger, David Napiorski, and Peter Andrews ("the Four")—signed the Motion. (Id. at 8.) They explained that under the supervision of ADA Matthew Stiegler, Mason had prepared the Concession. (Id. at 3 n.1.) The Four further stated without explanation that Mason had resigned from the DAO on June 2, 2026. (Id.)

On June 11, 2026, the OAG urged that the DAO's Withdrawal Motion did not capture all the 2022 Concession's deficiencies: that the Concession Brief "presented this Court with serious allegations that other attorneys did not fulfill their duty of candor to the tribunal and that the Magistrate Judge relied on those misstatements." (Doc. No. 119 at 2, 5.) The OAG further charged that the Four had failed to point out "factual and legal errors and omissions" that "had a significant impact" on Judge Sitarski's analysis. (Id. at 2.)

On June 24, 2026, in a filing authored by newly assigned ADA Thomas Gaeta, the DAO responded that no hearing was required "to resolve its motion to withdraw its prior, erroneous Response." (Doc. No. 122 at 3.) Oddly, the DAO did not respond to the accusations the OAG had made against the Four. Rather, Gaeta noted in a footnote that "since the filing of its motion to withdraw, [the Office] has recognized that some of the assistant district attorneys involved in the case may now have an actual or apparent conflict of interest, and the matter is in the process of being assigned or referred to non-conflicted counsel." (Id. at 2.) On June 25 and 26, 2026, the Four withdrew their appearances. (See Doc. Nos. 123–26.) The Withdrawal of Appearance Form jointly submitted by Ernst and Wildberger stated that they "believe, based on their best professional judgment, that the Philadelphia District Attorney's Office may have a conflict of interest in this case." (Doc. No. 123.)

Troubled by these filings and allegations, on June 30, 2026, I ordered that I would defer ruling on the merits of Johnson's Petition. (Doc. No. 127.) I would first conduct a hearing at which Mason, Stiegler, Ernst, Wildberger, Napiorski, and Andrews could explain the DAO's actions. (Doc. No. 127 at 5.) That hearing began on the morning of July 17, 2026. (Doc. No. 134.) Because Mason and Stiegler's testimony took up the entire day, I ordered the hearing to resume on a second date. (Id.)

On July 20, 2026, ADAs Ernst and Wildberger filed a Notice of Conflict, stating that the entire DAO had a conflict of interest in Johnson because the District Attorney received litigation advice from Stiegler, who—because he was more concerned with his professional reputation than Johnson's merits—had a clear conflict of interest. (Doc. No. 135 at 2.) Ernst and Wildberger further explained that Stiegler's advice to Mr. Krasner "suggested conduct they view[ed] as inappropriate for the person litigating the merits of this habeas case." (Id. at 2 n.1.) Ernst and

Wildberger further urged that the DAO was conflicted because Mr. Krasner had ordered Ernst and Wildberger to "litigate the case in a manner to 'protect the office,'" and that this was "incompatible with their ethical obligations and the interests of the Commonwealth." (Id. at 2.) On July 23, 2026, in a filing authored by Gaeta and Mr. Krasner, the DAO urged that the Four were conflicted because they would become fact witnesses once the July 17 hearing resumed. (Doc. Nos. 138, 169 at 30.) The July 23 filing also stated that any conflict with which the Four were burdened had been eliminated by Mr. Krasner's hiring of Missouri attorney Jean Peters-Baker whom he had specifically hired as an ADA and assigned to Johnson. (Doc. No. 138 at 9 n.16.)

The July 17 hearing resumed on August 27, 2026, when I heard from Ernst, Wildberger, and Napiorski, and concluded on September 1, 2026, when I heard from Napiorski and Andrews. (Doc. Nos. 134, 157, 163.) The testimony of all six witnesses is summarized in my Factual Findings.

At my request, on September 8, 2026, the Parties submitted Proposed Findings and Conclusions, addressing whether I should disqualify the DAO or Mr. Krasner on conflict grounds. (Doc. Nos. 167–69.) Johnson takes no position on the question. (Doc. No. 167.) The OAG urges me to disqualify Mr. Krasner and the DAO. (Doc. No. 168.) Mr. Krasner and Gaeta authored the DAO's filing—one of only two filings authored by the District Attorney. (Doc. No. 169; see Docket.) The DAO attached Professor Bruce Green's "expert opinion" that neither Mr. Krasner nor the DAO was conflicted. (Doc. No. 169. Ex. A at ¶ 1.) Although Mr. Krasner chose not to testify at the three hearing sessions (July 17, August 27, or September 1), or even to submit an affidavit after the hearing, he apparently does not dispute—or does not address—much of the testimony presented. (See Doc. No. 169.)

Finally, on September 11, 2026, ADA Peters-Baker moved for admission *pro hac vice* to appear on behalf of Respondents (Doc. No. 170), and filed a Motion to Respond to Johnson's Section 2254 Petition. (Doc. No. 171.) On September 14, Johnson responded in opposition. (Doc. No. 172.)

**FACTUAL FINDINGS**

At the three hearing sessions, I twice asked the DAO, Petitioner, and the OAG whether they wished to call any witnesses; they did not. (Doc. No. 160 at 180:7–15; Doc. No. 165 at 45:2–11.) I called six witnesses. I credit Mason, Ernst, Wildberger, Napiorski, and Andrews, whose testimony was compelling and corroborated by contemporaneous documents. I largely discredit Matthew Stiegler, whose testimony was often contradictory, evasive, or outright dishonest.

The following facts were proven clearly and convincingly:

Mason Joins the Federal Litigation Unit

Mason began at the DAO in July 2021 and was assigned to the Federal Litigation Unit, which Stiegler then supervised. (Doc. No. 141 at 13:5–11 (Mason).) The Unit's work was limited to litigating habeas matters. (Id. at 106:1–7 (Stiegler); Doc. No. 165 at 20:22–21:7 (Andrews)); see 28 U.S.C. §§ 2254, 2241. For some years, Mason had practiced patent and trademark law. (Doc. No. 141 at 13:14–16 (Mason).) She also clerked for Judge Kent Jordan on the District of Delaware and then on the Third Circuit, and served as a Third Circuit staff attorney. (Id. at 13:17–24 (Mason).) She had no experience as a criminal litigator, and the DAO gave her no training. (Id. at 14:14–19 (Mason).) She reported only to Stiegler, who assigned all cases in the Unit. (Id. at 15:1–2, 16:6–8 (Mason).)

Stiegler became the Supervisor of the Federal Litigation Unit in March 2021, supervising nine ADAs. (Id. at 64:9–12, 105:20–23 (Stiegler).) During his tenure, he sought to move the Unit

away from what he called the practice of "reflexively opposing" relief in habeas cases. (Id. at 105:12–19, 115:13–18 (Stiegler).) He described himself as "trying . . . [to] decide what was right." (Id. at 116:15–19 (Stiegler).) Promoted to head the DAO's Conviction Integrity Unit, Stiegler now reports directly to Mr. Krasner. That Unit is separate from the Law Division. (Id. at 63:13–19 (Stiegler).)

Stiegler Decides That the DAO Will Concede

Stiegler first learned of Johnson in 2021, when the Defender Association urged that the DAO take a close look at the matter and assign it to an experienced ADA. (Doc. No. 141 at 65:3–18 (Stiegler).) Stiegler then worked closely with the Defender and the Innocence Project, meeting with them regularly to discuss Johnson. (Id. at 16:15–25, 17:7–15, 20:18–25 (Mason).) On December 6, 2021, Stiegler assigned the case to Mason, who had been an ADA for some four months. (Ex. OAG-1; Doc. No. 141 at 16:15–25, 20:1–3 (Mason).) When he made the assignment, Stiegler had already decided—at the suggestion of the Defender and the Innocence Project—that the DAO would concede the grant of habeas relief on a *Brady* issue and waive the Respondents' exhaustion defense to that claim. (Ex. OAG-1; Doc. No. 141 at 21:1–7, 21:21–22, 122:24–123:2 (Mason).) As Mason put it, "Matt's already made the assessment and the decision here that this is going to be a case that should be conceded." (Doc. No. 141 at 21:5–7 (Mason).)

Preparing the Concession Brief

Because Stiegler had already decided to concede relief in Johnson, Mason saw no need to review the record. Rather, she simply carried out Stiegler's instructions. (Id. at 22:23–23:13 (Mason).) She was just the "conduit for drafting this," in accordance with the advice Stiegler received from the Innocence Project and the Defender. (Id. at 23:14–16 (Mason).) Stiegler told Mason, "if it's good enough for the Innocence Project, it's good enough for me." (Id. at 23:20–

21, 42:16–18, 123:9–10 (Mason).) Stiegler thus did not instruct Mason to do any independent investigation because it had already been done by Johnson's counsel. (Id. at 69:25–70:6 (Stiegler).) Stiegler and Mason thus never discussed the need to interview witnesses, and he did not suggest that she review any record materials. (Id. at 23:14–16, 26:18–27:13, 42:11–20 (Mason).) I do not credit Stiegler's hearing testimony that he believed Mason would conduct a full investigation of Johnson. (Id. at 70:6–21 (Stiegler).) Indeed, contrary to the Defender's advice, he assigned an inexperienced ADA to Johnson, making it more likely that she would not question his actions or orders. (Id. at 14:14–19, 21:20–22:10 (Mason), 65:3–18 (Stiegler).)

Stiegler acknowledged that the Federal Litigation Unit rarely conducted any investigations, and had no investigators or investigation resources. (Id. at 73:15–74:4 (Stiegler).) Accordingly, if a criminal defendant alleged that a critical prosecution witness had recanted after trial, Stiegler would decide the Commonwealth's position—doing "what was right"—without arranging for that witness to be interviewed. (Id. at 74:25–75:5 (Stiegler).) If a *Brady* claim were raised, Stiegler made no effort to talk to the trial prosecutor purportedly responsible. (Id. at 91:20–92:19 (Stiegler).) Once again, Stiegler would determine "what was right," basing his decision entirely on the defendant's allegations. Stiegler acknowledged that he had done no investigation in Johnson. (Id. at 77:17–20, 78:7–9 (Stiegler).)

In reopening Johnson's Section 2254 Petition, the DAO and the Defender entered into a joint briefing schedule. (Doc. No. 73.) As the filing deadline approached, Mason and Stiegler met with Defender and Innocence Project lawyers "many, many times." (Doc. No. 141 at 24:1–11 (Mason).) The participants discussed "which claim would be the best claim to concede on." (Id. at 29:11–16 (Mason).) Mason's September 15, 2022 notes of one such meeting (which Stiegler falsely described as Mason's "report . . . of her review of the case") confirm this. (Id. at 79:8–12,

88:11–16 (Stiegler).) She summarized the arguments defense counsel made: "Strategy for response: Concede that Johnson is entitled to complete relief on the *Brady* claims rendering other claims moot." (Exs. R-1, R-2; Doc. No. 141 at 80:25–81:1, 82:18–20, 83:10–12 (Stiegler).) When legal difficulties arose, the thinking then "shifted" to conceding Johnson's ineffectiveness claim, which had been exhausted. (Doc. No. 141 at 30:3–10 (Mason).)

On September 30, 2022, the Defender sent the DAO a letter from Michael Coard, Johnson's trial counsel, confessing to his own incompetence: that he had no reason for failing to object to Detective McDermott's hearsay testimony. (Ex. OAG-3; Doc. No. 141 at 28:9–15, 29:4–6, 31:24–32:3 (Mason).) Stiegler wanted to use the letter to avoid a Section 2254 hearing in which the District Court might ask the OAG to participate. He wrote on October 3, 2022: "I think the letter does increase the odds of [Judge Diamond] granting relief without a hearing, but I doubt it reduces the odds of him inviting the AG to participate if he does do a hearing. I remain keen to avoid the latter danger." (Ex. OAG-3; Doc. No. 141 at 32:10–21 (Mason).)

Mason completed a draft of the DAO's Concession in September 2022. (Doc. No. 141 at 34:14–16 (Mason).) She and Stiegler exchanged "several rounds" of revisions. (Ex. OAG-4; Doc. No. 141 at 34:17–22 (Mason).) Mason accepted "any edits that Matt made." (Doc. No. 141 at 37:6–9 (Mason), 78:15–18 (Stiegler).) Because the DAO was conceding relief, Nancy Winkelman, then Supervisor of the Law Division, also reviewed and edited the draft. (Id. at 34:23–35:8 (Mason).) The DAO informs me that it has conceded relief and "exonerated" "about sixty people" in this manner since 2018. (Doc. No. 169 at 2.) No DAO concession brief could be filed without Winkelman's approval, however. (Doc. No. 141 at 37:10–18 (Mason).) As a result, the Johnson Concession Brief "was heavily edited." (Id. at 35:2–3 (Mason).) Stiegler and Winkelman were also concerned with Coard's "significant disciplinary history"; Winkelman questioned

whether these earlier disciplinary transgressions were similar to Coard's confessed incompetence in Johnson. (Ex. OAG-5; Doc. No. 141 at 39:1–5, 39:19–22 (Mason).)

On November 4, 2022, the DAO filed its Concession Brief, signed only by Mason, urging that Johnson was entitled to relief because of Coard's ineffectiveness. (Doc. Nos. 86, 141 at 34:4–6, 54:22–55:2 (Mason).) I do not credit Stiegler's testimony that he "didn't have a consistent practice on whether [his] signature would be included on district court filings," and that the assigned ADA decided whether Stiegler would sign the brief. (Doc. No. 141 at 97:18–98:3 (Stiegler).)

The Court's May 7, 2026 Order

When the DAO received this Order (Doc. No. 97) and the Four first investigated Johnson, "all of the [Law Division] supervisors started to panic." (Doc. No. 141 at 43:2–7 (Mason); Doc. No. 160 at 7:14–21, 8:10–16 (Ernst), 113:23–114:7 (Wildberger), 145:7–15 (Napiorski); Doc. No. 165 at 18:18–20 (Andrews).) By May 2026, Napiorski supervised the Law Division; Wildberger was its Assistant Supervisor; Andrews supervised the Federal Litigation Unit; and Ernst was the Law Division's Chief of Training. (Doc. No. 160 at 5:5–10, 7:3–10 (Ernst).)

On May 13, the Four and Mason met to prepare for the hearing I had ordered, dividing various responsibilities. (Id. at 12:7–12 (Ernst), 114:10 (Wildberger).) Ernst reviewed the record and analyzed all eleven of Johnson's Section 2254 claims in a memorandum she sent to Mason and the other supervisors. (Doc. No. 141 at 45:22–24 (Mason); Doc. No. 160 at 14:5–15:17 (Ernst), 115:3–12 (Wildberger), 147:21–148:2 (Napiorski); Doc. No. 165 at 20:6–13 (Andrews).) Ernst concluded that most of the claims were "flat-out losers," but that the ineffectiveness claim might be plausible. (Doc. No. 141 at 45:22–46:6 (Mason).) Ernst subsequently determined, however, that the ineffectiveness claim "was not a winning claim," and that the Concession Brief

included "very significant errors." (Doc. No. 160 at 15:20–23, 16:10–13, 18:11–16 (Ernst).) Wildberger also concluded that the errors were significant, and that the DAO had a duty to correct them. (Id. at 17:13–17 (Ernst), 115:18–116:2 (Wildberger).)

The May 29 Meeting

On Friday, May 29, Ernst and Wildberger met with Napiorski, who eventually became convinced that the DAO had to withdraw the Concession Brief. (Doc. No. 160 at 18:1–10 (Ernst), 116:21–117:2 (Wildberger), 149:4–14 (Napiorski).) Napiorski, Wildberger, and Ernst found particularly disturbing that Judge Sitarski had accepted some of the DAO's misstatements. (Id. at 18:17–19:1 (Ernst), 117:2–8 (Wildberger), 149:15–23 (Napiorski).) They then met with Mason and told her that the DAO had to withdraw the Concession. (Doc. No. 141 at 47:11–21 (Mason); Doc. No. 160 at 21:18–22:10 (Ernst), 117:23–118:7 (Wildberger), 150:5–16 (Napiorski).) They explained that in another case, Napiorski had moved to withdraw a filing he had signed, and that he alone had apologized to the District Court—even though Stiegler was then his supervisor and even though Stiegler and ADA Paul George had authored the filing. (Doc. No. 141 at 48:1–9 (Mason); Doc. No. 160 at 23:12–24:7 (Ernst), 152:16–153:1 (Napiorski).) Napiorski thus suggested that "it might be a good idea" for Mason, the sole signer of the Concession Brief, to take some "responsibility" for its "mistakes." (Doc. No. 160 at 152:11–15 (Napiorski).) Napiorski wanted Mason to "take some ownership of it. Not all ownership." (Id. at 154:6–14 (Napiorski).)

Mason was "furious" and responded that Stiegler should take responsibility. (Doc. No. 141 at 48:14–19, 49:16–17 (Mason); Doc. No. 160 at 24:15–20 (Ernst), 150:23–151:2 (Napiorski).) She was angry at Stiegler and concerned that her professional reputation would suffer because she had signed the Concession he had ordered her to draft. (Doc. No. 160 at 156:19–22 (Napiorski).) Wildberger, who could see that Mason was upset, told her, "you'll find no Matt Stiegler apologists

here." (Doc. No. 141 at 48:25–49:2 (Mason); Doc. No. 160 at 118:15–21 (Wildberger).) Stiegler "does not have the best reputation on the 13th floor" (where the Law Division is located)—a description Napiorski found "largely accurate." (Doc. No. 160 at 119:15–19 (Wildberger), 151:3–15 (Napiorski).)

Mason nonetheless believed that the supervisors were directing that she alone take the blame. (Doc. No. 141 at 49:6–21 (Mason).) She thought they wanted her to lie: to tell the Court that she had made misstatements when, in truth, Stiegler had made them. (Id. at 50:1–4 (Mason).) Yet, the Four were not urging Mason to lie. They tried to reassure her. Ernst told her that any filing would acknowledge that Stiegler had supervised the Concession Brief, and Napiorski stressed that the DAO would not "sacrifice[] her or throw[] anyone under the bus." (Doc. No. 141 at 50:17–25 (Mason); Doc. No. 160 at 25:5–10 (Ernst), 159:21–160:1 (Napiorski).)

On Saturday, May 30, Mason called Napiorski and told him that she was considering quitting. (Doc. No. 141 at 50:7–22 (Mason); Doc. No. 160 at 157:7–21 (Napiorski).) She feared that the DAO "would try to throw her under the bus to protect Mr. Stiegler." (Doc. No. 160 at 157:22–158:1 (Napiorski).) Napiorski thus understood that Mason "was nervous that the office would prioritize protecting Mr. Stiegler over her professional reputation." (Id. at 159:12–20 (Napiorski).) He told her that he did not think that was likely and that he would not do it. (Id. at 159:21–160:1 (Napiorski).) Mason insisted that Stiegler take responsibility by executing an affidavit that he was responsible for the Concession Brief. (Doc. No. 141 at 51:4–11 (Mason); Doc. No. 160 at 160:2–8 (Napiorski).) She heard nothing further from the Four that weekend and was "falling apart." (Doc. No. 141 at 51:18–19 (Mason).)

The Four had no intention of "throwing" Mason "under the bus." (Doc. No. 160 at 52:23–53:2 (Ernst), 123:5–11 (Wildberger), 159:22–160:1, 170:1–4 (Napiorski); Doc. No. 165 at 37:5–

10 (Andrews).) Rather, as I find below, it was Stiegler and Mr. Krasner who would seek to sacrifice Mason to protect Stiegler.

Mason Quits

On Monday, June 1, Mason met with Napiorski and Andrews. (Doc. No. 141 at 51:19–52:4 (Mason); Doc. No. 160 at 160:20–25 (Napiorski); Doc. No. 165 at 21:14–16 (Andrews).) Napiorski again suggested that Mason help "clean up the mess" by signing the Motion to Withdraw and taking some responsibility, "while still making it clear that she was not in any way wholly at fault, that she was being supervised by somebody who had much more experience in this area of law and was driving the train"—Stiegler. (Doc. No. 160 at 161:19–162:5 (Napiorski).) Mason was agitated and asked, "how are you going to protect me?" (Doc. No. 165 at 22:4–7 (Andrews).) Andrews was frustrated with Stiegler: "I was just sort of learning about [the misstatements] for the first time, but I assumed in that moment that there was no way that we could have filed something with these kind of errors without Mr. Stiegler being asleep at the wheel, at a minimum." (Id. at 23:6–14 (Andrews).) Because no one at the meeting blamed Stiegler alone, Andrews felt that Mason may have misinterpreted this to mean that she alone, not Stiegler, would be blamed. (Id. at 25:5–6, 26:1–5 (Andrews).) Mason walked out. (Doc. No. 160 at 162:7–14 (Napiorski); Doc. No. 165 at 23:25–24:2 (Andrews).) That afternoon, Andrews reviewed the record and concluded that the DAO "had taken the wrong position and that our response contained significant errors." (Doc. No. 165 at 26:19–27:7 (Andrews).)

Early the next morning, June 2, Mason submitted her resignation letter to Mr. Krasner. (Ex. OAG-8; Doc. No. 141 at 52:16–24, 53:10–13 (Mason); Doc. No. 160 at 39:12–22 (Ernst); Doc. No. 165 at 27:11–16 (Andrews).) She wrote that Stiegler had "used me to further his personal agenda of conceding in federal habeas cases regardless of the merits"; that she had "been asked to

'fall on [her] sword,' in front of the [C]ourt and acknowledge that mistakes were made"; and that "Matt must submit and swear in an affidavit that he erred and that he was responsible for what was filed in this case." (Ex. OAG-8; Doc. No. 160 at 40:25–41:3, 42:13–20 (Ernst).) Although Mason had planned to stay until the end of June to complete several assignments, Chief of Staff Jennifer Lin told her that afternoon, "You do not need to report to work after today." Her email would be cut off, her badge (allowing her entry to the DAO building) would not work, and her cases were being reassigned. (Doc. No. 141 at 52:21–24, 53:10–25 (Mason).) By ordering Mason to leave the DAO on June 2, Lin made it falsely appear that Mason's immediate resignation was inculpatory.

Finally, Mason's understandable dismay caused her to misunderstand the Four: they sought truthfully to inform the Court of the errors in the Concession Brief, not falsely to protect Stiegler. (Doc. No. 160 at 30:8–14 (Ernst), 121:21–25 (Wildberger), 155:8–13 (Napiorski).)

Stiegler Schemes to Blame Mason

On June 2, Andrews told Stiegler about the Concession's errors and Mason's resignation. (Doc. No. 141 at 101:2–6 (Stiegler); Doc. No. 165 at 28:1–29:19 (Andrews).) That week, Andrews drafted the Motion to Withdraw the Concession, which the other supervisors reviewed and edited. (Doc. No. 160 at 36:2–12 (Ernst), 122:1–5 (Wildberger), 164:16–21 (Napiorski); Doc. No. 165 at 29:20–30:1 (Andrews).) Napiorski scheduled a June 5 meeting with Mr. Krasner to discuss Johnson. (Doc. No. 160 at 36:13–17 (Ernst).)

At this time, Stiegler "lobbied" Ernst and Napiorski. (Id. at 50:5–18, 53:9–15 (Ernst), 166:14–22 (Napiorski).) Early on June 5, Stiegler told Ernst that Mason "had purposefully inserted the false facts into the response," and that "this was one hundred percent her fault, zero percent his fault." (Id. at 45:3–16 (Ernst).) Stiegler suggested that the DAO "file something with the Court

preemptively before the hearing explaining that we had gone through Ms. Mason's cases, that we found mistakes in other cases too, and that, therefore, this was all her fault." (Id. at 45:16–20 (Ernst).) Ernst responded that if there were errors in Mason's other cases, this would only show a pattern of poor supervision by Stiegler. (Id. at 45:21–46:3 (Ernst).) He nonetheless persisted:

> [W]e have to get out ahead of this. Because if we get out ahead of it, then the Judge will view this as one rogue ADA—well, an ADA who went rogue basically. And whereas if we don't, then he will think of this as this was all Matthew Stiegler's fault.

(Id. at 46:6–10 (Ernst).) Stiegler made the same suggestion to Napiorski: "to look through old filings or old documents that Ms. Mason prepared and find more mistakes and to kind of paint her as a rogue actor." (Id. at 163:13–25 (Napiorski).) Yet, Stiegler testified before me that Mason was an "experienced" ADA, "one of our strongest ADAs in the [U]nit." (Doc. No. 141 at 92:25–93:5, 104:23–105:7 (Stiegler).) In urging Ernst and Napiorski to say just the opposite, Stiegler was urging them to misrepresent to the Court. See infra Section II.

Ernst was concerned that she could not do her job properly if she were called upon to protect the reputation of either Mason or Stiegler: "if you're thinking about who is at fault or protecting someone from a finding of fault, then that could theoretically make you not want to do a full investigation to find all of the facts relevant to the case." (Doc. No. 160 at 46:17–47:11 (Ernst).) Although Stiegler had not lobbied Andrews or Wildberger, they, too, believed that the need to "protect" others created "at a minimum, an appearance of a conflict of interest." (Id. at 50:2–24 (Ernst), 166:14–19 (Napiorski).)

Stiegler also spoke privately with Mr. Krasner about the case, "possibly twice." (Doc. No. 141 at 101:7–13 (Stiegler).) Mr. Krasner was "interested" in Stiegler's input. (Id. at 101:20–22 (Stiegler).)

The June 5 Meeting

The Four met with Mr. Krasner to obtain his approval to withdraw the Concession Brief and to ask him to refer Johnson to the OAG because of the conflicts I have described. (Doc. No. 160 at 49:2–6, 50:25–51:4 (Ernst), 122:9–13 (Wildberger), 165:5–9, 166:2–11 (Napiorski); Doc. No. 165 at 30:2–6 (Andrews).) Andrews handed Mr. Krasner a printed draft of the Motion to Withdraw. (Doc. No. 160 at 51:15–17 (Ernst); Doc. No. 165 at 30:9–13 (Andrews).) Mr. Krasner's edits included a change that lessened Stiegler's apparent involvement in preparing the Concession Brief. (Doc. No. 160 at 51:18–25 (Ernst).) By the end of the meeting, Mr. Krasner approved the filing. (Doc. No. 160 at 52:1–2 (Ernst), 165:10–13 (Napiorski); Doc. No. 165 at 11:15–12:1 (Napiorski), 30:14–16 (Andrews).)

Mr. Krasner then told the Four:

> [S]omeone gave me a really good idea. Actually, it was Matt, Mr. Stiegler, that gave me this really good idea. I think that we should go through Ms. Mason's cases, find mistakes that she made in other cases, say that this was a pattern by her, and then file something with the Court saying that.

(Doc. No. 160 at 52:5–11, 106:17–20 (Ernst), 122:23–123:2 (Wildberger), 165:14–20 (Napiorski); Doc. No. 165 at 36:9–14 (Andrews).) Like Stiegler, Mr. Krasner wanted the DAO to submit a false narrative to the Court. See infra Section II.

The Four rejected Mr. Krasner's proposal. (Doc. No. 160 at 52:18–53:2 (Ernst).) Wildberger found the proposal "tremendously inappropriate," and it was "pretty roundly rejected." (Id. at 123:5–11 (Wildberger), 165:16–23 (Napiorski).) The Four explained that because Stiegler's lobbying Ernst and Napiorski had created a conflict for them, Mr. Krasner should refer Johnson to the OAG. (Doc. No. 160 at 53:3–15 (Ernst), 124:3–17 (Wildberger), 166:2–22 (Napiorski); Doc. No. 165 at 30:17–23 (Andrews).)

Mr. Krasner was "very opposed." (Doc. No. 160 at 53:16–18 (Ernst).) He said that "we can't send it to OAG because essentially they're all evil." (Id. at 54:1–4 (Ernst).) He said that "we have to have somebody in the room, in the courtroom to protect the office." (Doc. No. 160 at 54:18–20 (Ernst), 124:18–21 (Wildberger); Doc. No. 165 at 31:15–22 (Andrews).) Ernst responded: "Larry, that's the conflict. . . . The person handling the case can't be in there to protect the office, they have to be in there to handle the case and to focus on the merits." (Doc. No. 160 at 54:20–25 (Ernst).) Mr. Krasner then suggested hiring someone from outside the office to handle the case. (Id. at 55:1–9 (Ernst).)

Mr. Krasner also said that Stiegler would want to see the Withdrawal Motion before it was filed. The Four refused; Ernst said, "absolutely not." (Id. at 55:18–25 (Ernst).) As the Four left the meeting, Wildberger took the printed Motion from Andrews, telling Ernst that he "just wanted to make sure we had it in our possession so there's no way that Mr. Stiegler could see the document." (Doc. No. 160 at 58:3–15 (Ernst); Doc. No. 165 at 32:11–15 (Andrews).)

Mr. Krasner then met with Napiorski, Andrews, Lin, and Stiegler. (Doc. No. 160 at 168:3–17 (Napiorski); Doc. No. 165 at 32:4–17 (Andrews).) Stiegler "reiterated his idea of going through some of Ms. Mason's old cases to look for mistakes and paint her as a rogue actor." (Doc. No. 160 at 168:21–25 (Napiorski); Doc. No. 165 at 33:25–34:4 (Andrews).) "Clearly his strategy was to pin blame for this incident on Ms. Mason." (Doc. No. 165 at 34:13–22 (Andrews).) Napiorski and Andrews again rejected the idea. Stiegler asked to see the Motion; they refused. Like Mr. Krasner, Stiegler opposed referring the case to the OAG. Stiegler asked them to delay filing the Motion; they refused. (Doc. No. 160 at 168:25–169:14, 170:5–10 (Napiorski); Doc. No. 165 at 32:18–33:21, 35:1–6 (Andrews).)

Andrews came away from the June 5 meeting believing that Mr. Krasner "was interested in this strategy of not assigning any blame to Mr. Stiegler." Andrews "didn't know how [Mr. Krasner] could possibly reach that conclusion without doing an independent—some sort of investigation." (Doc. No. 165 at 36:24–37:10 (Andrews).)

The DAO filed the Motion to Withdraw that afternoon. (Doc. No. 118.) At Napiorski's direction, all four signed the Motion because "it's a big deal . . . to withdraw any filing and admit a serious error happened in a place where I currently work." (Doc. No. 160 at 170:22–171:6 (Napiorski).)

<u>Mr. Krasner Again Refuses to Refer the Case</u>

On June 6, Napiorski left for a planned European vacation. (<u>Id.</u> at 52:2–4 (Ernst), 171:7–11 (Napiorski).) During Napiorski's two-week absence, Ernst and Wildberger continued to urge that <u>Johnson</u> be referred to the OAG. On Monday, June 8, they spoke with Trials Chief Cheryl Yankolonis, who agreed that <u>Johnson</u> should go to the OAG. All three agreed that Stiegler "should be suspended from his supervisory responsibilities, at the minimum, pending an investigation of what happened here." (<u>Id.</u> at 59:8–60:5 (Ernst), 124:22–125:9 (Wildberger).) Lin also agreed that the case should go to the OAG. (<u>Id.</u> at 59:16–18, 60:10–16 (Ernst).) "[L]ine ADAs" were angry because Mason was gone, yet "nothing bad had happened to Mr. Stiegler." (<u>Id.</u> at 60:17–23 (Ernst).)

As Ernst and Wildberger spoke with Lin, Mr. Krasner joined them. (<u>Id.</u> at 61:2–6 (Ernst), 125:10–16 (Wildberger).) When Ernst again urged him to refer the case, he "went on a long rant about how everyone in the AG's office is evil and that he didn't want to do that." (<u>Id.</u> at 61:6–11 (Ernst).) Mr. Krasner said that "someone had to be in the case from our office to protect the office and prevent it from becoming a shadow Rule 11 hearing," which Wildberger understood to mean

that Mr. Krasner "didn't want people poking around in what occurred." (Id. at 125:17–126:2 (Wildberger).) Mr. Krasner said that he would consult an ethics advisor and decide by the end of the week. (Id. at 61:12–17 (Ernst), 126:7–9 (Wildberger).) That same day, Ernst and Wildberger first consulted their own ethics expert who advised them to withdraw from Johnson on conflict grounds. (Id. at 86:23–87:4 (Ernst), 126:13–25 (Wildberger).)

Although Mr. Krasner did not take them off the Johnson assignment, Ernst and Wildberger told Andrews that Napiorski and Ernst believed they had a disabling conflict; Andrews agreed to do no further work on the case. (Doc. No. 160 at 61:18–62:7 (Ernst); Doc. No. 165 at 37:16–38:11 (Andrews).) Although Andrews did not then believe he had an actual conflict, when I asked at the hearing if he had a conflict, he answered, "It's entirely possible, Your Honor." (Id. at 39:9–15 (Andrews).)

On June 11, the OAG filed its Motion to Establish a Briefing Schedule. (Doc. No. 119.) Ernst, Wildberger, and Gaeta then met with Mr. Krasner, Lin, and Yankolonis. Before Mr. Krasner arrived, Lin told them that she had overheard Stiegler "lobbying" Mr. Krasner not to send the case to OAG. (Doc. No. 160 at 62:9–63:6, 106:21–23 (Ernst).) When Mr. Krasner arrived, he asked what the DAO would file in response to the OAG's Briefing Schedule Motion. Ernst told him that she and Wildberger could not file anything because they were conflicted. (Id. at 63:7–14 (Ernst).) Mr. Krasner said that he did not want to send the case to the OAG, and that he needed to speak to an ethics advisor. (Id. at 64:3–7 (Ernst).) He "went on a long, extended rant yet again about how he hated the OAG," calling everyone in the OAG "Nazis." (Id. at 64:8–14 (Ernst).) He said: "We need to protect the office. We need somebody in the room so that they can control the proceedings." (Id. at 64:23–25 (Ernst).)

Ernst told Mr. Krasner that "protecting the office is going to run headlong into doing what we need to do for the case." (Id. at 65:6–7 (Ernst).) In his preliminary investigation, Napiorski had already discovered problems with the recanting witnesses, and further investigation would likely uncover additional evidence undermining the Concession Brief. Ernst thus urged that "a person can't both protect the office and competently handle this case." (Id. at 65:17–18 (Ernst).) Mr. Krasner answered that he would just tell the ADA assigned to Johnson not to do any investigation because the "OAG is in the case anyway [and] they can do all of the investigation." The person handling the case would "just, like, sit there and they'll just object if OAG does something we don't like." (Id. at 65:19–24 (Ernst).) Ernst responded: "If you're saying that you would tell the person handling the case to not investigate the claims, that's exactly why there's a conflict." (Id. at 65:25–66:7 (Ernst).) Mr. Krasner repeated that he needed to speak to an ethics expert. (Id. at 66:8–10 (Ernst).)

Ernst and Wildberger feared that Mr. Krasner would withhold critical facts from the ethics expert. They thus prepared a memorandum setting out all the facts and the questions they wanted put to the expert. (Id. at 66:11–25 (Ernst), 127:7–17 (Wildberger).) Lin warned that Mr. Krasner "was feeling boxed in and that he can become very reactive if he feels like people are backing him into a corner." (Id. at 66:25–67:6 (Ernst), 127:18–22 (Wildberger).) Accordingly, they hand-delivered the memorandum to Lin, who said that she would give it to Mr. Krasner or ensure that the questions were asked. (Id. at 67:6–19 (Ernst), 127:18–128:1 (Wildberger).)

On June 18, Mr. Krasner texted Ernst, Wildberger, and Andrews, asking them to meet that day about a "narrow issue." (Doc. No. 160 at 68:18–69:4 (Ernst), 128:4–11 (Wildberger); Doc. No. 165 at 39:17–40:5 (Andrews).) Ernst participated by phone. (Doc. No. 160 at 69:5–14 (Ernst); Doc. No. 165 at 39:20–22 (Andrews).) Mr. Krasner said that he had spoken to an unidentified

ethics advisor who said the DAO was not conflicted, although Stiegler was. Mr. Krasner said that he could hire someone from outside the office to handle the case and thus eliminate the conflict. (Doc. No. 160 at 69:16–70:3, 70:22–25 (Ernst).)

Until he actually hired an outside lawyer, however, Mr. Krasner wanted someone from the Law Division, no matter how inexperienced, to prepare the DAO's Response to the OAG's Briefing Schedule Motion. (Doc. No. 119.) That ADA had to make certain that he or she inform the Court that there should be no hearing on the DAO's Motion to Withdraw the Concession. Mr. Krasner said: "I just want him to file a three-page thing that says I don't want there to be a hearing on the motion to file a response." (Id. at 70:4–21 (Ernst).) Mr. Krasner added "that it did not matter what it said as long as it expressed opposition." (Id. at 128:25–129:5 (Wildberger).)

At the hearing before me, Wildberger explained, "every meeting we had with [Mr. Krasner] we talked about the conflict issue and almost every meeting that we had with him we implored him to refer the case to the Office of Attorney General. He refused." (Doc. No. 160 at 129:6–11 (Wildberger).) Wildberger reiterated that "on several occasions [Mr. Krasner] said that someone should be in the case to protect the office." (Id. at 129:12–17 (Wildberger).) Wildberger added that Mr. Krasner "on several occasions, referred to [OAG lawyers] as Nazis that fled [to] Paraguay." (Id. at 129:24–130:9 (Wildberger).)

The Conflict Memorandum

Napiorski returned from vacation on Saturday, June 20. The next day, Ernst told him that she now believed Mr. Krasner and the DAO were conflicted because Mr. Krasner had repeatedly said that they needed to protect the office and have somebody in the courtroom, and because Mr. Krasner had spoken to Stiegler about Johnson. (Id. at 74:18–76:4 (Ernst), 171:12–172:5

(Napiorski).) Ernst and Wildberger had concluded over that weekend that they needed to advise the Court of the conflict. (Id. at 75:5–20 (Ernst).)

On Monday, June 22, Napiorski, Wildberger, and Ernst agreed to write a memorandum explaining to Mr. Krasner why he and the DAO were conflicted. (Id. at 76:7–22 (Ernst).) That day, Napiorski met with Mr. Krasner and Lin and again tried to convince Mr. Krasner to refer the case to the OAG. He told Mr. Krasner that he believed there was an apparent conflict. (Id. at 76:23–77:5 (Ernst), 172:6–173:5, 173:13–20 (Napiorski).) Mr. Krasner disagreed, again saying that "I want to have somebody in the room to, you know, protect the office." (Id. at 172:17–22 (Napiorski).) He again said that he would consult his own unidentified ethics expert. (Id. at 173:6–12 (Napiorski).)

Wildberger drafted the conflict memorandum, and the other supervisors edited it. (Doc. No. 160 at 77:9–18 (Ernst), 130:14–19 (Wildberger), 174:16–20 (Napiorski); Doc. No. 165 at 41:25–42:9 (Andrews).) Andrews did not sign it. (Doc. No. 160 at 130:16–19 (Wildberger); Doc. No. 165 at 42:10–11 (Andrews).) The memorandum from Napiorski, Wildberger, and Ernst to Mr. Krasner is dated June 24, 2026. (Ex. OAG-9; Doc. No. 160 at 78:16–24 (Ernst).) Napiorski emailed it to Mr. Krasner at both his work and "private" email addresses; Mr. Krasner typically never looked at his work email. (Ex. R-4; Doc. No. 160 at 81:10–18, 110:8–16 (Ernst), 174:21–25 (Napiorski).)

The memorandum stated that Stiegler was conflicted because he had a reputational interest in how the DAO explained the Concession's errors. Further, a full investigation "could uncover even more deficiencies with the [Concession]," so Stiegler "would have a reputational interest in not doing a full investigation." (Ex. OAG-9; Doc. No. 160 at 79:4–17 (Ernst).) The memorandum further stated "[w]e believe DA Krasner is conflicted because he has conferred with ADA Stiegler

about this case." (Ex. OAG-9; Doc. No. 160 at 79:18–21 (Ernst).) That conflict arose in part from Stiegler's advice to Mr. Krasner, including Stiegler's suggestion that the DAO find errors in Mason's other cases. (Doc. No. 160 at 79:22–80:7 (Ernst).) "We believe DA Krasner is conflicted because his litigation directives are potentially contrary to the underlying litigation." (Ex. OAG-9; Doc. No. 160 at 80:8–11 (Ernst).) As Ernst explained, Mr. Krasner "said he doesn't really care about the merits, he said that he would want the person handling the case to not do a full investigation, and he seemed to be caring more about the reputation of the office than about competently handling this case." (Doc. No. 160 at 80:12–18 (Ernst).) The memorandum concluded that under Commonwealth v. Breighner, 684 A.2d 143 (Pa. Super. Ct. 1996), which was attached to the memorandum, Johnson had to be referred to the OAG. (Ex. OAG-9; Doc. No. 160 at 80:19–81:7 (Ernst), 140:1–5 (Wildberger).)

About two hours later, a response arrived from Lin's email address. Remarkably, at the outset, the email provided: "this response is not from Jen Lin; it is from Larry Krasner." The message thus would not appear in Mr. Krasner's email history. (Ex. R-4; Doc. No. 160 at 81:14–22, 102:24–103:3 (Ernst).) Mr. Krasner suggested that he had communicated with Stiegler and Stiegler's counsel only about "prosaic matters," and had no further conversations with Stiegler. (Ex. R-4; Doc. No. 160 at 81:23–82:8 (Ernst).) Yet, Mr. Krasner had told the Four on June 5 that Stiegler gave him a "really good idea"—blaming Mason alone for the Concession's errors. (Doc. No. 141 at 101:7–13 (Stiegler); Doc. No. 160 at 52:5–8 (Ernst).) In Ernst's view, Mr. Krasner thus "misrepresented . . . his communications with Mr. Stiegler." (Doc. No. 160 at 83:12–20 (Ernst).) Mr. Krasner acknowledged that he wanted to "protect the office," but believed that as used in the memorandum, the phrase was out of context. (Ex. R-4; Doc. No. 160 at 82:9–15, 83:12–17, 105:24–106:6 (Ernst).)

Napiorski and Wildberger met with Mr. Krasner that afternoon. (Doc. No. 160 at 83:1–3 (Ernst), 132:2–4 (Wildberger), 178:13–18 (Napiorski).) Mr. Krasner was very angry that they had sent the memorandum by email instead of coming to talk with him, and he "discussed that that was discoverable." (Doc. No. 160 at 132:4–8 (Wildberger), 178:19–179:2 (Napiorski); Doc. No. 165 at 5:4–8 (Napiorski).) Wildberger believed this meant that "if there w[ere] litigation [the memorandum] would be discoverable in the discovery process[.]" (Doc. No. 160 at 132:9–12 (Wildberger).)

Mr. Krasner then acknowledged, "I recognize I have an apparent conflict—not an actual conflict, but an apparent conflict of interest," and, looking at Lin, said that "someone else would have to supervise the litigation of the case." (Doc. No. 160 at 132:1–24 (Wildberger); Doc. No. 165 at 5:13–18 (Napiorski).)

In the hearing before me, Napiorski reiterated his belief that Mr. Krasner's insistence on protecting the office created a conflict: Protecting the office was not the prosecutor's job in this habeas case and might be inconsistent with the prosecutor's duty to the client. (Doc. No. 160 at 177:19–178:7 (Napiorski).) When asked whether "protect the office" meant that Mr. Krasner wished to protect himself, Napiorski answered, "I think that was probably part of it." (<u>Id.</u> at 178:8–11 (Napiorski).)

That same day, the DAO, through Gaeta, responded to the OAG's Briefing Schedule Motion, stating, in accordance with Mr. Krasner's repeated directions, that no hearing was necessary on the Motion to Withdraw. (Doc. No. 122; Doc. No. 160 at 86:6–16 (Ernst).)

<u>Mr. Krasner Threatens "Consequences"</u>

On June 25, Napiorski spoke with the ethics expert previously consulted by Ernst and Wildberger, and was advised that because Mr. Krasner had admitted a conflict the day before, "the

only way to cure a conflict that the DA admitted to was to send the case to the OAG." (Doc. No. 160 at 86:21–87:19 (Ernst), 137:23–138:2 (Wildberger); Doc. No. 165 at 7:15–16 (Napiorski).) If Mr. Krasner refused, the Four would have to alert the Court promptly. (Doc. No. 160 at 87:19–20 (Ernst); Doc. No. 165 at 7:15–19 (Napiorski).)

Napiorski, Wildberger, and Gaeta then brought Mr. Krasner a draft letter referring the case to the OAG. (Doc. No. 160 at 133:6–134:6 (Wildberger); Doc. No. 165 at 7:25–8:14 (Napiorski).) Mr. Krasner was "apoplectic." He was "furious." He was "very angry with us." (Doc. No. 160 at 136:2–8 (Wildberger).) Mr. Krasner was "annoyed, again, that we brought something written." (Doc. No. 165 at 8:15–20 (Napiorski).) Napiorski and Wildberger told Mr. Krasner that someone had to inform the Court if the case was not referred, and that, at the very least, Ernst would do so. (Doc. No. 160 at 136:9–12 (Wildberger); Doc. No. 165 at 8:21–9:2 (Napiorski).) "District Attorney Krasner correctly assumed that Ms. Ernst was one of those people and he said that there would be consequences for Ms. Ernst if she alerted the Court to the conflict issue." (Doc. No. 160 at 136:13–16 (Wildberger).) He then said more generally that there would be consequences if anyone did so, saying "consequences" three times, once as "consequences, whatever they may be." (Id. at 136:17–22 (Wildberger).) Napiorski recalled Mr. Krasner saying, "if any of you do that without my approval, there will be consequences." (Doc. No. 165 at 8:23–9:7 (Napiorski).) Wildberger understood "consequences" to mean "termination from my employment." (Doc. No. 160 at 136:23–137:1 (Wildberger).) Napiorski "believed it to mean at the time that people could lose their jobs." (Doc. No. 165 at 9:8–11 (Napiorski).)

Napiorski and Wildberger then called Ernst, who insisted that they alert the Court immediately. (Doc. No. 160 at 89:11–91:6 (Ernst), 137:15–138:10 (Wildberger).) Napiorski told her, "Katie, I'm just trying to help you because I'm trying to protect your job." Napiorski added:

"The DA has threatened to fire anyone who tells the Judge about this." Wildberger interjected that Mr. Krasner "didn't say fired, he said there would be consequences." (Id. at 91:7–16 (Ernst).)

Napiorski then communicated with Lin, who conveyed that "jobs may be salvageable" if their filing stated that the office was going to remedy the conflict. (Id. at 93:6–94:2 (Ernst), 140:11–18 (Wildberger).) Ernst would not put anything in a filing that she did not believe was true, but she agreed to state that the office was "seeking" to remedy the conflict because she believed that it was. Wildberger agreed. (Id. at 94:3–12 (Ernst), 140:18–21 (Wildberger).)

That day, Ernst and Wildberger together filed a Withdrawal of Appearance. (Doc. No. 123.) They stated that "the Philadelphia District Attorney's Office may have a conflict of interest in this case," and that "undersigned counsel understand that the office is seeking to remedy this conflict." (Doc. No. 123; Doc. No. 160 at 94:13–21 (Ernst), 138:18–140:9 (Wildberger).) Napiorski and Andrews withdrew the next day. (Doc. Nos. 125, 126; Doc. No. 165 at 9:17–10:7 (Napiorski), 43:16–44:12 (Andrews).)

Ernst came to think about whether the Concession's errors had been intentional: "after everything that's happened here, I had to wonder what is going on, why is the DA doing the things that he's doing?" (Doc. No. 160 at 94:22–95:24 (Ernst).) Mr. Krasner had instructed the Four to find errors in Mason's other cases, and he later told Ernst that "he intended to tell the person who handled the case to not do any investigation and let OAG do it." (Id. at 102:4–9 (Ernst).) He "was not interested in talking about the merits of the case." (Id. at 105:10–14 (Ernst).)

The Notice of Conflict

On July 15, Wildberger told Napiorski that he would step down as Assistant Supervisor of the Law Division. He did so on July 20 because he had "lost faith in the administration of the Philadelphia District Attorney's Office." (Doc. No. 160 at 96:20–97:4 (Ernst), 113:13–22

(Wildberger).) Gaeta represented the DAO at the July 17 hearing. Three days later, Ernst and Wildberger filed a Notice of Conflict, further describing their basis for concluding a conflict existed. (Doc. No. 135; Doc. No. 160 at 98:14–99:4 (Ernst), 141:2–22 (Wildberger).) Wildberger believed that his duty of candor required him to inform the Court that the conflict was ongoing. (Doc. No. 160 at 141:23–142:5 (Wildberger).)

## CONCLUSIONS OF LAW

### I. Conflict of Interest

#### A. Legal Standards

This Court has adopted the Pennsylvania Rules of Professional Conduct. See E.D. Pa. Loc. R. 83.6 ("The Rules of Professional Conduct adopted by this court are the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania, as amended from time to time by that state court, except as otherwise provided by specific rule of this Court."). Under these Rules, "[a] concurrent conflict of interest exists if there is a significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer." Pa.R.P.C. 1.7(a)(2). "The lawyer's own interests should not be permitted to have an adverse effect on representation of a client." Pa.R.P.C. 1.7, cmt. [10].

Section 51.401 of the *Lawyers' Manual on Professional Conduct: Practice Guides* is also instructive:

> Clients' interests . . . clash sometimes with their attorneys' own interests in their professional reputations and affiliations.
>
> This type of conflict arises most frequently when a lawyer needs to defend her own conduct as the client's counsel. . . . In such situations, the lawyer must evaluate whether her professional self-interest could significantly constrain her representation of the client. If so, the lawyer must obtain the client's informed consent before continuing to serve as counsel. If it is unreasonable to believe that the lawyer will be able to provide adequate representation, client consent will not cure the conflict, and the lawyer must withdraw from or decline the representation.

> * * *
>
> A conflict between an attorney's self-interest and a client's interest is generally presented whenever the lawyer's own conduct in the client's matter is questioned. . . . As explained below, this type of conflict arises most frequently when a lawyer makes a serious mistake in a client's representation, or is accused of mishandling or acting unethically in a client's matter.
>
> * * *
>
> When a lawyer realizes she may have made a serious mistake potentially harmful to a client's interests, the situation presents a personal-interest conflict because a substantial risk exists that the lawyer's advice or actions would be colored by her concern about possible malpractice liability or disciplinary charges. The lawyer must withdraw from the representation if the client's objective can no longer be achieved, such as when the client's claim is lost by blowing a statute of limitations. . . . Moreover, the lawyer may not begin or continue any other representation of the client without disclosing the problem and getting the client's informed consent. . . . But in some circumstances it may be in the best interests of both lawyer and client for the lawyer to take corrective action, such as fixing errors made in a title search or trying to block use of privileged materials that were improperly produced. The representation may continue if the lawyer reasonably believes she will be able to provide competent and diligent representation despite her self-interest in avoiding malpractice liability, and she obtains the client's informed consent after full disclosure of the circumstances and risks.

51 Conflicts of Interest 401.190–210 (Am. Bar Ass'n & Bureau of Nat'l Affairs, Inc. 2021) (Professional Interests, Self Defense, Conflicts Arising From Blunders).

When a conflict arises in connection with a criminal prosecution, the prosecutors have distinct roles, and, unlike private attorneys, must exercise independent judgment. See Pa.R.P.C. 3.8, cmt. [1] (A prosecutor "has the responsibility of a minister of justice and not simply that of an advocate."). The prosecutor "must abandon the prosecution if, in his professional judgment, justice will be promoted by doing so." Commonwealth v. Eskridge, 604 A.2d 700, 701 (Pa. 1992). A "prosecution is barred when an actual conflict of interest affecting the prosecutor exists in the case; under such circumstances a defendant need not prove actual prejudice in order to require that the conflict be removed." Id. at 702.

Where, as here, the purported "conflict of interest issue arises based on a lawyer's self-interest, a sturdier factual predicate must be evident than when a case concerns multiple

representation." Essex Cnty. Jail Annex Inmates v. Treffinger, 18 F. Supp. 2d 418, 432 (D.N.J. 1998). "Rather, courts will look closely at the specific facts of the case and any remedial measures to determine whether any actual conflict of interest exists." Commonwealth v. Sims, 799 A.2d 853, 857 (Pa. Super. Ct. 2002). A "mere allegation or appearance of impropriety is insufficient to establish an actual conflict of interest." Id. (collecting cases). The Pennsylvania Supreme Court has recognized the "enormous burden upon the already strained resources of . . . the District Attorney's staff" that would result if the Court allowed disqualification based on a "mere assertion of impropriety." Commonwealth v. Harris, 460 A.2d 747, 750 (Pa. 1983).

Once a conflict arises, however, "it is improper for the conflicted district attorney to engage in any decision-making in the case, including choosing who will handle the prosecution." Breighner, 684 A.2d at 147. "[H]e or she cannot designate another county's district attorney as a temporary assistant in an effort to cure the conflict. In such cases, all decision-making duties of the conflicted district attorney must cease and the matter must be referred to the Attorney General." Id. at 148.

> The fact that a conflicted district attorney chooses not to refer a matter to the Attorney General because he or she opposes, for whatever reason, the manner in which the Attorney General may handle the case, presents the very danger we seek to avoid here. Consideration of the conflicted district attorney's discretionary preferences is no longer appropriate once a conflict arises.

Id. at 147 n.6.

### B. This Court's Authority

The OAG urges that Pennsylvania law requires that this matter be referred to the Attorney General. (Doc. No. 168 at 44–45; Doc. No. 135 at 2.) The Pennsylvania decisions on which the OAG relies support that view. Yet, Eskridge, Breighner, and Sims all arose from prosecutions in the Pennsylvania courts, and the referral remedy they prescribe is based on the Commonwealth Attorneys Act, which empowers the Attorney General to prosecute a case if "there is the potential

for an actual or apparent conflict of interest on the part of the district attorney or his office." 71 P.S. § 732-205(a)(3); see Eskridge, 604 A.2d at 702; Breighner, 684 A.2d at 145; Sims, 799 A.2d at 855.

That provision applies only at the local district attorney's request. The Act empowers the state courts alone to supersede over the District Attorney's objection: The Attorney General may "petition the court having jurisdiction over any criminal proceeding to permit the Attorney General to supersede the district attorney"; "the president judge shall [then] request the Supreme Court [of Pennsylvania] to assign a judge to hear the matter"; and supersession "shall be ordered" only if the Attorney General proves "by a preponderance of the evidence that the district attorney has failed or refused to prosecute and such failure or refusal constitutes abuse of discretion." 71 P.S. § 732-205(a)(4); see also id. § 732-205(a)(5) (providing that a president judge who believes a case is "a proper one for the intervention of the Commonwealth" shall ask the Attorney General to proceed under paragraph (4)). The Third Circuit has thus described the Attorney General's supersession authority as "a narrowly circumscribed power" requiring strict adherence to the statutory scheme. Carter v. City of Philadelphia, 181 F.3d 339, 353 (3d Cir. 1999). Because it is not a court of the Commonwealth, this Court has no part in that arrangement.

Nor may this Court compel a district attorney to invoke the Commonwealth Attorneys Act. See 71 P.S. § 732-205(a)(3). The Third Circuit has long held that a federal district court "ha[s] no jurisdiction" to "issue a writ of mandamus compelling action by a state official." In re Wolenski, 324 F.2d 309, 309 (3d Cir. 1963) (per curiam); see also White v. Ward, 145 F.3d 1139, 1140 (10th Cir. 1998) (federal courts "lack[] jurisdiction to direct a state court to perform its duty"). Directing Mr. Krasner to refer this case to the OAG would amount to just that: ordering a state officer to exercise a power that state law commits to his discretion and to the state courts. "[I]t is difficult

to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984).

In any event, there is no pressing need for supersession. The OAG already participates in this matter as amicus and so provides much of the adversarial testing that a referral to the OAG would otherwise provide. (Doc. No. 97); see Johnson v. Mahanoy, 144 F.4th 178, 184 (3d Cir. 2025). Accordingly, I will not order a referral to the OAG, and I will not decide whether Pennsylvania law requires me to do so.

This Court must decide, however, whether the attorneys appearing in Johnson should be disqualified. "The district court's power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it." United States v. Miller, 624 F.2d 1198, 1201 (3d Cir. 1980). "[T]he exercise of this authority is committed to the sound discretion of the district court and will be overturned on appeal only for an abuse of this discretion." Id.

> While there have been instances in which an entire prosecutor's office has been disqualified in federal courts, the weight of authority in the Third Circuit indicates that courts have generally declined to disqualify an entire government agency from representing litigants in habeas proceedings where . . . attorneys [with purported conflicts] adequately screened themselves from the matter and had avoided any actual impropriety.

Ploof v. Metzger, No. 13-294, 2022 WL 980434, at *7 (D. Del. Mar. 31, 2022) (citing Euell v. Rosemeyer, 153 F.R.D. 576, 577 (W.D. Pa. 1993); Wright v. Lamas, No. 13-6420, 2019 WL 1496055, at *1, *4 (E.D. Pa. Mar. 29, 2019)). "The disqualification of Government counsel is a drastic measure and a court should hesitate to impose it except where necessary." United States v. Zagami, 374 F. App'x 295, 297 (3d Cir. 2010) (internal citations and quotations omitted).

### C. The Conflicts and Disqualifications Here

I have found that Mr. Krasner directed the Four to implement Stiegler's proposal and blame Mason alone for the Concession's errors. (Doc. No. 160 at 52:5–11 (Ernst), 122:23–123:2 (Wildberger), 165:16–20 (Napiorski); Doc. No. 165 at 36:6–14 (Andrews).) Ernst, Wildberger, and Napiorski also testified that Mr. Krasner repeatedly insisted that an ADA remain in the case to "protect the office." (Doc. No. 160 at 54:18–20, 64:23–25 (Ernst), 124:20–21, 129:12–13 (Wildberger), 172:20–22 (Napiorski).) Ernst further testified that Mr. Krasner said he did not really care about the merits of Johnson's Section 2254 Petition. (Id. at 80:13–18, 105:13–14 (Ernst).) This conflicts with the Four's duties to the Commonwealth. Commonwealth v. Price, 684 A.2d 640, 642 (Pa. Super. Ct. 1996) ("The prosecutor's duty is to vindicate the interest of the Commonwealth not the interest of any particular individual."); see also Commonwealth v. Dunlap, 377 A.2d 975, 976 (Pa. 1977) (Roberts, J., opinion in support of reversal) ("A district attorney's professional responsibility is to seek justice to protect the innocent as well as to convict the guilty."). A prosecutor must be "'an administrator of justice with his mind on the public purpose, not . . . an advocate whose judgment may be blurred by subjective reasons.'" Eskridge, 604 A.2d at 701 (quoting Commonwealth v. Dunlap, 335 A.2d 364, 368 (1975), aff'd, 377 A.2d 975 (1977) (Hoffman, J., dissenting)).

Given that each of the Four has withdrawn from this matter, their existing conflicts are moot. (Doc. Nos. 123, 124, 125, 126.) Although Mr. Krasner recognized that Stiegler is conflicted and apparently "screened" him from participation in Johnson, I will order his disqualification on conflict grounds.

As for the District Attorney himself, the conflicts are far from cured: Mr. Krasner does not wish to give this Court a truthful account of how the Concession came to be even though his duty

to the Court requires him to do so. Moreover, Mr. Krasner's duty to the Commonwealth requires him to explore fully and then reveal to the Court his own actions, the actions of his long-time colleague Stiegler, and those of the office Mr. Krasner leads. I have found that Stiegler is responsible for the Concession Brief's errors. Mr. Krasner has promoted Stiegler to head the Conviction Integrity Unit, reporting directly to the District Attorney. (Doc. No. 141 at 63:13–19 (Stiegler).) Mr. Krasner urged the Four to blame Mason alone for the errors, adopting Stiegler's "really good idea": to review Mason's other cases, "say that this was a pattern by her, and then file something with the Court saying that." (Doc. No. 160 at 52:5–11 (Ernst), 122:23–123:2 (Wildberger), 165:16–20 (Napiorski).) Mr. Krasner repeatedly refused to refer this matter to the OAG, insisting that "we have to have somebody in the room, in the courtroom to protect the office." Indeed, he would "just tell the person handling the case to not do any investigation" of Johnson's claims—a direct violation of his duty to the Commonwealth. (Id. at 54:18–20, 65:19–21 (Ernst).) Mr. Krasner "was not interested in talking about the merits of the case." (Id. at 105:13–14 (Ernst).) And Mr. Krasner warned that there would be "consequences" if anyone alerted the Court to the conflict. (Id. at 136:13–22 (Wildberger); Doc. No. 165 at 9:2–7 (Napiorski).)

Plainly, Mr. Krasner is burdened by multiple conflicts. Professor Green's "expert" opinion is a disorganized mess and largely useless. (Doc. No. 169, Ex. A.) Moreover, Professor Green has ignored critical facts that bear directly on the conflicts question. (Doc. No. 169, Ex. A ¶¶ 10–11.) There is a "significant risk" that Mr. Krasner's duties to the Commonwealth are "materially limited by . . . a personal interest"—his interest in shielding himself, Stiegler, and his office from scrutiny. Pa. R.P.C. 1.7(a)(2). The Commonwealth's interest, by contrast, lies in candor and in a full and accurate account of how the Concession came to be filed. "Candor is especially critical when

proceedings are non-adversarial," as these were when the DAO conceded. Wharton v. Superintendent Graterford SCI, 95 F.4th 140, 149 (3d Cir. 2024). A lawyer cannot be expected to pursue that interest when doing so "threatens [his] professional reputation and livelihood." Christeson v. Roper, 574 U.S. 373, 378 (2015) (per curiam); see Matter of Discipline of Arabia, 495 P.3d 1103, 1113 (Nev. 2021).

This is not a "mere allegation of . . . impropriety." Sims, 799 A.2d at 857. Nor are the conflicts speculative. Cf. Essex Cnty. Jail Annex Inmates, 18 F. Supp. 2d at 432. They arise from Mr. Krasner's own words and actions, recounted consistently by four credible witnesses (whom Mr. Krasner does not contradict), and corroborated by contemporaneous documents. Indeed, Mr. Krasner acknowledges that he has an "apparent conflict of interest." (Doc. No. 160 at 132:14–20 (Wildberger).)

Finally, Mr. Krasner's possible criminal liability (which I discuss below) undoubtedly creates a conflict. See Gov't of Virgin Islands v. Zepp, 748 F.2d 125, 135–36 (3d Cir. 1984); United States v. DeFalco, 644 F.2d 132, 137 (3d Cir. 1979); Rubin v. Gee, 292 F.3d 396, 405 (4th Cir. 2002); see infra Section II.

Accordingly, I will disqualify Mr. Krasner from any participation in Johnson. That prohibition necessarily includes his hiring of ADA Peters-Baker and appointing her to represent the Commonwealth in Johnson. Breighner, 684 A.2d at 147 ("[I]t is improper for the conflicted district attorney to engage in any decision-making in the case, including choosing who will handle the prosecution."). Allowing Mr. Krasner to select his replacement would defeat the purpose of disqualifying him. Accordingly, I will deny Peters-Baker's Motion for *pro hac* admission and strike her recent filing.

Finally, the OAG and the Four urge that Mr. Krasner's conflict requires me to disqualify the entire DAO because every ADA answers to Mr. Krasner and knows that he has threatened the Four with "consequences." (Doc. No. 168 at 44–45; Doc. No. 135 at 2.) I decline to do so.

There is virtually no reported authority upholding the disqualification of an entire government agency. See United States v. Whittaker, 268 F.3d 185, 196–97 (3d Cir. 2001) (reversing disqualification of entire prosecutor's office, finding that the District Court "seemingly los[t] all sense of proportion"). Pennsylvania's Rules do not impute a current government lawyer's conflict to his or her colleagues. See Pa. R.P.C. 1.11 cmt. [2] ("Because of the special problems raised by imputation within a government agency, paragraph (d) does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees."). The conflicts here belong to identifiable individuals—the Four (who have withdrawn), Mr. Krasner, and Stiegler—in an office of "nearly 700 people." (Ex. R-4; Doc. No. 160 at 106:2–4 (Ernst).) Nothing suggests that any other DAO attorney shares the personal interests that disable Mr. Krasner and Stiegler. The record shows the opposite: at the risk of their jobs, the Four refused Mr. Krasner's directions, alerted the Court to the conflicts in Johnson, and withdrew their appearances. (Doc. Nos. 123–26.) Moreover, Mr. Krasner's disqualification removes him from any role here. Another DAO attorney may represent the Commonwealth, provided that the attorney is selected and supervised by someone other than Mr. Krasner. In acknowledging his apparent conflict, Mr. Krasner said "someone else would have to supervise [Johnson]"—apparently Chief of Staff Lin. (Doc. No. 160 at 132:14–20 (Wildberger).)

In these circumstances, I will not disqualify the entire DAO.

## II. Wrongdoing

The evidence before me and the facts I have found reveal more than a disabling conflict. I refer here not to Mr. Krasner's use of another's email address, his concern that documents written to him might be discoverable, his repeated insistence that there should be no hearing in this Court, or his almost irrational refusal to refer Johnson to the OAG even though he recently made such a referral. See Scott v. Ransom, No. 20-06198, 2023 WL 4057258, at *1 n.3 (E.D. Pa. Apr. 14, 2023), report and recommendation adopted, No. 20-6198, 2023 WL 7532460 (E.D. Pa. Nov. 13, 2023). Although that conduct might reveal that Mr. Krasner is aware that he might have acted improperly, it is not itself criminal conduct. See, e.g., United States v. Oyakhire, 431 F. App'x 126 (3d Cir. 2011); United States v. Hart, 273 F.3d 363 (3d Cir. 2001).

The credible evidence is tantamount to a prima facie showing of conduct that may constitute false statements, false declarations made under oath, perjury, obstruction of justice, and conspiracy. See 18 U.S.C. § 1001 (false statements); id. § 1623 (false declaration); id. § 1621 (perjury); id. § 1503 (obstruction of justice); id. § 371 (conspiracy).

Three days after Mason resigned, Stiegler told Ernst that Mason "had purposefully inserted the false facts into the response," that "this was one hundred percent her fault, zero percent his fault," and that the DAO should tell me that her other cases contained mistakes too, so that I would "view this as one rogue ADA." (Doc. No. 160 at 45:8–20, 46:6–10 (Ernst).) Stiegler made the same pitch to Napiorski, who understood him to want Mason "paint[ed] . . . as a rogue actor." (Id. at 163:21–25 (Napiorski).) He presented it to Mr. Krasner, who deemed it a "really good idea" and urged the Four to implement it. Even after they refused, Stiegler repeated it in Mr. Krasner's presence. (Id. at 52:5–11 (Ernst), 168:23–25 (Napiorski); Doc. No. 165 at 33:25–34:4 (Andrews).) Yet Stiegler testified before me that Mason was "one of our strongest ADAs in the [U]nit."

(Doc. No. 141 at 93:4–5 (Stiegler).) Stiegler was thus urging the DAO to present the Court with a false account to shield himself.

Moreover, at the July 17 hearing, Stiegler acknowledged that he had spoken with Mr. Krasner about this case "possibly twice." (Id. at 101:9–13 (Stiegler).) When I asked what they discussed he answered:

> What I remember about that conversation, Your Honor, is that he was interested in my input about the office's handling, and that what I was saying to him was that my view was that we had information about what had happened here, that this was—I think I said something to the effect of this was not a who done it, that we had information about how these errors had occurred and that we should act—and that information primarily was the drafts that had resulted in the ultimate filing. And that the office should make a decision on the basis of the information that it had, if there were errors that had occurred, it should acknowledge those errors and go forward.
>
> My position was that the errors that occurred here were not intentional, not an effort to deceive the Court, and that the information that the office had showed that and that that's how I believed that the office should proceed.

(Id. at 101:14–102:12 (Stiegler).)

It is disturbing that Stiegler omitted that he urged Mr. Krasner to blame Mason alone for the Concession's errors and paint her as a "rogue ADA." (Doc. No. 160 at 168:21–25 (Napiorski); Doc. No. 165 at 33:25–34:4 (Andrews).) Moreover, Stiegler's hearing testimony that the errors "were not intentional" cannot be squared with what he told Ernst on June 5: that Mason "had purposefully inserted the false facts." (Doc. 160 at 45:8–12 (Ernst).) These material omissions and falsehoods may well amount to perjury. 18 U.S.C. § 1621. Moreover, in urging that others lie to me, Stiegler might be liable for obstruction of justice. Id. § 1503.

Mr. Krasner's actions are more troubling. He did not simply learn of the Stiegler proposal; he urged the Law Division supervisors—who serve at Mr. Krasner's pleasure—to implement it and to present a false narrative to the Court. (Doc. No. 160 at 52:5–11 (Ernst).) Mr. Krasner

directed that the DAO stay involved in Johnson "to protect the office"—which Napiorski believed also meant protecting Mr. Krasner himself—and that the Four "not do any investigation" (Id. at 178:8–11 (Napiorski), 65:19–22 (Ernst).) "[Mr. Krasner] didn't want people poking around in what occurred." (Id. at 126:2 (Wildberger).) He thus sought to direct the very lawyers obligated by law to correct the Concession's errors to do just the opposite. See Pa. R.P.C. 3.3(a)(1), 3.8 cmt. [1]. Even worse, when told that the Four believed they had to alert me, Mr. Krasner responded that "there would be consequences for Ms. Ernst if she alerted the Court to the conflict issue," and that there would be consequences "if anyone did." (Doc. No. 160 at 136:13–19 (Wildberger).) Both Wildberger and Napiorski understood Mr. Krasner to be threatening their jobs. (Id. at 136:23–137:1 (Wildberger); Doc. No. 165 at 9:8–11 (Napiorski).) Lin confirmed this when she told Napiorski that their "jobs may be salvageable." (Doc. No. 160 at 93:18–94:2 (Ernst).) Mr. Krasner's threat thus could amount to obstruction of justice. 18 U.S.C. § 1503.

Moreover, as Ernst testified, she could not understand why Mr. Krasner took these actions. (Doc. No. 160 at 72:14–18 (Ernst).) If he or Stiegler did so to conceal that he had a hand in making the Concession Brief's misrepresentations intentionally, this, too, could be obstruction of justice. 18 U.S.C. § 1503.

Finally, I have also found that Mr. Krasner and Stiegler worked together to try to convince the Four to urge the Court to accept a false narrative. (Doc. No. 160 at 52:5–11 (Ernst).) This might amount to criminal conspiracy. 18 U.S.C. § 371.

I have thus reluctantly concluded that Philadelphia's highest law enforcement official and one of his top assistants may have violated the law. In these circumstances, with the issuance of this Memorandum, I refer the DAO, Mr. Krasner, and Stiegler to this District's United States Attorney's Office for investigation and other appropriate action.

## CONCLUSION

It appears that in attempting to impede the Court's hearing and inquiry into the DAO's conduct in Johnson, Mr. Krasner, aided by Stiegler, put the Law Division supervisors in an impossible situation that might jeopardize them professionally and may have violated the law. Mr. Krasner and Stiegler have thus created a basis for their disqualification from Johnson and their referral to the Department of Justice.

An appropriate Order follows.

**BY THE COURT:**

*/s/ Paul S. Diamond*

**Paul S. Diamond, J.**