**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DENNIS JOHNSON, *Petitioner*, | : | |
| | : | |
| v. | : | Civ. No. 15-4965 |
| | : | |
| SCOTT NICKELSON, et al., *Respondents* | : | |

## MOTION FOR RECONSIDERATION

Consistent with his sworn oath, should a chief prosecutor and his assistants fix errors his office has made, past and present? Should he investigate why and how they occurred? And should he seek to determine if those errors point to a larger problem to fix? The answer to each of these questions is plainly "Yes." But this Court's Order and Memorandum discourage that accountability and instead implies that doing so may constitute crimes. The Philadelphia District Attorney's Office ("DAO") respectfully requests the Court to reconsider.

More specifically, the DAO hereby respectfully moves for reconsideration of the following orders and conclusions in the Court's Order of September 15, 2026 (Doc. No. 174) and Memorandum of the same date (Doc. No. 173):

1. The Court's finding that DA Larry Krasner is disqualified on conflict grounds from appearing in this matter;[1]

---

[1] The DAO does not seek reconsideration of the Court's disqualification of ADA Matthew Stiegler, as he has already been internally screened from participating in this case and would take no part in representing the Commonwealth

2. The Court's denial of ADA Jean Peters-Baker's Motion for Admission *Pro Hac Vice* (Doc. No. 170);

3. The Court's striking of the Motion for Leave to File Response (regarding the brief prepared by Peters-Baker) (Doc. No. 171) "on conflict grounds"; and

4. The Court's conclusion (Doc. No. 173) that "what the [four DAO Law Division] supervisors [Katherine Ernst, Steven Wildberger, David Napiorski, and Peter Andrews] deem a 'conflict' is also evidence of possible criminal wrongdoing by Mr. Krasner and Stiegler[,]" *id.* at 1, and the Court's related conclusions.

In a companion motion, the DAO respectfully moves the Court to recuse for reasons contained in that motion. Some of those reasons are contained herein. The self-recusal motion incorporates them by reference.

The DAO specifically does not request re-consideration of two crucial and quiet rulings, on which the Court is compelled to agree:

1. The Philadelphia District Attorney's Office was legally right to seek to correct errors in its prior submission (as the DA and his more recently assigned, but now screened, ADAs jointly urged); and

2. The District Attorney was legally right not to refer the case to the OAG (despite the adamant contrary position taken via unauthorized and insubordinate filings of ADA Ernst and ADA Wildberger, who were legally wrong).

The Court's legally compelled and correct decisions on these two issues break the foundation of much of the Court's analysis, including the Court's baseless, and highly selective "referral" of DA Krasner and ADA Stiegler for crimes the Court states they "may" have committed.[2]

---

further in these proceedings.

[2] It's no small irony that that the Court refers DA Krasner and ADA Stiegler

Justice demands that the orders and conclusions listed above be reconsidered by the Court. The Court's Memorandum repeatedly makes factual findings that are against the weight of the evidence or are otherwise not supported by the publicly available evidentiary record. As a result, its legal conclusions are unfounded and faulty, and its orders should be reconsidered so that actual justice may be pursued in all aspects of this case—both on this ancillary matter and on the actual merits of Mr. Johnson's habeas petition.

While the Commonwealth's Motion to Withdraw remains pending,[3] the

---

for investigation to a Department of Justice led by Todd Blanche, the personal lawyer for President Donald J. Trump. By all accounts, Attorney General Blanche appears to wield his office and the department he leads to advance President Trump's personal and political interests rather than the nation's interest in pursuing justice.

[3] See Doc. No. 118. While the Court stated in open court that it "certainly" would address that motion at some unstated future time, it has not done so, nor requested further briefing or argument. The DAO can certainly be forgiven for thinking that the Motion to Withdraw was going to be decided when:

1. OAG suggested in its Motion for a Briefing Schedule that the July 17 hearing should be used "to litigate the county district attorney's Motion to Withdraw," (Doc. No. 119 at 5);
2. the Court's June 30 Order explicitly grants in part the OAG's Motion for a Briefing Schedule (Doc. No. 127 at 5); and
3. no party ever sought to disqualify DA Krasner or the DAO before the Court announced on September 2 that this was the issue to be briefed.

The Court still has not addressed this unopposed motion to withdraw the problematic concession. (Doc. No. 119 at 5 n.1 ("OAG expresses no opinion as to the county district attorney's request for permission to withdraw their response"); Doc. No. 120 at 16 ("Mr. Johnson takes no position on the Commonwealth's motion to withdraw its response").) The 2022 Response remains on the docket nearly four months after the DAO alerted the Court to the errors it contains and promptly sought to withdraw it. Instead, the Court *struck* the actual merits response the DAO has attempted to file, in its continuing efforts to seek justice in this case and to follow the law.

sole issue the Court sought proposed findings of fact and conclusions of law regarding was whether the DAO may continue to represent the Respondents in this matter.[4] The Order and Memorandum find that, although DA Krasner is deemed conflicted and therefore unable to participate in the case, the DAO itself is not. Due to that conclusion regarding DA Krasner's conflict, ADA Peters-Baker's motion for admission *pro hac vice* was denied and her proposed Response on the merits was stricken. The DAO requests reconsideration of all three of those rulings, as well as the conclusions about "wrongdoing" that "may have" occurred, as discussed further.

The DAO requests reconsideration on these rulings because the Memorandum supporting them repeatedly errs: it relies on parts of the evidentiary record as if they were the only evidence in the record, and ignores contrary evidence entirely; it misconstrues, misinterprets, or misstates evidence in the record in order to reach findings or conclusions that the actual evidence cannot sustain; it finds or suggests significance in alleged "omissions" that either weren't omissions at all or cannot fairly be said to bear such significance; it treats certain evidence and witnesses in ways that are not fairly applied across the board, without reasonable explanation; and it comes to findings and conclusions that cannot logically be reconciled with each other.

## I. Analysis

Just as the Law Division supervisors who signed the Motion to Withdraw only catalogued the errors they felt they needed to in order to make the case

[4] See companion Motion for Recusal for additional information about the timing of this announcement.

that the entire filing was problematic and should be disregarded, here too the DAO only explicates the Memorandum's errors to the extent necessary to show that the Court should reconsider it. This Motion for Reconsideration does not purport to be a full cataloguing of the problems in the Memorandum and should not be taken as having done so.

*A. The Memorandum erroneously implies that the evidentiary record does not include DA Krasner's account of these events, and any further "silence" on DA Krasner's part reflects nothing but this Court's irregular procedures and overall orientation towards the Philadelphia District Attorney's Office.*

The deficits in the Court's Memorandum are numerous. However, one repeated error may be the most telling. The Court repeatedly relies on alleged "omissions" to "find" or suggest wrongdoing everywhere in this case—beginning with its misguided suggestion that the four Law Division Supervisors "sought to mislead the Court" in the very same filing which first alerted the Court to anything amiss (*i.e.*, the Motion to Withdraw Response (Doc. No. 118)) and ending with spurious allegations of obstruction of justice and perjury.

Most egregiously, the Memorandum repeatedly represents or implies that DA Krasner "chose not to testify," "or even" to submit an affidavit, and purportedly concludes: "[DA Krasner] apparently does not dispute—or does not address—much of the testimony presented." (Doc. No. 173 at 6, citing to Doc. No. 169.) The Court slanders[5] the DA: "Mr. Krasner does not wish to give this Court a truthful account of how the Concession came to be." (Doc. No. 173 at 33.) Finally, the Court suggests that in the face of such "silence," the Court

[5] But see *supra* re judicial immunity.

must look to "Mr. Krasner's own words and actions, [as] recounted consistently by four credible witnesses (whom Mr. Krasner does not contradict), and corroborated by contemporaneous documents." *Id.* at 35.

On the contrary, it is the Court who appears to have taken pains to *avoid* having DA Krasner testify. The Court ordered this hearing and set this witness list. (Doc. No. 127 at 5.) The Court, when it wished to, recalled one (and only one) of those witnesses. Tr. 7/17/26 at 122 ("THE COURT: Could we hear from Ms. Mason again, please.")[6] The Court rejiggered the order of the witnesses (Doc. No. 144; *cf.* Doc. No. 127) to hear earlier than planned from two witnesses once they a filed a cryptic "notice"[7] with allegations of "conflict[s]" going "[un]remedied" at the DAO. (Doc. No. 135 at 1.) The Court stated it would recall a specific witness to testify for a third time but then never did. (See Doc. No. 144,[8] Tr. 8/27/26, and Tr. 9/1/26.[9]) The Court announced, after Andrews's testimony, "I don't wish to hear from any other witnesses." Tr. 9/1/26 at 45.

The Court implies that DA Krasner concedes the accuracy of witness testimony because he did not submit an affidavit. (Doc. No. 173 at 6.) Such an implication is puzzling, as the Court never stated or even implied that such an affidavit would be accepted. Now that the DAO has been informed that the

---

[6] Former ADA Jaclyn Mason, the sole signatory of the 2022 concession.

[7] Namely, their second unauthorized filing alleging conflicts at the DAO, but not citing to a single rule of professional conduct. See also Doc. No. 123 (their first filing, which alerted the Court that conflicts of interest were arising in this case).

[8] "[T]he Hearing in this matter begun July 17, 2026 will resume on August 27, 2026 at 10:30 a.m. . . . The following witnesses will testify: . . . Jaclyn Mason." (emphasis omitted)

[9] Mason was not recalled to testify a third time.

Court would accept an affidavit from DA Krasner, please refer to DA Krasner's Declaration, attached as Exhibit A.

DA Krasner's alleged silence during these proceedings is not inculpatory in any way. He remained available to testify, but the Court indicated: "I don't wish to hear from any other witnesses." Tr. 9/1/26 at 45. No unfavorable inference or "concession by silence" about DA Krasner's own conduct can be made on this record, and that the Court attempts to do so demonstrates that reconsideration is necessary. While the Court's posture resists obvious explanation, DA Krasner remains available to testify should the Court reconsider and reopen the record in this matter.

*B. The Memorandum erroneously states that DA Krasner "sought to direct" the Law Division supervisors who filed the Motion to Withdraw at his direction "to do just the opposite" of "correct[ing] the Concession's errors."*

Perhaps the most obvious of the Court's missteps is its conclusion that DA Krasner "sought to direct the very lawyers obligated by law to correct the Concession's errors to do just the opposite." (Doc. No. 137 at 39.) This accusation is risibly unsupported by both the docket in this case and the undisputed evidence. All four Law Division supervisors testified that DA Krasner approved the filing of the Motion to Withdraw during the same meeting it was presented to him. Notwithstanding the Court's attempt to turn DA Krasner's undisputedly minimal edits to the Motion into fodder for conspiracy, it's undisputed that the Law Division Supervisors they publicly identified and sought to correct the errors in the original concession *at DA Krasner's direction*. How can it be that DA Krasner approved the filing that *identified* the errors and

attempted to correct them as part of a scheme "to do just the opposite"? If such a scheme existed—and plainly, it did not—it seems a remarkably ineffective way to accomplish its goal, as it was obvious from the start that the filing of the motion to withdraw would lead to scrutiny of the concession. *See* Tr. 8/27/26 at 155 (Napiorski noting that motion to withdraw "pointed out the errors and guaranteed a very public proceeding where we would all testify").

The Court's only cited basis for this topsy-turvy allegation is Wildberger's testimony that DA Krasner "didn't want people poking around in what occurred." (Doc. No. 173 at 39, citing Tr. 8/27/26 at 126.) But that testimony refers to a meeting *three days later*. Tr. 8/27/26 at 125-26. There is no universe in which that testimony can bear the weight of the Court's nonsensical allegation that DA Krasner "sought to direct" the supervisors to "do . . . the opposite" of what he himself told them to do three days earlier. Again, all parties who prepared the motion (the four supervisors and DA Krasner) understood that the filing of this motion was a proactive and necessary, but effective, invitation to both the Court and the OAG to inquire into the circumstances of how the DAO came to submit a concession with material errors, necessitating both its withdrawal and for the DAO to change its position on the case. This is hardly "the opposite" of correcting the concession's errors. And all of this is supposed to form the predicate for DA Krasner's alleged conflict of interest and possible obstruction of justice. (Doc. No. 173 at 39.)

*C. The Memorandum erroneously states that DA Krasner "urged" the Law Division supervisors to "present a false narrative to the Court,"*

*and "worked together" with Stiegler "to urge the Court to accept a false narrative."*

As with the Court's unfounded determination that DA Krasner sought to direct the Supervisors to conceal the errors in the concession, it baselessly finds that DA Krasner was conflicted because he and Stiegler "worked together to urge the Court to accept a false narrative." (Doc. No. 173 at 39.) But DA Krasner undisputedly had no involvement in this case until the Law Division Supervisors alerted him that the concession Mason filed and Stiegler supervised had material errors. There is no basis in the record to conclude that DA Krasner had any reason to believe, on June 5, that the errors in the concession were not in fact Mason's fault.

Moreover, the Court's conclusion that DA Krasner "urged" others to blame only Mason for the errors in the Response she signed and filed with the Court is misplaced and unsupported. After the Law Division Supervisors brought their concerns regarding the Response to DA Krasner's attention, his role in preparing the motion to withdraw was limited to non-substantive revisions and approval to file. Tr. 8/27/2026 at 52. Only after reviewing and approving the motion to withdraw—which identified *both* Mason and Stiegler as responsible for its preparation—did he suggest the idea of reviewing Mason's other work to determine if she had made errors in other cases. *Id.* ("[n]ow that that's out of the way. . ."). When Ernst noted that any review would also need to encompass other cases supervised by Stiegler to determine whether he had also made errors in other cases, DA Krasner *agreed*. *Id.* at 52-53. Ultimately, DA Krasner deferred to the Supervisors, and made no further mention of the idea. *Id.* at 165 (Napiorski) ("We thought it was a bad idea . . . and it did not

happen."). Stiegler proposed a strategy that DA Krasner considered, but DA Krasner also considered *and accepted* the Law Division supervisors' advice that it was inadvisable. This is not misconduct.

Even assuming DA Krasner *had* directed the Supervisors to review Mason's and Stiegler's prior work for errors—and again, he didn't—that would not have led them to "submit a false narrative to the Court." Doc. No. 173 at 17. The proposal DA Krasner considered was to look for *actual errors* to determine whether there was a pattern of errors and then advise the Court of any findings. Nothing in the record supports the Court's determination that providing a broader account of their competence would have advanced a "false narrative": they either had or had not made errors in other cases, and there was absolutely no testimony indicating that DA Krasner (or Stiegler, for that matter) suggested submitting false allegations of error.

DA Krasner has always taken the position that "[o]ur sworn oath as prosecutors is to seek justice unconditionally, with no limit as to time. When we discover past injustices, we must not only right those wrongs, but implement policies to ensure that they do not occur again in the future." DAO Conviction Integrity Unit Report, Overturning Convictions—and an Era, 3 (June 15, 2021) available at tinyurl.com/CIUreport (last visited Sept. 27, 2026). This position animated DA Krasner's approval of the motion to withdraw the flawed concession, and it is why he believed reviewing prior work for errors was a good idea in light of the serious deficiencies the Supervisors identified. If more material errors or a pattern of errors were found, the DAO would be duty-bound to attempt to correct them.

At the time of the June 5 meeting, DA Krasner knew that Mason had filed and signed a response that contained multiple factual errors. As the chief prosecutor, DA Krasner has a responsibility and a duty to ensure DAO employees meet the standards of performance. If he has information that an employee has not done so, it is his obligation to investigate the matter and, if appropriate, take corrective action. In almost all circumstances of evaluating employee conduct, this would at a minimum include an inquiry into the employee's current and past performance. Therefore, the suggestion to investigate Mason's other cases was an appropriate measure to ensure that the DAO had satisfied its duty of candor in those matters.

The Supervisors may have believed this approach was objectionable because they believed that the office's role *in this case, at this time,* was not to assign blame to Mason or Stiegler, but rather simply to alert the Court to deficiencies in the earlier concession. This is particularly so because Mason and Stiegler lacked standing or ability to defend themselves against allegations of incompetence or wrongdoing (see *infra*). But given that the Court was ultimately keenly concerned with apportioning blame between Mason and Stiegler, informing the Court of the results of an investigation into their work product could only have served as evidence upon which the Court could base a better-supported finding than the one it eventually made. Similarly, the Court found Krasner and Stiegler allegedly "worked together" to "try to convince the Four to urge the Court to accept a false narrative." (Doc. No. 173 at 39.) If DA Krasner had no basis to know that this narrative was false (a conclusion that is itself unsupported by the evidentiary record, see *infra*) when he urged it (on

June 5, after he approved the filing of the Motion to Withdraw), and he immediately accepted the supervisors' still-unexplained unwillingness to even search for whether Mason had made other errors, there is no space in the timeline for DA Krasner and Stiegler to have had a meeting of culpable minds, where both of them knew Mason was somehow not to blame for the error-filled response with her signature on it, but floated it to the Supervisors separately anyway—but then also DA Krasner abandoned it before Stiegler floated it again. One would have to string content-free speculation to conclusory and unsupported (and unsworn) allegations, more closely resembling fever-dream conspiracy theories than evidence, in order to make it so.

When it comes to all of these nominally-serious-but-actually-wafty accusations of criminal conduct, tempered by "coulds" and "mights" and "may haves," the Court's analysis rests on nothing of substance. Moreover, the Court's holding that DA Krasner is conflicted as a result of simply considering reviewing other cases for error turns the disqualification standard on its ear.

The Court was required to follow binding Third Circuit precedent governing disqualification of a prosecutors' office. Mere allegations of a conflict of interest or the appearance of impropriety are insufficient to require disqualification of a district attorney or his office. *See, e.g.*, *United States v. Shah*, 43 F.4th 356, 362-63 (3d Cir. 2022); *Commonwealth v. Jermyn*, 709 A.2d 849, 860 (Pa. 1998). As the District Court for the District Court of New Jersey once opined:

> Because of the virtually limitless cases in which a "conflict" may theoretically arise when a lawyer's self-interest is implicated, there is a very real danger of analyzing these issues not on fact but on speculation and conjecture. Accordingly, when a conflict of

> interest issue arises based on a lawyer's self-interest, a sturdier factual predicate must be evident than when a case concerns multiple representation. Only by requiring a more specific articulation of the facts giving rise to a conflict situation can courts refrain from effectively "straightjacket[ing] counsel in a stifling, redundant federal code of professional conduct." Supposition and speculation, therefore, will simply not do.

*Essex Cnty. Jail Annex Inmates v. Treffinger*, 18 F.Supp.2d 418, 432 (D.N.J. 1998) (quoting *Beets v. Scott*, 65 F.3d 1258, 1272 (5th Cir.1995)). Here, the Court found that DA Krasner committed misconduct via his thoughts, not his actions. Its speculation regarding his motivations are simply insufficient to require disqualification, so reconsideration is necessary.

*D. The Memorandum erroneously states that DA Krasner's interest in "protect[ing] the office" was evidence of a conflict of interest.*

The Court spills much ink criticizing the manner in which DA Krasner chose to litigate this case after approving the motion to withdraw, but none give rise to a conflict of interest. The Memorandum DA Krasner for wishing to retain the case—a case in which there was no conflict of interest for the DAO, see *infra*—to "protect the office." But the Court did not appear to have any interest in what protecting the office entails, and instead points to ADA Napiorski's response to the Court's leading questions whether "protecting himself" also was "probably part of" DA Krasner's admonition to "protect the office[,]" to a "greater or lesser extent." (Doc. No. 173 at 39, citing Tr. 8/27/26 at 178.)

Not only does the Memorandum overstate Napiorski's testimony (it characterizes this partial concession by Napiorski, in response to the Court's own

fourth consecutive leading question,[10] as, "Napiorski believed ['Protect the office'] also meant protecting Mr. Krasner himself"), it entirely ignores the "contemporaneous document" that states in DA Krasner's own words exactly what he did and didn't mean when he said "Protect the office"—his June 24 email to Napiorski, Ernst, and Wildberger, reproduced in DA Krasner's Declaration, and as Respondent's Exhibit 4. And, despite its obvious willingness to take the reins of the proceedings and call and question witnesses, the Court apparently

---

[10] Tr. 8/27/26 at 177-78:

> Q. What was your reaction specifically to the District Attorney's statement about protecting the office? Was that consistent with what you had heard in meetings from him?
>
> A. Well, he [DA Krasner] had—he had said "protect the office" to me, but he never explained what he meant by that and I didn't press him on that.
>
> THE COURT: But you thought it created a conflict?
>
> THE WITNESS: I thought—yeah, I thought that—
>
> THE COURT: You thought it created a conflict because protecting the office was not your job in the 2254, correct?
>
> THE WITNESS: That is correct.
>
> THE COURT: And in fact, it might be inconsistent with your obligation to the Court in the 2254?
>
> THE WITNESS: That's correct.
>
> THE COURT: Did you think 'protect the office,' to a greater or lesser extent, he meant protect himself?
>
> THE WITNESS: I think that was probably part of it.

Tr. 8/27/26. *Cf.* Tr. 7/17/26 at 112 ("THE COURT: . . . you're doing the testifying here, Mr. Gaeta. You're ending every question with 'correct.' I don't know what he knows and what you're telling him he should know."), but see Tr. 7/17/26 at 3 ("CROSS-EXAMINATION BY MR. GAETA: 102").

had no desire to hear from DA Krasner himself. See supra.

As DA Krasner explained in his email, his interest in having a member of the DAO participate, and not referring the case entirely to the OAG, was in making sure that the DAO could object on the basis of privilege, question witnesses, and otherwise participate in the litigation of this ancillary matter. The Court agreed that this was appropriate, allowing ADA Gaeta to do just that.

*E. The Memorandum erroneously states that DA Krasner's discussion of "consequences" for insubordination "could amount to obstruction of justice."*

The Memorandum bemoans the fact that DA Krasner warned of "consequences" should Ernst and Wildberger alert the Court of the conflict, but it misconstrues both the weight and intention of this statement by ignoring the context and the timeline in which it was said. The statement was made on June 25, *after* the DAO had already notified the Court that there were potential conflicts. The Supervisors apparently consulted with an unnamed ethics advisor who believed they should alert the Court "promptly" to the conflict if the case was not referred to the OAG. (Doc. No. 165 at 7:15-19 (Napiorski).) They informed DA Krasner, who was still considering whether the DAO was conflicted and how best to proceed on the merits of Johnson's petition, that ADA Ernst planned to immediately file a withdrawal of appearance "notifying" the Court of the conflict she perceived, and DA Krasner told them that "if any of you do that without my approval, there will be consequences." Tr. 9/1/26, 8-9 (Napiorski).

The Court construes this statement as evidence that District Attorney Krasner attempted to hide the issue of a potential conflict to this Court. But

that cannot possibly be the case because the DAO had already alerted the Court the day prior: "since the filing of the motion to withdraw, [the Office] has recognized that some of the assistant district attorneys involved in the case many now have an actual or apparent conflict of interest, and the matter is in the process of being assigned or referred to non-conflicted counsel." (Doc. No. 122 at 23).

The issue of the Four facing "consequences" had nothing to do with alerting the Court to a potential conflict. Indeed, the Court has held that there is no conflict disqualifying the DAO from representing the Respondents in this case. Rather, DA Krasner took issue with his subordinates submitting pleadings without his approval; just as the Supervisors consulted the District Attorney to approve the motion to withdraw its response, they had the same duty to seek the approval for any other filing on this case as well. That is particularly so where, as here, those pleadings are premature, legally incorrect, and unnecessary. It is reasonable to expect consequences for filing a pleading the District Attorney disapproves of while he is still examining the issue and determining the correct course of action.

*F. The Memorandum baselessly suggests that DA Krasner's duty of candor to the tribunal is violated by DA Krasner's alleged failure to "explore fully and then reveal to the Court" the actions of DA Krasner, Stiegler, and "the office [DA] Krasner leads."*

The Memorandum states, for the first time during these proceedings, that DA Krasner's "duty to the Commonwealth requires him to explore fully and then reveal to the Court his own actions, the actions of his long-time colleague Stiegler, and those of the office Mr. Krasner leads." (Doc. No. 173 at 34.)

At no time prior to the issuance of its Memorandum did the Court indicate that DA Krasner must himself personally "explore fully" and "reveal to the Court" all of the actions taken that may be at issue in this case. Most of them pre-date his knowledge of the case, which began no earlier than June 2, 2026. He would have to undertake significant efforts to "explore fully" "all of the actions" "of the office" in that regard, but had he known the Court expected him to do so, he would have delighted in the attempt.

DA Krasner and the DAO have promptly and preemptively informed the Court of both material errors (effectively as soon as they were discovered) and even ultimately-specious allegations of office-wide conflicts. *See* Pa. R. Prof. Conduct R. 3.3(a). The attorney's duty of candor only requires informing the tribunal "of all *material* facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse" *in an* ex parte *proceeding*. *Id.* at R. 3.3(d)(emphasis added). Not only does that not cover facts that are not material (*i.e.*, important or meaningful), this isn't an *ex parte* proceeding. The duty of candor in a non-*ex parte* proceeding does not compel the affirmative production of all relevant facts known to a lawyer, nor does it compel a "full" "explor[ation]" of all relevant facts for disclosure. So if the Court wanted DA Krasner to do so, the time to let him know was earlier than in the Memorandum issued two weeks after the Court closed the evidentiary record.

But on top of that, the Court appears to hold that one such action (examining Mason's previous work product for errors, now that she has for the first time during these very proceedings revealed that she engaged in such shocking and flagrantly unprofessional misconduct as signing and filing a response to a

habeas petition without either having reviewed the trial testimony herself or having reason to believe that any other member of the DAO had done so) is actually "inappropriate." The Court appears to rule that advising this Court (or any other relevant tribunal) of any such discovered errors would be "present[ing] a false narrative to the Court."

Which is it? Is DA Krasner required, as a previously-unspoken surprise-extension of his duty of candor, to provide a "full and accurate account of how the Concession came to be filed"? (Doc. No. 173 at 34.) Or would doing so, if a truly full account involves exercising reasonable diligence[11] and searching Mason's cases for other errors now that the DAO is aware of her negligence in this case, to understand how such negligence went undiscovered for over three years, itself constitute misconduct?

This Court cannot have it both ways—not if it wants to do justice. Which is it? Is searching for answers required, or is it misconduct? One begins to suspect that the answer might depend on whose conduct the Court is considering.

*G. The Memorandum erroneously implies that DA Krasner's "refusal" to refer this matter to the Office of the Attorney General is "almost irrational" and therefore "might reveal" DA Krasner's "aware[ness] that he might have acted improperly."*

The Memorandum takes issue with DA Krasner's "almost irrational refusal to refer *Johnson* to the OAG." But DA Krasner's reluctance to refer a case to the OAG absent a conflict of interest is not evidence of a conflict, nor does it create one. District Attorneys, like judges, have a "duty to sit;" that is to say,

[11] See Pa. R. Prof. Conduct 1.3, Diligence: "A lawyer shall act with reasonable diligence and promptness in representing a client."

it is vital that they "not recuse [themselves] on unsupported, irrational or highly tenuous speculation." *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987). As one judge of this District put it:

> Although, at times, it may seem appealing or even wise to yield to another court, on the premise that the allegations of impartiality are a distraction to the main event, to do so, while a short term expedient, will reward the culprit, punish the other parties to the litigation and encourage the tactic of judge shopping.

*Cooney v. Booth*, 262 F.Supp.2d 494, 508 (E.D. Pa. 2003).

The same holds true for prosecutors. They, like judges, are subject to criticism by parties and the public, but they have "as strong a duty to sit when there is no legitimate reason to recuse as [they do] to recuse when the law and facts require." *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 659 (10th Cir. 2002). District Attorneys owe a duty to the public that elected them to prosecute the cases arising from the jurisdiction to which they were elected.[12]

As the Court noted, the DAO regularly refers cases to OAG *when an actual conflicts of interest exist*. *See* Memorandum at 37 (citing *Scott v. Ransom*, No. 20-06198, 2023 WL 4057258, at *1 n.3 (E.D. Pa. Apr. 14, 2023), *report and recommendation adopted*, No. 20-6198, 2023 WL 7532460 (E.D. Pa. Nov. 13, 2023); *e.g.*, *Osbourne v. Greenberg*, 305 A.3d 622, 2023 WL 5949214, *5 n.5 (Pa.Cmwlth. 2023) (table). Whatever DA Krasner's personal feelings towards

[12] Indeed, the Commonwealth's Attorney's Act allows for supersession by the OAG only in the limited circumstances of a conflict of interest or where the District Attorney lacks the resources to adequately prosecute a case. 71 P.S. § 732-205 (a)(3).

certain personnel at OAG may be, based on his evidence-based and considered view that they have acted illegally, immorally, and with bias in the past, he and the DAO take seriously their commitment to recuse from any cases in which a conflict of interest exists. District Attorney Krasner's refusal to do so here occurred because there is no conflict, and the DAO is obligated to participate. This is the opposite of "irrational."

*H. The Memorandum erroneously finds, against the weight of the evidentiary record, that DA Krasner's edit to the draft Motion to Withdraw "lessened Stiegler's apparent involvement" in preparing the Concession.*

The Court characterizes DA Krasner's edits to the Motion to Withdraw as including "a change that lessened Stiegler's apparent involvement in preparing the Concession Brief." (Doc. No. 173 at 17.) This is false. The original draft stated that Stiegler edited drafts of the response, and DA Krasner amended it to reflect that he "supervised" its preparation.

Courts have repeatedly noted the importance of supervision and the responsibility borne by supervisors. See, e.g., Wharton v. Superintendent Graterford SCI, 95 F.4th 140, 146 (3d Cir. 2024). By contrast, ADA Napiorski testified to proofreading ADA Mason's draft without substantive involvement. Tr. 8/27/26 at 145-46. Plainly, Stiegler's role in supervising the concession went beyond simply editing drafts, and DA Krasner's edit in fact served only to emphasize Stiegler's role. Moreover, it was indisputably viewed by all four Law Division supervisors as "non-substantive," "minor," or "minimal."

*I. The Memorandum is replete with additional errors*

In an effort to respect the Court's twenty-five page limit for motions

pleadings, the DAO lists additional errors that help form the basis for the request for the Court to reconsider its Order and Memorandum *seriatim* below. Many of the most critical errors noted below form the basis of the Motion For Recusal Pursuant To 28 U.S.C. § 455(A), filed concurrently with this motion.

1. The Memorandum erroneously credits five of the six witnesses (Mason and the four Law Division supervisors), when Mason's account of the period from May 7, 2026, through her resignation on June 2, 2026, cannot be reconciled with any of the others' testimony by any reasonable finder of fact, and the Memorandum only does so by misstating or ignoring Mason's actual testimony.

2. The Memorandum inexplicably ignores contrary evidence to find non-credible Stiegler's testimony that he had no policy on when he would sign on to briefs as the supervisor of the assigned ADA.

3. The Memorandum repeats its erroneous misreading of the OAG's Motion for Briefing Schedule to imply that the DAO's failure to defend against a non-existent accusation by OAG against the four Law Division supervisors was "odd" (i.e., reflects a guilty silence in the face of an accusation).

4. The Memorandum states, without a basis in the evidentiary record, that Stiegler omitted a material fact in his testimony regarding what he discussed about this case with DA Krasner before the Motion to Withdraw was filed.

5. The Memorandum states, without a basis in the evidentiary record, that Stiegler's testimony saying that the concession's errors were "not intentional" constituted a "falsehood" because Ernst testified he told her he thought Mason had "purposefully inserted the false facts."

6. The Memorandum states, without a basis in the evidentiary record, that Stiegler's testimony that he considered Mason to be a strong ADA in the Federal Litigation Unit at the time he assigned her this case means that his blaming of Mason to Napiorski, Ernst, and DA Krasner was "a false account to shield himself."

7. The Memorandum inexplicably finds that Stiegler committed wrongdoing by allegedly lobbying other members of the DAO to shift the blame for errors in the concession, but the evidentiary record shows that he and Mason were both involved in preparing the concession, and the evidentiary record does not support that one version or the other is a "falsehood."

## II. Conclusion

The DAO seeks the Court's reconsideration of its Order and Memorandum of September 15, 2026, for the reasons set forth above.[13]

Respectfully submitted,

*/s/Thomas Gaeta*
THOMAS GAETA
Assistant District Attorney
Supervisor, Civil Litigation

*/s/Lawrence S. Krasner*
LAWRENCE S. KRASNER
District Attorney of Philadelphia

[13] Should the Court decline to reconsider, the DAO notes that further motions may ensue. If and when the Court sets a briefing schedule, either for further briefing or argument on the pending Motion to Withdraw, or for the DAO's response to any of Mr. Johnson's pending claims on their merits, it may well be that the DAO anticipates filing a motion for clarification to inquire, among other things, whether ADA Lin may independently assign and supervise ADA Peters-Baker to represent the Respondents on the merits on behalf of the DAO.

**CERTIFICATE OF SERVICE**

I, Thomas Gaeta, certify that on September 29, 2026, I served a copy of this response on all counsel of record via the Court's CM/ECF system.

*/s/Thomas Gaeta*
THOMAS GAETA
Assistant District Attorney
Supervisor, Civil Litigation