**DISTRICT ATTORNEY'S OFFICE**
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499
(215) 686-8000

LAWRENCE S. KRASNER
DISTRICT ATTORNEY

# DECLARATION OF LARRY KRASNER DISTRICT ATTORNEY OF PHILADELPHIA (ELECTED)

This Court's oral and written accusations of ADA Matt Stiegler and me (DA Larry Krasner) and its "referral" to the US Department of Justice are virtually unprecedented and are, in fact, baseless. I respectfully submit they must be re-considered.

In this Declaration and Motion for Reconsideration, we respectfully argue that the Court's factual findings and accusatory legal conclusions twist the truth to the point of breaking in ways that defy logic and employ Orwellian language. Arguably, in any other context than the legally immunized space of a courtroom and an official court record, these accusations could be litigated as civil claims of defamation, slander, or libel.

While the Court's "referral" is virtually unprecedented and doesn't compel the DOJ to do anything, there is reason to believe the DOJ probably will. These are fraught, authoritarian times at the formerly independent DOJ.

The US DOJ under Donald Trump, a President who would be king, and would willfully end democracy and the rule of law, is now run by President Trump's personal lawyer, US AG Todd Blanche. As private criminal defense counsel, Blanche failed in his efforts to prevent Trump from being convicted of 34 felonies. The President will never be pardoned for his felony convictions by himself or by any other US President because his criminal convictions were obtained in state court by a New York state prosecutor.

This is state court prosecutors' superpower---their ability to obtain convictions against criminals that no US President can undo. For that reason, about a year ago several other state court chief prosecutors (including Mary Moriarty, chief prosecutor in Minneapolis whose office is addressing criminal homicides by federal officials deployed there at the President's election) formed an organization called the Fight Against Federal Overreach (FAFO) to support any prosecutor in the nation, regardless of political affiliation, who is committed to using state law to preserve democracy and the rule of law against crimes

committed by federal officials and anyone else who would commit crimes to interfere with elections.

Under AG Blanche and his predecessor, the DOJ has repeatedly functioned as an attack arm for people the President perceives as enemies. The President, his spokesperson, and Blanche himself have all made statements that identify DA Krasner, in their view, as the President' s enemy. The President believes he has many.

Trump likes to prosecute his perceived enemy, nearly always for nothing. Elected Attorney General Letitia James of New York and elected US Senator Mark Kelly (a potential Presidential candidate, whom the President suggested should be 'hanged'), five other elected members of the US House who are veterans, Ras Baraka, elected Mayor of Newark among others have endured bogus investigations and bogus prosecutions merely because they made efforts to save American democracy and the rule of law from a would be king. There are dozens more good Americans who are and have been unjustly targeted and willfully terrorized by bogus investigations and prosecutions to benefit Trump[1].

It is in this context, and on the eve of a historically important election that the President's party looks to lose badly, that this Court made a choice to draw the attention of the DOJ to DA Krasner whose job includes protecting voters in the most important city of the most important American swing state in America.

Counsel for former ADA Jaclyn Mason, Bryan Lentz, Esq. of the firm Bochetto and Lentz PC, whose firm just achieved a pardon for John Dougherty that relieves Dougherty of a $1.6 million payback obligation in money stolen from union members is now a newly minted Republican. His law partner, George Bochetto, Esq., a serial litigator against Krasner, among others involved in this matter, have well documented affiliations and involvement with the President's party that go back decades.

These facts alone give rise to a compelling appearance of impropriety that in the public's eye urge this Court to recuse from this matter and every other matter involving the Philadelphia District Attorney's Office for the foreseeable future. I respectfully request and hope the Court will do so.

But the ominous "referral" to DOJ resembles this matter. In the Johnson matter, some participants' perception of targeting and being terrorized have played a pivotal role, as I will explain in the declaration below.

The Court's opinion addresses a number of themes and draws conclusions that should be re-considered for the reasons stated in the Motion for Re-Consideration because the Court

[1] Protectdemocracy.org catalogues and updates these cases and their status.

never asked, requested or ordered (as it did with so many other witnesses) my input and then blamed that on me.

I know many of the facts found by the Court and conclusions inferred by the Court are not correct from personal knowledge. I lived it. The Court's accusatory themes reference and wildly misstate the significance and meaning of phrases like "protect the office", "consequences", "conflict". I address them here.

Other accusatory themes in the Court's Opinion defy logic: 1) DAO personnel finding errors made by the DAO, disclosing them to the Court before anyone else does, and asking to correct them is somehow…a coverup?; 2) DAO personnel who propose looking for additional errors not yet discovered to disclose and correct are somehow… obstructing justice?; 3) DAO personnel's vigorous candor with the Court is somehow…not candor at all and inexplicably constitutes a crime.

One theme the Court does not address in its Opinion is the pervasive fear in the DAO especially among some Law Division and CIU attorneys of being unfairly targeted for exonerating the innocent and supporting new trials where a defendant was robbed of a fair trial in the first place. I respectfully submit, without speculating on the Court's intent, that this Court has been an engine of that fear. Understanding the role of that fear in the various behaviors and testimonies of the participants is central to analyzing what occurred.

This Court is aware of and played a major role in ethical allegations initiated in the federal district court against two highly respected and distinguished leaders of the Law Division who are now retired, Nancy Winkelman (former Chief of the Law Division at the DAO) and Paul George (former Assistant Chief of the Law Division at the DAO).

The repeatedly expressed general belief among DAO personnel was that an error of omission made by Winkelman and George was being unfairly investigated, and that their imperfect efforts to communicate with survivors and to explain what they did was unfairly characterized. It was believed that they were being excessively punished in ways that DAO personnel believed were selective (prior administrations made the same error of omission without consequence; the highly experienced signatory of the erroneous filing (the lawyer closest to the work)[2] was also given a pass while George and Winkelman, who supervised the signatory's work, were harshly punished).[3]

[2] Max Kauffman, who is now employed by the Pennsylvania Supreme Court.

[3] It is undisputed that there were errors. I wrote an apology letter to survivors not all of whom were fully informed and consulted after one informed family member requested the DAO not contact the rest of the family, stating he would do it. Policy was changed

In explaining the mental state of many DAO personnel, I am not asserting that their belief was or was not correct. Nor am I expressing a personal opinion on this Court, other judges or those proceedings or their outcome. I am merely stating that this was the mental state of DAO personnel, reflected in the expressed belief of many personnel in the Law Division.

Some personnel expressed directly to me their belief that Winkelman and George were being 'targeted' to 'get to you (DA)' or 'to get the Office (DA's Office)'. Undoubtedly, the idea that the DA's Office and one or more of its personnel might be 'targeted' was discussed out of my presence as well, as a few examples of conversations I had with DAO personnel clearly imply:

ADA Katherine Ernst, who was at that time a Deputy in the Law Division, accepted the position of Chief of the DAO Law Division while George and Winkelman scaled down their work hours in anticipation of eventual retirement during the above-noted process. Shortly after becoming Law Division Chief, Ernst expressed that she was reluctant to stay in the position of Chief for a few reasons, including what was happening to Winkelman and George. She insisted on significantly higher compensation. She argued that she was unwilling to continue taking the risk of 'losing my ticket,' which I understood her to mean losing the license to practice law, without higher compensation and that she could need higher compensation to 'hire a lawyer' to 'defend' her against unjust targeting. She also said higher compensation would give her some funds in the event she unjustly 'lost my ticket'. She remained in the position of Chief of the Law Division for several months before advising she wanted to step down and change her duties due to extraordinary personal challenges at home[6], a request that was granted.

ADA David Napiorski, who served as Deputy in the Law Division, agreed to replace her in that position after a few meetings, but only on condition of a substantial compensation adjustment for essentially the same reasons as Ernst, while expressing the same fears. He accepted and remains in that position today.

This fear was obvious to me when Law Division leaders Ernst, Wildberger, Napiorski and Andrews first informed me about the Dennis Johnson matter in mid-2026. This occurred immediately after ADA Jaclyn Mason, whom I barely knew, had resigned. My assistance

---

afterward to require disregarding a single family member's request to be a conduit for further DAO communications with family.

[6] My understanding is that her testimony in court referenced these personal challenges. If not, there is no need to disclose them here.

in speaking with her about the multiple errors[7] in the filing she executed under the supervision of Matt Stiegler was not sought. I was unfamiliar with the details of this years' old case when it was first brought to my attention.

When Mason's errors were explained to me in the first of several increasingly breathless meetings, I agreed with Ernst, Wildberger, Napiorski and Andrews that the errors should be corrected promptly for the same reason we had corrected errors (and worse) that had occurred in other administrations by supporting defense efforts to exonerate approximately 60 people (to date) who were innocent and who were robbed of a fair trial or both[8]. All of those exonerations were judicially approved. Stiegler was not present for that meeting. We promptly filed the motion seeking to withdraw the erroneous filing to correct it.[9]

---

[7] I am informed that former ADA Jaclyn Mason testified that she never read the notes of testimony or much of the case law, if any, referenced in her filing. This is the equivalent of a baseball player standing at the plate to hit without a bat. It is a wholesale abandonment of the lawyer's obligation that no lawyer (but especially no lawyer with Mason's background, whose application seeking employment claimed her love of fairness, her love for deep dives into the record, included her multiple federal clerkships, and included two decades of experience as a lawyer) should ever engage in. Abandoning the work is not heroic, in lawyering or any other field, including journalism. Mason's claiming that she did no work before verifying her filing's accuracy because she was somehow a 'pawn' until (years passed and many taxpayer-funded paychecks later) she got caught is also not heroic. Or credible, in my opinion.

[8] ADA Wildberger and others have informed me that a review of convictions indicates the DAO supports relief less than 2% of the time. 98% of the time the DAO opposes relief.

[9] DAO was first and only entity involved to correct approximately five errors in the DAO's filing on the record, despite OAG's concurrent involvement. Innocence Project did not. Federal Defenders did not. This Court, which had the case for years, and had the ability to discover these errors on the cold record did not. To her credit, US Magistrate Judge Sitarski did catch and correct a couple of those errors, but not the others. Magistrate Sitarski, after laudably correcting the errors she found, still maintained that relief was appropriate. It would be wrong and unfair to blame any of the above for not having found these errors. It would be wrong to refer any of them to the DOJ. But it is also deeply wrong to blame the DAO for finding those errors, disclosing them, and trying to correct them first. Apparently imperfect oversight and review of legal filings comes in many forms.

I believe prosecutors should tell the truth, all the time, and regardless of the personal or political consequences. Some other prosecutors, including some who worked in the DAO in previous administrations, believed in winning by whatever means, and in disregard of their oaths. We are all paying the price now for that prosecutorial culture.

Chief prosecutors should also be even-handed in correcting errors in their own administrations just as they should correct the errors of prior administrations. Integrity, justice and our oaths require nothing less. Innocent people should not sit in jail while the people who committed their crimes are free to commit more. And guilty people should not go free due to lawyers who won't read the record or the law. Finality is not more important than truth or justice.

After approving and slightly toning down an excessively apologetic[10] draft of the motion to withdraw Mason's filing in order to correct it, it was promptly filed at my direction and after discussion.

As soon as the Court prioritized the ancillary proceeding it has now conducted over the years' old Johnson matter itself (which was already scheduled for a hearing before this Court)[11], and named witnesses from the DAO alone[12], there were a series of panicky, often unscheduled (for me) meetings with Law Division leadership in which some, especially Ernst and Wildberger, argued a series of sometimes contradictory and sometimes unsupported reasons why they and the Office should get as far away from the DAO having any involvement in the Johnson case as possible. There was disagreement among some of the Law Division leadership. The positions taken by Ernst and Wildberger in particular were adamant if not frantic and were sometimes inconsistent, but always pointed toward getting themselves and the DAO as far away from the Johnson case as possible. They include Ernst and Wildberger's insistence that the entire case (ancillary proceeding

---

[10] My recollection is that I concluded the first draft contained multiple and repeated apologies by the authors because they were afraid. Like me, the authors of the motion had no involvement of note when the errors were made. The DAO owed an apology and that apology was provided. Stiegler's activity was described as editing when he had supervised her, which includes more than editing. I believe I edited that.

[11] The Court has yet to re-schedule a hearing on the Johnson matter itself, or set a briefing schedule.

[12] The Court's complete disinterest in the actions of three entities that did not disclose these errors before the DAO did, including the entities whose positions Mason supported, implied selective targeting. The Court's disinterest in even hearing from parties involved in Mason's alleged 'collusion' with Stiegler, parties that now include a sitting Third Circuit judge, also implied selective targeting.

and the Johnson case itself) should be referred to the AG's Office[13]. They argued for the DAO to play no role whatsoever. One or more of the leadership stated, with general agreement, that 'all gray areas will be resolved (by this Court) against us'.

Problems with Ernst and Wilberger's approach (two of many) included: 1) The DAO had a duty to represent in the Johnson case itself if the law did not support a referral of the case to the AG. The Court's opinion agrees by finding that the DAO has no office-wide conflict; 2). Turning the ancillary proceeding and the case-in-chief over to the AG's Office would leave no one to protect the Office in the ancillary proceeding either.

I disagreed and wanted to "protect the office" . I meant a couple things. First, I meant we needed to protect the office by doing what ADA Tom Gaeta did in and out of court (and was allowed to do by this Court in highly controlled and limited ways) in the ancillary proceeding: object to violations of privilege; present documents that were not being presented; make appropriate objections; ask questions; make argument; file motions; file findings of fact and conclusions of law, etc.. I also meant I wanted to ensure that the Office continued to meet its oath[14] and accurately represent the Commonwealth with integrity in the Johnson matter.

I consulted with four ethics experts, most of national calibre. They all agreed that there was no office-wide conflict and there was no legal reason we should refer the case to the AG[15]. So does the Court in its opinion, which finds no office-wide conflict.

---

[13]They are: 1). Ernst, Wildberger, Napiorski, Andrews have personal connections to Stiegler that cause a conflict; 2). The entire Office has a conflict because a lawyer in another jurisdiction says so and the supposed conflict must be reported to the Court now; 3). No one else in the Law Division but the leadership is capable of representing the Commonwealth on the Johnson matter itself; 4). A competent lawyer hired to represent the Commonwealth who didn't know any of the people involved and worked independently would be ethically appropriate; 5). Nope. Changed my mind about 4).

[14]The oath is to uphold the Constitution and laws and to seek justice.

[15] Although I have had a professional and cordial relationship with Attorney General Sunday and many others in the PA AG's office over decades, there is a small group at the PA AG's office whom I do not trust and whose work when they were in the Philadelphia DA's Office, is associated with Brady violations, including in post-trial posture. Their conduct resulted in innocent people sitting in jails for decades fighting for DNA testing to be done and concealment of exculpatory evidence in ways that are inexcusable. This subset includes people I separated upon arriving at the DAO in January, 2018 and includes some who departed the DA's Office precipitously after I won my election in 2017 and before taking office. A number of them were immediately accepted in the AG's Office. I hold people who let the guilty go free by locking up the innocent in very low regard.

Nevertheless, driven by fear and against my urging, Ernst and Wildberger filed a notice of office-wide conflict that was flat wrong. It was also unauthorized. My decision that there was no office-wide conflict was not just reasonable and well-considered. It was right, as this Court agrees in its Opinion. My efforts to dissuade their unauthorized filing by advising of possible consequences failed to prevent their insubordination. Obviously, consequences (if any) should be fair and proportionate, especially where the insubordination is driven by fear amidst personal challenge.

During one or more of the meetings, Law Division supervisors discussed Mason's performance in my presence. In general, they stated she was generally viewed as a likely high performer when she arrived upon hiring due to her resume, but she underperformed. She was less trusted over time, viewed as lazy, was said to have gone through personal struggles, and was then assigned easier cases such as those cases where the DAO supporting relief was unlikely.[16] DAO personnel also advised me that Mason stated, over the years following her erroneous filing and before the errors were discovered, that she believed Johnson was innocent, that 'she(Mason) cared more about Mr. Johnson than his (Johnson's) attorneys did' and expressing her dismay that this Court was 'taking too long' in deciding the Johnson case because Johnson was an 'innocent man'[17]

I spoke with, but had less contact with then CIU Chief Stiegler on the Johnson matter. That contact included my hearing his input on what occurred, including Stiegler advising that the drafts written by Mason and edited by him as one aspect of his supervision, did not support her claims. I have not reviewed those drafts yet. Neither has this Court. It is worth noting that Mason had full access to those drafts before she quit.

I also made sure that Stiegler (like anyone else in the office in need, including the Law Division supervisors, and even Mason post-departure) had the opportunity to seek lawyers supplied by the City Solicitor's Office[18].

CIU Chief Stiegler never told me Mason was 100% responsible. I was not present for his conversations with Law Division leaders. He did propose to me that a more sweeping

[16] DAO's position early in a case is merely a possibility based on a limited review of information. DAO's position requires reading all notes, all caselaw and other work prior to making a final determination.

[17] Obviously, these statements are inconsistent with her testimony, and consistent with her claim of being a coerced, 'pawn' in collusion, who never reported her 'pawn' status until after being confronted with her errors.

[18] The City Solicitor did not supply counsel to Mason, who obtained Bryan Lentz, Esq. and his office. The City determined the four supervisors had no potential conflict, and supplied them no counsel. The City determined Stiegler had a potential conflict and supplied him counsel.

'sentinel review' be done to determine whether or not Mason made other errors in other cases. A 'sentinel review' is commonly done in CIU work. Simply put, where there is a problem you look for more problems. One clear example, in a different context, is the sentinel review that the DAO did of many homicide cases investigated by PPD Homicide Detective Nordo after it was learned that Nordo had serially sexually assaulted informants and abused his power in other ways that corrupted the reliability of his Homicide investigations and convictions. The DAO convicted Nordo and then reviewed about 70 Homicide cases Nordo investigated, finding several that were corrupted beyond repair. Those convictions were overturned. The large majority of cases Nordo investigated were sound and those convictions were not disturbed. Nordo is now serving 24.5 – 49 years for those crimes.

Stiegler's idea would not only reveal any additional errors by Mason, but any errors of hers that he or any supervisor failed to catch. It was not self-protective for Stiegler any more or less than the sentinel review would show. Stiegler indicated he believed checking other cases would be consistent with the DAO's duty to fix error and would shed light on everyone's relative responsibility, which in my mind obviously included his. Any additional errors by Mason that had slipped past other supervisors would also be revealed. Stiegler was right to raise a good idea. I was right to raise it with Law Division leadership. I never stated and he never stated to me that the point was to blame Mason or anyone else. The point was to get at the truth, let accountability be determined by the truth, and disclose and fix whatever errors we found consistent with our duty.

Law Division supervisors, led by Ernst, disagreed. They were opposed to this sentinel review. I dropped the issue for the moment. Time was short given the enormous distraction this Court's days of ancillary proceedings and other requirements. To date, a sentinel review has not been done. Given enough time, it probably should be. In retrospect, I am concerned that opposition to a sentinel review may have been driven by fear that any errors Mason made under their own presumably careful, good faith supervision could result in unjust investigation and targeting of them. A number of them had supervised her as well.

No attorney and no supervisor is perfect. Errors happen, despite attorneys' best efforts to prevent them. The point is to correct them as quickly as possible and in good faith, not to crush people's careers and livelihoods for making ordinary errors in their supervision.

<u>*/s/Lawrence S. Krasner*</u>
LAWRENCE S. KRASNER
Philadelphia District Attorney (Elected)

Date: September 29, 2026