**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DENNIS JOHNSON, | : |
| *Petitioner*, | : |
| | : |
| v. | : Civ. No. 15-4965 |
| | : |
| SCOTT NICKELSON, et al., | : |
| *Respondents* | : |

**MOTION FOR RECUSAL**
**PURSUANT TO 28 U.S.C. § 455(a)**

Pursuant to 28 U.S.C. § 455(a), the Philadelphia District Attorney's Office ("DAO") moves to recuse the assigned judge, Hon. Paul S. Diamond, from this case. For the reasons described below, this action should be reassigned to a judge who does not appear biased or prejudiced against counsel for the Respondents in this matter, the DAO and District Attorney Larry Krasner. A party may allege bias of a district court judge pursuant to 28 U.S.C. § 455(a), by establishing that the judge's impartiality might reasonably be questioned. The standard for recusal under Section 455 is whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned. *Id.* at § 455(A); *see In re Asbestos Litigation*, 977 F.2d 764,776 (3d Cir. 1992) ("[S]ection 455 addresses not only fairness to the litigants but also the public's confidence in the judiciary[.]").

In this case, the Court's apparent bias is evident from a number of remarkable circumstances.

***First***, the Court departed from its role as a neutral arbiter and undertook an active inquisitorial and advocacy role. Although a court is permitted to conduct probing and critical questioning of witnesses, Judge Diamond's questioning crossed into the role of an advocate against DA Krasner, ADA Matthew Stiegler, and the policies of the DAO. The Court's questions and assertions reflected the Court's apparently preconceived view that the DAO's conduct in all cases is inherently suspect. *See* Fed. R. Evid. 614, Advisory Committee's note to subdivision (b) ("The authority [to question a witness] is, of course, abused when the judge abandons his proper role and assumes that of advocate . . . ."). The Third Circuit has noted that "the Pennsylvania Supreme Court has proscribed questioning from the bench that 'clearly convey[s] the impression that the trial court d[oes] not believe [a witness'] trial testimony' or puts 'pressure [on] a witness to testify in a particular way.'" *Rogers v. Superintendent Greene SCI*, 80 F.4th 458, 463 (3d Cir. 2023) (alterations in original) (quoting *Commonwealth v. Laws*, 378 A.2d 812, 816 (Pa. 1977)). "[A] trial judge cannot . . . take over the cross-examination from the government to merely emphasize the government's proof or question the credibility of the defendant and [the] witness." *United States v. Ottaviano*, 738 F.3d 586, 595 (3d Cir. 2013) (ellipses in original) (quoting *United States v. Beaty*, 722 F.2d 1090, 1095 (3d Cir. 1983)). While such questioning is particularly problematic in a jury trial, the concern of improper questioning remains even outside the presence of a jury because the trial judge's questioning may unduly pressure a witness to change their testimony. *See Laws*, 378 A.2d at 326.

In this case, the Court directed a great deal of ire towards ADA Stiegler,

repeatedly interrupting counsels' questioning during direct and cross examination and badgering the witness. *E.g.*, Tr. 7/17/26, 72, 74-79 (repeatedly interrupting ADA Stiegler's testimony and admonishing, "Everything you testified to you preface by saying it's more complicated."); *id.* at 88-91 (interrupting testimony to exclaim, "Are you going to answer any of my questions?"); *id.* at 93-97 (asking repetitive, argumentative questions); *id.* at 115-117 (badgering).

Most troubling, the Court expressed incredulity at ADA Stiegler's testimony that his role was to make accurate legal decisions in the cases the DAO worked on:

> THE WITNESS: I would say that I viewed our role as making accurate legal decisions in cases.
>
> THE COURT: Isn't that the court's job?
>
> THE WITNESS: Yes, absolutely.
>
> THE COURT: But you're going to do it first. You're going to make an accurate decision in a legal case and not take an adversarial position. You can't do both, right? You can't be an adversary and take an accurate view.

*Id.* at 117. As ADA Stiegler testified, "in most cases taking an accurate view did mean being an adversary. In most cases we were opposing relief." Tr. 7/17/26, 117. But it is beyond cavil that an attorney may not advance inaccurate arguments to the courts irrespective of the side of the aisle on which they sit, and that responsibility is particularly true for prosecutors. *See, e.g.*, *Commonwealth v. Price*, 684 A.2d 640, 642 (Pa. Super. 1996) ("The district attorney is not an advocate in the ordinary sense of the word as his role is to seek justice rather than to advocate the particular position of a particular client"). Indeed,

that is precisely what motivated the Law Division Supervisors and DA Krasner to file the motion to withdraw. The Court's skepticism that a prosecutor would elevate accuracy over adversarial posture is particularly shocking given the Court was considering a motion to correct prosecutorial errors.

***Second***, the vague and baseless accusations, made both in open court on August 27 and in the Court's Order and Memorandum, that members of the DAO "may have" violated criminal laws, distract from the essential reality of this summer's proceedings, which could most accurately be described as a circus. The Court was the ringmaster, hosting irregular hearings without clarifying the issues it wished to address. And now we see the results in the Court's Order and Memorandum. (See generally, Motion to Reconsider.)

This was a routine proceeding where errors in a years' old filing were discovered by different personnel when the case began moving again. The newly involved DAO lawyers who found these errors immediately and proactively alerted the Court to these errors by motion in order to correct them in a subsequent filing. They never stated or suggested that these were all of the errors in that years' old filing, but rather that the ones discovered were serious enough that the errors simply could not be fixed and the case continue to move forward; instead, despite the embarrassment and scrutiny seeking to withdraw the concession would bring, the DAO—with DA Krasner's explicit approval—asked the Court to allow it to put the entire filing in the ashbin.

But instead of treating the case normally, the evidentiary record in this case reflects the Court's unorthodox orchestration of these proceedings: to deny

a routine request to sequester the witnesses,[1] to re-call one (and only one) witness to rebut the testimony of another,[2] to shuffle the order of the witnesses to suit some unstated interest,[3] to change without notice whether a witness would be recalled to testify a third time,[4] to repeatedly take the reins of questioning itself from the parties,[5] to repeat questions over and over when the witness did not answer to the Court's liking,[6] to designate the DAO's advocate (ADA Tom Gaeta) as the second party to question witnesses (which usually implies that

---

[1] Tr. 7/17/26 at 12 ("MS. AFFRONTI: Your Honor, we would ask for the witnesses to be sequestered, if possible. THE COURT: I'm not going to sequester the witnesses.").

[2] *Id.* at 122 ("THE COURT: Could we hear from Ms. Mason again, please."). It was the stenographer's decision to render this statement, verbally phrased as a question, as one ending with a period.

[3] Doc. No. 144 (moving Katherine Ernst and Steven Wildberger ahead of David Napiorski in the witness list); *cf.* Doc. No. 127 at 5 ("I expect, *inter alia*, to hear live testimony from: i. Jaclyn Mason[;] ii. Matthew Stiegler[;] iii. David Napiorski[;] iv. Katherine Ernst[;] v. Steven Wildberger . . . ") and Tr. 7/17/26 at 12 ("THE COURT: . . . I would like to begin to hear from the witnesses and I would – I think the way I would like to proceed is to hear from the witnesses in the order I listed them in my June 30th Order. That means we begin with Ms. Mason.").

[4] Doc. No. 144 (stating that Mason would be recalled at the continuation of the hearing on August 27, 2026); *cf.* Tr. 8/27/26 and Tr. 9/1/26 (Mason not recalled).

[5] See, *e.g.,* Tr. 8/27/26 at 47-48 ("THE COURT: . . . I am sorry, Mr. Boscia. Go ahead.").

[6] Tr. 7/17/26 at 73 (question posed by DAG Affronti), 78 (question posed by the Court), 86 (question posed by the Court), 87 (question posed by the Court), 89 (question posed by the Court) (questioning Stiegler five separate times whether it wasn't actually the case that he decided that the Commonwealth should concede habeas relief without any input from Mason, which Stiegler denied five separate times).

leading questions are permissible) and then admonish him for asking leading questions,[7] and then to blow past assertions of privilege[8] and general rules of evidence that call for witnesses not to offer testimony on the basis of speculation rather than their actual personal knowledge,[9] and to close the evidence

[7] Tr. 7/17/26 at 112 ("THE COURT: I've been very liberal with all of you about leading, but you're doing the testifying here, Mr. Gaeta. You're ending every question with 'correct.' I don't know what he knows and what you're telling him he should know. MR. GAETA: I apologize, Your Honor.")

[8] Tr. 7/17/26 at 18-19; Tr. 8/27/26 at 32-34.

[9] See, *e.g.*, Tr. 9/1/26 at 25:

> THE COURT: . . . Is it possible when [Mason] said this is Stiegler's fault and nobody agreed with her and she was asked to sign the withdraw[al] acknowledging mistakes that *she felt* that she was going to be blamed for all this before the Court?
>
> THE WITNESS: So candidly, Your Honor, I don't remember in that meeting—the meeting on June 1st I had, I don't remember anyone ever saying this is all Stiegler's fault.
>
> (emphasis added).

See also *id.* at 26:

> THE COURT: I know that. But is it *possible* because nobody blamed Stiegler and asked her to sign it, she took that—*she took from that the sense* that she was going to be blamed, not Mr. Stiegler? Is that *possible*?
>
> THE WITNESS: I think that's *possible*, Your Honor.

(emphasis added.)

*Cf.* Fed. R. Evid. 602, Need for Personal Knowledge, and R. 701, Opinion Testimony by Lay Witnesses; *see also Barry v. DePuy Synthes Products, Inc.*, No. 17-3003, 2022 WL 22891180, at *4 (E.D.Pa. July 13, 2022)("Lay witnesses may testify only to opinions that are . . . rationally based on the witness's perception . . . . Fed. R. Evid. 701)(Diamond, J.); *Joy Mfg. Co. v. Sola Basic Industries,*

before announcing what the question to be briefed would be.[10]

When the hearing began on July 17, the Court again made it clear that this was not a merits hearing, but rather that "attorney conduct" would be at issue. Tr. 7/17/26 at 10. It mentioned that it believed OAG had made an "accusation of misconduct by anywhere from two to six Assistant DAs[,]" and had earlier told Petitioner's counsel that "we'll be discussing [the actual petition] to some extent in talking about . . . possible errors in the motion to withdraw [*sic*] and why they were erroneous and things of that nature but only—my interest at this particular time is only in what was represented to me and why people did certain things, people being lawyers, did certain things." *Id.* at 5.

Over six weeks after the Court set out those parameters, the Court announced that it did not " wish to hear from any other witnesses." Tr. 9/1/26 at 45. When the Parties and amici indicated that they did not intend to call any, the Court "concluded" the "hearing" and only *then* stated that the Court would, "[a]mong other things[,] . . . decide whether or not the DA's Office can continue representing the respondents in this case alongside the OAG as an amicus."

---

*Inc.*, 697 F.2d 104, 111 (3d Cir. 1982)("a witness ought to state only those facts of which he has personal knowledge")(internal citation omitted); *Slayton v. Tullytown Borough*, No. 04-CV-5632, 2006 WL 925052, at *4 (E.D. Pa. Apr. 7, 2006)("To the extent that Eklund is testifying to Johnson's state of mind, such testimony is inadmissible at trial because Johnson's state of mind the night of the incident is beyond the ken of Eklund. *See* Fed. R. Evid. 602."); *Meyer Chatfield Corp. v. Century Business Svcs., Inc.*, No. 05-3673, 2010 WL 3221944, at *2 (E.D.Pa. Aug. 12, 2010)("it is clear that Meyer's challenged testimony is merely his speculation about Kosanda's thought process, and as such is inadmissible under Rule 602.").

[10] Tr. 9/1/26 at 45-46.

*Id.* Petitioner's counsel needed the Court to clarify: "Just to be clear, Your Honor, the findings and conclusions are on the question of whether the District Attorney's Office should be removed from this case?" *Id.* When the Court answered in the affirmative (and affirmed that "it's certainly not on the merits"), DAG Affronti cautiously sought additional clarification because, after all, "the [DAO's] motion to withdraw the response may [*sic*] still be pending, so we may have to resolve that[.]" (Tr. 9/1/26 at 46.)

A review of all three days' worth of the notes of testimony reveals that this was the first mention in open court that the DAO's continued representation of the respondents was at issue, and the first mention of removing the DAO as well. No party ever moved to remove or disqualify the DAO (only Ernst and Wildberger asserted that the DAO had an office-wide conflict, but they did so in a "Notice," not a motion, and did not explicate their legal reasoning). The Court gave the parties one week, over a holiday weekend, to submit proposed findings of fact and conclusions of law. Tr. 9/1/26 at 45.

***Third,*** the Court repeatedly found fault on the part of DA Krasner and the DAO due to alleged failures to respond to arguments that had not been made or present evidence and testimony the Court did not indicate it wished to hear. The first instance occurred when the Court faulted the DAO for failing to respond to accusations levied at the Law Division Supervisors by OAG. Opinion at 2 ("Oddly, the DAO did not respond to the accusations the OAG had made against the Four.") But the DAO's failure to respond to these accusations is entirely understandable, as they appear only in the *Court's* description of OAG's pleading, which contended that "The OAG further charged that the

Four [Law Division supervisors who signed the Motion to Withdraw] had failed to point out 'factual and legal errors and omissions' that 'had a significant impact' on Judge Sitarski's analysis." (Id. at 2.)[11]

In reality, the OAG's Motion for a Briefing Schedule reads, in all relevant parts, as follows:

> OAG asks the Court to continue the evidentiary hearing as it relates to Claim IV that is currently scheduled for July 17, 2026. Instead, OAG suggests that the July 17, 2026 hearing be used to litigate the county district attorney's Motion to Withdraw [the Response].
>
> . . . On November 4, 2022, the Philadelphia District Attorney's Office submitted a response addressing only Claim IV in the petition[.] . . . On June 5, 2026, the county district attorney reversed course, admitting that "the prior response misstated parts of the record" and sought permission to withdraw the 2022 Response. Doc. 118 [sic].
>
> . . .

[11] The Court also Order of June 30 (Doc. No. 127), also noted this mischaracterization:

> The OAG [in the Motion for Briefing Schedule] charged that the DAO's 2022 concession "is seriously deficient," and that the DAO's June 5, 2026 Motion [to Withdraw] failed to point out "factual and legal errors and omissions" which "had a significant impact" on Judge Sitarski's analysis. ([Doc. No. 119] at 2. It thus appears that the *OAG has suggested that* in their June 5 Motion, *the Four [Law Division supervisors] themselves may have sought to mislead the Court.*
>
> . . . Remarkably, although the DAO agreed with the [OAG's] request, it did not address the OAG's apparent accusation of misconduct.

(Doc. No. 127 at 3-4 (emphasis added).)

> The county district attorney's response to the operative petition is seriously deficient. The county district attorney's Motion to Withdraw sets forth serious errors in the concession, which need not be restated here. *See* Doc. 118. But the misstatements noted in the Motion only tell part of the story. The response contains both factual and legal errors and omissions. These errors had a significant impact on the conclusions reached in the Report and Recommendation.
>
> . . .
>
> The county district attorney has presented this Court with serious allegations that other attorneys did not fulfill their duty of candor to the tribunal and that the Magistrate Judge relied on those misstatements. These serious allegations merit further inquiry. As this Court saw in the *Wharton* case, the signatory on a pleading sometimes bears less responsibility for its drafting than is apparent from the face of the document. *Wharton v. Vaughn*, No. 01-CV-6049, 2022 WL 4133291, at *3-4 (E.D. Pa. Sept. 12, 2022), aff'd sub nom. *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140 (3d Cir. 2024). It seems most prudent to fully evaluate the allegations presented in the county district attorney's motion.
>
> However this Court ultimately decides to handle the county district attorney's Motion to Withdraw, OAG respectfully requests that this Court set a briefing schedule and continue the evidentiary hearing related to claim IV until after the competition [*sic*] of the briefing in this case. . . .

(Doc. No. 119 at 1-6.)

The only language the OAG's pleading that is even remotely susceptible to the Court's reading is the sentence: "But the misstatements noted in the Motion only tell part of the story." The OAG's filing did not catalog any errors or omissions in the Motion to Withdraw, or even any additional errors in the Response that, OAG alleged, the Motion to Withdraw had failed to identify. Instead, the OAG appeared to be referencing the notion that the blame for the

errors in the original response merited further inquiry, *not* that the attorneys who submitted it were accused of any misconduct. The OAG did not accuse the attorneys of misconduct, so there was nothing to which the DAO could respond. The Court's repeated negative comments about the DAO's failure to do so speak far more to the Court's own biases than any misconduct on the part of the DAO.[12]

A second and far more troubling instance of the Court's faulting DA Krasner and the DAO for such failures is the Court's repeated implication that DA Krasner "chose not to testify," "or even" to submit an affidavit,[13] and based on that "decision" the Court concluded: "[DA Krasner] apparently does not dispute—or does not address—much of the testimony presented." (Doc. No. 173 at 6, citing to Doc. No. 169.) The Court went on to malign DA Krasner for failing to testify, concluding that "Mr. Krasner does not wish to give this Court a truthful account of how the Concession came to be." (Doc. No. 173 at 33.)

[12] In any event, the Motion to Withdraw never purported to be a full catalog of errors in the Concession: it alerted the Court that the errors it *had* found were significant enough to merit, in the DAO's view, the full withdrawal of the concession rather than leave to amend its mistakes and proceed. The Motion's explication of those errors, and the import of them, was to help the Court understand why the DAO felt full withdrawal was necessary. The Motion to Withdraw was not a Full and Final Report of All Errors in the Concession, it was a Motion to Withdraw. Even if the OAG *had* identified additional errors, the DAO would *still* not have perceived that an accusation of misconduct or an attempt to mislead the Court, but rather a further acknowledgement of the concession's and so no defense of the Motion to Withdraw or its authors would have been forthcoming.

[13] The Court's implication that DA Krasner concedes the accuracy of witness testimony because he did not submit an affidavit, (Doc. No. 173 at 6.) is particularly puzzling, as the Court never indicated that an affidavit would be accepted.

Finally, the Court suggests that in the face of such "silence," the Court must look to "Mr. Krasner's own words and actions, [as] recounted consistently by four credible witnesses (whom Mr. Krasner does not contradict), and corroborated by contemporaneous documents." *Id.* at 35.

On the contrary, the Court appears to have taken pains to *avoid* having DA Krasner testify. The Court ordered this hearing and set this witness list. (Doc. No. 127 at 5.) The Court, when it wished to, recalled one (and only one) of those witnesses. Tr. 7/17/26 at 122 ("THE COURT: Could we hear from Ms. Mason again, please.")[14] The Court rejiggered the order of the witnesses (Doc. No. 144; *cf.* Doc. No. 127) to hear earlier than planned from two witnesses once they a filed a cryptic "notice"[15] with allegations of "conflict[s]" going "[un]remedied" at the DAO. (Doc. No. 135 at 1.) The Court stated it would recall a specific witness to testify for a third time but then never did. (See Doc. No. 144,[16] Tr. 8/27/26, and Tr. 9/1/26.[17]) The Court announced, after Andrews's testimony, "I don't wish to hear from any other witnesses." Tr. 9/1/26 at 45.

DA Krasner's alleged silence is not inculpatory in any way. DA Krasner remained available to testify, but the Court stated: "I don't wish to hear from

---

[14] Former ADA Jaclyn Mason, the sole signatory of the 2022 concession.

[15] Namely, their second unauthorized filing alleging conflicts at the DAO, but not citing to a single rule of professional conduct. See also Doc. No. 123 (their first filing, which alerted the Court that conflicts of interest were arising in this case).

[16] "[T]he Hearing in this matter begun July 17, 2026 will resume on August 27, 2026 at 10:30 a.m. . . . The following witnesses will testify: . . . Jaclyn Mason." (emphasis omitted).

[17] Mason not recalled to testify a third time.

any other witnesses." Tr. 9/1/26 at 45.

No unfavorable inference or "concession by silence" about DA Krasner's own conduct can be made on this record, and that the Court attempts to do so demonstrates that reconsideration is necessary.

***Fourth***, the Court's unfair treatment of DA Krasner and ADA Stiegler is all the more apparent because there was one individual that the Court seemed keenly interested in exonerating: Jaclyn Mason.

Mason, by her own testimony and in her own writings, and as corroborated by sworn testimony of the people *she* lobbied, sought to have this Court informed that *Stiegler* was one hundred percent responsible, and that she was zero percent responsible. (See, *e.g.*, Tr. 7/17/26 at 48 ("I said, what about Matt? I said, Matt was my supervisor, he's upstairs on 18. He's *the one* who should be taking responsibility for this" (emphasis added)); 51 ("I said, you [Napiorski] need to have him take responsibility for this, have him – I said, have him execute an affidavit saying that he's the one who's responsible for this brief, not me.").) She attempted to condition her continued employment with the office on such a sworn representation being made. OAG's Exhibit 7 at 2 ("Matt must submit and swear in an affidavit that he erred, and that he was responsible for what was filed in this case. I've made it clear that I may have considered remaining with the office if that happened, but it has not.")

Not only did Mason have an obvious interest in and concern for her professional self-interest[18] when addressing a concession with her signature on it

[18] See Doc. No. 173 at 28-30. See also Doc. No. 147 (Mason's Motion for Leave for Participation as *Amicus Curiae*), discussed *infra*. Of course, Stiegler is implicitly assumed to have had such an interest that led him to take the actions

and material errors within it, Mason undisputedly lobbied Ernst, Wildberger, Napiorski, and, via her resignation letter, DA Krasner, to tell the Court that Stiegler alone was responsible for the errors in the brief she drafted and submitted. She also testified to that effect ("He was the supervisor, this was his work" (Tr. 7/17/26 at 51); *cf. Id.* at 54 ("Q. Ms. Mason, I could see from your submission that it was only your signature at the bottom of the response. Could you explain why that was the case? A. It was just my signature on it.").

There are many additional reasons to question the honesty of Mason's testimony, all of which were ignored by the Court. Mason testified clearly and repeatedly that she was *never* advised prior to her resignation that the Concession contained mistakes. Tr. 7/17/26 at 47, 58-59 ("*That's correct. It was never discussed.* I was blind-sided by what [the Law Division supervisors] filed. *Nobody ever said anything about there being material misstatements in that brief.*" (emphasis added)). But Ernst, Wildberger, and Napiorski all testified, consistently with each other and in stark opposition to Mason, that the errors were discussed during the Friday afternoon meeting on May 29.[19] And in fact the Court actually found that the Concession's "mistakes" were discussed in the meeting with Mason on May 29. (Doc. No. 173 at 12 ("Napiorski thus suggested that 'it might be a good idea for Mason, the sole signer of the Concession Brief, to take some 'responsibility' for its mistakes.'") (citing Tr. 8/27/26 at 152).)

The evidentiary record more easily supports the following than it does

---

he took, or the Court assumes he took. See, *e.g.*, Doc. No. 173 at 15-18.

[19] Tr. 8/27/26 at 35 (Ernst); 118 (Wildberger); 150 (Napiorski).

the Court's finding that Mason, generally speaking, offered testimony that was "compelling" and "corroborated": Mason's testimony that errors in the response were "never discussed" was false; there is ample reason to believe that she knew this testimony was false when she said it. If anyone's testimony can be said to be "contradictory, evasive, or outright dishonest," it is Mason's. (See Doc. No. 173 at 7.) But despite this, the Court singles out DA Krasner (who did not testify) and ADA Stiegler for allegations of wrongdoing.

The Court likewise went to some pains in its own recounting of the evidence to avoid pointing out the ways in which Mason's testimony about the events involving the Law Division supervisors in May and June of 2026 diverges from the accounts of the other people present. In its factual findings on the May 29 meeting, the Court found that "[Mason] was . . . concerned that her professional reputation would suffer because she had signed the Concession [Stiegler] ordered her to draft." (Doc. No. 173 at 12 (citing Tr. 8/27/26 at 156:19-22).) The Court, however, cites Napiorski's testimony to support this, and Napiorski's testimony at the cited location in the notes of testimony states:

> Ms. Mason was upset at Mr. Stiegler, upset at the situation, was nervous about her own professional reputation because she had signed this thing that we had identified a bunch of problems in.

Tr. 8/27/26 at 156:19-22. ADA Napiorski provided *absolutely no testimony* that Stiegler had ordered Mason to draft the concession or that Mason alleged to him that he had. Indeed, Napiorski never claimed anywhere in his testimony that Mason ever told him Stiegler "ordered" her to draft a concession during any of their interactions or indicated that she had drafted the concession in this case without review of the relevant records. (*See* Tr. 8/27/26 at 145-162

(covering the period between May 7 and Mason's resignation)).[20] The Court reiterates Mason's hotly disputed testimony that Stiegler "ordered" her to file the concession but misattributes it to one of the Law Division supervisors, who never vouched for any such thing or even that Mason alleged it in their presence.

All of the Law Division supervisors disputed throughout their sworn testimony that Mason *ever* discussed a collusive process or protested that she was being urged to take too much blame compared to Stiegler: Mason was visibly furious, presumably at Stiegler, but never really said why, per Wildberger, and he didn't ask; Mason wanted Stiegler to be thrown under the bus and assume full responsibility for the concession she signed, per Ernst.

Similarly, the Court "finds" that Mason "thought [after the May 29 meeting that] they wanted her to lie: to tell the Court that she had made misstatements when in truth, Stiegler had made them." Doc. No. 173 at 13 (citing Tr. 7/17/26 at 50:1-4). Her testimony at that point in the proceedings does in fact suggest that she did not want to "lie to a judge to protect the District Attorney's Office[,]" but it includes nothing about anyone making any misstatements in the concession—again, Mason's repeated testimony was that her supervisors never even discussed misstatements with her, let alone who bore responsibility

[20] Ernst and Wildberger also corroborate that Mason never said anything of the sort on May 29. See Tr. 8/27/26 at 24 (Ernst didn't know what Mason meant on May 29 when Mason said Stiegler should be "thrown under the bus"), 26-29 (Ernst reiterates that Mason never claimed Stiegler made her do anything during the May 29 meeting in response to the Court's repeated questions), 108 (Mason never told Ernst she was Stiegler's "pawn"), and 118-20 (unclear to Wildberger during May 29 meeting why Mason was upset with Stiegler).

for their inclusion.

The Court's selective credibility determinations would be problematic on their own, but they served as the basis for the Court's determination that ADA Stiegler was solely to blame for the errors in the concession. Indeed, it seems that if the Court were interested in determining who was actually to blame for the errors in the 2022 concession, it would have sought to review contemporaneous records establishing which attorney authored which aspects of the case. As ADA Stiegler testified:

> [M]y view was that we [the DAO] had information about what had happened here . . . I think I said something to the effect that this was not a [whodunnit], that *we had information about how these errors had occurred* and that we should act—*and that information primarily was the drafts that had resulted in the ultimate filing*. And that the office should make a decision on the basis of the information that it had, if there were errors that had occurred, it should acknowledge those errors and go forward.

Tr. 7/17/26 at 101-02 (emphasis added).

The Court has, in the more than two months since this undisputed testimony was offered, never shown the slightest interest in reviewing these records. Had the DAO known, before the closing of the evidentiary record, that the Court was not merely litigating the Motion to Withdraw, but planned on apportioning blame for the concession between Stiegler and Mason, the DAO would likely have sought to introduce these drafts.

The Court should reconsider its decision to blame Stiegler over Mason without the benefit of all of the evidence readily available to it. In the alternative, the Court should reconsider its decision to close the evidentiary record on this issue, and should reopen it to actually admit this evidence if it wishes to

make a fair and reasonable decision after a fuller investigation. In the alternative, it should reconsider its decision to apportion blame at all as between the two.

***Fifth***, while the DAO has not sought reconsideration of the Court's disqualification of ADA Stiegler as the issue had already been largely mooted by his screening from the case, the process by which the Court assigned blame for the errors in the concession must be addressed. Before the Court was a motion to withdraw an erroneous pleading, and neither Stiegler's nor Mason's interests were represented at the hearing or in the later briefing. Both sought leave for their representatives to participate as *amicus curiae*,[21] but the Court denied their requests.

Mason's *amicus* motion correctly pointed out that the proceedings had developed in such a way so as to "directly concern the conduct, communications, credibility, and professional actions of Jaclyn Mason." (Doc. No. 147 at 1.) Mason did not request to intervene as a party, but rather only to have her counsel be "permitted—subject at all times to the Court's direction and discretion—to conduct limited examination of witnesses whose testimony materially concerns Mason's conduct, communications, credibility, or professional responsibilities," and to address "evidentiary or privilege issues" directly affecting her, or to argue in a limited fashion concerning issues bearing directly on her. *Id.* at 2. Stiegler, by his counsel, argued that he was in the same posture as Mason, and likewise sought to have his counsel appear in *amicus* capacity.

[21] Doc. No. 147 (Mason's Motion for Leave for Limited Participation of Counsel as *Amicus Curiae*) and Doc. No. 151 (Stiegler's Motion for Leave for Limited Participation of Counsel as *Amicus Curiae*).

(Doc. No. 151-1 at 1-2.) In the alternative, he requested that if the Court denied his motion, that it likewise deny Mason's "so that Mason and Stiegler are treated equally." *Id.* at 2.

It is abundantly clear neither Mason nor Stiegler had a fair chance to defend themselves. Both were limited to answering questions from the parties and the Court and had no opportunity to object to argumentative or repetitive questions (from either the Parties or the Court). Nor could they introduce evidence they might have wished or call other witnesses to bolster their defense to the Court's allegations. Stiegler, for example, could not introduce drafts of the concession brief or cross-examine the Law Division supervisors, for instance, about what precise theory of "conflict" meant that Stiegler's participation in the preparation of the Motion to Withdraw was inappropriate and could not be countenanced, when only a week before, all of them appeared to agree that *Mason's* participation in the drafting and filing of the very same motion was highly desirable.

The DAO took no position on Mason's request, but noted that it was "unclear how, if at all, allowing an additional attorney to participate in the evidentiary hearing with the goal of protecting Mason's professional reputation will be of use to the Court," but believed that if that participation would be of use to the Court, *i.e.*, if the Court sought to assign blame, the other witnesses should have the same opportunity to participate. (Doc. No. 150, 4-5). In part, the DAO believed that the Court intended to recall Mason "to provide further testimony, . . 'from [her] perspective and in her best interest.'" *Id.* (quoting Doc. No. 147, ¶ 9). In retrospect, the DAO was wrong; neither Mason nor Stiegler

had an opportunity to defend themselves. Although the issue of blame was completely unnecessary for the Court to decide, it nevertheless chose to rule on whether Mason or Stiegler bore responsibility for the deficient brief. And because it denied their requests for representation—even limited to acting as *amici curiae*—they had no opportunity to defend themselves. It seems this worked out well for Mason, less so for Stiegler. Due process concerns likely preclude the Court's determinations from being used against Stiegler in future proceedings, but that may be cold comfort given the reputational damage done by the Court's ruling.

As noted, the DAO has not sought reconsideration of the Court's disqualification of Stiegler, but the Court's conduct here provides a clear and obvious view into the type of unfair and improper proceedings and decisions the Court deigned to make. To paraphrase the Court, the potential bias abounds, Tr. 8/27/26, 34, and recusal is necessary.

## Conclusion

The Court's conduct throughout the evidentiary hearing, its various comments, and its inconsistent and unsupported factual findings and legal determinations present ample basis to question its impartiality here. Rather than acting as a neutral arbiter, the Court served as prosecutor for DA Krasner and his office. Accordingly, the Court's recusal is required under 28 U.S.C. § 455(a).

Respectfully submitted,

*/s/Thomas Gaeta*
THOMAS GAETA
Assistant District Attorney
Supervisor, Civil Litigation

*/s/Lawrence S. Krasner*
LAWRENCE S. KRASNER
District Attorney of Philadelphia

## CERTIFICATE OF SERVICE

I, Thomas Gaeta, certify that on September 30, 2026, I served a copy of this response on all counsel of record via the Court's CM/ECF system.

*/s/Thomas Gaeta*
THOMAS GAETA
Assistant District Attorney
Supervisor, Civil Litigation